UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: PORSCHE CARS NORTH AMERICA, INC. PLASTIC COOLANT TUBES PRODUCTS LIABILITY LITIGATION<br><br><br>This document relates to: ALL ACTIONS | Case No. 2:11-MD-2233<br><br>**MASTER CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JUDGE GREGORY L. FROST**<br>**Magistrate Judge E.A. Preston Deavers** |

**TABLE OF CONTENTS**

I.     SUMMARY OF THE CASE ........................................................................1

II.    JURISDICTION AND VENUE ...............................................................3

III.   THE PARTIES ..........................................................................................3

     A.     PLAINTIFFS ...................................................................................3

         1.     CALIFORNIA.......................................................................3

         2.     COLORADO ........................................................................4

         3.     FLORIDA .............................................................................4

         4.     GEORGIA.............................................................................4

         5.     ILLINOIS.............................................................................4

         6.     MICHIGAN .........................................................................4

         7.     NEW JERSEY ......................................................................4

         8.     NEW YORK .........................................................................5

         9.     OHIO ...................................................................................5

         10.    TEXAS ................................................................................5

         11.    WASHINGTON ...................................................................5

     B.     DEFENDANTS ...............................................................................5

IV.   TOLLING OF THE STATUTE OF LIMITATIONS .................................6

     A.     DISOVERY RULE TOLLING .......................................................6

     B.     FRAUDULENT CONCEALMENT TOLLING ...............................6

     C.     ESTOPPEL......................................................................................7

V.    COMMON FACTUAL ALLEGATIONS ..................................................7

     A.     PLAINTIFF CONRAD'S EXPERIENCE ......................................14

     B.     PLAINTIFF GRAAS' EXPERIENCE .............................................15

     C.     PLAINTIFF KRIDER'S EXPERIENCE .........................................17

     D.     PLAINTIFF TRANS'S EXPERIENCE ...........................................17

     E.     PLAINTIFF STARKEY'S EXPERIENCE.......................................19

     F.     PLAINTIFF DUDLEY'S EXPERIENCE.........................................20

G.     PLAINTIFF GELFAND'S EXPERIENCE ......................................................21

H.     PLAINTIFF GARDNER'S EXPERIENCE......................................................21

I.     PLAINTIFF FLOREZ'S EXPERIENCE.........................................................22

J.     PLAINTIFF HOFFECKER'S EXPERIENCE..................................................23

K.     PLAINTIFF DELGADO'S EXPERIENCE .....................................................24

L.     PLAINTIFF GOROSPE'S EXPERIENCE......................................................25

M.     PLAINTIFF SPAGNOLETTI'S EXPERIENCE ............................................26

N.     PLAINTIFF CADMAN'S EXPERIENCE ......................................................27

O.     PLAINTIFF JACKMAN'S EXPERIENCE......................................................28

P.     PLAINTIFF MCINTOSH'S EXPERIENCE ..................................................29

Q.     PLAINTIFF BREDEFELD'S EXPERIENCE .................................................31

R.     PLAINTIFF CRAWFORD'S EXPERIENCE...................................................32

S.     PLAINTIFF STUEWE'S EXPERIENCE........................................................33

T.     PLAINTIFF WUST'S EXPERIENCE ...........................................................34

U.     PLAINTIFF DAHER'S EXPERIENCE .........................................................34

**VI.**     **CLASS ACTION ALLEGATIONS** ........................................................36

**VII.**     **CAUSES OF ACTION** ................................................................................41

A.     NATIONWIDE.................................................................................................41

    1.     FIRST CAUSE OF ACTION
          VIOLATIONS OF MAGNUSON-MOSS
          FEDERAL WARRANTY ACT
          (On Behalf of the Nationwide Class) ......................................41

B.     CALIFORNIA ...................................................................................................42

    1.     SECOND CAUSE OF ACTION
          VIOLATIONS OF CALIFORNIA CONSUMER LEGAL
          REMEDIES ACT ..............................................................................
          California Civil Code §§ 1750, et seq.
          (On Behalf of the California Sub-Class) ...................................42

    2.     THIRD CAUSE OF ACTION
          VIOLATIONS OF CALIFORNIA UNFAIR BUSINESS
          PRACTICES ACT
          Cal. Bus. & Prof. Code §§ 17200, et seq.
          (On Behalf of the California Sub-Class) ...................................44

    3.    FOURTH CAUSE OF ACTION
          UNJUST ENRICHMENT
          (On Behalf of the California Sub-Class) ..................................................45

C.    COLORADO .................................................................................................46

    1.    FIFTH CAUSE OF ACTION
          VIOLATIONS OF THE COLORADO CONSUMER
          PROTECTION ACT
          (On Behalf of the Colorado Sub-Class)....................................................46

    2.    SIXTH CAUSE OF ACTION
          STRICT PRODUCT LIABILITY
          (On Behalf of the Colorado Sub-Class)....................................................47

    3.    SEVENTH CAUSE OF ACTION
          IMPLIED WARRANTY OF MERCHANTABILITY
          (On Behalf of the Colorado Sub-Class)....................................................48

D.    FLORIDA......................................................................................................49

    1.    EIGHTH CAUSE OF ACTION
          VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR
          TRADE PRACTICES ACT
          Florida Stat. § 501.201, *et seq.*
          (On Behalf of the Florida Sub-Class) ......................................................49

    2.    NINTH CAUSE OF ACTION
          NEGLIGENCE
          (On Behalf of the Florida Sub-Class) ......................................................50

    3.    TENTH CAUSE OF ACTION
          UNJUST ENRICHMENT
          (On Behalf of the Florida Sub-Class) ......................................................51

E.    GEORGIA .....................................................................................................51

    1.    ELEVENTH CAUSE OF ACTION
          BREACH OF IMPLIED WARRANTY UNDER UCC
          (On Behalf of the Georgia Sub-Class).....................................................51

    2.    TWELFTH CAUSE OF ACTION
          VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE
          TRADE PRACTICES ACT
          (On Behalf of the Georgia Sub-Class).....................................................52

    3.    THIRTEENTH CAUSE OF ACTION
          UNJUST ENRICHMENT
          (On Behalf of the Georgia Sub-Class)
          Pled in the Alternative to Counts
          [Magnusson-Moss] & [Implied Warranty] .............................................54

F.    ILLINOIS ......................................................................................................54

iii

1.     FOURTHEENTH CAUSE OF ACTION
VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE PRACTICES ACT
(On Behalf of the Illinois Sub-Class) ....................................................54

2.     FIFTEENTH CAUSE OF ACTION
UNJUST ENRICHMENT
Pled in the Alternative to Cause of Action One
(On Behalf of the Illinois Sub-Class) ....................................................56

G.     MICHIGAN ..............................................................................................57

    1.     SIXTEENTH CAUSE OF ACTION
STRICT PRODUCT LIABILITY
(On Behalf of the Michigan Sub-Class) ................................................57

    2.     SEVENTEENTH CAUSE OF ACTION
BREACH OF IMPLIED WARRANTY UNDER UCC
(On Behalf of the Michigan Sub-Class) ................................................58

    3.     EIGHTEENTH CAUSE OF ACTION
VIOLATIONS OF THE MICHIGAN CONSUMER
PROTECTION ACT
(On Behalf of the Michigan Sub-Class) ................................................59

    4.     NINTEENTH CAUSE OF ACTION
NEGLIGENCE
(On Behalf of the Michigan Sub-Class) ................................................61

H.     NEW JERSEY ..........................................................................................61

    1.     TWENTIETH CAUSE OF ACTION
VIOLATIONS OF NEW JERSEY CONSUMER
FRAUD ACT ("CFA")
N.J.S.A. 56:8-1, et seq.
(On Behalf of the New Jersey Sub-Class) .............................................61

    2.     TWENTY-FIRST CAUSE OF ACTION
BREACH OF THE IMPLIED WARRANTY OF
MERCHANTABILITY
(On Behalf of the New Jersey Sub-Class) .............................................64

I.     NEW YORK ............................................................................................65

    1.     TWENTY-SECOND CAUSE OF ACTION
VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW
§ 349 Deceptive Acts and Practices Unlawful
(On Behalf of the New York Sub-Class).................................................65

    2.     TWENTY-THIRD CAUSE OF ACTION
UNJUST ENRICHMENT
(On Behalf of the New York Sub-Class).................................................68

J.     OHIO........................................................................................................69

1.    TWENTY-FOURTH CAUSE OF ACTION
BREACH OF IMPLIED WARRANTY IN TORT
(On Behalf of the Ohio Sub-Class) ........................................................69

2.    TWENTY-FIFTH CAUSE OF ACTION
VIOLATIONS OF OHIO'S CONSUMER SALES PRACTICES ACT
(On Behalf of the Ohio Sub-Class) ........................................................70

3.    TWENTY-SIXTH CAUSE OF ACTION
NEGLIGENCE
(On Behalf of the Ohio Sub-Class) ........................................................71

4.    TWENTY-SEVENTH CAUSE OF ACTION
DECEPTIVE TRADE PRACTICES
(On Behalf of the Ohio Sub-Class) ........................................................72

K.    TEXAS .........................................................................................................72

1.    TWENTY-EIGHTH CAUSE OF ACTION
BREACH OF IMPLIED WARRANTY
(On Behalf of the Texas Sub-Class) ......................................................72

2.    TWENTY-NINTH CAUSE OF ACTION
NEGLIGENCE
(On Behalf of Texas Sub-Class) ............................................................73

3.    THIRTIETH CAUSE OF ACTION
DECEPTIVE TRADE PRACTICES
(On Behalf of the Texas Sub-Class) ......................................................74

4.    THIRTY-FIRST CAUSE OF ACTION
UNJUST ENRICHMENT
(On Behalf of the Texas Sub-Class) ......................................................76

L.    WASHINGTON ..........................................................................................77

1.    THIRTY-SECOND CAUSE OF ACTION
VIOLATIONS OF WASHINGTON'S CONSUMER
PROTECTION ACT
RCW 19.86 et seq.
(On Behalf of the Washington Sub-Class) .............................................77

VIII.    **PRAYER FOR RELIEF**.............................................................................78

Plaintiffs Bob Conrad, David Graas, Sean Krider, Sy Duc Tran, Kevin Starkey, Joseph Dudley, Alan Gelfand, Anthony Gardner, Scott Florez, Kyle Hoffecker, Daniel Delgado, Richard Gorospe, Nicholas Spagnoletti, Gregory Cadman, Ecliff Jackman, Dane McIntosh, Lance Bredefeld, Deana Crawford, Randall Stuewe, Swen Wust, and Ghassan Daher, on behalf of themselves and the other members of the below-defined nationwide class and statewide subclasses they respectively seek to represent (collectively the "Class," unless otherwise identified herein), for their Master Consolidated Amended Class Action Complaint (the "Consolidated Amended Complaint") against Defendants Dr. Ing. h.c. F. Porsche AG ("Porsche AG") and Porsche Cars North America, Inc. ("Porsche North America") (collectively, "Porsche" or "Defendants"), allege as follows. This Consolidated Complaint is filed for purposes of consolidated pre-trial proceedings. By filing said Complaint, Plaintiffs do not waive their rights, pursuant to 28 U.S.C. § 1407(a), to have their actions remanded to their originating courts at the conclusion of pre-trial proceedings here. This Consolidated Amended Complaint does not assert, and is not intended to assert, Class standing for wrongful death or personal injury claims, or any damages therefrom.

## I.    SUMMARY OF THE CASE

1.     This consolidated class action is brought by Plaintiffs seeking damages and equitable relief on their own behalf and on behalf of all other current and former owners or lessees of Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S sport utility vehicles in the United States, from 2003, the year of their first commercial sales and leases in the United States, through the 2010 model year (collectively "Cayenne," when referred to herein in the singular and "Cayennes," when referred to herein in plural).

2.     Porsche manufactured its Cayenne models with plastic coolant tubes as part of the vehicle's cooling system.

3.     Porsche installed the plastic coolant tubes knowing that the tubes will prematurely degrade and fracture. This failure causes coolant fluid to leak, often resulting in coolant seeping directly into the vehicle's starter, transmission seals, and other components causing possible engine damage and engine failure. When Cayenne owners present their vehicles to Porsche for repair or

replacement, they are forced to purchase an OEM "update kit" from Porsche that replaces the plastic coolant tubes with aluminum coolant pipes for all Cayenne models.

4.     Porsche knows that its customers will ultimately be forced to replace the plastic coolant tubes with costly aluminum coolant pipes and thereby incur not just the cost of the replacement pipes, but also significant labor costs. Despite this knowledge, Porsche made a corporate decision to conceal information about the defects in the original parts from its customers. Moreover, Porsche has chosen not to warn consumers of the potential dangers of a sudden coolant spill directly into the starter and transmission seals. Porsche continues to promote the Cayenne engine and its component parts as safe, reliable and free from material defects.

5.     Porsche's uniform failure to disclose this defect constitutes both an actionable misrepresentation and an unfair, unlawful, fraudulent, and deceptive business practice in violation of the consumer protection statutes of several states, among other violations discussed below.

6.     Plaintiffs and the other Class members have been damaged by Defendants' concealment and non-disclosure of the Cayenne coolant pipe defect, because they were misled into purchasing or leasing Cayennes of a quality and value different than they were promised, and/or have been forced into paying repair and replacement costs (not only to replace the defective coolant tubes, but also other parts damaged when doused with coolant from leaky coolant tubes) that they would not otherwise have paid.

7.     Defendants had the knowledge and capability to notify purchasers of the fix of replacing the plastic tubes with metal pipes. Nevertheless, Porsche chose to conceal the defect and let purchasers suffer repair costs or reduction in value of their vehicles. Plaintiffs and the other members of the Class were and are also subject to a substantial safety risk should the tubes fail while driving.

8.     As a result of Porsche's practices, Plaintiffs and the other Class members have suffered injury in fact and have lost money or property, including economic damages. Moreover, Porsche has committed unfair and/or deceptive acts and practices under the laws of California, Colorado, Florida, Georgia, Illinois, Michigan, New Jersey, New York, Ohio, Texas and

Washington, breached its common law warranty obligations in Colorado, Georgia, Michigan, New Jersey, Ohio, and Texas unjustly enriched itself at the expense of consumers in California, Florida, Georgia, Illinois, New York, and Texas, and violated the Magnuson-Moss Federal Warranty Act, 15 U.S.C. § 2301, *et seq.*

9.      Plaintiffs therefore bring this action on behalf of a proposed class of similarly situated Porsche Cayenne owners and lessees, nationwide, and on behalf of sub-classes of similarly situated Cayenne owners and lessees in California, Colorado, Florida, Georgia, Illinois, Michigan, New Jersey, New York, Ohio, Texas, and Washington.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. §1332 because the proposed class consists of 100 or more members and the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of costs and interest.  Additionally, at least one Class member is a citizen of a state different from Porsche.  Further, Porsche AG has transacted business in the United States, including within each of the original districts in which each action was originally filed, and has substantial contacts with the United States, including with each District. Porsche AG also dominates and controls Porsche North America.

11.     Venue is proper in this District pursuant to the Transfer Order of the United States Judicial Panel on Multidistrict Litigation, and under 28 U.S.C. §1391 in the original districts in which each action was originally filed, because at least one Plaintiff resides in each District, Porsche transacts business and is found within each District, and a substantial part of the events and conduct giving rise to the violations of law alleged in this Complaint arose in each District.

## III.   THE PARTIES

### A.      PLAINTIFFS

#### 1.      California

12.     During the time period relevant to this suit, Plaintiff BOB CONRAD was a resident of Orange County, California

13.     During the time period relevant to this suit, Plaintiff DAVID GRAAS was a resident of Santa Clara County, California.

14.     During the time period relevant to this suit, Plaintiff SEAN KRIDER was a resident of El Dorado County, California.

15.     During the time period relevant to this suit, Plaintiff SY DUC TRAN was a resident of Orange County, California.

### 2.     Colorado

16.     During the time period relevant to this suit, KEVIN STARKEY was a resident of Arapahoe County, Colorado.

### 3.     Florida

17.     During the time period relevant to this suit, Plaintiff JOSEPH DUDLEY was a resident of Valusia County, Florida.

18.     During the time period relevant to this suit, Plaintiff ALAN GELFAND was a resident of Broward County, Florida.

### 4.     Georgia

19.     During the time period relevant to this suit, Plaintiff ANTHONY GARDNER was a resident of Fulton County, Georgia.

### 5.     Illinois

20.     During the time period relevant to this suit, Plaintiff SCOTT FLOREZ was a resident of Cook County, Illinois.

### 6.     Michigan

21.     During the time period relevant to this suit, KYLE HOFFECKER was a resident of Oakland County, Michigan.

### 7.     New Jersey

22.     During the time period relevant to this suit, Plaintiff DANIEL DELGADO was a resident of Essex County, New Jersey.

23.     During the time period relevant to this suit, Plaintiff RICHARD GOROSPE was a resident of Hudson County, New Jersey.

24.     During the time period relevant to this suit, Plaintiff NICHOLAS SPAGNOLETTI was a resident of Morris County, New Jersey.

### 8.     New York

25.     During the time period relevant to this suit, Plaintiff GREGORY CADMAN was a resident of Westchester County, New York.

26.     During the time period relevant to this suit, Plaintiff ECLIFF JACKMAN was a resident of Queens County, New York.

27.     During the time period relevant to this suit, Plaintiff DANE MCINTOSH was a resident of Westchester County, New York.

### 9.     Ohio

28.     During the time period relevant to this suit, Plaintiff DEANA CRAWFORD was a resident of Delaware County, Ohio.

29.     During the time period relevant to this suit, Plaintiff LANCE BREDEFELD was a resident of Knox County, Ohio.

### 10.    Texas

30.     During the time period relevant to this suit, Plaintiff RANDALL STUEWE was a resident of Dallas County, Texas.

31.     During the time period relevant to this suit, Plaintiff SVEN WUST was a resident of Dallas County, Texas.

### 11.    Washington

32.     During the time period relevant to this suit, Plaintiff GHASSAN DAHER was a resident of King County, Washington.

### B.    DEFENDANTS

33.     Defendant PORSCHE CARS NORTH AMERICA, INC. is a Delaware corporation with its headquarters in Atlanta, Georgia.  Porsche Cars North America, Inc. is a wholly-owned,

indirect subsidiary of Porsche AG.  Porsche North America is the importer of Porsche AG's Porsche vehicles, including the Cayenne, for sale and lease in the United States, and is responsible for vehicles, parts, servicing, marketing, training, and warranting Porsche vehicles in the United States.  In addition to its national headquarters, Porsche's customer service center, where consumers may request clarification on vehicle concerns, is located in Atlanta, Georgia.  At all times relevant to this suit, Porsche Cars North America, Inc. was the exclusive manufacturer, importer, and/or seller of Porsche Cayenne vehicles in the United States.  Porsche Cars North America, Inc. is a State of Delaware Corporation licensed to do business in all states at issue in this Consolidated Complaint.

34.     Defendant DR. ING.H.C. F. PORSCHE AG is a German company registered at Stuttgart, Registriergericht HRB 5211, with its headquarters in Germany.  Porsche AG was actively involved in designing, manufacturing, marketing, distributing, and selling Porsche Cayennes nationwide at all relevant times.  The cars were exported to and sold in the United States, but designed and manufactured in Germany.

## IV.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     DISOVERY RULE TOLLING

35.     Plaintiffs could not have discovered through the exercise of reasonable diligence that their Cayennes' plastic coolant tubes were defective within the time period of any applicable statute of limitations.  Among other things, Plaintiffs did not know and could not have known that the coolant tubes regularly fail in other similar vehicles and/or that Porsche recommended to its dealerships that they be replaced with aluminum tubes.  Due to the concealed placement of the tubes within the engine bay, Plaintiffs did not and could not have performed a visual inspection that would have revealed the defect.

### B.     FRAUDULENT CONCEALMENT TOLLING

36.     Any applicable statute of limitations that might otherwise apply to bar any of Plaintiffs' claims is tolled by Porsche's knowing and active concealment of the fact that its plastic coolant tubes fail and need to be replaced with costly aluminum coolant pipes.  Porsche kept

Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiffs nor the other Class members could have discovered, even upon reasonable exercise of diligence, that their plastic coolant tubes would prematurely crack and fail.

### C. ESTOPPEL

37. Porsche was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality and nature of its plastic coolant tubes. Porsche knowingly, affirmatively and actively concealed the true nature, quality and character of its plastic coolant tubes from consumers. Based upon the foregoing, Porsche is estopped from relying on any statutes of limitations in defense of this action.

### V. COMMON FACTUAL ALLEGATIONS

38. Porsche sells and distributes automobiles, sold under the Porsche brand name to approximately 202 dealerships located throughout the United States. Porsche also provides parts, service, marketing, advertising and training for its dealerships.

39. Porsche advertises that it has "developed numerous technologies that have advanced vehicle performance, improved safety and spurred environmental innovations within the automotive industry." Porsche maintains that it "strives to maintain a standard of excellence, commitment and distinction synonymous with its brand."

40. With respect to design, Porsche claims to have invented "The concept of maximum power with minimum weight."

41. In 2003, Porsche first introduced the "Cayenne" sports utility model to the United States.

42. Porsche has represented that "[t]he Cayenne had to satisfy not only Porsche's extreme high performance and quality standards, but it had to meet the utility and reliability expectations only Porsche engineers demand from an SUV."

43. In its representations about the Cayennes, Porsche specifically emphasized the Cayenne's cooling system. Porsche described the Cayenne's cooling system in its marketing

brochure as follows:  "Keeping cool is essential to any engine.  A high-performance engine can only maintain its maximum capability over a long service life if all components are operating consistently within a specific temperature range.  The engines in the new Cayenne models are therefore designed for optimal cooling."

44.    The cooling system is an integral part of the engine.  The coolant tubes circulate coolant through the engine while simultaneously maintaining an even temperature throughout the motor.

45.    Various pipes and seals make up the "water crossover" section of the cooling system, which carries coolant to and from the engine.  These pipes carry the cooled coolant from the radiator into the engine block, thus cooling the engine.  The heated coolant is then carried out of the engine from the coolant pipes through the thermostat and back to the radiator where it is cooled and brought back into the engine via the coolant pipes.  The coolant traveling from the engine back to the radiator is extremely hot.

46.    Most high-end performance vehicles with powerful engines use aluminum pipes to transport the coolant.  Aluminum pipes have been proven to withstand the extreme temperatures of the cooling system.  Notwithstanding that fact – and further notwithstanding that Porsche only manufactures high-end performance vehicles – Porsche manufactured its Cayennes with plastic coolant tubes.

47.    In the Cayenne, valley coolant tubes run on top of the engine, underneath the intake manifold.  The valley coolant tubes are the three black tubes shown below:



48.    In the valley between the cylinder heads of the Cayennes, plastic coolant tubes transport coolant between the front and rear of the engine.

49.    According to Porsche, "[e]ngine coolant is distributed to the crankcase and cylinder heads by a distribution pipe located above the transmission.  The water pump, mounted at the front of the engine, pumps coolant through a pipe located in the interior of the engine's V. Approximately 20 percent of the coolant flows through the crankcase in a lengthwise direction with 80 percent flowing through the cylinder heads in a 'crossflow' architecture from the hot to cold side.  Heat from the engine oil is fed onto the coolant through an oil/water heat exchanger."

50.    The circulation of coolant is vitally important because it prevents the engine from overheating.

51.    The integrity of the coolant tubes is also vitally important because the coolant flowing through the tubes is very hot and under pressure.  The coolant tubes must thus be able to withstand both the high temperature of the coolant and the heat from the engine, as well as the pressure within the tubes.

52.    As a result of continuous exposure to extreme heat, plastic coolant tubes crack and degrade.  Compounding this problem, as part of Porsche's design of its Cayenne engines, the plastic tubes are located between the intake manifold and the engine – a placement that guarantees constant increased exposure to heat.  Specifically, unlike most vehicles, the water crossover in the Cayenne is not located on top of the engine.  Rather, Porsche has designed the water crossover such that the plastic coolant tubes sit directly on top of the vehicle's starter and engine block.

53.    This combination of (a) the tube placement relative to the engine and (b) use of plastic composite material to carry the coolant, virtually guarantees that the plastic coolant tubes Porsche used in its Cayennes will prematurely fracture and fail.

54.    Porsche's plastic coolant tubes in its Cayenne are defective, as they regularly fail under normal use and within the cooling system's expected useful life, rendering the vehicle inoperable and causing engine damage.

55.     Moreover, coolant escaping from the defective plastic coolant tubes can come into contact with the car's starter and permanently damage it.  Escaping coolant can also leak into Porsche's "Tiptronic" transmission torque converter area.  If this occurs, the Tiptronic transmission torque converter seals can be damaged, causing coolant to leak between the transmission and the torque converter.  Extensive coolant leakage to this area can result in complete transmission failure.

56.     When a consumer attempts to correct the defective plastic coolant tubes, the consumer is immediately faced with a costly labor charge.  A mechanic cannot access the coolant tubes and properly diagnose the problem without disassembling a significant portion of the engine.  Once the cracked tube is located, the Cayenne owner or lessee is then informed that Porsche does not offer replacement plastic coolant tubes.  Rather, the Cayenne owner or lessee must purchase from Porsche aluminum coolant pipes to replace the defective plastic coolant tubes.  The aluminum pipes can cost more than $1,000, which is significantly more than the originally installed plastic coolant tubes.

57.     Specifically, the consumer is forced to buy an "OEM update kit" that contains the aluminum coolant pipes.  Unlike the plastic coolant tubes, the new aluminum coolant pipes are designed to last the lifetime of the engine.  The labor to install the aluminum coolant pipes is on average 8-10 hours for experienced mechanics.  By way of example, the average hourly rate of Porsche-certified mechanics in California is between approximately $95 and $165 per hour, and between approximately $94 and $115 per hour in Ohio.

58.     Porsche acknowledged the defective nature of plastic coolant tubes as part of its engine design in an Internal Technical Bulletin (attached as Exhibit A hereto) which it issued to its authorized Porsche mechanics.  That Bulletin states, in pertinent part:

> Coolant Pipe Leak
>
> Information: Plastic coolant pipe leaking.
>
> Note: Both coolant pipes (lower and heater) must be replaced at the
> same time with new coolant pipes made from aluminum.

59.     Porsche is aware of the failure rate of its plastic coolant tubes and has received many complaints from Cayenne owners and lessees concerning failure of the tubes since the U.S. commercial launch of the Cayenne in 2003.

60.     In fact, one of the leading independent Porsche publications, "Excellence" magazine, has run multiple articles highlighting the plastic coolant tube problem, most recently a Spring 2011 article detailing the problem and stating:  "The demise of the original Cayenne V8's plastic valley coolant pipes is pretty much unavoidable; at some point, they will leak and require replacement."

61.     Porsche had and continues to have exclusive knowledge of the coolant tube defect in its Cayennes.  Porsche had access to aggregate data from its dealers regarding the coolant tubes; Plaintiffs and the other Class members did not.  Porsche had access to pre- and post-release testing data; Plaintiffs and Class members did not.  Porsche had access to complaints made to it and its dealers regarding the coolant tubes; Plaintiffs and the other Class members did not.  As such, Porsche was – and continues to be – in a superior position to know that its coolant tubes were prone to premature failure.

62.     Despite this knowledge, in addition to the statements above, Porsche has made numerous and repeated representations regarding the quality of its Cayennes, and the Cayenne's cooling system in particular.  Among other misrepresentations Porsche has made concerning the Cayenne's cooling system in its brochures and other marketing materials, are that:

(a) The Cayenne includes "a cooling system perfected in the deserts of Dubai;"

(b) "In the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperatures throughout every part of the engine;"

(c) "The entire cooling system is specifically designed for prolonged heavy-duty operation;"

(d) "Every technical detail has been examined and optimized to ensure that the Cayenne Turbo reaches benchmark levels of SUV performance;"

(e) "The cooling system is extremely robust;"

11

(f)  "The Cayenne Turbo engine is among the most advanced internal combustion engines ever produced by Porsche [and that] this mechanical symphony integrates a list of technical features that is a culmination of everything our engineers have learned about watercooled V8 engines and turbo technology over the past four decades;"

(g)  "The Cayenne V8 engine's cooling system helps to maximize performance in every respect [and that] the strategy for achieving these objectives is nothing if not thorough;"

63.    Porsche made the above described misrepresentations, concealments and omissions of material facts with full knowledge or recklessness that they were false and misleading and with the intent that consumers – including Plaintiffs and the other Class members – would rely upon such concealment, suppression and omission.  Specifically, Porsche knew or was reckless in not knowing that these representations were false at the time it made them, based on, among other things, widespread customer complaints of prematurely cracking coolant tubes, dealer inquiries, repair shop inquiries, dealer-provided repair data, the high volume of replacement parts being ordered, and NHTSA complaints.

64.    While publicly touting the Cayenne's performance, Porsche knew, reasonably should have known, or was reckless in not knowing that its use of plastic coolant tubes in its Cayenne vehicles would result not just in failure of the parts, but also in potential damage to the Cayenne's engine and/or its component parts.  Porsche's specific representations regarding the quality of the Cayenne's cooling system, coupled with Porsche's omission of the fact that the plastic coolant tubes were destined to crack or fracture, had the likely effect of misleading the public, including Plaintiffs and the other members of the Class.

65.    The facts that Porsche's plastic coolant tubes – a critical component of the vehicles – were destined to crack and fracture and that they were subject to a costly replacement program were material facts.  Knowledge of these material facts would have altered consumers' buying decisions.

66.     Rather than fix the problem, Porsche chose to exploit owners and lessees of its Cayenne vehicles by making them incur the cost of new parts and labor charges for the repair - as well as to run the risks associated with resulting engine damage.  Despite its knowledge, Porsche never made any attempt to notify Cayenne owners or lessees of the problem, nor did it effect a recall.

67.     As a result of Porsche's practices, Plaintiffs and the other Class members were overcharged by Porsche for their vehicles, and incurred, or will incur, expensive repairs that they should not have to bear.  As a result of Porsche's concealment and deceptive practices, Porsche was unjustly enriched.

68.     The damages sustained by Plaintiffs and the other members of the Class flow from the common nucleus of operative facts surrounding Defendants' misconduct, including:

> (a) That Porsche designed, manufactured, and sold Cayennes with defective plastic valley coolant tubes that would prematurely degrade and leak, and that can also rupture during normal vehicle use;

> (b) That the extent of wear and tear on the Cayenne's plastic valley coolant tubes is entirely disproportionate to the age of these vehicles, constituting a manifestation of the valley coolant pipe defect;

> (c) That the Cayennes purchased and/or leased by Plaintiffs and the other members of the Class were worth less than promised because of the presence of the aforementioned valley coolant pipe defect; and

> (d) That Porsche, despite its knowledge of this problem, has not informed the Class thereof, nor has Porsche taken steps to inspect, repair, or replace all the defective valley coolant tubes at no charge to the owners or lessees.

69.     The cost of replacing the defective valley coolant tubes in Plaintiffs and the other Class members' Cayennes, including parts and labor, can be at least $1,500 to $3,600 per vehicle.

70.     Further, Cayenne owners and lessees unknowingly took on additional safety risks from hot coolant leaking and disabling the vehicle.  Plaintiffs and the other Class members

expressly disclaim any recovery in this Complaint for physical injury flowing from accidents caused by valley coolant pipe leaks or for damage to property other than damage caused by coolant leaking from the tubes.  Nevertheless, the increased safety risk from leaking valley coolant tubes is an obvious consequence of Porsche's defective design and serves as an independent justification for the relief sought by Plaintiffs on their own behalf and for the other Class members.  The defect with the Cayenne's coolant tubes implicates serious safety concerns, as acute failure of the part can and sometimes does occur while travelling at high speeds on public roadways, causing risk of severe injury or even death to Cayenne drivers, passengers, and to others sharing the road with the Cayenne.  Particularly in light of these safety implications, Porsche had common law and statutory duties to disclose the defective plastic coolant tubes to Porsche owners and lessees.

71.    As indicated by Plaintiffs' experiences alone, described in detail below, the problem with the coolant tubes is widespread, material, and dangerous.

A.    **PLAINTIFF BOB CONRAD'S EXPERIENCE**

72.    Plaintiff Conrad leased a new 2005 Porsche Cayenne S equipped with defective plastic coolant pipes for approximately $68,000 from Circle Porsche in Long Beach, California in March 2005.  Plaintiff Conrad purchased the vehicle after the lease ended.  Mr. Conrad leased and purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  Mr. Conrad was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Conrad known that the plastic coolant tubes were likely to fail, he would have not leased or purchased the Cayenne, or would have insisted on paying less for the Cayenne.

73.    In August 2010, the low coolant light came on in Plaintiff Conrad's Porsche Cayenne.  Plaintiff Conrad added coolant to the vehicle, but it drained out of the vehicle.  Plaintiff Conrad took the vehicle to Shorecliffs Auto Service in San Clemente, where it was discovered that the plastic coolant pipes had degraded and cracked prematurely.  On August 4, 2010, Plaintiff Conrad paid $2,097.70 to have the defective coolant pipes replaced, including $1,170.25 for

Defendants' update kit containing the replacement aluminum coolant pipes and $765.00 in labor costs to have the aluminum coolant pipes installed at Shorecliffs Auto Service.

74.    Two months later, Plaintiff Conrad discovered that the coolant leak that resulted from the defective plastic coolant pipes had ruined the seals in his vehicle's transmission.  On October 11, 2010, Plaintiff Conrad paid $1,415.61 to have the damage to the transmission that resulted from the factory-installed defective plastic coolant pipes repaired at Shorecliffs Auto Service.

75.    As a consequence of Porsche's practices, Plaintiff Conrad paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses to repair and replace the defective coolant tubes and repair the transmission.

76.    Plaintiff Conrad's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

77.    Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's plastic coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

**B.    PLAINTIFF GRAAS' EXPERIENCE**

78.    In December 2008, Plaintiff David Graas bought his 2004 Cayenne Turbo for approximately $27,000.  Mr. Graas purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  Mr. Graas was not aware that Porsche manufactured the vehicle with plastic coolant tubes that were destined to stress and fracture.  Had Mr. Graas known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

79.    In March 2010, Mr. Graas became aware that the plastic coolant tubes in his Cayenne model had been known to prematurely crack.  Concerned that this problem would occur while he was driving, he brought his Cayenne to his local authorized Porsche dealer, Stevens Street Porsche in San Jose, California, and had them conduct a pressure test for a possible coolant leak.  Mr. Graas was told that the pressure test revealed no problems.

80.     Several months later, in September 2010, while driving with his daughter on Highway 88 in the Sierra Nevada mountain range, his plastic coolant tubes burst.

81.     Stranded on the highway in the middle of the night, Mr. Graas attempted to call all towing companies within a 100 mile radius, but no one would come out to help him.  Eventually, a California highway patrol officer arrived and stayed with Mr. Graas and his daughter until a relative arrived to get them, approximately four hours later.

82.     Mr. Graas was issued a warning for having to leave his disabled Cayenne on Highway 88.

83.     Unable to find a towing company willing to pick up and transport the Cayenne from where it broke down, Mr. Graas was forced to rent a vehicle himself and tow the Cayenne all the way back to San Jose.

84.     Mr. Graas' local Porsche dealership, Stevens Street Porsche, replaced the cracked plastic coolant tubes with the OEM "update kit".  This repair cost Mr. Graas approximately $2200.

85.     Unfortunately, less than 48 hours after the aluminum pipes were installed, the Cayenne's transmission seals failed, causing the entire transmission to fail.  Mr. Graas was told that the transmission seals failed because of the coolant leakage into his engine when his plastic coolant tubes cracked.  Stevens Street Porsche estimated that it would cost Mr. Graas between $5000 to $8000 to repair the transmission.

86.     Due to his inability to pay for this costly repair, Mr. Graas traded in his damaged Cayenne to a local VW dealership for approximately $18,000, less than two years after purchasing the vehicle.

87.     As a consequence of Porsche's practices, Plaintiff Graas paid more for his vehicle than the vehicle was worth and incurred out- of-pocket expenses to repair and replace the defective coolant hoses.  He then lost money on the trade-in of the vehicle in order to avoid additional expensive repairs.

88.     Plaintiff Graas' vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

89.     Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's plastic coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

### C.     PLAINTIFF KRIDER'S EXPERIENCE

90.     In September 2008, Sean Krider purchased a 2004 Cayenne Turbo with approximately 29,000 miles.  Mr. Krider purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  Mr. Krider was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Krider known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

91.     While driving his children to a Halloween event on October 31, 2010, the coolant tubes in his Cayenne burst, resulting in coolant pouring all over the road.  Mr. Krider drove a short distance to a family friend's house and called a towing company to tow the Cayenne back to his home.

92.     The following day Mr. Krider called his local Porsche authorized dealership, Niello Porsche, located in Rocklin, California, and described what had happened to a service department representative.

93.     Mr. Krider asked the service person if he could estimate the potential cost of such a repair.  Without hesitation, the employee replied "the average cost for this is between $3200-3300 because the repair takes so many labor hours."  Mr. Krider was also informed that the only available replacement part for the repair was the OEM update kit with aluminum pipes.  The service person informed Mr. Krider that the dealership did "a lot of these" coolant pipe repairs, "usually a few a month."

94.     Unwilling to pay for such a costly repair, Mr. Krider purchased a discounted OEM update kit from a Porsche dealership in Oregon and repaired the coolant pipes himself.  Mr. Krider spent over $1000 as a result of the defective plastic coolant hoses and over twelve hours of his time repairing the vehicle himself.

95.     Although it is impossible to visually inspect the transmission seals, Mr. Krider is extremely concerned that both his starter and transmission seals may have been compromised as a result of the amount of coolant that poured out from the plastic tubes.

96.     As a consequence of Porsche's practices, Plaintiff Krider paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses to repair and replace the defective coolant tubes.

97.     Plaintiff Krider's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

98.     Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's plastic coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

### D.     PLAINTIFF TRAN'S EXPERIENCE

99.     Plaintiff Tran purchased a new 2006 Porsche Cayenne S equipped with defective plastic coolant tubes for approximately $72,000 from McKenna Porsche in Norwalk, California in May 2006.

100.    Mr. Tran purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  Mr. Tran was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Tran known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

101.    In November 2010, the low coolant light came on in Plaintiff Tran's Porsche Cayenne.  Plaintiff Tran's wife took the vehicle to Steve's Independent Repair of Porsche & V.W. in Orange, California a couple of days later, where it was discovered that the plastic coolant pipes had degraded and cracked prematurely.  On November 4, 2010, Plaintiff Tran, through his wife, paid $1,739.48 to have the defective coolant pipes replaced, including $771.93 for Defendant's update kit containing the replacement aluminum coolant pipes and $900.00 in labor costs to have the aluminum coolant pipes installed at Steve's Independent Repair of Porsche & V.W.

102.     As a consequence of Porsche's practices, Plaintiff Tran paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses to repair and replace the defective coolant tubes.

103.     Plaintiff Tran's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

104.     Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's plastic coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

### E.     PLAINTIFF STARKEY'S EXPERIENCE

105.     During the time period relevant to this action, Kevin Starkey was a resident of Arapahoe County, Colorado and the owner of a 2006 Porsche Cayenne S Sport Utility Vehicle.

106.     In 2010, Plaintiff Starkey purchased his Cayenne, his eighth Porsche brand vehicle, as a consumer for personal use as a family vehicle.  Plaintiff Starkey purchased his Cayenne because, among other reasons, he wanted a luxury, high performance Sport Utility Vehicle because he lives near the mountains of Colorado.  Mr. Starkey was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Starkey known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

107.     In March 2011, Plaintiff Starkey was driving his Cayenne in the mountains of Colorado on the way to a ski resort with his children when suddenly, and without warning, his plastic coolant tubes cracked and his Cayenne ceased operating.  The cracked coolant tubes leaked coolant throughout the engine, damaging the transmission seals and other components, and rendering his Porsche disabled.

108.     After repairing the coolant tubes, Plaintiff was forced to replace his transmission seals because of the damage caused to them by the leaked coolant.

109.    Plaintiff Starkey has incurred more than $3,600 of expenses to repair his Cayenne, which expenses have not been reimbursed by Porsche.

110.    Plaintiff Starkey's vehicle failed to meet reasonable consumer expectations for a luxury, high-performance vehicle.

111.    Plaintiff Starkey lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes, and could not by exercising additional diligence have filed his claims any earlier.

112.    As a consequence of Porsche's practices, Plaintiff Starkey paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

F.    **PLAINTIFF DUDLEY'S EXPERIENCE**

113.    In 2010, Plaintiff Joseph Dudley purchased the subject 2004 Cayenne CTT for personal use as a family vehicle. Mr. Dudley was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture. Had Mr. Dudley known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

114.    Plaintiff Dudley became aware in 2010 that the plastic coolant tubes in his 2004 Cayenne CTT faced defective coolant tube issues. To avoid leaking or failed tubes and the potential catastrophic failure of other major engine/transmission components, Dudley replaced the tubes at a cost exceeding approximately $1,500.00 in parts and labor.

115.    As a consequence of Porsche's practices, Plaintiff Dudley paid more for his vehicle than the vehicle was worth, and was forced to incur out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes. Plaintiff Dudley's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

### G.     PLAINTIFF GELFAND'S EXPERIENCE

116.    In September 2010, Plaintiff Alan Gelfand purchased a previously owned 2005 Cayenne S from USAuto LTD in Pompano Beach, Florida.  Mr. Gelfand purchased the vehicle as a family vehicle.  Mr. Gelfand was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Gelfand known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

117.    In the Spring of 2011, Plaintiff Gelfand's wife was driving the car and noticed an excessive amount of steam from the car and that the car began to overheat.  Mrs. Gelfand was forced to pull off the highway and have the car towed.  Mr. Gelfand immediately took the car to a mechanic German Car Depot located in Hollywood, Florida.

118.    After being told by the mechanic that the cause of the problem was caused by the cracked plastic coolant tubes, Plaintiff Gelfand had his mechanic replace them with aluminum pipes at a cost of approximately $2,000 in parts and labor.  As a consequence of Porsche's practices, Plaintiff Gelfand paid for a vehicle worth less than the vehicle promised by Porsche and incurred out-of-pocket expenses to repair and replace the defective coolant hoses.

119.    In addition, Plaintiff Gelfand's vehicle also had damage to the water pump at the same time, which he believes, based on information he obtained from his mechanic, is related to the defective coolant tubes.  These issues cost Plaintiff an additional $1,200 to have fixed.

120.    As a consequence of Porsche's practices, Plaintiff Gelfand paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

121.    Plaintiff Gelfand's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

### H.     PLAINTIFF GARDNER'S EXPERIENCE

122.    During the relevant time period, Plaintiff Anthony Gardner was a resident of Fulton County, Georgia, and the owner of a V8-equipped 2005 Porsche Cayenne S Sport Utility Vehicle.

123.    In December 2008, Plaintiff Gardner purchased his Cayenne as a consumer for personal use.  Mr. Gardner was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Gardner known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

124.    In March 2011, Plaintiff Gardner's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine.  Plaintiff Gardner noticed the issue and obtained the services of a mechanic before more extensive damage to the engine occurred.

125.    Even with his early detection of the leak, Plaintiff Gardner has incurred approximately $1,800 of expenses in repairing his Cayenne that have not been reimbursed by Porsche.

126.    Plaintiff Gardner's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

127.    Plaintiff Gardner lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

128.    As a consequence of Porsche's practices, Plaintiff Gardner paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

I.    **PLAINTIFF FLOREZ'S EXPERIENCE**

129.    During the time period relevant to this suit, Plaintiff Scott Florez was a resident of Cook County, Illinois, and the owner of a 2004 Porsche Cayenne S Sport Utility Vehicle.

130.    In November 2009, Plaintiff Florez purchased his Cayenne as a consumer for personal use.  Mr. Florez was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Florez known that the plastic

coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

131.    In May 2011, Plaintiff Florez's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine.  Plaintiff noticed the issue and obtained the services of a mechanic before more extensive damage to the engine occurred.

132.    Even with his early detection of the leak, Plaintiff Florez has incurred approximately $2,000 of expenses in repairing his Cayenne that have not been reimbursed by Porsche.

133.    Plaintiff Florez's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

134.    Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.  He lacked any means by which he could have exercised any additional diligence to file such claims any earlier.

135.    As a consequence of Porsche's practices, Plaintiff Florez paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

### J.    PLAINTIFF HOFFECKER'S EXPERIENCE

136.    During the time period relevant to this suit, Kyle Hoffecker was a resident of Oakland County, Michigan, and the owner of a 2006 Porsche Cayenne Turbo S Sport Utility Vehicle.

137.    In 2006, Plaintiff Hoffecker purchased his Cayenne as a consumer for personal use as a family vehicle.  Mr. Hoffecker was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Hoffecker known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

138.    In February 2011, Plaintiff Hoffecker's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine. Plaintiff obtained the services of a mechanic before more extensive damage to the engine occurred.

139.    Even with early detection, Plaintiff Hoffecker incurred more than $1,800 of expenses in repairing his Cayenne that have not been reimbursed by Porsche.

140.    Plaintiff Hoffecker's vehicle failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

141.    Plaintiff lacked any knowledge that Porsche Cars North America, Inc. had faced numerous complaints concerning the Cayenne's coolant tubes. He lacked any means by which he could have exercised any additional diligence to file his claims any earlier.

142.    As a consequence of Porsche's practices, Plaintiff Hoffecker paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

### K.    PLAINTIFF DELGADO'S EXPERIENCE

143.    During the time period relevant to this suit, Plaintiff Daniel Delgado was a resident of Essex County, New Jersey.

144.    He purchased his 2004 Cayenne S from a used car dealer in 2009 for approximately $39,000. Mr. Delgado was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture. Had Mr. Delgado known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

145.    In or around September 2010, Mr. Delgado brought his Cayenne to Dealer Alternative in West Orange, New Jersey, an authorized Porsche mechanic, after the coolant warning light came on.

146.    During this service, the mechanic informed Mr. Delgado that the Cayenne's plastic coolant tubes were leaking coolant and cracked, and that the repair to replace them would cost approximately $1,800.

147.    Mr. Delgado subsequently brought his Cayenne to KMD Tuning in Mountainside, New Jersey, for another estimate on the repair. Mr. Delgado's mechanic estimated the repair to cost approximately $1,600. Mr. Delgado's mechanic also informed him that the failure of the plastic coolant tubes in the Cayenne was a common issue.

148.    Mr. Delgado paid approximately $1,600 for the repair, which included replacing the defective plastic coolant tubes with aluminum coolant pipes.

149.    Although the coolant tubes have been replaced, Mr. Delgado's vehicle is now beginning to show signs of collateral damage to other car parts, including the starter.

150.    KMD Tuning recently informed Mr. Delgado that problems with the starter in his vehicle are also associated with problems caused by the defective plastic coolant tubes, and estimated that repair to the starter would cost approximately $1,500.

151.    As a consequence of Porsche's practices, Plaintiff Delgado paid more for the vehicle than he would have paid had he known that it needed or would need an expensive coolant pipe replacement to prevent failure of the engine cooling system and to avoid collateral damage to car parts.

152.    At all times prior to the acute coolant system failure described above, Plaintiff Delgado lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

L.    **PLAINTIFF GOROSPE'S EXPERIENCE**

153.    During the time period relevant to this suit, Plaintiff Richard Gorospe was a resident of Hudson County, New Jersey, and the owner of a V8-equipped 2005 Porsche Cayenne S Sport Utility Vehicle purchased in November 2009, from a used car dealer in Smithtown, New York, without knowledge of the coolant tube defect. Mr. Gorospe was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and

fracture. Had Mr. Gorospe known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

154. In November 2010, Mr. Gorospe brought his Cayenne to Towne Porsche in Englewood, New Jersey, because it was leaking coolant.

155. At that time, he was told that the tubes were subject to failure, but could not be replaced without charge because the tubes had not actually failed. He was told that the repair, if performed, would cost approximately $1,800.

156. Mr. Gorospe had his coolant tubes replaced at Elite Motorsports in Medford, New York on June 9, 2011.

157. Prior to the coolant system problems described above, Plaintiff Gorospe lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

158. Plaintiff Gorospe's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

### M.   PLAINTIFF SPAGNOLETTI'S EXPERIENCE

159. During the time period relevant to this suit, Plaintiff Nicholas Spagnoletti was a resident of Morris County, New Jersey, and the owner of a V8-equipped 2004 Porsche Cayenne S Sport Utility Vehicle.

160. In December 2010, Plaintiff Spagnoletti purchased his certified pre-owned Cayenne from Herb Chambers Porsche in Burlington, Massachusetts, for personal use. Mr. Spagnoletti was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture. Had Mr. Spagnoletti known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

161. In November 2010, Plaintiff Spagnoletti brought his Cayenne to his authorized Porsche mechanic for the scheduled 60,000 mile maintenance service. During this service, Mr. Spagnoletti's mechanic informed him that the Cayenne's plastic coolant tubes had to be replaced.

The mechanic told Mr. Spagnoletti that the plastic coolant tubes were destined to fail earlier than the expected life of the vehicle, and if it happened on a highway at high speeds, the damage could be significant and dangerous. Specifically, the mechanic told him that it was very likely that once the coolant tubes fractured, the coolant would leak out very fast, creating clouds of smoke and possibly causing the vehicle to stall.

162.    Further, because the plastic cooling tubes in the Cayenne were placed directly above the starter, Mr. Spagnoletti's mechanic believed that replacement of the starter was also necessary. Mr. Spagnoletti paid $2159 for his cooling pipe "update kit" and additional monies for the labor to install it, a portion of which charge was delivered by Porsche's authorized mechanic directly to Porsche, because the update kit at issue was manufactured by Porsche.

163.    Even with his early detection of the leak, Plaintiff Spagnoletti has incurred over $2,000 of expenses in repairing his Cayenne.  None of these expenses have been reimbursed by Porsche.

164.    At all times prior to the acute coolant system failure described above, Plaintiff Spagnoletti lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

165.    As a consequence of Porsche's practices, Plaintiff Spagnoletti paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

### N.    **PLAINTIFF CADMAN'S EXPERIENCE**

166.    During the time period relevant to this suit, Plaintiff Gregory Cadman was a resident of Westchester County, New York, and the owner of a 2004 Porsche Cayenne Turbo Sport Utility Vehicle.

167.    In September 2008, Plaintiff Cadman purchased his certified pre-owned Cayenne from Danbury Porsche in Danbury, Connecticut, as a consumer for personal use.  Mr. Cadman was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were

destined to stress and fracture.  Had Mr. Cadman known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

168.    In late July 2011, Plaintiff Cadman's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine while Plaintiff was idling at a gas station in New Rochelle, New York approximately ½ mile from his home.  Plaintiff noticed a substance leaking from his Cayenne's engine and called his mechanic, Kip Harris, who instructed him to drive the vehicle home while carefully monitoring the temperature gauge.  The vehicle was then towed to Mr. Harris' repair shop.

169.    Plaintiff Cadman incurred approximately $1,700 of expenses in repairing his Cayenne.  None of these expenses have been reimbursed by Porsche.

170.    Prior to the acute coolant system failure described above, Plaintiff Cadman lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

171.    As a consequence of Porsche's practices, Plaintiff Cadman paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

172.    Plaintiff Cadman's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

### O.    PLAINTIFF JACKMAN'S EXPERIENCE

173.    During the time period relevant to this suit, Plaintiff Ecliff Jackman was a resident of Queens County, New York, and the owner of a 2005 Porsche Cayenne S Sport Utility Vehicle.

174.    In 2007, Plaintiff Jackman purchased his certified pre-owned Cayenne from Porsche Roslyn in Roslyn Heights, New York, for personal use.  Mr. Jackman was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and

fracture.  Had Mr. Jackman known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

175.    In June 25, 2011, Plaintiff Jackman noticed his "check coolant" light come in while driving in Queens County, New York.  He immediately pulled into a nearby auto supply store, purchased and added new coolant to his Cayenne engine.

176.     By the time he arrived home, approximately five to ten minutes later, his "check coolant" light was again activated, and Plaintiff Jackman noticed coolant leaking onto the ground.

177.    The next morning, June 26, 2011, Plaintiff Jackman again added new coolant to his Cayenne engine and drove the car to a nearby mechanic, Queenshill Service Station, which performed the necessary repairs to the Cayenne's coolant system, as Plaintiff Jackman's Cayenne had been disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine.

178.    Even with his early detection of the leak, Plaintiff Jackman incurred approximately $1,550 of expenses in repairing his Cayenne.  None of these expenses have been reimbursed by Porsche.

179.    At all times prior to the acute coolant system failure described above, Plaintiff Jackman lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

180.    As a consequence of Porsche's practices, Plaintiff Jackman paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

181.    Plaintiff Jackman's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

**P.    PLAINTIFF MCINTOSH'S EXPERIENCE**

182.    During the time period relevant to this suit, Plaintiff Dane McIntosh was a resident of Westchester County, New York, and the owner of a V8-equipped 2004 Porsche Cayenne Turbo Sport Utility Vehicle.

29

183.　In December 2008, Plaintiff McIntosh purchased his previously owned Cayenne from Ray Catena Auto Wholesaler, Inc., in Teterboro, New Jersey, for personal use.  Mr. McIntosh was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. McIntosh known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

184.　In October 2010, Plaintiff McIntosh's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine.  Plaintiff noticed a pool of liquid underneath his car and after smelling the liquid and concluding that it was coolant, Plaintiff McIntosh immediately drove the vehicle to the nearest service station, Knights Auto Repair, Inc. in Hawthorne, New York.

185.　After determining that the coolant leak was a result of the cracked plastic coolant tubes attached to the cooling system, the mechanic called the nearest certified Porsche dealer, Pepe Performance Cars, Ltd.  in White Plains, New York, to order replacement coolant tubes. The mechanic was informed by Pepe that the plastic tubes were not available as "replacement parts," and that the only replacement part available was a set of aluminum pipes – packaged and sold by Porsche as an "OEM update kit" at a cost of $1000.  During discussions with Pepe, Mr. McIntosh's mechanic was told that Pepe performs about "three repairs a week" for this exact problem on Cayennes.

186.　Even with his early detection of the leak, Plaintiff McIntosh incurred approximately $2,000 of expenses in repairing his Cayenne.  None of these expenses have been reimbursed by Porsche.

187.　Plaintiff McIntosh's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

188.　At all times prior to the acute coolant system failure described above, Plaintiff McIntosh lacked any knowledge of the defect in the Cayenne's coolant system or that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.

189.     As a consequence of Porsche's practices, Plaintiff McIntosh paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

### Q.     PLAINTIFF BREDEFELD'S EXPERIENCE

190.     Lance Bredefeld purchased his 2006 Cayenne S in September 2010 from "Bobb Suzuki" in Columbus, Ohio.  At the time of purchase, the Cayenne had approximately 54,000 miles on it.  Mr. Bredefeld purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards. At the time of purchase, Mr. Bredefeld was not aware that the plastic coolant tubes in his Cayenne model had been known to prematurely crack.  Had Mr. Bredefeld known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

191.     In November 2010, while in Indianapolis, Mr. Bredefeld's coolant tubes failed. Driving through downtown, the "check coolant" notice suddenly appeared on his information screen.  Steam started rising from under the hood and coolant was streaming on the ground behind his car.  Mr. Bredefeld immediately pulled into the next available parking lot and turned off the engine.

192.     His Cayenne was towed to the "Tom Wood" authorized Porsche dealership in Indianapolis. The service department told Mr. Bredefeld that because the starter is often damaged when the coolant tubes break, that they would inspect the starter during the repair. The dealership installed the OEM update kit and charged Mr. Bredefeld $1650. However, when he went to pick up the vehicle the following week, the battery was almost dead and there was a yellow film all over the Cayenne. Further, there were extensive coolant stains on the interior leather covered grab handles which cost an additional $300 to repair.

193.     Left in Indianapolis without a vehicle, Mr. Bredefeld had to have someone pick him up from 5 hours away.

194.    Mr. Bredefeld called Porsche to inquire about reimbursement. His request was flatly denied, although a customer service representative told Mr. Bredefeld that "Porsche was aware of the problem" and that Porsche "had corrected the design."

195.    As a consequence of Porsche's practices, Mr. Bredefeld paid for a vehicle worth less than the vehicle promised by Porsche and incurred out- of-pocket expenses to repair and replace the defective coolant tubes.

196.    Plaintiff Bredefeld's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

**R.    PLAINTIFF CRAWFORD'S EXPERIENCE**

197.    During the time period relevant to this action, Plaintiff Deana Crawford was a resident of Delaware County, Ohio, and the owner of a 2004 Porsche Cayenne Turbo Utility vehicle.

198.    In 2005, Plaintiff Crawford purchased her Cayenne as a consumer for personal use as a family vehicle.  Ms. Crawford was not aware that Porsche manufactured the vehicle with coolant tubes made of plastic that were destined to stress and fracture.  Had Ms. Crawford known that the plastic coolant tubes were likely to fail, she would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

199.    In late July 2011, Plaintiff Crawford's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant throughout her engine.  Plaintiff's husband noticed the issue and obtained the services of a mechanic before more extensive damage to the engine occurred.

200.    Even with Plaintiff Crawford's husband's early detection of the leak, she has incurred more than $2,000 of expenses in repairing her Cayenne that have not been reimbursed by Porsche.

201.    Plaintiff Crawford's vehicle has failed to meet her reasonable consumer expectations for a luxury, high-performance vehicle.

202.     Plaintiff lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant tubes.  She lacked any means by which she could have exercised any additional diligence to file such claims any earlier.

203.     As a consequence of Porsche's practices, Plaintiff Crawford paid more for her vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

### S.     PLAINTIFF STUEWE'S EXPERIENCE

204.     In 2006, Plaintiff Stuewe purchased his Cayenne for personal use.

205.     In March 2011, Plaintiff Stuewe's Cayenne was rendered disabled when the plastic coolant pipes cracked and leaked coolant through his engine.

206.     Plaintiff Stuewe has incurred more than $2,000 of expenses in repairing his Cayenne that have not been reimbursed by Porsche.

207.     His vehicle has failed to meet his reasonable expectations for a luxury, high-performance vehicle.

208.     Plaintiff Stuewe lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant pipes.  He lacked any means by which he could have exercised any additional diligence to file such claims earlier.

209.     As a consequence of Porsche's practices, Plaintiff Stuewe paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes.

210.     Mr. Stuewe purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  At the time of purchase, Mr. Stuewe was not aware that the plastic coolant tubes in his Cayenne model had been known to prematurely crack.  Had Mr. Stuewe known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

### T.    PLAINTIFF WUST'S EXPERIENCE

211.    In 2003, Plaintiff Sven Wust purchased his Cayenne for personal use.

212.    In May, 2010, Plaintiff Wust's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant through his engine.

213.    Plaintiff Wust has incurred nearly $2,000 of expenses in repairing his Cayenne that have not been reimbursed by Porsche.

214.    His vehicle has failed to meet his reasonable expectations for a luxury, high-performance vehicle.

215.    Plaintiff Wust lacked any knowledge that Porsche had faced numerous complaints concerning the Cayenne's coolant pipes.  He lacked any means by which he could have exercised any additional diligence to file such claims earlier.

216.    As a consequence of Porsche's practices, Plaintiff Wust paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes.

217.    Mr. Wust purchased the vehicle because he believed the Cayenne Turbo was a high performance vehicle manufactured to the highest standards.  At the time of purchase, Mr. Wust was not aware that the plastic coolant tubes in his Cayenne model had been known to prematurely crack.  Had Mr. Wust known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne.

### U.    PLAINTIFF DAHER'S EXPERIENCE

218.    In January 2007, Plaintiff Ghassan Daher bought a used 2003 Cayenne Turbo with approximately 28,000 miles for $48,500 from a Ferrari Dealer in Scottsdale, Arizona.  The vehicle came with a 5 year or 50,000 mile warranty which began sometime in 2003.

219.    Upon purchase of the vehicle, Plaintiff Daher was under the impression that the Cayenne Turbo was a high performance vehicle engineered by Porsche to the highest quality standards.  Mr. Daher was not aware that Porsche manufactured the Cayenne Turbo with coolant tubes made of plastic that were destined to stress and fracture.  Had Mr. Daher known that the

plastic coolant tubes were destined to stress and fracture, he would not have purchased the vehicle, or he would have insisted on paying less for the vehicle.

220.    In the late evening of February 14, 2011, Mr. Daher was driving approximately 60 miles an hour on I-90 from Bellevue, Washington to Seattle, Washington for a Valentine's Day dinner with his wife.

221.    Plaintiff was driving under the speed limit on I-90 when he witnessed the temperature gauge on the dashboard spike suddenly and a "low coolant" light flash on.

222.    Startled and confused by the sudden engine temperature rise, Plaintiff Daher slowed the vehicle and traveled approximately four miles to the nearest gas station.  Plaintiff feared damage to his engine as well as for the safety of both himself and his wife as a result of the surprise temperature spike and the need to slow down on a busy freeway.

223.    When Plaintiff came to a halt, he noticed smoke rising from his engine.  He lifted the hood and was further engulfed by a wave of steam and/or smoke from the engine.  Plaintiff did not feel safe continuing to operate the vehicle and called a tow-truck.

224.    Plaintiff requested the vehicle be towed to Eastside European Auto, a Porsche ASE Certified Mechanic, which had performed service on the vehicle in the past.

225.    The next morning, after performing a quick investigation of the engine, Eastside European Auto concluded that the coolant tubes had failed and drained the vehicle of coolant.  The mechanic further explained that this is a frequent problem with Porsche Cayennes.

226.    Mr. Daher called the local Porsche Dealership service department at Barrier Porsche, where he had also previously had the vehicle serviced, and was told by a service department representative that the problem he had experienced was "well-known" and was fixed on later models, while previous model year owners were left unaware of the problem. Plaintiff further inquired about the repair costs and was given an almost immediate oral estimate of around $3,600 for parts and labor.  Mr. Daher recalls the estimate seemed to roll off the tongue of the service department representative, suggesting that the technician was accustomed to providing estimates for repair of the coolant tubes.

227.    The service representative at Barrier Porsche also told Plaintiff that Porsche had known about the problem for awhile and began manufacturing the aluminum replacement kit in 2005.  Despite having had his Cayenne Turbo serviced multiple times at Barrier Porsche, Mr. Daher had never been informed of the coolant pipe problem until his coolant tubes failed.

228.    Mr. Daher authorized Eastside European Auto to repair the Cayenne for less than the cost quoted by Barrier Porsche.  The final cost of the repair of the coolant tubes was $1,617.52. The mechanic at Eastside European Auto described the coolant pipe repair as a ten (10) hour job.

229.    Plaintiff also had additional repairs done to the CAM sensors located in the engine block of the Cayenne Turbo while the coolant tubes were being replaced.  On information and belief, these sensors may have failed as a result of the coolant pipe failure.

230.    Additionally, Plaintiff has experienced problems with his heating and air conditioning system, as well as several other Cayenne systems and components, which may have been affected by the coolant pipe failure.

231.    As a consequence of Porsche's practices, Plaintiff Daher paid more for his vehicle than the vehicle was worth, and incurred out-of-pocket expenses in association with the repair and replacement of the defective coolant tubes and other components that may have been damaged as a result of the coolant pipe failure.

232.    Plaintiff Daher's vehicle has failed to meet his reasonable consumer expectations for a luxury, high-performance vehicle.

## VI.    CLASS ACTION ALLEGATIONS

233.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. Plaintiffs seek to represent a Class (the "Nationwide Class" or "Class") initially defined as:

> All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, in the United States.

234.    Additionally, Plaintiffs seek to represent the following sub-classes (collectively, the "State Sub-Classes") initially defined as follows:

(a) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of California and/or who purchased or leased said vehicle in California. ("the California Sub-Class")

(b) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Colorado and/or who purchased or leased said vehicle in Colorado. ("the Colorado Sub-Class")

(c) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Florida and/or who purchased or leased said vehicle in Florida.  ("the Florida Sub-Class")

(d) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Georgia and/or who purchased or leased said vehicle in Georgia. ("the Georgia Sub-Class")

(e) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Illinois and/or who purchased or leased said vehicle in Illinois.  ("the Illinois Sub-Class")

(f) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Michigan and/or who purchased or leased said vehicle in Michigan. ("the Michigan Sub-Class")

(g) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of New Jersey and/or who purchased or leased said vehicle in New Jersey.  ("the New Jersey Sub-Class")

(h) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of New York and/or who purchased or leased said vehicle in New York. ("the New York Sub-Class").

(i) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Ohio and/or who purchased or leased said vehicle in Ohio.  ("the Ohio Sub-Class")

(j) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Texas and/or who purchased or leased said vehicle in Texas.  ("the Texas Sub-Class")

(k) All current and former owners or lessees of a 2003-2010 model year Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S, residing in the State of Washington and/or who purchased or leased said vehicle in Washington.  ("the Washington Sub-Class")

235.    Excluded from the Class and each of the State Sub-Classes are individuals who have claims for personal injury resulting from failure of the plastic coolant tubes in their vehicles.  Also excluded from the Class are Porsche Cars North America, Inc., Porsche Automobil Holding SE, any affiliate, parent, or subsidiary of Porsche Cars North America, Inc. or Porsche Automobil Holding SE; any entity in which Porsche Cars North America, Inc. or Porsche Automobil Holding SE has a controlling interest; any officer, director, or employee of Porsche Cars North America, Inc. or Porsche Automobil Holding SE; any successor or assign of Porsche Cars North America, Inc. or

Porsche Automobil Holding SE; any Judge to whom this case is assigned as well as his or her immediate family and staff; and anyone who purchased a Cayenne for the purpose of resale.

236.    This action has been brought and may properly be maintained on behalf of the Class and the State Sub-Classes proposed herein under the criteria of Federal Rule of Civil Procedure Rule 23.

237.    Numerosity.  Members of the Nationwide Class and State Sub-Classes are so numerous that their individual joinder herein is impracticable.  Upon information and belief, Porsche has sold or leased more than 83,000 Cayennes in the United States.  Although the exact number of Class members and their addresses are unknown to Plaintiffs, they are readily ascertainable from Porsche's records.  Class members may be notified of the pendency of this action by mail and/or electronic mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

238.    Existence and predominance of common questions.  Common questions of law and fact exist as to Plaintiffs and all other members of the Nationwide Class and State Sub-Classes and predominate over questions affecting only individual Class members.  These common questions include:

(a) Whether Porsche provided Plaintiffs and the other Class and State Sub-Class members with a vehicle installed with defective cooling system component parts, specifically plastic coolant tubes;

(b) Whether Plaintiffs and Class members' vehicles have a lower market value as a result of the plastic coolant tubes manufactured and/or installed on their vehicles;

(c) Whether Porsche knew or should have known that the plastic coolant tubes were destined to crack and leak coolant;

(d) Whether the defective nature of the plastic coolant tubes or of Porsche's costly replacement program constitute material facts;

(e) Whether Porsche has a duty to disclose the defective nature of the plastic coolant tubes to Plaintiffs and Class and State Sub-Class members;

(f) Whether the plastic coolant tubes defect leads to damage to other component parts;

(g) Whether Porsche has engaged in unlawful, unfair, or fraudulent business practices;

(h) Whether Plaintiffs and the other Class and State Sub-Class members are entitled to equitable relief, including but not limited to restitution or injunctive relief; and

(i) Whether Plaintiff and the other Class and State Sub-Class members are entitled to damages and other monetary relief and, if so, in what amount.

239.    Typicality.  Plaintiffs' claims are typical of the claims of the Nationwide Class and State Sub-Classes because, among other things, Plaintiffs purchased or leased a Cayenne automobile with the same plastic coolant tubes in the cooling system found in other Cayenne automobiles.

240.    Adequacy.  Plaintiffs are adequate representatives of the Nationwide Class and State Sub-Classes because their interests do not conflict with the interests of the members of the Class and State Sub-Classes they respectively seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of members of the Class and State Sub-Classes will be fairly and adequately protected by Plaintiffs and their counsel.

241.    Superiority.  The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs.  While substantial, the damages suffered by each individual Class and State Sub-Class member do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct.  Further, it would be virtually impossible for the members of the Nationwide Class and State Sub-Classes to individually and effectively redress the wrongs done to them.  Even if the members of the Nationwide Class and State Sub-Classes themselves could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, the

class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

242.     In the alternative, the Nationwide Class and State Sub-Classes may be certified because:

(a)  The prosecution of separate actions by the individual members of the Nationwide Class and State Sub-Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Porsche;

(b)  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)  Porsche has acted or refused to act on grounds generally applicable to the Nationwide Class and State Sub-Classes, thereby making appropriate final and injunctive relief with respect to the members of the Nationwide Class and State Sub-Classes as a whole.

## VII.   CAUSES OF ACTION

### A.   NATIONWIDE

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT**
**(On Behalf of the Nationwide Class)**

243.     The foregoing Paragraphs of this Consolidated Complaint are expressly incorporated as if fully re-written and re-alleged herein.

244.     Porsche's Cayennes constitute "consumer products," as defined in 15 U.S.C. § 2301.

245.     Plaintiffs and the other Class members are "consumers," as defined in 15 U.S.C. § 2301.

246.     Porsche is a "supplier" of the consumer products to consumers and a "warrantor," as defined in 15 U.S.C. § 2301.

247.    Porsche made written and implied warranties regarding its Porsche Cayennes, as defined in 15 U.S.C. § 2301.

248.    Porsche violated the Magnuson-Moss Federal Warranty Act by its failure to comply with the written and implied warranties that it made to Plaintiffs and other Class members.  See 15 U.S.C. § 2301, et seq.

249.    Plaintiffs and the other members of the Class sustained injuries and damages as a proximate result of Porsche's violation of its written and/or implied warranties.

**B.    CALIFORNIA**

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**California Civil Code §§ 1750, et seq.**
**(On Behalf of the California Sub-Class)**

250.    On behalf of themselves and the California Sub-Class members, California Plaintiffs Conrad, Graas, Krider, and Tran expressly incorporate by reference and reallege the foregoing Paragraphs 1-242 of this Consolidated Complaint.

251.    This cause of action is brought against Defendants pursuant to the California Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, et seq.

252.    Defendants' conduct that violated and continues to violate the CLRA , includes without limitation, the following:

(a) Representing that its Cayenne vehicles have characteristics, uses, and benefits which they do not have in violation of § 1770(a)(5); and/or

(b) Representing that its Cayenne vehicles are of a particular standard or quality, when they are of another, in violation of § 1770(a)(7).

253.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of the CLRA when Porsche failed to disclose and/or concealed material facts from the California Plaintiffs and the other California Sub-Class members, namely, that the plastic coolant tubes manufactured and installed by Porsche were defective in design, materials and workmanship, and that the plastic coolant tubes were likely to fail prematurely resulting in damage to other

component parts and the engine. The California Plaintiffs and the other California Sub-Class members suffered damages as a result.

254.    To this day, Defendants continue to engage in unlawful practices in violation of the CLRA. California Plaintiffs are informed and believe that Defendants continue to conceal the defective nature of the plastic coolant tubes by failing to notify California Plaintiffs and the other California Sub-Class members of the defective plastic coolant tubes in the Cayenne vehicles.

255.    The information Porsche failed to disclose was material. Had Porsche disclosed the defective nature of its coolant tubes, and that they were subject to a costly replacement program, consumers would have behaved differently – by either not purchasing the Cayenne, or insisting on paying less for it. A reasonable consumer would not expect the coolant tubes – a critical component – to prematurely fracture and crack. Instead, a reasonable consumer would expect the coolant tubes to last for the life of the vehicle.

256.    California Plaintiffs and the other California Sub-Class members seek injunctive relief for the CLRA claims in this complaint.

257.    California Plaintiffs have served on Defendants a CLRA notice letter in compliance with Civil Code § 1782(a). Defendants have refused to cure the defect.

258.    Plaintiffs seek actual and punitive damages pursuant to Civil Code Section 1780(a)(4).

259.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to Civil Code Section 1780(d).

260.    As a result of Defendant's acts and practices as alleged herein, California Plaintiffs and the other California Sub-Class members suffered injury, and pursuant to Civil Code §§ 1780 et seq., Plaintiffs seek:

       (a) An order temporarily and permanently enjoining defendants from continuing the unfair business practices alleged in this Complaint;

       (b) Injunctive relief in the form of a recall or free replacement program;

       (c) Actual and punitive damages pursuant to Civil Code Section 1780(a)(4); and

(d)  Attorneys' fees and costs pursuant to Civil Code Section 1780(d).

### THIRD CAUSE OF ACTION
### VIOLATIONS OF CALIFORNIA UNFAIR BUSINESS PRACTICES ACT
### Cal. Bus. & Prof. Code §§ 17200, et seq.
### (On Behalf of the California Sub-Class)

261.    On behalf of themselves and the other California Sub-Class members, California Plaintiffs expressly incorporate by reference and reallege the foregoing Paragraphs 1-242 of this Consolidated Complaint.

262.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

263.    Defendants engaged in unfair competition or unlawful, unfair or fraudulent business practices in violation of the Unfair Business Practices Act when Porsche committed the acts alleged in this Complaint, including the failure to disclose that the plastic coolant tubes in the Cayenne are defective and can lead to damage to engine component parts and engine failure. Defendants further violated the Unfair Business Practices Act when it unlawfully designed, manufactured, formulated, sold, and introduced into the stream of commerce for purchase by the California Plaintiffs, the general public, and the California Sub-Class, the Cayennes containing the defective plastic coolant tubes.

264.    Defendants' also violated § 17200 by failing to provide California Plaintiffs and the other California Sub-Class members any notice or recall program for the defective plastic coolant tubes despite Porsche's knowledge of the plastic coolant tubes premature failure, said knowledge evidenced by Porsche's manufacture of the OEM update kit as the only available replacement part.

265.    As a direct and proximate cause of Defendants' unfair methods of competition and unfair or deceptive acts or practices, California Plaintiffs and the other California Sub-Class members have suffered actual damages in that they own Cayennes containing plastic coolant tubes that will prematurely fail, and that have required, or will require, California Plaintiffs and the other California Sub-Class members to incur costs to repair and/or replace the coolant tubes with

aluminum pipes, and to repair any damage caused to other engine component parts as a result of the plastic coolant tube failure.

266.    Defendants' conduct is ongoing and constitutes unfair, unlawful, and/or fraudulent business acts and practices within the meaning of § 17200.

267.    California Plaintiffs and the other California Sub-Class members seek preliminary and permanent injunctive relief against these unfair business practices.  Pursuant to §§ 17203 and 17204 of the Business & Professions Code, California Plaintiffs and the other California Sub-Class members are entitled to:  (a) an Order requiring Porsche to cease the unfair and unlawful, deceptive acts alleged herein; (b) full restitution of all monies paid to Porsche as a result of its deceptive practices, including but not limited to, disgorgement of all profits derived from its concealment of the defective plastic coolant tubes; (c) interest at the highest rate allowable at law; and (d) the payment of their attorneys' fees and costs pursuant to California Civil Code Procedure §1021.5.

### FOURTH CAUSE OF ACTION
**UNJUST ENRICHMENT**
**(On Behalf of the California Sub-Class)**

268.    Plaintiffs on behalf of themselves and all others similarly situated, reallege, as if fully set forth, the allegations set forth in paragraphs 1-242 of this Consolidated Complaint.

269.    As set forth above, Porsche has profited unjustly from the sale of the Cayennes at inflated prices as a result of concealing the defective plastic coolant tubes and has profited from its extensive sales of its manufactured aluminum replacement pipes and component parts contained in the OEM "update kits."

270.    Porsche has further unjustly profited by avoiding the costs associated with a government mandated recall or other enforcement actions by engaging in the conduct alleged herein.

271.    It would be unfair for Porsche to retain the profits it has unjustly earned at the expense of California Plaintiffs and the other California Sub-Class members.

272.    California Plaintiffs and the other California Sub-Class members seek an Order requiring full restitution of all monies paid to Porsche as a result of its deceptive practices,

including but not limited to, disgorgement of all profits derived from its concealment of the defective plastic coolant tubes.

### C.   COLORADO

### FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
#### (On Behalf of the Colorado Sub-Class)

273.   The foregoing Paragraphs 1-242 of this Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

274.   Defendants are "person[s]" as defined under the Colorado Consumer Protection Act ("CCPA").  Colo. Rev. Stat. §6-1-102(6).

275.   Plaintiff Starkey is a "consumer" under the CCPA.

276.   The Porsche Cayennes that are the subject of this Complaint are "goods" under the CCPA.

277.   Porsche engaged in deceptive and misleading trade practices when, in the course of its business it, among other acts and practices:

   (a)  Knowingly made false representations as to the characteristics, uses and benefits of the Porsche Cayennes;

   (b)  Represented that the Porsche Cayennes were of a particular standard, quality, or grade, or that that they were of a particular style or model, when it  knew or should have known that they were of another;

   (c)  Advertised Porsche Cayennes with intent not to sell them as advertised;

   (d)  Advertised or otherwise represented that Porsche Cayennes were   warranted when, under normal conditions, the warranties could not be practically fulfilled or which were for such a period of time or were otherwise of such a nature as to have had the capacity and the tendency to mislead purchasers or prospective purchasers into believing that the Cayennes had a greater degree of serviceability, durability, or performance capability in actual use than was true in fact.

(e) Failed to disclose material information concerning Porsche Cayennes, which information was known to it at the time of advertising and selling Cayennes, all of which was intended to induce consumers to purchase Cayennes.

278.    Porsche's conduct significantly impacts the public as actual or potential consumers of Porsche Cayennes because, upon information and belief, and as will be borne out through discovery, Porsche sold thousands of Porsche Cayennes in the particular model years at issue in the State of Colorado, the consumers who purchased the vehicles were unsophisticated as to coolant tubes and vehicle engines generally, the consumers who purchased the vehicles had no bargaining power as to the coolant tubes in the vehicles, and the coolant tubes have impacted consumers and have significant potential to do so in the future.

279.    Additionally, this is a matter of public concern and the state has a strong interest in protecting purchasers from the conduct in which Porsche engaged.

280.    Plaintiff Starkey and the prospective Colorado Sub-Class Members suffered injury in fact to their legally protected interest under the CCPA in not being subjected to deceptive trade practices when purchasing goods.

281.    Plaintiff Starkey's and the prospective Colorado Sub-Class Members' injuries were proximately caused by Porsche's deceptive trade practices set forth above.

**SIXTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**(On Behalf of the Colorado Sub-Class)**

282.    The foregoing Paragraphs 1-242 of this Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

283.    Colorado law recognizes an action for product defects that complements Colorado's Product Liability Statute Colo. Rev. Stat. Title 13, Article 21, Part 4.

284.    Porsche constitutes a "manufacturer" and "seller" of the Porsche Cayenne within the meaning of Colo. Rev. Stat. §13-21-401(1).

285.    Porsche manufactured and sold the Porsche Cayennes in a defective condition and in a condition that was unreasonably dangerous to users and consumers or to their property, including

persons who may reasonably be expected to use, consume or be affected by them, in at least the following respects:

    (a) The Porsche Cayennes were defectively designed, assembled, fabricated, produced, and constructed using plastic coolant tubes that prematurely cracked and deteriorated thereby causing coolant to leak and damage other parts of the vehicles.

    (b) The Porsche Cayennes were not accompanied by adequate warnings about their defective nature.

286.    The Porsche Cayennes were defective and unreasonably dangerous at the time they were sold by Porsche and were intended to and did reach Plaintiff Starkey and prospective Colorado Sub-Class Members in substantially the same condition as they were when they were manufactured, sold and left the control of Porsche.

287.    Plaintiff Starkey and prospective Colorado Sub-Class Members are persons who were reasonably expected to use, consume or be affected by the Porsche Cayennes.

288.    As a direct and proximate result of the defective and unreasonably dangerous conditions of the Porsche Cayennes, Plaintiff Starkey and prospective Colorado Sub-Class Members have suffered damages.

**SEVENTH CAUSE OF ACTION**
**IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Colorado Sub-Class)**

289.    The foregoing Paragraphs of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

290.    Porsche Cayennes are "goods" within the definition found in Colo. Rev. Stat. §4-2-105.

291.    Plaintiff Starkey and Colorado Sub-Class members are "buyers" within the definition of Colo. Rev. Stat. §4-2-103.  Additionally, they are persons who were reasonably expected to use, consume or be affected by the Porsche Cayennes.

292.    Defendants are "merchant[s]" within the definition found in Colo. Rev. Stat. §4-2-104.

293.    A warranty that goods shall be merchantable and fit for the ordinary purposes for which such goods are used is implied in a contract for the sale of goods when the seller is a merchant with respect to goods of that kind.

294.    Porsche breached the implied warranty of merchantability because the Porsche Cayenne was not fit for the ordinary purposes for which such vehicles are used.  More specifically, the Cayennes contained defects that caused the coolant tubes to crack and leak, which caused the need for extensive repairs to the coolant tubes and potentially other parts of the engines.

295.    To the extent required by Colorado law, if at all, Porsche had notice of the breach within a reasonable time after discovery of the breach by, including but not limited to, the filing of this lawsuit.

296.    Porsche's breach of this implied warranty proximately caused damages to Plaintiff Starkey and other Colorado Sub-Class members.

297.    Plaintiff Starkey and Colorado Sub-Class members reserve the right to amend to include a claim for exemplary damages following initial disclosures, per Colo. Rev. Stat. §13-21-102(1.5)(a).

D.    **FLORIDA**

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Florida Stat. § 501.201, *et seq.***
**(On Behalf of the Florida Sub-Class)**

298.    Paragraphs 1-242 of this Consolidated Complaint are expressly incorporated as if fully re-written and re-alleged herein.

299.    At all times relevant to this lawsuit and in connection with this transaction, Defendants were engaged in the conduct of trade or commerce.

300.    At all times relevant to this suit, Plaintiffs Dudley and Gelfand and other Florida Sub-Class members were consumers.

301.    At all times relevant to this suit, Plaintiffs Dudley and Gelfand and other Florida Sub-Class members purchased the subject Cayenne vehicles by way of consumer transactions.

302.    Porsche committed unfair and deceptive acts in violation of Florida's Deceptive and Unfair Trade Practices Act by knowingly placing into the stream of commerce defectively designed Porsche Cayenne vehicles likely to result in catastrophic engine/transmission failure and refusing to pay for and or contribute to the cost of repairing/replacing/retrofitting Porsche's defectively designed plastic coolant lines with Porsche's redesigned metal coolant lines.

303.    Further, Porsche has committed unfair and deceptive acts by intentionally concealing from consumers the defects in the coolant lines and failing to inform Cayenne owners of the defects, and by making the false and misleading statements described elsewhere in this Master Consolidated Complaint.

304.    Porsche is liable to Plaintiffs Dudley and Gelfand and other Florida Sub-Class members under Fla. Stat. Section 501.201 et seq. for damages for failure to pay for the cost of repairing/replacing Porsche's defective plastic coolant lines.

305.    Plaintiffs Dudley and Gelfand and other Florida Sub-Class members are entitled to compensatory damages, injunctive/equitable relief, and attorneys' fees and costs pursuant to Fla. Stat. Section 501.201 et seq.

306.    Florida law takes judicial notice of the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. Section 45(a)(1).  See Fla. Stat. Section 501.204(2).

## NINTH CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of the Florida Sub-Class)

307.    Paragraphs 1-242 of this Consolidated Complaint are expressly incorporated as if fully re-written and re-alleged herein.

308.    Porsche negligently designed the plastic coolant lines in the subject Porsche Cayenne vehicles sold in the United States.

309.    Porsche owed a duty to Plaintiffs Dudley and Gelfand and other Florida Sub-Class members with regard to the plastic coolant tubes installed in the subject Porsche Cayenne vehicles sold in the United States.

310.     As a direct and proximate result of Porsche's negligence, Plaintiffs Dudley and Gelfand and other Florida Sub-Class members have sustained damages.

**TENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of the Florida Sub-Class)**

311.     Paragraphs 1-242 of the Original Complaint are expressly incorporated as if fully re-written and re-alleged herein.

312.     Plaintiffs Dudley and Gelfand and other Florida Sub-Class members bought and/or leased a Porsche Cayenne manufactured by Porsche with the defective coolant tubes.

313.     By purchasing and/or leasing Cayennes and otherwise, Plaintiffs Dudley and Gelfand and other Florida Sub-Class members conferred a benefit on Porsche, which it appreciated when it received the monetary compensation for the Cayennes and other benefits conferred by Plaintiffs Dudley and Gelfand and other Florida Sub-Class members.

314.     As a result of defects, Porsche charged Plaintiffs Dudley and Gelfand and other Florida Sub-Class members more than a fair market price for their vehicles.

315.     In addition, the vehicles of Plaintiffs Dudley and Gelfand and other Florida Sub-Class members have depreciated in value because of Porsche's actions without any corresponding injury to Porsche.

316.     As such, Porsche has accepted and retained benefits conferred from the Plaintiffs and Class Members under circumstances that make it inequitable for Defendants to retain it without paying the value of the benefit conferred.

**E.     GEORGIA**

**ELEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY UNDER UCC**
**(On Behalf of the Georgia Sub-Class)**

317.     Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

318.     The Porsche Cayennes are "goods" within the meaning of Ga. Code Ann. § 11-2-105(1).

51

319.    Plaintiff Gardner and the other Georgia Subclass members are "buyers" within the meaning of Ga. Code Ann. § 11-2-103(1)(a).

320.    Defendants are "merchant[s]" within the meaning of Ga. Code Ann. § 11-2-104(1) with respect to Porsche Cayennes.

321.    A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

322.    Porsche breached the implied warranty of merchantability because the Porsche Cayenne was not fit for the ordinary purposes for which such vehicles are used. More specifically, the Cayennes contain defects that cause the coolant tubes to crack and leak, which, when manifested, require extensive repairs to the coolant tubes and potentially other parts of the engine. Moreover, the Cayennes would not pass without objection in the trade under the contract description of luxury, high-performance SUV.

323.    Porsche has received timely notice of the breach, but it has failed to pay for, or offer to pay for, any of the associated repair or replacement costs for the coolant pipes and/or resulting costs from these defective tubes.

324.    Plaintiff Gardner and the other Georgia Subclass members sustained injuries and damages as a proximate result of the breach.

**TWELFTH CAUSE OF ACTION**
**VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of the Georgia Sub-Class)**

325.    Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

326.    Georgia's Uniform Deceptive Trade Practices Act defines a deceptive trade practice to include, inter alia, the following:

(a)    "Represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a

sponsorship, approval, status, affiliation, or connection that he does not have," Ga. Code Ann. § 10-1-372(a)(5); and

(b) "Represent[ing] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another," Ga. Code Ann. § 10-1-372(a)(7).

327.    Porsche's conduct, as set forth herein, constitutes unfair or deceptive acts or practices under the Uniform Deceptive Trade Practices Act, including, but not limited to Porsche's manufacture and sale of vehicles with a cooling pipe defect that Porsche failed to adequately investigate, disclose, and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

328.    Porsche's actions as set forth above occurred in the conduct of trade or commerce.

329.    Porsche's actions impact the public interest because Plaintiff Gardner was injured in exactly the same way as thousands of others purchasing and/or leasing Porsche Cayennes as a result of Porsche's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Porsche's business.

330.    Plaintiff Gardner and the other Georgia Subclass members were injured as a result of Defendants' conduct.  Plaintiff Gardner and the other Subclass members overpaid for their defective vehicles and did not receive the benefit of their bargain, and their vehicles have suffered a diminution in value.  Further, Plaintiff Gardner and the other Georgia Subclass members are very likely to experience coolant leakage in the future from the plastic valley coolant tubes, if they have not done so already.

331.    In light of Porsche's conduct as alleged herein, an injunction should be entered requiring Defendants to stop the unlawful, unfair, and deceptive conduct alleged herein and/or requiring Defendants to inspect and/or replace all of the Cayenne plastic valley coolant tubes.

53

## THIRTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (On Behalf of the Georgia Sub-Class)
### Pled in the Alternative to Counts [Magnusson-Moss] & [Implied Warranty]

332.     Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

333.     Plaintiff Gardner and the other Georgia Subclass members leased and/or purchased Cayennes from Porsche.

334.     As a consequence of the conduct described above, Porsche has received a benefit in the form of higher payments from Plaintiff Gardner and the other Georgia Subclass members for Cayennes than if the defect had been known.

335.     Additionally, Porsche obtained revenues from the repair of Cayennes using replacement parts sold by Porsche.

336.     Porsche has knowingly appreciated and accepted this benefit, which has resulted and is continuing and/or may continue to result in an inequity to Plaintiff Gardner and the other Georgia Subclass members.

337.     Porsche's appreciation and acceptance of this benefit is inequitable.

338.     As a result of Porsche's unjust enrichment, Plaintiff Gardner and the other Georgia Subclass members have sustained damages, in an amount to be determined at trial.

339.     Plaintiff Gardner and the other Georgia Subclass members seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

### F.     ILLINOIS

## FOURTHEENTH CAUSE OF ACTION
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE PRACTICES ACT
### (On Behalf of the Illinois Sub-Class)

340.     Paragraphs 1-242 of this Consolidated Complaint are expressly incorporated as if fully re-written and re-alleged herein.

341.     Plaintiff Scott Florez asserts this claim on behalf of the Illinois Subclass only.

342.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits unfair methods of competition and unfair and deceptive acts or practices, including, among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been mislead, deceived or damaged thereby." The Illinois Consumer Fraud and Deceptive Business Practices Act is to be liberally construed.

343.    815 Ill. Comp. Stat. 505/1(b) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "merchandise" to include the Cayenne vehicles at issue.

344.    815 Ill. Comp. Stat. 505/1(c) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "person" to include Defendants.

345.    815 Ill. Comp. Stat. 505/1(e) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "consumer" to include Plaintiff Florez and the other Illinois Subclass members.

346.    Porsche's acts and practices, as alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, including, but not limited to, Porsche's manufacture and sale of vehicles with a cooling pipe defect that Porsche failed to adequately investigate, disclose, and remedy, and its misrepresentations and omissions regarding the safety and reliability of its vehicles.

347.    Porsche intended for Plaintiff Florez and the other Illinois Subclass members to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

348.    Plaintiff Florez and the other Illinois Subclass members did rely on such misrepresentations or were deceived.

349.    Porsche's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiff Florez and the other Illinois Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages, in an amount to be determined at trial.

350.     Porsche's conduct in this regard was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff Florez and the other Illinois Subclass members and, as such, warrants the imposition of punitive damages.

351.     815 Ill. Comp. Stat. 505/10 permits the Court to enter injunctive relief to require Porsche to stop the unlawful, unfair, and deceptive conduct alleged herein and/or inspect and replace all of the Cayenne plastic valley coolant tubes, and award Plaintiff Florez and the other Illinois Subclass members their costs and reasonable attorneys' fees.

**FIFTEENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**Pled in the Alternative to Cause of Action One**
**(On Behalf of the Illinois Sub-Class)**

352.     Paragraphs 1-242 of this Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

353.     Plaintiff Florez and the other Illinois Subclass members leased and/or purchased Cayennes from Porsche.

354.     As a consequence of the conduct described above, Porsche has received a benefit in the form of higher payments from Plaintiff Florez and the other Illinois Subclass members for Cayennes than if the defect had been known.

355.     Additionally, Porsche obtained revenues from the repair of Cayennes using replacement parts sold by Porsche.

356.     Porsche has knowingly appreciated and accepted this benefit, which has resulted and is continuing and/or may continue to result in an inequity to Plaintiff Florez and the other Illinois Subclass members.

357.     Porsche's appreciation and acceptance of this benefit is inequitable.

358.     As a result of Porsche's unjust enrichment, Plaintiff Florez and the other Illinois Subclass members have sustained damages, in an amount to be determined at trial.

359.     Plaintiff Florez and the other Illinois Subclass members seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

### G.     MICHIGAN

### SIXTEENTH CAUSE OF ACTION
### STRICT PRODUCT LIABILITY
### (On Behalf of the Michigan Sub-Class)

360.    The foregoing Paragraphs of this Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

361.    Michigan law recognizes an action for product defects that complements Michigan's Product Liability statute, MCL 600.2945, *et seq.*

362.    A breach occurs if a defect in a product, attributable to the product's manufacturer, causes damage.

363.    A product is defective if it is not reasonably fit for its intended or foreseeable use or creates an unreasonably dangerous condition.

364.    Porsche marketed, sold, designed, and/or manufactured the Cayennes owned by Plaintiff Hoffecker and the other Michigan Sub-Class members.

365.    The Porsche Cayenne was defectively designed and constructed using plastic coolant tubes which prematurely cracked and deteriorated, thereby causing coolant to leak and damage other parts of the vehicle.

366.    Based upon the leaking coolant caused by the defective plastic coolant tubes, the Porsche Cayennes of Plaintiff Hoffecker and the other Michigan Sub-Class members were not reasonably fit and/or safe at the time the Cayennes left the control of the manufacturer.

367.    A practically and technically feasible alternative means of design/production was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm.

368.    Alternative production was technically feasible because the technical and scientific knowledge, at the time that the Cayennes of Plaintiff Hoffecker and the other Michigan Sub-Class members left Porsche's control, was developed, available, and capable of use by the manufacturer.

369.    Porsche possessed actual knowledge that its product was defective and had a substantial likelihood of causing damages and injury, and it actively concealed these defects while it continued to manufacture and sell its Cayennes.

370.     The deterioration and/or failure of the plastic coolant tubes is attributable to Porsche, which is the manufacturer of the Cayennes.

371.     Plaintiff Hoffecker and the other Michigan Sub-Class members did nothing to alter or misuse their Cayennes in any way.

372.     Plaintiff Hoffecker and the other Michigan Sub-Class members suffered damages proximately caused by the defects and/or unreasonably dangerous condition.

373.     As a result of the product defects in the Porsche Cayenne, Porsche breached its duties to Plaintiff Hoffecker and the other Michigan Sub-Class members and is responsible for all of Plaintiff's and the prospective Michigan Sub-Class members' damages.

### SEVENTEENTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY UNDER UCC
#### (On Behalf of the Michigan Sub-Class)

374.     The foregoing Paragraphs of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

375.     Porsche Cayennes are "goods" within the meaning of MCL 440.2105(1).

376.     Plaintiff Hoffecker and the other Michigan Sub-Class members are "buyers" within the meaning of MCL 440.2103(1)(a).

377.     Defendants are "merchant[s]" within the meaning of MCL 440.2104(1) with respect to Porsche Cayennes.

378.     A warranty that goods shall be merchantable and fit for ordinary purposes for which such goods are used is implied in a contract for their sale if the seller is a merchant of goods of that kind.

379.     Porsche breached the implied warranty of merchantability because the Porsche Cayenne was not fit for the ordinary purposes for which such goods are used.  More specifically, the Cayenne contained defects that caused the coolant tubes to crack and leak, which caused the need for extensive repairs to the coolant tubes and potentially other parts of the engine.  Moreover, the Cayennes would not pass without objection in the trade under the contract description of luxury, high-performance SUV.

380. Porsche has received timely notice of the breach, but it has failed to pay for, or offer to pay for, any of the associated repair or replacement costs for the coolant tubes and/or resulting costs from tubes that cracked and leaked.

381. Plaintiff Hoffecker and the other Michigan Sub-Class members sustained injuries and damages as a proximate result of the breach.

**EIGHTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(On Behalf of the Michigan Sub-Class)**

382. The foregoing Paragraphs 1-242 of this Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

383. At all times relevant to this suit, Porsche was conducting trade or commerce, as defined under MCL 445.902(1)(g), which is also known as the Michigan Consumer Protection Act (MCPA).

384. A party to a transaction covered under the MCPA must provide the other party the promised benefits of the transaction.

385. Michigan courts, and federal courts applying Michigan law, have held that implied warranties contain a "promised benefit" that the product is fit for its intended and foreseeable use.

386. The coolant tubes, by cracking, deteriorating, and otherwise failing at a point unreasonably early for a luxury, high-performance vehicle, failed to provide Plaintiff Hoffecker and the other Michigan Sub-Class members the promised benefits of the implied warranties.

387. Porsche has committed unfair and deceptive acts by knowingly placing into the stream of commerce defectively designed Porsche Cayennes, which were and are likely to result in catastrophic engine/transmission failure before replacing the defective plastic coolant tubes with aluminum ones in newer models.

388. In addition, Porsche refused to pay for or contribute to the cost of repairing/replacing/retrofitting Porsche's defectively designed plastic coolant tubes with Porsche's redesigned aluminum coolant pipes.

389. Porsche committed these and other unfair and deceptive acts with regard to the marketing and sale of its Porsche Cayennes. For instance, Porsche has made representations and/or public statements about the effectiveness of its engine cooling and engine performance, which are unfair and deceptive in violation of Michigan law.

390. Porsche knew that the coolant tubes installed in its Cayennes in the years referenced above were defective long before it changed its design to incorporate aluminum coolant pipes.

391. Porsche concealed and/or failed to warn Plaintiff Hoffecker and the other Michigan Sub-Class members that its Cayennes' coolant tubes were defective for these model years.

392. Along with other examples listed above, such concealment and/or failure to warn constitutes an unfair, unconscionable, or deceptive act or practice within the meaning of the MCPA.

393. Based upon all of these allegations, Porsche violated MCL 445.903(d), (p), and (s), as well as other sections of MCL 445.903 to be developed during the course of discovery.

394. The unfair, unconscionable, and deceptive acts committed by Porsche caused damages to Plaintiff Hoffecker and the other Michigan Sub-Class members.

395. Porsche is liable to Plaintiff Hoffecker and the other Michigan Sub-Class members under the MCPA for damages for breaching its implied warranties, for the aforesaid unfair, unconscionable and deceptive acts and for failing to pay for the cost of repairing/replacing Porsche's defective plastic coolant tubes.

396. Plaintiff Hoffecker and the other Michigan Sub-Class members are entitled to compensatory damages. injunctive/equitable relief, and attorneys' fees under the MCPA.

397. The allegations made by Plaintiff and prospective Class Members meet the requirements of MCL 445.911(11)(3) because the acts and/or practices of Porsche violate MCL 445.903, have been declared unlawful by an appellate court of the state which is either officially reported or made available for public dissemination in accordance with the MCPA, and/or have been declared by a circuit court and/or the United States Supreme Court to constitute unfair or deceptive acts under the specified standards set forth by the Federal Trade Commission.

60

## NINTEENTH CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of the Michigan Sub-Class)**

398.    The foregoing Paragraphs of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

399.    Porsche negligently designed and/or manufactured the plastic coolant tubes in V8-equipped Porsche Cayennes sold in the United States for these model years.

400.    Porsche owed Plaintiff Hoffecker and the other Michigan Sub-Class members the duty to design and manufacture the Cayenne in such a way as to ensure that  its critical components would not prematurely crack, deteriorate, and otherwise fail, leading to substantial repair costs and damages to other parts of the Cayenne unreasonably early for a luxury, high-performance vehicle.

401.    Discovery will reveal additional information from Porsche regarding the design and manufacturing process to support the conclusion that use of plastic in the Cayenne's coolant tubes constitutes negligence and/or negligent design.

402.    As a direct and proximate result of Defendants' negligence, Plaintiff Hoffecker and the other Michigan Sub-Class members have sustained damages.

**H.     NEW JERSEY**

### TWENTIETH CAUSE OF ACTION
### VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT
**("CFA") N.J.S.A. 56:8-1, et seq.**
**(On Behalf of the New Jersey Sub-Class)**

403.    On behalf of themselves and New Jersey Sub-Class members who purchased a Class Vehicle for personal, family or household purposes, Plaintiffs Delgado, Gorospe and Spagnoletti expressly incorporate by reference and reallege the foregoing Paragraphs 1-242 of this Consolidated Complaint.

404.    The Porsche Cayennes are "goods" under New Jersey CFA, §56:8-1(c).

405.    Porsche is a "person" under New Jersey CFA §56:8-1(d).

406.    New Jersey CFA §56:8-1 states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

As set forth herein, Porsche failed to disclose and/or concealed material facts from New Jersey Plaintiffs and New Jersey Class members concerning their Porsche Cayennes, including but not limited to, the fact that the coolant system's plastic tubes were defective in materials, design and workmanship, and that the coolant tubes are likely to fail prematurely.

407. For example, Porsche has violated the New Jersey CFA by engaging in the following conduct:

(a) Representing that its goods had characteristics, uses, benefits or quantities which they do not have;

(b) Representing that its goods were of a particular standard, quality or grade when they were of another;

(c) Concealing, suppressing and making fraudulent or negligent misrepresentations concerning the plastic coolant tubes as set forth above;

(d) Failing to adequately and properly inform and warn Plaintiffs Delgado, Gorospe and Spagnoletti, and the other New Jersey Sub-Class members of the materials and design defects relating to the plastic coolant tubes; and

(e) Failing to repair, replace or reimburse Plaintiffs Delgado, Gorospe and Spagnoletti, and the other New Jersey Sub-Class members for damages incurred due to the plastic coolant tubes.

(f) Representing that the Cayenne includes "a cooling system perfected in the deserts of Dubai;"

(g) Representing that "in the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperatures throughout every part of the engine;"

(h) Representing that "the entire cooling system is specifically designed for prolonged heavy-duty operation;"

(i)  Representing that "every technical detail has been examined and optimized to
     ensure that the Cayenne Turbo reaches benchmark levels of SUV
     performance;"

(j)  Representing that "the cooling system is extremely robust;"

(k)  Representing that "the Cayenne Turbo engine is among the most advanced
     internal combustion engines ever produced by Porsche [and that] this
     mechanical symphony integrates a list of technical features that is a
     culmination of everything our engineers have learned about watercooled V8
     engines and turbo technology over the past four decades;"

(l)  Representing that "the Cayenne V8 engine's cooling system helps to
     maximize performance in every respect [and that] the strategy for achieving
     these objectives is nothing if not thorough."

408.  Porsche made the above described misrepresentations, concealment and omissions of
material facts with full knowledge or recklessness that they were false and misleading and with the
intent that their consumers would rely upon such concealment, suppression and omission.

409.  Porsche has known for years about this plastic coolant tubes materials defect and
design defect.  Indeed, upon information and belief, Porsche knew that these representations were
false at the time it made them, as it had already become aware of the defect in the Cayenne's
cooling system by means of widespread customer complaints of prematurely cracking coolant
tubes, dealer inquiries, repair shop inquiries, dealer-provided repair data, authorized service center
repair data, the high volume of replacement parts being ordered, and NHTSA complaints.

410.  Porsche chose not to fully and honestly disclose to its customers the true nature of
the inherent cooling system design defect, which was not readily discoverable by consumers, often
until after the vehicle's warranty had expired.

411.  The defect with the Cayenne's coolant tubes implicates serious safety concerns, as
acute failure of the part can and sometimes does occur while travelling at high speeds on public
roadways, causing risk of severe injury or even death to the driver of the Cayenne, the other

passengers in the Cayenne, and to others sharing the road with the Cayenne. *See, e.g.* paragraphs 78-89, *supra* (coolant tubes burst while plaintiff travelling with his daughter, at night, on Highway 88 in the Sierra Nevadas).

412.     Particularly in light of these safety implications, Porsche had an equitable duty to disclose the defective plastic coolant tubes to Porsche owners, as well as a statutory duty to makes this disclosure, inter alia, pursuant to 49 USC §§ 30118 and 30119, and NJSA 2A:58C-3 and NJSA 2A:58C-4.

413.     Porsche, as the manufacturer, should have made this disclosure by the methods set forth in 49 USC § 30119(d), and/or by some other method reasonably designed to reach each individual purchaser, e.g. in writing, by mail or email.

414.     Yet, Porsche chose to not inform and warn the public, and specifically Cayenne owners, of the potential coolant leakage and resulting damage to the engine and engine component parts.

415.     As a result of Porsche's practices in violation of the CFA, Plaintiffs Delgado, Gorospe and Spagnoletti, and the other New Jersey Sub-Class members have suffered damages in an amount to be determined at trial.

## TWENTY-FIRST CAUSE OF ACTION
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the New Jersey Sub-Class)

416.     The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

417.     Porsche Cayennes are "goods" within the meaning of N.J. Stat. Ann. § 12A:2-314 (codifying UCC § 2-314)

418.     Plaintiffs Delgado, Gorospe and Spagnoletti, and the other New Jersey Sub-Class members are "buyers" within the meaning of N.J. Stat. Ann. § 12A:2-314.

419.     Porsche is a "merchant" within the meaning of N.J. Stat. Ann. § 12A:2-314 with respect to Porsche Cayennes.

420.    Defendants impliedly warranted that the Cayennes were of a merchantable quality and fit for their ordinary purpose.

421.    Defendants breached the implied warranty of merchantability, as the class vehicles were not of a merchantable quality due to their defective cooling systems.  Specifically, and without limitation, the cooling system was substandard and of lower quality than similar goods in the industry

422.    Porsche knew or was reckless in not knowing this at the time of sale, and knew or was reckless in not knowing that the cooling systems would fail well before their useful lives.

423.    In light of the above, any express limitation or negation of Porsche's implied warranty, including any time limitation, is unconscionable, unreasonable, and unenforceable.

424.    As a direct and proximate result of the breach of said implied warranty, Plaintiffs Delgado, Gorospe and Spagnoletti, and the other New Jersey Sub-Class members were injured, and are entitled to damages.

I.      **NEW YORK**

**TWENTY-SECOND CAUSE OF ACTION**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**Deceptive Acts and Practices Unlawful**
**(On Behalf of the New York Sub-Class)**

425.    On behalf of themselves and New York Sub-Class members who purchased a Class Vehicle for personal, family or household purposes, Plaintiffs Cadman, Jackman, and McIntosh expressly incorporate by reference and reallege the foregoing Paragraphs 1-242 of the Consolidated Complaint.

426.    Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members are "consumers" under New York GBL §349.

427.    Porsche failed to disclose and/or concealed material facts from Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members, namely, that the plastic coolant tubes manufactured and installed by Porsche were defective in design, materials and workmanship, and that the plastic coolant tubes were likely to fail prematurely resulting in damage to other component parts and the engine. Thus, Porsche has violated the NYGBL §349 by:

65

(a) Representing that its goods had characteristics, uses, benefits or quantities which they do not have;

(b) Representing that its goods were of a particular standard, quality or grade when they were of another;

(c) Advertising its goods with intent not to sell them as advertised;

(d) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve;

(e) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

(f) Representing that the Cayenne includes "a cooling system perfected in the deserts of Dubai;"

(g) Representing that "in the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperatures throughout every part of the engine;"

(h) Representing that "the entire cooling system is specifically designed for prolonged heavy-duty operation;"

(i) Representing that "every technical detail has been examined and optimized to ensure that the Cayenne Turbo reaches benchmark levels of SUV performance;"

(j) Representing with regard to the Cayenne, that "the cooling system is extremely robust;"

(k) Representing that "the Cayenne Turbo engine is among the most advanced internal combustion engines ever produced by Porsche [and that] this mechanical symphony integrates a list of technical features that is a culmination of everything our engineers have learned about watercooled V8 engines and turbo technology over the past four decades;"

(l)    Representing that "the Cayenne V8 engine's cooling system helps to maximize performance in every respect [and that] the strategy for achieving these objectives is nothing if not thorough;"

428.    The deceptive acts and practices engaged in by Porsche were consumer-orientated.

429.    Upon information and belief, Porsche knew that these representations were false at the time it made them, as it had already become aware of the defect in the Cayenne's cooling system by means of widespread customer complaints of prematurely cracking coolant tubes, dealer inquiries, repair shop inquiries, dealer-provided repair data, the high volume of replacement parts being requested, and NHTSA complaints.

430.    Porsche chose not to fully and honestly disclose to its customers the true nature of the inherent cooling system design defect, which was not readily discoverable by consumers, often until after the vehicle's warranty had expired.

431.    Each of the deceptive acts and practices set forth herein were materially misleading and constitute violations of NYGBL §349 independent of whether these acts and practices constitute violations of any other law, including common law.

432.    These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state. Defendant's conduct was not a unique, one-time occurrence without possibility of replication or recurrence and without implication for the broader consuming public.  To the contrary, the deceptive conduct set forth herein is part of a regular and recurring practice that impacts all of the New York Sub-Class members.

433.    As a result of Porsche's practices in violation of NYGBL §349, Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members have suffered actual damages in that they own Cayennes containing plastic coolant tubes that will prematurely fail, and that have required, or will require, Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members to incur costs to repair and/or replace the coolant tubes with aluminum pipes, and to repair any damage caused to other engine component parts as a result of the plastic coolant tube failure.

434. Upon information and belief, Porsche's violations were willful and knowing and committed in bad faith.

435. For these reasons, Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members are entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL §349(h), and a declaratory judgment that Defendant's practices are deceptive as defined under §349.

### TWENTY-THIRD CAUSE OF ACTION
#### UNJUST ENRICHMENT
#### (On Behalf of the New York Sub-Class)

436. On behalf of themselves and Class members who purchased a Class Vehicle for personal, family or household purposes, Plaintiffs Cadman, Jackman, and McIntosh expressly incorporate by reference and reallege the foregoing Paragraphs 1-242 of this Consolidated Complaint.

437. Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members bought or leased their Porsche Cayennes which were manufactured with plastic cooling tubes.

438. Porsche knew, reasonably should have known, or was reckless in not knowing that Porsche provided Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members with a vehicle installed with defective cooling system component parts, specifically plastic coolant tubes and that the use of the plastic coolant tubes would result in damage to the Cayenne's engine and/or its component parts.

439. As a result of Porsche's practices, Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members were overcharged by Porsche for their vehicles.

440. As a result of Porsche's practices, the Cayennes of Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members now have a lower market value, and Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members incurred, or will incur, expensive repairs that they should not have to bear.

441. In addition, to the extent that any member of the class was forced to purchase the Porsche manufactured "update kit" and/or were serviced for the repair by authorized Porsche

dealerships, Porsche realized an additional direct benefit because it was paid for such sale and repair.

442.    As a result of Porsche's concealment and deceptive practices, Porsche was unjustly enriched.

443.    Plaintiffs Cadman, Jackman, McIntosh, and the other New York Sub-Class members have no remedy provided by law and for these reasons, Plaintiff and Class members are entitled to full restitution.

**J.    OHIO**

**TWENTY-FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY IN TORT**
**(On Behalf of the Ohio Sub-Class)**

444.    The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

445.    Defendants manufactured, imported, and supplied Porsche Cayenne Sports Utility Vehicles in the United States to Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members.

446.    These Porsche Cayennes contained a design defect, namely, plastic coolant lines that crack and leak, requiring replacement with Porsche's redesigned metal coolant lines, as well as expensive repairs in the event the plastic coolant lines' failure causes coolant to leak onto the starter, manifold, transmission seals, or other engine parts.

447.    The design defect existed at the time these Porsche Cayennes left the hands of Porsche.

448.    Based upon the product defect and its certainty to occur, Porsche has failed to meet the expectations of a reasonable consumer. The Porsche Cayenne has failed its ordinary, intended use because the coolant tubes could not function for their reasonably expected useful life without significant repairs that were reasonably avoidable through different design.

449.    This design defect in the plastic coolant lines of V8-equipped Porsche Cayenne Vehicles was the direct and proximate cause of economic damages to Plaintiffs Bredefeld and

Crawford, as well as damages incurred or to be incurred by each of the other Ohio Sub-Class members.

**TWENTY-FIFTH CAUSE OF ACTION**
**VIOLATIONS OF OHIO'S CONSUMER SALES PRACTICES ACT**
**(On Behalf of the Ohio Sub-Class)**

450.    The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

451.    At all times relevant to this suit, Defendants were "supplier[s]," as defined in the Ohio Consumer Sales Practices Act, Rev. Code 1345.01.

452.    At all times relevant to this suit, Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members were "consumers," as defined in the Ohio Consumer Sales Practices Act, Rev. Code 1345.01.

453.    At all times relevant to this suit, Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members purchased the Porsche Cayenne vehicles through "consumer transactions," as defined in the Ohio Consumer Sales Practices Act, Rev. Code 1345.01.

454.    As a result of placing a defective product into the stream of commerce, Porsche has breached its implied warranty in tort.  A vehicle manufacturer's breach of an implied warranty has previously been declared by Ohio courts to be an unfair and deceptive act, as defined in Rev. Code 1345.09(B).  *Mason v. Mercedes Benz USA, LLC*, 2005 Ohio App. Lexis 3911 (8th Dist. Aug. 18, 2005).

455.    Porsche has committed unfair and deceptive acts in violation of Ohio's Consumer Sales Practices Act by knowingly placing into the stream of commerce defectively designed the Porsche Cayennes likely to result in catastrophic engine/transmission failure before removing the defective plastic coolant lines and replacing them with aluminum ones in newer models.

456.    Moreover, Porsche has committed an unfair, deceptive, and unconscionable act by knowingly concealing the defects in the Cayenne's coolant tubes and failing to inform Cayenne purchasers of this defect.

457.    In addition, Porsche has refused and/or failed to pay for or contribute to the cost of repairing/replacing/retrofitting Porsche's defectively designed plastic coolant lines with Porsche's redesigned metal coolant lines.

458.    Further, Porsche, as reflected by the facts alleged elsewhere in this Consolidated Amended Complaint, has made representations and/or public statements about the effectiveness of its engine cooling and engine performance, which are unfair and deceptive in violation of Ohio law.

459.    Porsche committed these and other unfair and deceptive acts with regard to the marketing and sale of the Cayennes. Porsche is liable to Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members under Ohio Rev. Code 1345.09 for damages for failure to pay for the cost of repairing/replacing Porsche's defective plastic coolant lines in violation of an implied warranty.

460.    Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members are entitled to compensatory damages. injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code 1345.09.

461.    The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Porsche as detailed in this Master Consolidated Complaint, including but not limited to the failure to honor both implied warranties and express warranties, constitute deceptive sales practices in violation of Ohio's Consumer Sales Practices Act.  These cases include, but are not limited to, the following: *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. Lexis 22114 (S.D. Ohio WD 2006); *Mason v. Mercedes Benz USA, LLC*, 2005 Ohio App. Lexis 3911 (8th Dist. Aug. 18, 2005).

### TWENTY-SIXTH CAUSE OF ACTION
#### NEGLIGENCE
#### (On Behalf of the Ohio Sub-Class)

462.    The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

463.    Porsche negligently designed the plastic coolant lines in all V8-equipped Porsche Cayenne Vehicles sold in the United States.

464.    Porsche owed Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members the duty to design and manufacture the Cayenne in such a way as to ensure that it would not leak coolant and would not require substantial repair costs or cause damages to other parts of the vehicle unreasonably early in its usable life.

465.    Discovery will reveal additional information from Porsche regarding the design and manufacturing process to support the conclusion that use of plastic in the Cayenne's coolant lines constitutes negligence and/or negligent design.

466.    As a direct and proximate result of Defendant Porsche's negligence, Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members have sustained damages.

### TWENTY-SEVENTH CAUSE OF ACTION
### DECEPTIVE TRADE PRACTICES
### (On Behalf of the Ohio Sub-Class)

467.    The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

468.    The allegations set forth herein constitute Deceptive Trade Practices, pursuant to Ohio Rev. Code 4165.01 et seq.

469.    Specifically, as described above, Porsche misrepresented that its services are of a particular standard, quality, or grade.

470.    In addition, and as set forth previously, Porsche misrepresented that its Cayennes have characteristics, uses, and/or benefits that they do not have.

471.    Plaintiffs Bredefeld and Crawford and the other Ohio Sub-Class members request injunctive and declaratory relief as a proximate result of the actions of Porsche as well as damages as detailed in the Prayer for Relief.

### K.    TEXAS

### TWENTY-EIGHTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY
### (On Behalf of the Texas Sub-Class)

472.    The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

473. Defendants manufactured, imported, and supplied Porsche Cayenne Sports Utility Vehicles in the United States to Plaintiffs Stuewe and Wust and the other Texas Sub-Class Members. Defendants were thus merchants with respect to Porsche Cayennes at all relevant times.

474. These Porsche Cayennes contained a design defect, namely, plastic coolant lines that crack and leak, requiring replacement with Porsche's redesigned metal coolant lines, as well as expensive repairs in the event the plastic coolant lines' failure causes coolant to leak onto the starter, manifold, transmission seals, or other engine parts.

475. The design defect existed at the time these Porsche Cayennes left the hands of Porsche.

476. Based upon the product defect and its certainty to occur, Porsche has failed to meet the expectations of a reasonable consumer. The Porsche Cayenne has failed its ordinary, intended use because the coolant tubes could not function for their reasonable expected useful life without significant repairs that were reasonably avoidable through different design. As a result of the design defect, the Porsche Cayennes are unfit for the ordinary purpose for which they are used because of a lack of something necessary for adequacy.

477. This design defect in the plastic coolant lines of V8-equipped Porsche Cayenne Vehicles was the direct and proximate cause of economic damages to Plaintiffs Stuewe and Wust, as well as damages incurred or to be incurred by each of the other Texas Sub-Class Members.

### TWENTY-NINTH CAUSE OF ACTION
#### NEGLIGENCE
#### (On Behalf of the Texas Sub-Class)

478. The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

479. Porsche negligently designed the plastic coolant lines in all Porsche Cayennes sold in the United States.

480. Porsche owed Plaintiffs Stuewe and Wust and the other Texas Sub-Class Members the duty to design and manufacture the Cayenne in such a way as to ensure that it would not leak

coolant and would not require substantial repair costs or cause damages to other parts of the vehicle unreasonably early in its usable life.

481. Discovery will reveal additional information from Porsche regarding the design and manufacturing process to support the conclusion that use of plastic in the Cayenne's coolant lines constitutes negligence and/or negligent design.

482. As a direct and proximate result of Defendants' negligence, Plaintiffs Stuewe and Wust and the other Texas Sub-Class Members have sustained damages.

### THIRTIETH CAUSE OF ACTION
### DECEPTIVE TRADE PRACTICES
#### (On Behalf of the Texas Sub-Class)

483. The foregoing Paragraphs 1-242 of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

484. The Porsche Cayennes are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattels that were purchased or leased for use.

485. Each Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

486. Plaintiffs Stuewe and Wust and the other Texas Sub-Class members are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired Porsche Cayennes by purchase or lease.

487. At all relevant times, Defendants have engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing the Cayennes in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

488. The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, et seq. Specifically, as described above, Porsche misrepresented that its services are of a particular standard, quality, or grade. In addition, and as set forth previously, Porsche misrepresented that that Porsche Cayenne Vehicles have characteristics, uses,

and/or benefits that they do not have.  Furthermore, Porsche failed to disclose information concerning Porsche Cayenne vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

489.    Plaintiffs Stuewe and Wust and the other Texas Sub-Class members relied to their detriment on those false, misleading, or deceptive acts or practices.

490.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiffs Stuewe and Wust and the other Texas Sub-Class members.

491.    Defendants' intentional concealment of and failure to disclose the defective nature of the plastic coolant tubes installed in Porsche Cayenne Vehicles to Plaintiffs Stuewe and Wust and the other Texas Sub-Class members constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs Stuewe and Wust and the other Texas Sub-Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs Stuewe and Wust and the other Texas Sub-Class members.

492.    Defendants are also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendants breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiffs Stuewe and Wust and the other Texas Sub-Class members.

493.    Defendants' violations of the DTPA were made in connection with the purchase or lease of Porsche Cayenne Vehicles by Plaintiffs Stuewe and Wust and the other Texas Sub-Class members.

494.    Plaintiffs Stuewe and Wust and the other Texas Sub-Class members relied on Defendants to disclose material information it knew about, such as the defective nature of the

plastic coolant tubes, and not induce them into transactions which they would not have entered had Defendants disclosed that information.

495.     All procedural prerequisites, including notice, have been met.

496.     Plaintiffs Stuewe and Wust and the other Texas Sub-Class members should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of the plastic coolant tubes in their Porsche Cayenne Vehicles.

**THIRTY-FIRST CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of the Texas Sub-Class)**

497.     The foregoing Paragraphs of the Master Consolidated Amended Complaint are expressly incorporated as if fully re-written and re-alleged herein.

498.     Plaintiffs Stuewe and Wust and the other Texas Sub-Class members conferred benefits on Defendants when they purchased Porsche Cayenne Vehicles with defective plastic coolant tubes.

499.     Plaintiffs Stuewe and Wust and the other Texas Sub-Class members also conferred benefits on Defendants when they paid for Defendants' update kit with aluminum coolant pipes and/or paid parts and labor costs to Defendants or their agents to replace the defective plastic coolant tubes with non-defective coolant pipes and/or to repair other parts of the Porsche Cayenne Vehicles damaged as a result of the defective plastic coolant tubes.

500.     Under the circumstances, it would be contrary to equity and good conscience to permit Defendants to retain the entirety of the benefits conferred on it given that Defendants have, at all relevant times, known and should have known that the plastic coolant pipes installed in Porsche Cayennes are defective but intentionally concealed and failed to disclose that material information to Plaintiffs Stuewe and Wust and the other Texas Sub-Class members in order to induce them to purchase or lease Porsche Cayennes, and then forced them to purchase its expensive update kit that contains aluminum coolant pipes that do not prematurely degrade, crack, and fail.

501.    Plaintiffs Stuewe and Wust and the other Texas Sub-Class members relied to their detriment on Defendants to disclose material information, such as the defective nature of the plastic coolant tubes installed in Porsche Cayennes, to them.

502.    It would therefore be unjust and inequitable for Defendants to retain the benefits they received and not provide restitution to Plaintiffs Stuewe and Wust and the other Texas Sub-Class members.

503.    The amount of restitution to which Plaintiffs Stuewe and Wust and the other Texas Sub-Class members are entitled should be measured by the extent of Defendants' unjust enrichment.

504.    Plaintiffs Stuewe and Wust, individually and on behalf of the Class, demand judgment against Defendants for restitution, reasonable attorneys' fees, and costs.

### L.    WASHINGTON

### THIRTY-SECOND CAUSE OF ACTION
### VIOLATIONS OF WASHINGTON'S CONSUMER PROTECTION ACT
### RCW 19.86 et seq.
### (On Behalf of the Washington Sub-Class)

505.    The foregoing Paragraphs 1-242 of the Consolidated Complaint are expressly incorporated as if fully re-written and re-alleged herein.

506.    Defendants engaged in unfair and/or deceptive acts or practices by, *inter alia*:

(a) failing to disclose that their Cayennes' were not of a particular standard, quality or grade;

(b) failing to disclose at and after the time of purchase, lease or repair known material defects or material non-conformity with respect to the coolant tubes;

(c) failing to disclose that the coolant tubes were destined to fail, were not in good working order, were defective, and/or were not fit for their intended purpose;

(d) failing to give warning regarding the defects with the Cayennes' coolant tubes to customers who purchased or leased the trucks;

(e) actively concealing the defect from customers despite having knowledge that the coolant tubes were defective;

    (f)   causing Plaintiff Daher and other members of the Washington Sub-Class to expend sums of money to repair or replace the coolant tubes and other affected parts.

507.    Defendants knew or should have known that their Cayennes and their coolant tubes were defectively designed and/or manufactured, would fail prematurely, were not suitable for their intended use and were not as warranted, promised or marketed by Defendants.

508.    Defendants' unfair and deceptive acts and practices repeatedly occurred in Defendants' trade and business and were capable of deceiving the purchasing public, and actually did deceive Plaintiff Daher and other members of the Washington Sub-Class.

509.    As a direct and proximate cause of Defendants' unfair and/or deceptive acts or practices, Plaintiff Daher and other members of the Washington Sub-Class have suffered and will continue to suffer actual damages, including, but not limited to:

    (a)   paying for repairs of the coolant tubes, replacement of the coolant tubes, repairs of the damage caused when the coolant tubes fail and loss of use of their vehicle during the time the repairs are being made;

    (b)   Suffering diminution of resale value of the Cayennes as a result of the defective parts.

510.    As a result of Defendants' unfair and deceptive practices, Plaintiff Daher and other members of the Washington Sub-Class are entitled to injunctive relief, restitution of funds paid to repair the Cayennes' defective coolant tubes and other damage caused by their malfunction; disgorgement of funds paid to Defendants to repair the Cayennes' defective coolant tubes and other damage cause by their malfunction, as well as compensatory and treble damages in an amount to be proven at trial.

511.    Plaintiff Daher and other members of the Washington Sub-Class are also entitled to attorneys' fees and costs pursuant to the Consumer Protection Act.  RCW 19.86.090.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, seek judgment against Defendant, and in favor of Plaintiffs, and to award the following relief:

1.     Certification of the proposed Class and State Sub-Classes;

2.     An order temporarily and permanently enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

3.     Injunctive relief in the form of a recall or free replacement program;

4.     Costs, restitution, damages and disgorgement in an amount to be determined at trial;

5.     An award of costs and attorneys' fees; and

6.     Such other or further relief as may be appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial for all claims so triable.

Respectfully submitted,

Dated: August 25, 2011

**COTCHETT, PITRE & McCARTHY, LLP**

**ISAAC, BRANT, LEDMAN & TEETOR, LLP**

**RODDY, KLEIN & RYAN**

**WOLF HALDENSTEIN ADLER  FREEMAN & HERZ LLC**

By:     /s/ Mark H. Troutman                                     _
Mark H. Troutman
*Interim Co-Lead Counsel for Plaintiffs*

[Additional Counsel for Plaintiffs listed in Appendix]

## COUNSEL FOR PLAINTIFFS

### LEAD COUNSEL

Niall P. McCarthy
Justin T. Berger
Eric J. Buescher
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone:     (650) 697-6000
Facsimile:     (650) 692-3606
nmccarthy@cpmlegal.com
jberger@cpmlegal.com
ebuescher@cpmlegal.com

Mark Landes
Gregory M. Travalio
Mark H. Troutman
Christopher J. Wagner
Joanne S. Peters
**ISAAC, BRANT, LEDMAN &**
**TEETOR, LLP**
250 East Broad Street, 9th Floor
Columbus, OH 43215
Telephone:     (614) 221-2121
Facsimile:     (614) 365-9516
marklandes@isaacbrant.com
gmt@isaacbrant.com
marktroutman@isaacbrant.com
cjw@isaacbrant.com
jsp@isaacbrant.com

Gary Klein
Shennan A. Kavanaugh
**RODDY, KLEIN & RYAN**
727 Atlantic Avenue, 2nd Floor
Boston, MA 02111
Telephone:     (617) 357-5500
Facsimile:     (617) 357-5030
klein@roddykleinryan.com
kavanagh@roddykleinryan.com

Adam J. Levitt
John E. Tangren
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone:     (312)984-0000
Facsimile:     (312) 984-0001
levitt@whafh.com
tangren@whafh.com

### EXECUTIVE COMMITTEE

Fletcher Trammel
Justin Jenson
**BAILEY PERRIN BAILEY**
440 Louisiana Street, Suite 2100
Houston, Texas 77002
Telephone:     (713) 425-7100
Facsimile:     (713) 425-7101
ftrammel@bpblaw.com
jjenson@bpblaw.com

Joseph C. Kohn
William E. Hoese
Craig W. Hillwig
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Telephone:     (215) 238-1700
Facsimile:     (215) 238-1968
jkohn@kohnswift.com
whoese@kohnswift.com
chillwig@kohnswift.com

Daniel Schlanger
**SCHLANGER & SCHLANGER, LLP**
1025 Westchester Avenue, Suite 108
White Plains, New York 10604
Telephone:     (914) 946-1981
Facsimile:     (914) 946-2930
daniel@schlangerlegal.com

## OTHER COUNSEL

Jeffrey M. James
**BANKER LOPEZ GASSLER P.A.**
501 East Kennedy Boulevard, Suite 1500
Tampa, Florida 33602
Telephone:    (813) 221-1500
Facsimile:    (813) 222-3066
jjames@bakerlopez.com

James M. Evangelista
David J. Worley
**EVANGELISTA & ASSOCIATES, LLC**
One Glenlake Parkway, Suite 700
Atlanta, GA 30328
Telephone:    (404) 478-7195
Facsimile:    (404) 478-7139
jme@eafirm.com
djw@eafirm.com

Craig M. Patrick
**PATRICK LAW FIRM P.C.**
3333 Lee Parkway, Suite 600
Dallas, Texas 75219
Telephone:    (214) 665-9510
Facsimile:    (214) 665-9511
craigpatrick@att.net

Christopher J. McGinn
**LAW OFFICE OF CHRISTOPHER J.
    MCGINN**
75 Raritan Ave., Suite 220
Highland Park, New Jersey 08904
Telephone:    (732) 937-9400
Facsimile:    (800) 931-2408
cjmcginn@njconsumerprotection.com

W. Craft Hughes
**HUGHES ELLZEY, LLP**
2700 Post Oak Boulevard, Suite 1120
Houston, Texas 77056
Telephone:    (888) 350-3931
Facsimile:    (888) 995-3335
craft@crafthugheslaw.com

Steven Marchbanks
**PREMIER LEGAL CENTER, A.P.C.**
610 Newport Beach Center, Suite 1200
Newport Beach, California 92660
Telephone:    (877) 441-4441
Facsimile:    (619) 330-1955
steve@premierlegalcenter.com