# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF OHIO

### EASTERN DIVISION

| | |
|---|---|
| IN RE: PORSCHE CARS NORTH AMERICA, INC., PLASTIC COOLANT TUBES PRODUCTS LIABILITY LITIGATION | MDL Docket No. 2233<br><br>Judge Gregory L. Frost<br><br>Magistrate Judge Preston-Deavers |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PORSCHE CARS NORTH AMERICA, INC.'S MOTION TO DISMISS THE MASTER CONSOLIDATED AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Plaintiffs individually and on behalf of themselves and the other members of a nationwide class and various statewide subclasses submit the following Memorandum of Law in Opposition to Defendant Porsche Cars North America, Inc.'s Motion to Dismiss the Master Consolidated Amended Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 62). In compliance with S.D. Ohio Civ. R. 7.2(a)(3), Plaintiffs provide the following Table of Contents and Summary for the Court because their Memorandum exceeds 20 pages.

/s/ Mark H. Troutman
Mark Landes (0027227)
Gregory M. Travalio (0000855)
Mark H. Troutman (0076390)
Joanne S. Peters (0063274)
**ISAAC, BRANT, LEDMAN**
**& TEETOR, LLP**
250 East Broad Street, Suite 900
Columbus, Ohio 43215
Tel.: 614-221-2121 / Fax: 614-365-9516
ml@isaacbrant.com
gmt@isaacbrant.com
mht@isaacbrant.com
jsp@isaacbrant.com

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND AND SUMMARY OF THE COMPLAINT .......................1

  A. General allegations......................................................................................1

    1. Plaintiffs' claims................................................................................1

    2. Porsche and the Cayenne ...................................................................4

    3. The defective Cayenne cooling system ..............................................5

    4. Porsche knew of the defective coolant tubes......................................8

    5. Porsche has made material misrepresentations regarding the Cayenne cooling system ...............................................................9

  B. The named Plaintiffs' experiences .............................................................12

    1. Bob Conrad.......................................................................................12

    2. David Graas ......................................................................................12

    3. Sean Krider.......................................................................................14

    4. Sy Duc Tran......................................................................................15

    5. Kevin Starkey...................................................................................15

    6. Joseph Dudley...................................................................................16

    7. Anthony Gardner...............................................................................16

    8. Scott Florez ......................................................................................16

    9. Jamie Hoffecker ...............................................................................17

    10. Daniel Delgado ................................................................................17

    11. Richard Gorospe ..............................................................................18

    12. Nicholas Spagnoletti........................................................................19

    13. Gregory Cadman ..............................................................................20

    14. Ecliff Jackman.................................................................................20

    15. Dane McIntosh .................................................................................21

i

**16. Lance Bredefeld** ...................................................................................**22**

**17. Deana Crawford** ...................................................................................**23**

**18. Randall Stuewe** ...................................................................................**24**

**19. Sven Wust** ...........................................................................................**24**

**20. Ghassan Daher** ..................................................................................**24**

**III. LEGAL STANDARD** ...............................................................................**26**

**IV. ARGUMENT** ............................................................................................**28**

**A.  Magnuson-Moss Act claims** ................................................................**28**

**1.  Plaintiffs pled cognizable Magnuson-Moss claims for breach of implied warranties** ................................................................................**28**

**a.  Porsche made written warranties to Plaintiffs** ................................**28**

Porsche made promises and warranties to Plaintiffs.  Mot. to Dismiss, Exs. A-D (2003-2006 warranties); Compl. ¶¶ 218.  PCNA stated it would repair or replace all defective parts, and that it would make those repairs free of charge for parts and labor.  Warranty p. 7.  This sufficiently identifies the written warranty at issue.

**b.  Plaintiffs can bring claims for breach of implied warranties after the expiration of the express warranty term because the duration limitation is unconscionable and is not prominently displayed on the face of the warranty** ..............................................................................................**29**

Any limitation of implied warranties must be consionable and set forth in clear unmistakable language prominently displayed on the face of the warranty.  15 U.S.C. § 2308(b) (LexisNexis 2012).  PCNA's duration was neither consionable nor prominently displayed on the face of the warranty.  Warranty p. 5.  At the pleading stage, allegations that PCNA knew of the defect and yet attempted to disclaim it are sufficient to show unconscionability.  *Carlson v. General Motors Corp.*, 883 F. 2d 287, 293 (4th Cir. 1989); *In re Samsung DLP Television Class Action Litig.,* No. 07-2141, 2009 U.S. Dist. LEXIS 100065, at *14-16 (D.N.J. Oct. 27, 2009); *Payne v. Fujifilm U.S.A., Inc.,* No. 07-385, 2007 U.S. Dist. LEXIS 94765, at *14-16 (D.N.J. Dec. 28, 2007); *Henderson v. Volvo Cars of N. Am., LLC,* Civ. No. 09-4146, 2010 U.S. Dist. LEXIS 73624, at *26-27 (D.N.J. Jul. 21, 2010).  Determination of the factual question of whether Plaintiffs can prove their unconscionability claims is better made after the completion of discovery.

*Szymczak v. Nissan North America, Inc.,* No. 10 cv 7493, 2011 U.S. Dist. LEXIS 153011, at *27-29 (S.D.N.Y. Dec. 16, 2011).

**c. Contrary to Porsche's assertion, the Plaintiffs who brought implied warranty claims in states requiring privity have valid Magnuson-Moss claims**.....................................................................................................**32**

Plaintiffs alleging implied warranty claims have privity where required. Plaintiffs in California, Florida, Illinois, New York, and Washington have not alleged implied warranty claims. Plaintiffs in Colorado, Michigan, New Jersey, and Texas have valid claims for implied warranties, and PCNA has not argued that privity does not exist for these latter states – therefore their Magnuson-Moss claims have been adequately alleged. Plaintiffs in Ohio and Georgia also have valid claims under Magnuson-Moss as set forth in detail in those sections. See §§ IV.E.1. and IV.I.1.

**2. Plaintiffs have standing to bring their Magnuson Moss claims**............................**32**

Plaintiffs have standing to bring Magnuson-Moss Act claims. The requirement to notify the defendant and provide an opportunity to cure the defect is eliminated where the manufacturer knows of the defect at the time of the sale. *Radford v. Daimler Chrysler Corp.*, 168 F.Supp.2d 751, 754 (N.D. Ohio 2001); *Alberti v. Gen. Motors Corps.*, 600 F. Supp. 1026, 1028 n 2 (D.D.C. 1985); *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W. 3d 145, 184-85 (Mo. Ct. App. 2006). PCNA had knowledge of the defect and has taken no steps to cure the defect at any stage, including since this litigation was filed, despite the safety risks presented by the coolant tubes.

**B. New Jersey** ..........................................................................................................**33**

**1. New Jersey Plaintiffs have adequately alleged claims under New Jersey's Consumer Fraud Act** ...............................................................................**33**

Because New Jersey Plaintiffs have made specific allegations of PCNA's knowledge of a dangerous defects and that PCNA's failure to inform consumers of the defect caused Plaintiffs to pay more for the Cayenne vehicles than if they would have known and/or caused Plaintiffs to incur the cost of replacing the defective parts, Plaintiffs have successfully stated a claim for relief under New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 to 13 (CFA).

**a. Because the defect poses a safety hazard and PCNA knew of this defect, New Jersey Plaintiffs are able to maintain a claim under the CFA after the applicable warranty period has expired**......................................................**34**

New Jersey courts recognize that where a manufacturer had knowledge of a defect but concealed it from consumers the warranty defense is not available. *Maniscalco*, 627 F. Supp.2d 494, *Henderson v. Volvo*, No. 09-cv-4146, 2010 U.S. Dist. LEXIS 73624 at *26-27 (D.N.J. July 21, 2010); *Dewey v. Volkswagen AG,* 558 F. Supp. 2d 505, 526 (D.N.J. 2008). This is particularly true when the defect, as here, poses safety concerns. *Perkins v. Daimler Chrysler* Corp., 383 N.J. Super. 99, 111-112( App. Div. 2006); *In re Philips/Magnavox TV Litig.*, 2010 U.S. Dist. LEXIS 91343 *19 (D.N.J. Sept. 1, 2010).

**i. Knowledge of the defect and intent to conceal that knowledge……...34**

A consumer claim alleging knowledge of a product defect and the intent to conceal the defect adequately alleges unlawful conduct under the CFA. *Maniscalco*, 627 F. Supp.2d at 502. Defendants have cited a line of cases that merely hold that a post-warranty CFA claim cannot be maintained when the only claim is that a part failed after the expiration of a warranty. Where, as here, Plaintiffs have made detailed allegations of PCNA's knowledge, misrepresentations, and intentional omissions regarding the defective cooling pipes, they have adequately alleged a claim under the CFA. *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146, 2010 U.S. Dist. LEXIS 73624 at *15-21 (D.N.J. July 21, 2010)

**ii. Safety concerns............................................................................37**

The decisions in *Henderson*, and *In re Philips/Magnavox*, make clear that the warranty defense asserted by Defendants has no application where, as here, consumers point to a manufacturer's knowledge of a dangerous defect and a failure to comply with obligations to inform consumers.

**b. New Jersey Plaintiffs have pled their CFA claim with the particularity required under FRCP 9(b)................................................................40**

Although CFA claims are subject to the heightened pleading standards of FRCP Rule 9(b), "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Accordingly, in the context of fraudulent omissions, plaintiffs who allege that a car manufacturer "did not fully and truthfully disclose to its customers the true nature of […]inherent design defects, which are not readily discoverable until years later, often after the warranty has expired," successfully state a claim for consumer fraud under the CFA. *Dewey v. Volkswagen AG*, 558 F.Supp. 2d 505, 526 (D.N.J. 2008). Because New Jersey Plaintiffs have provided detailed allegations that PCNA knew of the defects in the Cayenne vehicles as evidenced

by PCNA's specific recommendations for replacement of the defective parts in internal technical service bulletins and NHTSA complaints, in addition to other customer complaints on the internet, and failed to notify consumers of the defect. Plaintiffs have met the pleading standards for a CFA claim under Rule 9(b). *Luppino v. Mercedes-Benz*, 2010 U.S. Dist. LEXIS 83584, 21-24 (D.N.J. 2010); *Henderson*, 2010 U.S. Dist. LEXIS 73624 at *3-4.

**2. New Jersey Plaintiffs may maintain claims for breach of implied warranty despite the expiration of the manufacturer's warranty limiting liability under UCC § 2-314**............................................................................................**44**

Although the applicable warranty period has expired, New Jersey courts have approved consumer claims under implied warranty related to auto parts that have failed after the expiration of limited warranties, where the time limit is unconscionable or unreasonable. *Henderson*, 2010 U.S. Dist. LEXIS 73624 at *25-27; *In re Ford Motor Co.,* 2008 U.S. Dist. LEXIS 73690, *59 (D.N.J. 2008). *Ford Motor Co. Ignition Switch Litig.*, 1999 U.S. Dist. LEXIS, *12 (D.N.J. 1999). Although case law is split on the issue, the better view has found that for purposes of a 12(b)(6) motion, allegations of knowing omission of a defect that will not present itself until after the expiration of the limited warranty adequately state a claim for breach of implied warranty under New Jersey law. See *In re Samsung DLP TV Class Action Litig*, 2009 U.S. Dist. LEXIS 100065, *15 (D.N.J. 2009); *Payne v. Fujifilm U.S.A.*, 2007 U.S. Dist. LEXIS 94765, *14-16 (D.N.J. 2007) Because New Jersey Plaintiffs have alleged that the warranty limitations were unreasonable and unconscionable due to PCNA's knowledge of the defective cooling pipes, Plaintiffs have adequately stated a claim for breach of implied warranty, and are entitled to a "reasonable opportunity to present evidence as … to aid the court in making the determination as to whether the time limitations of the warranties are unconscionable, which can only occur after an opportunity for discovery." *Payne*, 2007 U.S. Dist. LEXIS 94765 at *16.

**C. California** ........................................................................................................**46**

**1. The claims against PCNA satisfy Rule 9(b)**............................................................**46**

California Plaintiffs have pled their claims under the CLRA and UCL with particularity. Rule 9(b) requires identification of the circumstances constituting fraud in order to allow the defendant to prepare an adequate answer. *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1232 (C.D. Cal. 2011); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). When the necessary information to identify the circumstances of the fraud is under the exclusive control of the defendant, California Plaintiffs are given leeway in alleging the specific conduct constituting fraud. See *United States v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)); see also *Deutsch v.*

*Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987); 2-9 James Wm. Moore et al., Moore's Federal Practice - Civil § 9.03. California Plaintiffs have met this standard. *Falk v. GMC*, 496 F. Supp. 2d 1088, 1098-1099 (N.D. Cal. 2007). California Plaintiffs described with particularity the roles of PCNA and PAG. Compl. ¶ 33. Additionally, California Plaintiffs have described the defect, the concealment of that defect and the impact of the non-disclosure with particularity. This is sufficient.

**2. Plaintiffs state a claim under the Consumer Legal Remedies Act .........................49**

California Plaintiffs allege two violations of the CLRA – representing that goods have characteristics which they do not and representing that goods are of a certain quality when they are not. Cal. Civ. Code §§ 1770(a)(5),(7). California Plaintiffs' allegations regarding the use of defective plastic coolant tubes, combined with the numerous specific representations about the quality of the coolant system are sufficient to state a claim under the CLRA. The legislature intended the CLRA to be broadly construed in order to prevent and remedy all types of misrepresentations and to protect consumers from unfair and deceptive business practices. See Cal. Civil Code § 1760; accord *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 869-879 (2002).

**a. Bardin and Daugherty do not bar all post-warranty CLRA claims ...............50**

Claims of post-warranty defects are allowed under the CLRA where the misrepresentations and omissions could likely mislead the public and where the defendant had a duty to disclose the defect. See *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006); see also *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (Cal. Ct. App. 2006). Under the *Bardin* and *Daugherty* line of cases, California Plaintiffs state a claim for violation of the CLRA because PCNA's representations were misleading and because PCNA had a duty to disclose the defect. *Falk*, 496 F. Supp. 2d at 1094.

**b. PCNA made representations that were misleading ..........................................51**

PCNA made a series of representations regarding the Cayennes' coolant system which were misleading to the public. See Compl. ¶¶ 39, 40, 42, 43, 49, 62(a)-(g). PCNA represented that the plastic coolant tubes were designed for long service life, optimal cooling, and prolonged heavy-duty operation. See *Bardin*, 144 Cal. App. 4th at 836. These representations were not "puffery," but instead were specific actionable statements about particular components of the Cayennes. *In re Sony Grand WEGA KDF-E A 10/A20 Series Rear Projection HDTV Television Litig.*, Nos. 08-CV-2276-IEG (WVG), 09-CV-0620-IEG (WVG), 09-CV-0736 (WVG), 09-CV-2703-IEG (WVG), 2010 U.S. Dist. LEXIS 126077, at *21 (S.D. Cal. Nov. 30, 2010). PCNA knew of the defective coolant tubes but did not disclose that defect to consumers. *Bardin*, 144 Cal. App. 4th at 836. At the

pleadings stage, PCNA's attempts to assert that its statements are factually accurate, are opinions, and are mere semantics are inappropriate. *Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 384 (6th Cir. 2009). This Court must accept as true all factual allegations in the Complaint, including the allegations that consumers were in fact misled by the statements and omissions.

**c. PCNA had a duty to disclose the coolant tube defect** ........................................54

A duty to disclose arises when a defendant has exclusive knowledge of a material defect, where the defendant actively conceals a material fact, when the defendant makes partial representations but suppresses material facts, or where the defect constitutes a safety risk to the public. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (Cal. Ct. App. 1997); accord *Falk*, 496 F. Supp. 2d at 1095. Each of these circumstances is present in this action. The Complaint alleges that the defect is material, the defendant actively concealed material facts, partial representations were made about the coolant system while material facts were concealed, and that the defective coolant tubes represent a safety risk to consumers and the public.

**i. The defect is material** ................................................................................55

The Complaint alleges that had the omitted information been disclosed Plaintiffs would have behaved differently. Compl. ¶¶ 65, 72, 76, 78, 88, 90, 97, 100, 103. The Complaint also alleges that a reasonable consumer would have wanted to know the coolant tubes were guaranteed to fail. Id. These allegations are supported by California law and precedent. *Falk*, 496 F. Supp. 2d at 1095 (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (Cal. 1993)); *Chamberlan v. Ford Motor Co.* (314 F. Supp. 2d 953 (N.D. Cal. 2004). At this stage, it is sufficient to allege that a reasonable consumer would believe the defects are material. This gives rise to a duty to disclose.

**ii. Defendant had exclusive knowledge of the coolant tube defect** ...........58

PCNA was aware of the defective coolant tubes, was aware of the failure rate of those tubes and was in possession of aggregate data from mechanics that repaired broken coolant tubes. See *Judkins*, 52 Cal. App. 4th at 337; *Falk*, 496 F. Supp. 2d at 1096-1097. Porsche issued a technical bulletin in 2008 detailing the leak and the fix for it. Compl. ¶ 58, Ex. A. California Plaintiffs had no opportunity or ability to discover the defect through a visual inspection or to know that the defect was systematic and widespread. Compl. ¶ 35. This gives rise to a duty to disclose.

**iii. Defendant actively concealed the defect from Plaintiffs** ......................59

PCNA's failure to notify customers of the defect or to issue a recall suggests that the defect was actively concealed.  See *Falk*, 496 F. Supp. 2d at 1097; see also *Judkins* 52 Cal. App. 4th at 337.  PCNA was aware of the systematic failure of the coolant tubes but did not attempt to inform or notify Cayenne owners.  This gives rise to a duty to disclose.

### iv.  The Complaint alleges a significant safety risk to the public resulting from the defect ..........................................................................60

As a matter of fact and law, the defect presents an unreasonable safety risk to consumers and the public.  See e.g., Compl. ¶ 70, 71.  When coolant tubes crack drivers may be forced to stop on the side of the highway and engines can be disabled.  See, e.g., Comp. ¶¶ 74, 78, 85, 107, 108, 119, 149, 150, 192, 229, 230.  The act of pulling over on the side of the highway is unsafe as a matter of law.  See *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (Cal. 2011).  Additionally, numerous individuals felt unsafe operating their vehicle as a result of the defective coolant tubes, both before and after those tubes failed.  See e.g., Comp. ¶¶ 80-82, 91, 107, 117, 193, 220-223.  The safety risks implicated by the defective coolant tubes required PCNA to disclose the defect.  See discussion of *Falk* and *Chamberlan* at §§ III.C.2.c.i-iii., supra.

## 3.  Plaintiffs state a valid claim under all three prongs of the UCL ............................62

The UCL prohibits business acts or practices which are unlawful, unfair, or fraudulent.  See *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir. 2009).  The statute is written in the disjunctive and is to be broadly and expansively construed.  *South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 877 (Cal. Ct. App. 1999).  California Plaintiffs have adequately alleged that PCNA's misrepresentations and omissions constitute unlawful, unfair and fraudulent conduct, stating a claim under each prong of the UCL.

### a.  PCNA's conduct was unlawful ..........................................................................63

The UCL borrows violations of other laws and makes them independently actionable.  Virtually any law, federal state or local can serve as a predicate for a UCL claim, including violation of other states' laws.  *Stevens v. Superior Court,* 75 Cal. App. 4th 594, 602 (Cal. Ct. App. 1999); *Process Specialties, Inc., v. Sematech, Inc.,* No. Civ. S-00-414 (FCD) (PAN), 2001 U.S. Dist. LEXIS 26261, at *45-48.  Because California Plaintiffs adequately allege violations of the laws of each state, violation of Magnusson Moss and violation of the CLRA, they have stated a claim under the unlawful prong of the UCL.  *Process Specialties*, at *45; see also *AICCO, Inc. v. Ins. Co. of North Am.*, 90 Cal. App. 4th 579, 587 (Cal. Ct. App. 2001).

**b. PCNA's actions constitute "unfair" conduct under the UCL.........................64**

The unfairness prong is intentionally broad in order to allow courts maximum flexibility to prohibit schemes to defraud. *South Bay Chevrolet v. v. GM Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999). There are two different tests for determining whether conduct is unfair under the UCL. Violations of this prong of can be based either on conduct which is tethered to a legislatively declared policy or by balancing the utility and benefit of the conduct against the gravity of the potential harm caused. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999). California Plaintiffs meet both of these standards. There are legislatively declared policies in California and nationally against misleading consumers and against manufacturing, marketing, and selling unsafe vehicles. Additionally, the risk of harm to consumers is significant – posing a safety risk and causing significant monetary damage in the form of expensive repairs. *Falk*, 496 F. Supp. 2d at 1098. There is no justification or utility in using plastic tubes except for providing cost savings to PCNA. This constitutes unfair conduct under the UCL.

**c. Fraudulent ..............................................................................66**

The analysis of the fraudulent prong under the UCL is similar to analysis under the CLRA. In order to state a claim, plaintiffs must allege that members of the public are likely to be deceived. *Bardin*, 136 Cal. App. 4th at 1261; *Falk*, 496 F. Supp. 2d at 1098. California Plaintiffs do this with their allegations. PCNA had a duty to disclose the material facts and breached that duty. This constitutes fraudulent conduct under the UCL.

**4. Unjust enrichment ............................................................................66**

In California, unjust enrichment can either be construed as a claim for restitution or an independent cause of action. *Keilholtz v. Superior Fireplace Co.*, No. C-08-00836 (CW), 2009 U.S. Dist. LEXIS 30732, *10-11 (N.D. Cal. March 30, 2009) (citing *Lectrodryer v. Seoul Bank*, 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000)); *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662-63 (Cal. Ct. App. 1992). Determination of whether the claim is superfluous to the restitution claim under the UCL is inappropriate at this stage of the litigation. *Keilholtz*, 2009 U.S. Dist. LEXIS 30732 at *11. California Plaintiffs have alleged that PCNA received benefits in the form of increased purchase prices and repair proceeds and unjustly retained those benefits at the expense of California Plaintiffs. That is sufficient to state a claim for unjust enrichment.

**D. New York ....................................................................................................67**

**1. New York Plaintiffs' properly stated claims under Gen. Bus. Law § 349 ...........67**

New York Plaintiffs have specifically alleged that PCNA made both material misrepresentations and omissions regarding a dangerous defect in the Cayenne's coolant system, that those material misrepresentations and omissions were consumer-oriented, and that they suffered damages as a direct result, insofar as the defect caused Plaintiffs to pay more for their vehicles than if they otherwise would have, and/or they were forced to incur the cost of replacing the defective parts. Plaintiffs have therefore successfully stated a claim for relief under New York's Gen. Bus. Law § 349.

a. **New York Plaintiffs claims under § 349 are properly tied to the geographic territory of New York state** ...............................................................**68**

All of the claims asserted by New York Plaintiffs meet the standard set forth in *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d, 324-25 (N.Y. 2002), with respect to § 349's geographic nexus test because they assert that PCNA committed deceptive acts in New York State; that New York Plaintiffs Gregory Cadman and Ecliff Jackman suffered injury in New York as a result of PCNA's deceptions inasmuch as their Cayennes' coolant tubes failed inside New York State; and that all three New York Plaintiffs were then forced to purchase the "OEM update kit" from PCNA while in New York State.

b. **New York Plaintiffs properly allege deceptive acts or omissions under § 349** ....................................................................................................**70**

As with plaintiffs in both *Szymczak v. Nissan N. Am., Inc.*, No. 10-7493, 2011 U.S. Dist. LEXIS 153011 (S.D.N.Y. Dec. 16, 2011), and *Doll v. Ford Motor Co.*, No. 10-01505, 2011 U.S. Dist. LEXIS 95427 (D. Md. Aug. 25, 2011), New York Plaintiffs have adequately pled a cause of action under § 349 insofar as they contend that PCNA misled consumers by withholding material information regarding the defective coolant system on the Cayenne, and, as a result, that they were harmed by high repair and replacement costs and by having paid a premium for their automobiles.

c. **PCNA's statements regarding the robustness, superiority, and durability of the Cayenne's coolant system are not mere puffery** ....................................**77**

The veracity of PCNA's marketing statements regarding the Cayenne's coolant system are demonstrably true or false, and thus are not properly classified as puffery. *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F.Supp.2d 401, 405 (E.D.N.Y. 2004). Moreover, New York plaintiffs' allegations also assert that PCNA failed to adequately and timely disclose material information regarding the true performance of the Cayenne's cooling system, i.e., that PCNA violated § 349 by omission. See e.g. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 27 (N.Y. 1995).

x

**2. New York Plaintiffs' have properly stated claims for unjust enrichment............79**

**a. PCNA's warranty does not foreclose New York Plaintiffs' unjust enrichment claims ................................................................................79**

While it is true that New York courts generally refuse to allow an unjust enrichment claim where a valid contract governs the subject matter over which plaintiff complains, PCNA's 4-year/50,000-mile warranty is not valid and enforceable with respect to the Cayenne's coolant pipes because PCNA concealed material facts about the performance of said pipes while simultaneously representing that the Cayenne's cooling system was designed for optimal cooling, durability, and performance.  See e.g. *Szymczak v. Nissan N. Am., Inc.*, No. 10-7493, 2011 U.S. Dist. LEXIS 153011 (S.D.N.Y. Dec. 16, 2011), and *Martin v. Ford Motor Co.*, 765 F.Supp.2d 673, 683 n.6 (E.D. Pa. 2011).

**b. Plaintiffs unjust enrichment claims are viable because Plaintiffs conferred a benefit upon PCNA both directly and indirectly..........................81**

New York Plaintiffs bestowed value to PCNA directly when they were forced to purchase repair parts for their Cayennes' cooling systems from PCNA.  No other parts manufacturer produces the necessary parts, and upon the inevitable failure of the Cayennes' coolant tubes, New York Plaintiffs were left with no other option than to return to PCNA to purchase repair parts.  Furthermore, New York Plaintiffs bestowed value to PCNA indirectly when they paid a premium for their Cayennes, even where they were down-stream purchasers.  See, e.g. *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 41 (N.Y. App. Div. 1st Dep't 2004).

**c. Allowing PCNA to keep the ill-gotten gains of its deceptive acts would be inequitable, unjust, and unreasonable ................................................83**

PCNA's argument that it would not be inequitable for PCNA to retain benefits unjustly conferred is meritless.  New York Plaintiffs' allegations—of knowing material misstatements, omissions, and intentional concealment regarding a severe, safety-related defect, the inflated prices paid by Plaintiffs' for their vehicles, as well PCNA's practice of charging Plaintiffs for replacement of the defective plastic coolant tubes—comport with well-established notions of what constitutes unjust enrichment.  See e.g. *Szymczak v. Nissan N. Am., Inc.*, No. 10-7493, 2011 U.S. Dist. LEXIS 153011 (S.D.N.Y. Dec. 16, 2011).

**E. Georgia ................................................................................................84**

**1. Plaintiff Gardner pleads a valid cause of action for breach of implied warranty................................................................................................84**

**a. PCNA's express warranty creates privity for purposes of Plaintiff Gardner's breach of implied warranty claim** ....................................................**84**

PCNA's express warranty establishes the requisite privity for Plaintiff Gardner's breach of implied warranty claim under Georgia law. "[P]rivity exists between a buyer and manufacturer if the manufacturer extends an express warranty to the buyer." *Terrill v. Electrolux Home Prods., Inc.*, 753 F. Supp. 2d 1272, 1288 (S.D. Ga. 2010); see also *Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402, 406 (Ga. Ct. App. 1977); *Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321, 323 (Ga. Ct. App. 1974).

**b. PCNA's disclaimer of implied warranties was not conspicuous and, therefore, was ineffective** .....................................................................................**85**

Section 2-316 of the UCC, adopted by Georgia, requires that any disclaimer of implied warranties be "conspicuous." PCNA's attempt to limit its implied warranty to the extent of its express warranty fails because it is not conspicuous: it is buried in small type in the middle of the page with no heading that would make its meaning clear. Similar disclaimers have been held not to be conspicuous by Georgia courts. See *Bailey v. Tucker Equip. Sales, Inc.*, 510 S.E.2d 904, 906 (Ga. Ct. App. 1999); *Leland Industries, Inc. v. Suntek Industries, Inc.*, 362 S.E.2d 441 (Ga. Ct. App. 1987).

**2. Plaintiff Gardner has plead a valid claim for injunctive relief under the UDTPA**.....................................................................................................................**86**

Plaintiff Gardner has properly requested injunctive relief for his UDTPA claim. Compl. ¶ 331. The Complaint plainly establishes the deceptive conduct at issue, Compl. ¶¶ 42-43, 62, and alleges the future harm that would result absent an injunction, Compl. ¶¶ 69-70.

**3. Plaintiff Gardner pleads a valid cause of action for unjust enrichment**...............**87**

Plaintiff Gardner pleads his implied warranty claim and unjust enrichment claims in the alternative, Compl. at 54, which is expressly permitted by the rules, Fed. R. Civ. P. 8(d)(2)-(3). See also *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1363 (N.D. Ga. 2007); *McBride v. Life Ins. Co. of Va.*, 190 F. Supp. 2d 1366, 1378-1379 (M.D. Ga. 2002). Plaintiff Gardner has also provided substantial support for his allegations of unjust enrichment. Compl. ¶¶ 334-335.

**F. Illinois**...............................................................................................................................**89**

**1. Plaintiff Florez has satisfied the pleading standards for his CFA claim** ..............**89**

**a.  Heightened pleading standards do not apply to the allegations of Plaintiff Florez's CFA claim that are not based on fraud**................................................**89**

The CFA prohibits not just fraudulent conduct, but also any act or practice that is "unfair."  See 815 Ill. Comp. Stat. 505/2.  Rule 9(b) heightened pleading standards apply only when "alleging fraud or mistake," and not to Plaintiff Florez's allegations that Defendants' conduct was unfair under the CFA.  *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 670 (7th Cir. 2008); *Russian Media Group LLC v. Cable Am., Inc.*, No. 06 C 3578, 2008 U.S. Dist. LEXIS 9788, at *9 (N.D. Ill. 2008).  Furthermore, Rule 9(b) applies heightened pleading standards only to the "circumstances constituting fraud." Fed. R. Civ. P. 9(b); see also *United States ex rel. Raymer v. Univ. of Chi. Hosps.*, No. 03 C 806, 2006 U.S. Dist. LEXIS 7943, at *10 (N.D. Ill. Feb. 28, 2006).  Plaintiff Florez has sufficiently pled these elements of his CFA claim under Rule 8.

**b.  Plaintiff Florez's fraud-based allegations are pled with particularity consistent with Rule 9(b)** ..................................................................................**90**

As PCNA acknowledges, Florez has alleged that PCNA violated the CFA by making affirmative 'misrepresentations and omissions regarding the safety and reliability of its vehicles,'" (Mot. to Dismiss at 57 (quoting Compl. ¶ 346)) and that Florez also alleges fraud by concealment (Mot. to Dismiss at 58).  Florez has supported these allegations with the requisite particularity under Rule 9(b), particularly since matters such as which Defendant knew about the defect and each Defendant acquired such knowledge "may be alleged generally" even under Rule 9(b)'s heightened pleading standards.  Illinois courts have held that similar allegations are sufficient to state a CFA claim.  See *Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill. App. 3d 1139, 759 N.E.2d 66 (Ill. App. Ct. 2001); *Federico v. Freedomroad RV, Inc.*, No. 09-CV-2027, 2010 U.S. Dist. LEXIS 121107 (N.D. Ill. Nov. 10, 2010); *IWOI, LLC v. Monaco Coach Corp.*, 581 F. Supp. 2d 994 (N.D. Ill. 2008).

**c.  The circumstances of Plaintiff Florez's purchase establish a nexus to Illinois**......................................................................................................................**92**

Plaintiff Florez is prepared to establish that all of the circumstances pertaining to his transaction occurred in Illinois; this is sufficient to establish a nexus to Illinois for purposes of the CFA claim.

**d.  PCNA's Alleged Misrepresentations and Omissions Violate the CFA** ..........**93**

PCNA's misrepresentations are not just "puffery," but are actionable statements pertaining directly to the cooling system's ability to perform its intended function. See *Cold Spring Granite Co. v. Information Mgmt. Assocs., Inc.*, No. 99 C 6690, 1999 U.S. Dist. LEXIS 19730, at *9 (N.D. Ill. Dec. 16, 1999). The complaint also establishes a well-pled claim based on Defendants' concealment of the coolant tube defect, by comparison with *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1997). The CFA does not require Plaintiff Florez to identify the person or entity that sold him the vehicle, and Plaintiff Florez's allegation of Defendants' intent that he and the other class members rely on their omission of the defect may be made "generally" pursuant to Rule 9(b).

e. **Plaintiff Florez adequately pleads causation**.......................................................95

As PCNA concedes, Plaintiff Florez has alleged that "[he] and the other Illinois Subclass members did rely on such misrepresentations or were deceived." Mot. to Dismiss 60 (quoting Compl. ¶ 348). This allegation is sufficient to establish proximate causation.

2. **Plaintiff Florez's unjust enrichment claim should be sustained**.............................96

Each of PCNA's four arguments should be rejected, and Plaintiff Florez's unjust enrichment claim should be sustained. First, Plaintiff Florez's unjust enrichment claim is independent of his CFA claim, but even if it were not, the unjust enrichment claim should not be dismissed for the same reasons. Second, Plaintiff Florez pleads that Defendants owed him a duty, see, e.g., Compl. ¶ 37, even though there is no requirement to do so for an unjust enrichment claim. Third, Plaintiff Florez is permitted to plead unjust enrichment in the alternative to any allegations concerning PCNA's written warranty. Fourth, Plaintiff Florez has adequately pleaded that Defendants' retention of the benefit was inequitable

G. **Florida** ...................................................................................................................98

1. **Plaintiff states a claim under Florida's Deceptive and Unfair Trade Practices Act**.....................................................................................................................98

Plaintiff adequately alleges that PCNA engaged in deceptive or unfair conduct that caused him actual damages, which is all that is required to state an FDUTPA claim. See *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006); *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000).

a. **Plaintiff Dudley's allegations satisfy the applicable pleading standard** .........99

FDUTPA claims are governed by Rule 8(a)'s liberal pleading standard. See *State of Florida, Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*,

420 F. Supp. 2d 1288, 1310-1311 (S.D. Fla. 2005).  Even if Rule 9(a) did apply, Plaintiff's fraud allegations pertaining to his FDUTPA claim satisfy Rule 9(b)'s particularity requirement because they adequately set forth the statements or omissions that were made, when and where they were made, the content of the statements or omissions and the manner in which they mislead the plaintiff, and what the defendant obtained as a consequence of the fraud, especially in light of the fact that information about the alleged fraud is peculiarly within Defendant's knowledge or control.  See *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield, Inc*., 755 F. Supp. 1040, 1052 (D. Ga. 1990).

**b. Plaintiff Dudley sets forth facts establishing causation** ...................................102

PCNA's argument is without merit because Plaintiff adequately alleges that he would not have purchased his Cayenne, or would have insisted on paying less for it, if PCNA had not concealed the coolant pipe defect.  Plaintiff has also sufficiently pled that he would not have had to replace the plastic coolant tubes at substantial expense if PCNA had not concealed the defect.

**c. Plaintiff Dudley adequately allege that he suffered "actual damages" under the FDUTPA** ...........................................................................103

**i.  The FDUTPA permits recovery for damages incurred outside of the warranty period** ..............................................................103

There is no merit to PCNA's contention that its manufacturer's warranty somehow governs Plaintiffs' FDUTPA claim, nor is there any merit to PCNA's assertion that Plaintiff has only suffered subjective feelings of disappointment.  Even if PCNA's manufacturer's warranty did somehow govern the FDUTPA claim—which it does not—"any attempt to limit one's liability for deceptive or unfair trade practices would be contrary to public policy."  *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984).  Thus, in Heller, the court held that the "recovery of actual damages pursuant to [the FDUTPA] violation . . . is not limited by the limitation of damages provision in the contract."  Id.

**ii.  Plaintiff Dudley incurred actual damages when he overpaid for his Cayenne and when he replaced its coolant tubes** ................................104

The class action certification decisions PCNA cites do not support the broad proposition that Plaintiff cannot recover under the FDUTPA because the defect has not yet cased the coolant pipes to rupture.  See *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1139-40 (Fla. Dist. Ct. App. 2008); *Butland*,

xv

951 So. 2d at 873.  Plaintiff may recover the amount he overpaid for his Cayenne and the amount he paid to replace its coolant tubes as a result of PCNA's concealment of the coolant pipe defect because they constitute actual loss.

iii. Plaintiff Dudley's replacement costs are recoverable under the FDUTPA ....................................................................................................104

The costs Plaintiff incurred to replace the defective coolant pipes are recoverable under the FDUTPA because they are not consequential damages. Plaintiff was remedying the defect, not repairing damage sustained as a consequence of the defect.  PCNA does not even attempt to argue that Plaintiff's overpayment damages are not recoverable under the "diminished value" measure of damages articulated in *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 1984).

2. Plaintiff Dudley's negligence claims are not barred by the Economic Loss Rule....................................................................................................................105

The economic loss rule does not apply to Plaintiff's negligence claim because Plaintiff alleges that PCNA's intentional and/or knowing omissions caused him to enter into a purchase agreement for a Porsche Cayenne.  "The test to determine if the economic loss rule applies is to ask if the fraud alleged is in an act of performance or in a term of the bargain."  *D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. Dist. Ct. App. 2003).  The fraud alleged relates to a term of the bargain, and the economic loss rule does not apply, if "the fraud occurs in connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction."  *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. Dist. Ct. App. 2000).

3. Plaintiff Dudley's unjust enrichment claim is valid................................................106

a. PCNA's manufacturer's warranty does not preclude Plaintiff Dudley's unjust enrichment claim....................................................................................106

When there is a contract between the parties that is the subject of the action that an unjust enrichment claim is not viable under Florida law.  *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. Dist. Ct. App. 2009).  That is not the situation here because Plaintiff's purchase agreement, not the manufacturer's warranty, is the subject of this claim, and PCNA was not a party to the purchase agreement.

b. Plaintiff's unjust enrichment claim is adequately alleged..............................107

i. Plaintiff Dudley conferred benefits on PCNA ......................................107

PCNA cites no case law in support of the unfounded proposition that a plaintiff must directly confer a benefit on the defendant. Plaintiff has adequately pled that he conferred a benefit on PCNA misses the mark because Plaintiff alleges that as a result of PCNA's concealment of the coolant pipe defect from Plaintiff and other consumers, PCNA received benefits – increased purchase prices and repair proceeds – and unjustly retained those benefits at Plaintiff's expense, which remains true regardless of whether Plaintiff purchased his Porsche Cayenne new or used.

### ii. It would be inequitable for PCNA to retain the benefits Plaintiff Dudley conferred..................................................................................108

It would be inequitable for PCNA to retain profits from increased purchase prices and repair proceeds that resulted from its concealment of the coolant pipe defect. That circumstance is further supported by the fact that after learning of the coolant pipe defect PCNA had concealed, Plaintiff replaced the plastic coolant tubes on his Porsche Cayenne with aluminum ones to avoid leaking or failed tubes and the potential catastrophic failure of other major engine/transmission components.

## H. Texas..................................................................................................................108

### 1. Plaintiffs' breach of implied warranty claim is viable ..........................................108

The Texas Plaintiffs have sufficiently alleged a claim against PCNA for breach of implied warranty in tort. PCNA's attempt to disclaim or limit implied warranties is unconscionable, and, further, it is neither prominently displayed on the fact of the warranty as required by Magnuson-Moss nor conspicuous as required by the UCC as incorporated in Texas. See Tex. Bus. & Com. Code §§ 1.201, 2.302, 2.316; see also *Fieldtech Avionics & Instruments, Inc. v. Component Control.com, Inc.*, 262 S.W.3d 813, 829 (Tex. App. 2008); *Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex. App. 1990).

### 2. Texas Plaintiffs' negligence claim is not barred by the Economic Loss Doctrine.................................................................................................................111

The absence of contractual privity between Plaintiffs and PCNA under Texas law precludes application of the economic loss doctrine. *Jackson v. Dole Fresh Fruit Co.*, 921 F. Supp. 454, 459 (S.D. Tex. 1996); *Juarez v. Chevron USA, Inc.*, 911 F. Supp. 257, 260 (S.D. Tex. 1995); *Lyda Constructors, Inc. v. Butler Mfg. Co.*, 103 S.W.3d 632, 639 (Tex App.2003).

### 3. Texas Plaintiffs state a claim under Texas' Deceptive Trade Practices Act ......112

#### a. Texas Plaintiffs' allegations satisfy the applicable pleading standard..........112

Even if Rule 9(b) applies to Plaintiffs' DTPA claim, Plaintiffs have adequately alleged the time, place, and contents of the non-disclosures PCNA made and what PCNA obtained thereby, especially given that facts relating to the alleged fraud are peculiarly in Defendants' possession.  See *United States ex rel. Russell v. EPIC Healthcare Management Group*, 193 F.3d 304, 308 (5th Cir. 1999). Plaintiffs adequately allege that they relied to their detriment on PCNA's material nondisclosures that violated the DTPA.  See Tex. Bus. & Com. Code § 17.46(b)(24) (Vernon 2006).  Plaintiffs also sufficiently allege that they relied on PCNA's marketing claims discussed above, which constitute additional DTPA violations.  See Tex. Bus. & Com. Code §§ 1746(b)(5), (7); 1750(a)(1).

i.  **Texas Plaintiffs set forth facts showing that PCNA's deceptive conduct was "in connection with a consumer transaction" ...............115**

Plaintiffs have sufficiently pled that PCNA's marketing efforts were intended to be, and were, incorporated into the marketing of the Porsche Cayenne. Under *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644 (Tex. 1996), such allegations show that PCNA's deceptive or unfair conduct occurred "in connection with a consumer transaction."  See *Church & Dwight Co. v. Huey*, 961 S.W.2d 560, 565 (Tex. App. 1997).

ii.  **Texas Plaintiffs have set forth a plausible claim that PCNA's conduct was "unconscionable" under the DTPA .................................116**

PCNA engaged in unconscionable conduct in violation of the DTPA because its concealment of the coolant pipe defect took "advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus. & Com. Code § 17.45(5) (Vernon 2006).

b.  **Texas Plaintiffs state a DTPA claim based on breach of implied warranty.117**

PCNA's argument that Plaintiffs have not stated a DTPA claim based on breach of implied warranty is based solely on PCNA's arguments regarding Plaintiffs' breach of implied warranty claim.  Both arguments fail for the same reasons.

**4. Texas Plaintiffs' unjust enrichment claim is viable .................................................117**

a.  **Unjust enrichment is an independent cause of action .....................................117**

Texas courts have recognized unjust enrichment as an independent cause of action.  See, e.g., *Pepsi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App. 2007) (citing *HECI Exploration Co. v. Steel*, 982 S.W.2d 881, 891 (Tex. 1998)); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000).  As such, Plaintiffs' unjust enrichment claim should not be dismissed on that ground.

**b. Texas Plaintiffs' unjust enrichment claim is pled sufficiently** ........................118

Plaintiffs have stated an unjust enrichment claim under Texas law, which provides that unjust enrichment occurs when the defendant wrongfully secures a benefit or passively receives a benefit which would be unconscionable to retain. *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App. 2009).

**i. Texas Plaintiffs' adequately allege PCNA was unjustly enriched through fraud, duress, or undue advantage, and that they conferred benefits on PCNA** .................................................................119

Plaintiffs have sufficiently pled that as a result of PCNA's concealment of the coolant pipe defect from Plaintiffs and other consumers, PCNA received benefits – increased purchase prices and repair proceeds – and unjustly retained those benefits.

**ii. Texas Plaintiffs' unjust enrichment claims are quasi-contractual in nature** ..................................................................................119

Because PCNA was not a party to Plaintiffs' purchase agreements, it is not entitled to dismissal of Plaintiffs' unjust enrichment claim on the ground that the claim is not quasi-contractual. See *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App. 2008). Furthermore, the Texas Supreme Court has recognized an exception to the rule that an express contract between the parties precludes an unjust enrichment claim where, as here, overpayment was made under the contract. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998).

**iii. Texas Plaintiffs' adequately allege that it would be inequitable for PCNA to retain the benefits they conferred** .........................................120

It would be inequitable for PCNA to retain the benefits Plaintiffs and the class conferred on it as a result of PCNA's concealment of a known safety risk that would have been material to Plaintiffs' purchase decisions.

**I. Ohio** ....................................................................................................................120

**1. The Ohio Plaintiffs have stated a claim for breach of implied warranty under the Magnuson-Moss Act** ...........................................................................120

The Ohio Plaintiffs have sufficiently alleged a claim against PCNA for breach of implied warranty in tort, so they have also stated a cause of action for breach of implied warranty under Magnuson-Moss. To allege implied warranty of merchantability under the UCC,

the Ohio Plaintiffs would need to show privity.  *Curl v. Volkswagen of Am.*, 114 Ohio St.3d 266, ¶ 28 (Ohio 2007).  The lack of privity would have likewise defeated the Ohio Plaintiffs' claims under Magnuson-Moss.  Id.  On the other hand, the Ohio Plaintiffs brought a claim for breach of implied warranty in tort, which provides Ohio consumers an action beyond the UCC's privity requirements.  See *White v. DePuy*, 129 Ohio App.3d 472, 479 (Ohio Ct. App. 1998).  Thus, the Court should deny PCNA's Motion to Dismiss on the Ohio Plaintiffs' Magnuson-Moss claims

**2.  The Ohio Plaintiffs alleged proper claims for a breach of implied warranty in tort based upon reasonable consumers' expectations...........................................123**

All manufacturers must make products of merchantable quality and fit for the purposes for which they are designed.  *McDonald v. Ford Motor Co.*, 42 Ohio St.2d 8, 10 (Ohio 1975); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 322 (Ohio 1977).  In Ohio, an implied warranty in tort claim is available for a consumer to bring a claim against a supplier not in privity with a buyer when the harm from the breach is solely economic.  *LaPuma v. Collinwood Concrete*, 75 Ohio St. 3d 64, 67 (Ohio 1996); *Hartman v. Mercedes-Benz, U.S.A., L.L.C.*, No. 1:08-cv-03034, 2010 U.S. Dist. LEXIS 22536, at *20 (N.D. Ohio 2010).  The Court should judge an implied warranty in tort claim from the standpoint of the reasonable consumer, considering all circumstances surrounding the transaction.  *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 249 (Ohio 1958).

**3.  PCNA lacks authority to suggest that the Ohio Plaintiffs' implied warranty in tort claims contradict consumers' reasonable expectations ...........................124**

This Court should find that the Ohio Plaintiffs' implied warranty in tort claims are consistent with reasonable consumers' expectations.  PCNA offers no authority for its contention that no reasonable consumer would expect that a product would not fail after the expiration of its written warranty.  Both cases it relies upon may be distinguished because neither case deals with implied warranty in tort or allegations regarding safety issues.  See *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008).  Taken to its logical conclusion, PCNA's argument would necessarily imply that if a supplier offers no express warranty, it gives no implied warranties either.  Based upon this authority, the Court should allow this claim to proceed because what constitutes a "reasonable consumer" is best decided by the trier of fact.

**a.  Recovery for breach of implied warranty in tort is not constrained by the UCC statute of limitations..............................................................................127**

The Court should allow the Ohio Plaintiffs' implied warranty in tort claims to proceed because the UCC statute of limitations does not apply.  PCNA's entire argument is incorrectly based upon the premise that a consumer who purchases a

new vehicle from a dealer would be required to sue the manufacturer for breach of UCC implied warranties, subject to the UCC statute of limitations, and would lack any cause of action under implied warranty in tort.  But the *Curl* case holds precisely the opposite of what PCNA suggests.  *Curl*, 114 Ohio St.3d at ¶ 32.  As a result, the Court has no reason to believe that its allowing the Ohio Plaintiffs' claims to proceed raises second-hand purchasers' rights above the rights of first-hand purchasers.

**4. The Ohio Plaintiffs have adequately pleaded notice and the elements of their CSPA claims, if the Court chooses to proceed with these issues on the pleadings ..................................................................................................129**

**a. Plaintiffs adequately pleaded notice for purposes of making class action claims under the CSPA....................................................................................129**

The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' CSPA claims at the pleading stage of the lawsuit.  To bring class action claims under R.C. 1345.09(B), a plaintiff must show that a defendant had prior notice that conduct substantially similar to its alleged conduct is deceptive or unconscionable through either: a) a rule adopted by the Ohio Attorney General; or, b) an Ohio state Court holding.  See *Marrone v. Philip Morris USA, Inc.*, 110 Ohio St.3d 5, ¶ 9 (Ohio 2006).  PCNA's notice argument appropriately belongs at the class certification state, not the pleading stage.  *In re: Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F.Supp.2d 942, 948-49 (N.D. Ohio 2009); *Lilly v. Hewlett-Packard Co.*, No. 1:05-cv-465, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006).  At the pleading stage, Plaintiff must merely plead that notice sufficient for class certification exists, which it has done.

**b. Adequate notice exists to support the class action notification requirements under Ohio Rev. Code Ann. § 1345.09(B).............................130**

Even if notice must be provided at this stage, the Ohio Plaintiffs have provided sufficient case law under from the OPIF to substantiate their class action claims.  The Ohio Supreme Court has held that cases providing notice must have only "substantial similarity," which means "a similarity not in every detail, but in essential circumstances and conditions."  *Marrone*, 110 Ohio St.3d at ¶ 24; see also *Kline v. Mortg. Elec. Sec. Sys.*, No. 3:08-cv-408, 2010 U.S. Dist. LEXIS 143391, *27-28 (S.D. Ohio Dec. 30, 2010).  *Maronne* relied on crucial differences between the automobile and cigarette industries irrelevant to the Plaintiffs' allegations.  Thus, the Court should find substantial similarity in the Ohio Plaintiffs' cases offered from the OPIF.

i.  **Sufficient authority exists in the OPIF to support the class action claims under the CSPA for breach of implied warranty....................130**

The Ohio Plaintiffs sufficiently pleaded allegations supported by case law from the OPIF to support their class action claims under the CSPA.  Initially, PCNA misstated what notice would be necessary in the OPIF because it disregarded allegations made by the Ohio Plaintiffs regarding PCNA's misrepresentations and safety issues regarding the defect.  Once properly considering the Plaintiffs' allegations in their entirety, two cases support that failure to honor an implied warranty constitutes a deceptive sales practice.  *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006); *Mason v. Mercedes-Benz USA, LLC*, No. 85031, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005).  As such, the Ohio Plaintiffs' class action claims under the CSPA should proceed at least on this basis.

ii.  **The Ohio Plaintiffs have sufficient authority so that their class action claims under the CSPA related to deceptive representations should be allowed to proceed .................................................................132**

The OPIF provides sufficient authority to support the Ohio Plaintiffs' claims that PCNA's misrepresentations and/or omissions constitute CSPA violations.  Two of these cases directly acknowledged the CSPA's prohibition on misrepresentations concerning the automobile industry.  *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025).  In *Bellinger*, the Court observed that a failure to disclose material information can constitute an actionable claim under the CSPA.  *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077).  As a result of these and other cases, the Ohio Plaintiffs have provided sufficient notice for these claims to proceed as a class action.

iii. **The consent judgments offered by the Ohio Plaintiffs qualify as notice from the PIF for purposes of  Ohio Rev. Code Ann. § 1345.09(B))..............................................................................................134**

Consent judgments that contain detailed findings of fact and conclusions of law satisfy the notice requirements under R.C. 1345.09(C).  It is anticipated that PCNA will suggest that the state court decisions coming from consent judgments fail to satisfy the notice requirement under the CSPA.  See *Kline v. Mortg. Elec. Sec. Sys.*, 2010 U.S. Dist. LEXIS 143391 at *24-25.  This overstates Kline and disregards that the examples cited by the Ohio Plaintiffs

are replete with detail.  In addition, one Ohio state case specifically dealt with this issue and declined to find that consent judgments are either quasi judgments or second-class judgments.  *Musuraca v. Kurlemann Bldrs., Inc.*, Case No. 05 CV 652446, *3 (Warren Cty. Ct. Comm. Pl. Oct. 25, 2007).

c.  **The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' individual CSPA claims because deceptive and unconscionable conduct was properly pleaded in the Complaint**............................................................**135**

When considering all of the Ohio Plaintiffs' allegations in the CAC, they sufficiently pleaded acts or practices embodying the deceptive or unconscionable acts prohibited by the CSPA.  *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29 (Ohio 1990).  Under R.C. 1345.02(A)(2), representations that the subject of a consumer transaction is of a particular grade, quality, or character is specifically prohibited by the CSPA.  *Hoffer v. Cooper Wiring Devices, Inc.,* No. 1:06cv763, 2007 U.S. Dist. LEXIS 42871, at *9-10 (N.D. Ohio June 13, 2007); *Keel v. Toledo Harley-Davidson/Buell*, 184 Ohio App. 3d 348 (Ohio Ct. App. Sept. 30, 2009).  Instead of describing the Court's actual holding in *Noble*, PCNA adds additional words that suggest consideration of issues that the Court never reached.  See *Noble v. Porsche Cars North America, Inc.*, 694 F.Supp.2d 333 (D.N.J. 2010).  On the other hand, the Central District of California has recently denied PCNA's precise argument based upon the same allegations as those made by the Ohio Plaintiffs.  In the *Keegan* case, that Court held that "[a] manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue."  *Keegan v. Am. Honda Motor Co.*, No. 10-09508, 2012 U.S. Dist. LEXIS 3007, at *23 (C.D. Cal. Jan. 6, 2012) (emphasis added).  As such, PCNA's Motion should be denied.

5.  **The Court should deny PCNA's request for the Court to dismiss Plaintiffs' DTPA claims because they have standing for their adequately pleaded claims** ..........................................................................................................................**139**

a.  **Plaintiffs have standing to bring claims under the DTPA** .............................**139**

i.  **The plain language of the DTPA supports standing**..........................**139**

The Court should follow the plain language of the DTPA to find that consumers have standing to bring such a claim.  Under R.C. 4165.01(D), "[p]erson means an individual."  The DTPA uses the term "person" many times throughout the statute, most importantly in R.C. 4165.03(A)(1) and (2).  The only case on point from the Southern District of Ohio, after applying Ohio Supreme Court precedent on statutory interpretation, properly construed the term "person" to include an individual consumer.  See *Bower v. IBM*, 495

F.Supp.2d 837, 843-44 (S.D. Ohio 2004).  As such, the Court should find that the Ohio Plaintiffs are "persons" who may bring claims under the DTPA.

**ii. The logic behind applicable case law supports consumer standing under the DTPA** ....................................................................................**140**

The Court should follow the plain language approach to the DTPA because such an approach lacks the soundness of Bower.  Both cases from the Northern District of Ohio may be distinguished because they never relied upon statutory interpretation or a full analysis of the issue.  *Chamberlain v. The Am. Tobacco Co.*, No. 1-96 CV 2005, 1999 U.S. Dist. LEXIS 22636 (N.D. Ohio Nov. 19, 1999); *Glassner v. R.J. Reynolds Tobacco Co.*, No. 5:99 CV 0796, 1999 U.S. Dist. LEXIS 22637 (N.D. Ohio June 29, 1999).  When evaluating whether consumers have DTPA standing under state case law, PCNA cited to only one case besides a common pleas case.  *Dawson v. Blockbuster*, No. 86451, 2006 Ohio App. LEXIS 1138, *11 (Ohio Ct. App. Mar. 16, 2006.  On the other hand, the Ohio Plaintiffs cited to at least five cases in which consumers have advanced DTPA claims.  For these reasons, the Court should allow the Ohio Plaintiffs' DTPA claims to proceed.

**b. Once standing is established, the Ohio Plaintiffs have adequately pleaded their claims under the DTPA** ..........................................................................**143**

As before, PCNA simply disregarded many of the Plaintiffs' allegations regarding PCNA's representations and safety issues.  Instead, PCNA focused on only two paragraphs in the CAC.  Under R.C. 4165.02(A)(7), the Plaintiffs claim that PCNA made representations that its Cayenne possessed characteristics or qualities that it never had.  Compl. ¶¶ 42-43, 62.  As such, the Court should allow the Plaintiffs' claims to proceed.

**c. The Ohio Plaintiffs provided numerous, specific representations upon which they based their DTPA claims, so the Court should not dismiss such claims as mere promotion and puffery** ....................................................**144**

As discussed previously, this Court should refuse PCNA's attempts to have the Lanham Act supplant the clear, plain language provided in the DTPA.  Even to the extent that the Lanham Act supplements the DTPA, the Ohio Plaintiffs' DTPA allegations do not constitute the kind of puffery present in the authority relied upon by PCNA.  *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 689 (6th Cir. 2003).  In Paragraph 62 of the CAC alone, the Plaintiffs alleged at least seven different ways that PCNA represented the kinds of qualities and characteristics that go beyond mere puffing or advertising.  The

Plaintiffs' allegations included very specific representations made by PCNA, so the Court should allow such allegations to proceed.

**6. The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' negligence claims because they are consumers rather than commercial entities** ................................................................................................................145

The Court should allow the Ohio Plaintiffs' negligence claims to proceed because such a claim may be alleged by a consumer not in privity with the manufacturer solely for economic loss caused by a defective product. *In re Whirlpool*, 684 F.Supp.2d at 950-51. The key distinction made in Whirlpool was whether a consumer or commercial buyer is involved, for which the Court found that the economic loss rule does not bar a consumer's negligence claim. Id. PCNA's reliance on cases such as *Chemtrol* is unfounded because they involve a commercial buyer, not a consumer. *Chemtrol Adhesives, Inc. v. Am. Manuf.'s Mut. Ins. Co.*, 42 Ohio St.3d 40, 42-43 (Ohio 1989). Thus, after reviewing the relevant case law on the issue, the Court should deny PCNA's Motion to Dismiss on the Ohio Plaintiffs' negligence claims.

**J. Michigan** ........................................................................................................**149**

**1. Consumer Protection Act** ........................................................................**150**

PCNA violated the Michigan Consumer Protection Act because the presence of the defective plastic coolant tubes in the Cayennes breached the implied warranty of merchantability, and PCNA committed unfair, unconscionable or deceptive acts by misrepresenting that the Cayennes were of a particular standard, quality or grade when they were not, and omitted a material fact about the defectiveness of the plastic coolant tubes, which could not have been reasonably known by consumers. MCL § 445.903(1); § 445.903(d), and (s). The Complaint provides sufficient facts to plausibly suggest PCNA intended to deceive consumers and individual reliance does not have to be plead or proven because a reasonable person would have relied on PCNA's misrepresentations. *Dix v. Am. Bankers Life Ass. Co.*, 429 Mich. 410, 415, 418 (1987); *Am. Ass'n of Retired Persons v. Nat'l Sur. Corp.*, 2001 WL 1530348, *9 (Mich. Cir. Ct. Oct. 23, 2001).

**2. Strict liability and negligence** ................................................................**152**

Because the sale and purchase of the Cayennes were not for commercial purposes, the economic loss rule is inapplicable and does not provide a basis to dismiss the strict liability and negligence claims. *Neibarger v. Univ. Coop., Inc.*, 439 Mich. 512, 520 (1992); *Blackward v. Simplex Prod. Div.*, No. 221066, 2001 Mich. App. LEXIS 1940, at *1-2, *8-9 (Mich. Ct. App. Oct. 19, 2001); see *Safeco Ins. Co. of Am. v. CPI Plastics Group, Ltd.*, 625 F. Supp. 2d 508, 520 (E.D. Mich. 2008). Further, if there is a lack of privity or safety concerns, then the economic loss rule does not apply. *Auto-Owners Ins.*

*Co. v. Chrysler Corp.*, 129 Mich. App. 38, 341 N.W.2d 223 (Mich. Ct. App. 1983)(privity), *Neibarger*, 439 Mich. at 519(safety); *State Farm Fire & Casualty Co. v. Conair Corp.*, No. 11-20237, 2011 U.S. Dist. LEXIS 68921, at *5 (E.D. Mich. 2011)(safety).

### 3. Breach of warranty ..................................................................................157

PCNA did not validly disclaim the implied warranty of merchantability under Michigan law because PCNA's attempted disclaimer was neither conspicuous nor conscionable. While the implied warranty of merchantability may be excluded or disclaimed in writing under MCL § 440.2316 if certain conditions are met, in this case the disclaimer was not conspicuous under MCL § 440.1201(10) because attention would not reasonably be called to it, and is not conscionable under MCL § 440.2302 because enforcing the disclaimer would deprive purchasers of a substantial benefit of their bargain.

## K. Colorado..........................................................................................................158

PCNA has not challenged the sufficiency of Plaintiff Starkey's assertion of claims pursuant to Colo. Rev. Stat. §6-1-105(1)(i) and (r) and, therefore, they should not be dismissed. With respect to the remaining claims ((e), (g) and (u) claims), only those claims dealing with representations by PCNA require proof of a "knowingly false representation." *Schmaltz v. SmithKline Beecham Corp.*, No. 08-cv-00119, 2009 U.S. Dist. LEXIS 47825 (D. Colo. 2009. Otherwise, Plaintiff Starkey need only allege the failure to disclose or omit material information with an intent to deceive. Id.; see also *Warner v. Ford Motor Company*, 06-cv-02443, 2008 U.S. Dist. LEXIS 82858 (D. Colo. 2008).

### 1. Starkey has pled with particularity that PCNA engaged in unfair and deceptive practices .........................................................................................160

Per Rule 9(b), Plaintiff Starkey need only allege the circumstances constituting fraud, including facts sufficient to apprise PCNA of the nature of the alleged deceptive trade practices. *Duran v. Clover Club Foods Company*, 616 F. Supp. 790 (D. Colo. 1985). Additionally, the Court and PCNA must judge the CAC in its entirety and not in a piecemeal fashion as PCNA has, which includes not allowing particularity requirements to pervert and allow a sophisticated "defrauder" to successfully conceal its fraud. *HealthOne of Denver, Inc. v. UnitedHealth Group Inc.*, 805 F. Supp.2d 1115, 1121 (D. Colo. 2011). Here, Plaintiff Starkey has pled the who, what, where, when and how sufficient to satisfy Rule 9(b). *Birdsall v. Roanoke Companies Group, Inc.*, no. 07-cv-001738, 2010 U.S. Dist. LEXIS 138105 (D. Colo. 2010); *Schmaltz*, 2009 U.S. Dist. LEXIS 47825; *DeWitt v. Liberty Mut. Ins. Co.*, No. 07-cv-002485, 2008 U.S. Dist. LEXIS 23522 (D. Colo. 2008).

### 2. Starkey has pled sufficiently that he suffered injuries in fact to a legally protected interest and that PCNA's challenged practices caused his injuries ... 165

Plaintiff Starkey has adequately alleged an injury in fact to a legally protected interest and causation. Injury to property and to property value is a legally protected interest under the CCPA. *Hall v. Walter*, 969 P.2d 224,236-237 (Colo. 1998). Further, *Hall* instructs that causation is more properly a fact question, but even so, causation is sufficiently established if PCNA's acts or failures to act produced the claimed injury or loss. *Id*. at 237. *Warner v. Ford Motor Co.*, No. 06-cv-24432008 U.S. Dist. LEXIS 82858 (D. Colo. 2008) is also instructive. It held that causation is established even if there was not a transaction between PCNA and Plaintiff Starkey as long as Starkey presents sufficient evidence that PCNA's deception caused his injuries.

### 3. Starkey's strict liability claim is not barred by the economic loss doctrine ....... 168

*Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975), which remains good law in Colorado, holds that damage to the product itself caused by a defect supports a strict liability claim under Colorado law. So, too, held the Colorado District Court in *Loughridge v. Goodyear Tire and Rubber Co.*, 192 F. Supp.2d 1175 (D. Col. 2002). Additionally, Plaintiff Starkey has also pled that the Cayenne was "unreasonably dangerous," including he has pled the facts that lead to this conclusion. At this stage, Plaintiff Starkey does not have to prove the Cayenne is "unreasonably dangerous;" rather, this is a seven factor analysis ripe for a later time. *Camacho v. Honda Motor Co.*, 741 P.2d 1240 (Colo. 1987).

### 4. Starkey's claim for breach of implied warranty of merchantability does not fail ................................................................................................................ 171

PCNA omitted a vital step in its analysis of this issue in its Motion to Dismiss. Significantly, per Colo. Rev. Stat. §§4-2-316 and 4-1-201, because PCNA's attempt to modify/limit the implied warranty of merchantability without making the modification/limit "conspicuous," there is no temporal limitation to this warranty. Colo. Rev. Stat. §§ 4-2-316 and 4-1-201. The attempted modification/limit is buried at page 5 of the warranty document and is in no way distinguished from the surrounding text. *Lutz v. Asgrow Seed Company*, 948 F.2d 638 (10th Cir. 1991). Also, the implied warrant modification/limit is unconscionable. Col. Rev. Stat. § 4-2-302.

## L. Washington ................................................................................................ 174

Plaintiff Daher adequately alleges violation of the Washington Consumer Protection Act. In order to demonstrate a violation, a consumer must show (1) an unfair or deceptive act or practice occurred; (2) the act or practice occurred in the conduct of trade or commerce; (3) the act or practice impacted the public interest; (4) the plaintiff suffered an injury to

business or property; and, (5) there is a causal link between the unfair or deceptive act or practice and the injury. *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., PLLC*, 168 Wash. 2d 421, 442 (Wash. 2010) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.. 2d 778, 784-93 (Wash. 1986)); see also *Zwicker v. GMC*, No. C07-0291-JCC, 2007 U.S. Dist. LEXIS 99310 (W.D. Wash. July 26, 2007). The WCPA is to be liberally construed in order to protect the public from inventive attempts to engage in unfair and deceptive business practices. *Lewis v. Chase Home Fin. LLC*, No. C11-0088 (JLR), 2011 U.S. Dist. LEXIS 142683 (W.D. Wash. Dec. 12, 2011) (citing *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 898 (Wash. 2009)); see also *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 81 (Wash. 2007). Porsche only challenges the first and last requirements. Plaintiff Daher has adequately alleged that PCNA's actions were deceptive and unfair and that they caused the injury suffered by Plaintiffs.

### 1.  PCNA's actions are deceptive and/or unfair as a matter of law...........................175

Deceptive and unfair practices when there is a misrepresentation or omission which is likely to mislead a reasonable consumer. *Panag*, 166 Wash. 2d at 47; see also *Sing v. John L. Scott, Inc.*, 134 Wash. 2d 24, 30 (Wash. 1997). Whether an act or practice is unfair is a question of law. *Panag*, 166 Wash. 2d at 47. A practice need not be intended to deceive in order to violate the WCPA. *Panag*, 166 Wash. 2d at 50 (citing *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th Cir. 1986)). Plaintiff Daher adequately alleges deceptive conduct.

#### a.  Plaintiff alleges facts sufficient to establish that PCNA's acts or practices had the capacity to deceive a substantial portion of the Washington public................................................................................................................176

PCNA's argument that there is nothing deceptive about withholding information that the plastic coolant tubes were destined to fail is meritless. *Zwicker*, at *15. The allegations in the Complaint of specific representations regarding the coolant system and the systematic failures of that system of which PCNA was aware is misleading as a matter of law. See *Panag* 166 Wash. 2d at 47. Plaintiff Daher has alleged PCNA's conduct actually misled them and that the misrepresentations and omissions had the capacity to mislead the public. See e.g., Compl. ¶¶ 219, 232, 508.

### 2.  Plaintiff Daher pleads sufficient facts to establish causation for the purposes of the WCPA claim ...............................................................................................177

Plaintiff Daher also adequately alleged causation under the WCPA. Causation under the WCPA is measured by a "but for" standard. *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 81 (Wash. 2007). Plaintiff Daher

alleged that "but for" PCNAs representations and omissions about the quality of its product, he would have paid less for the vehicle.  Compl. ¶¶ 219.  Additionally, Plaintiff Daher was forced to spend money repairing his vehicle and was placed in a dangerous situation when the pipes failed.  Compl. ¶¶ 219, 221-223, 228, 231.  Those damages would not have occurred but for the defect in the product.  This is sufficient to state a claim under the WCPA.

**V.  CONCLUSION** ....................................................................................................................**180**

## I.  INTRODUCTION

In its ongoing efforts to incrementalize this litigation and shift the focus away from Plaintiffs' straightforward theory and well-pleaded claims, Defendant Porsche Cars North America, Inc. (hereinafter, "PCNA" or "Porsche"), in the introduction to its Motion to Dismiss, dramatically asserts that Plaintiffs' claims "would upend state and federal warranty law and instantaneously alter the entire system of commerce in the United States." Mot. to Dismiss 2. PCNA's alarmist contention is demonstrably incorrect. Rather, Plaintiffs seek redress under well-established state and federal doctrines that protect consumers against deceptive, unfair, and unconscionable conduct and against significant and unsafe defects, such as Porsche's improper use of plastic coolant tubes in its Cayenne vehicles. Stated simply, Porsche put out a defective product and then covered it up. Accordingly, Plaintiffs request that the Court deny PCNA's Motion, in its entirety.

## II.  FACTUAL BACKGROUND AND SUMMARY OF THE COMPLAINT

### A.  General Allegations

#### 1.  Plaintiffs' claims

The Master Consolidated Amended Class Action Complaint (hereinafter, "Complaint" or "Compl.") is brought by the named Plaintiffs individually and on behalf of themselves and the other members of a nationwide class and various statewide subclasses (collectively, the "Class" unless otherwise identified herein), against Defendants Dr. Ing. h.c. F. Porsche AG ("Porsche AG" or "PAG") and PCNA (collectively, "Porsche" or "Defendants").

Plaintiffs seek damages and equitable relief on their own behalf and on behalf of all other current and former owners or lessees of Porsche Cayenne, Cayenne GTS, Cayenne S, Cayenne Turbo, or Cayenne Turbo S sport utility vehicles in the United States, from 2003, the year of

their first commercial sales and leases in the United States, through the 2010 model year (collectively, "Cayenne" when referenced in the singular and "Cayennes" when referenced in plural). Compl. ¶ 1.

Porsche manufactured its Cayenne models with plastic coolant tubes as part of the vehicle's cooling system. Compl. ¶ 2. Porsche installed the plastic coolant tubes knowing that the tubes would prematurely degrade and fracture. *Id.* ¶ 3. This failure causes coolant fluid to leak, often resulting in coolant seeping directly into the vehicle's starter, transmission seals, and other components causing possible engine damage and engine failure. *Id.* When Cayenne owners present their vehicles to Porsche for repair or replacement, they are forced to purchase an OEM "update kit" from Porsche that replaces the plastic coolant tubes not with other plastic tubes, but with aluminum coolant pipes for all Cayenne models. *Id.*

Porsche knows that its customers will be forced to replace the plastic coolant tubes with costly aluminum coolant pipes and thereby incur not just the cost of the replacement pipes, but also significant labor costs. Compl. ¶ 4. Despite this knowledge, Porsche made a corporate decision to conceal information about the defects in the original parts from its customers. *Id.* Indeed, Porsche has chosen not to warn consumers of the potential dangers of a sudden coolant spill directly into the starter and transmission seals. *Id.* Porsche continues to promote the Cayenne engine and its component parts as safe, reliable, and free from material defects. *Id.*

Porsche's uniform failure to disclose this defect constitutes both an actionable misrepresentation and an unfair, unlawful, fraudulent, and deceptive business practice in violation of the consumer protection statutes of several states, among other violations discussed below. Compl. ¶ 5.

Plaintiffs and the other Class members have been damaged by Defendants' concealment and non-disclosure of the Cayenne coolant tubes defect. They were misled into purchasing or leasing Cayennes of a quality and value different than they were promised, and/or have been forced to pay repair and replacement costs that they would not otherwise have paid. Compl. ¶ 6. These costs include not only replacement costs associated with the defective coolant tubes themselves, but also other parts damaged when doused with coolant from the leaky coolant tubes. *Id.*

Defendants had the knowledge and capacity to notify purchasers of the necessity of replacing the plastic tubes with metal pipes and Porsche's willingness to do so without charge. Compl. ¶ 7. Instead, Porsche chose to conceal the defect and let purchasers suffer repair costs or reduction in value of their vehicles. *Id.* Moreover, Plaintiffs and the other members of the Class were, and remain, subject to a substantial safety risk should the tubes fail while driving. *Id.* Cayenne owners and lessees are especially at risk from hot coolant leaking and disabling the vehicle, whether on crowded freeways or isolated stretches of rural highway. Compl. ¶ 70.[1]

The increased safety risk from leaking valley coolant tubes is an obvious consequence of Porsche's defective design and serves as an independent justification for the relief sought by Plaintiffs on their own behalf and for the other Class members. *Id.* The defect with the Cayenne's coolant tubes implicates serious safety concerns, as acute failure of the part can and sometimes does occur while travelling at high speeds on public roadways, causing risk of severe injury or even death to Cayenne drivers, passengers, and to others sharing the road with the

---

[1] Plaintiffs and the other Class members have expressly disclaimed any recovery in the Complaint for physical injury flowing from accidents caused by valley coolant pipe leaks or for damage to property other than damage caused by coolant leaking from the tubes.

3

Cayenne.  *Id*.  Particularly in light of these safety implications, Porsche had common law and statutory duties to disclose the defective plastic coolant tubes to Porsche owners and lessees.  *Id*.

As a result of Porsche's practices, Plaintiffs and the other Class members have been injured in fact, having lost money or property, and suffered both economic and non-economic damages.  Compl. ¶ 8.  Moreover, Porsche has committed unfair and/or deceptive acts and practices under the laws of California, Colorado, Florida, Georgia, Illinois, Michigan, New Jersey, New York, Ohio, Texas, and Washington, breached its warranty obligations in Colorado, Georgia, Michigan, New Jersey, Ohio, and Texas, unjustly enriched itself at the expense of consumers in California, Florida, Georgia, Illinois, New York, and Texas, and violated the Magnuson-Moss Federal Warranty Act, 15 U.S.C. § 2301, *et seq.  Id.*

Plaintiffs therefore bring this action on behalf of a proposed class of similarly-situated Cayenne owners and lessees, nationwide, and on behalf of Sub-Classes of similarly situated Cayenne owners and lessees in California, Colorado, Florida, Georgia, Illinois, Michigan, New Jersey, New York, Ohio, Texas, and Washington.  Compl. ¶ 9.

### 2.    Porsche and the Cayenne

PCNA is a Delaware corporation with its headquarters in Atlanta, Georgia.  Compl. ¶ 33. PCNA is a wholly-owned, indirect subsidiary of PAG.  *Id*.  PCNA is the importer of PAG's Porsche vehicles, including the Cayenne, for sale and lease in the United States, and is responsible for vehicles, parts, servicing, marketing, training, and warranting Porsche vehicles in the United States.  *Id*.  In addition to its national headquarters, Porsche's customer service center, where consumers may request clarification on vehicle concerns, is located in Atlanta, Georgia. *Id*.  At all times relevant to this suit, PCNA was the exclusive manufacturer, importer, and/or seller of Porsche Cayenne vehicles in the United States.  *Id*.

4

PAG is a German company registered at Stuttgart, Registriergericht HRB 5211, with its headquarters in Germany.  Compl. ¶ 34.  PAG was actively involved in designing, manufacturing, marketing, distributing, and selling Porsche Cayennes nationwide at all relevant times.  *Id.*  The cars were designed and manufactured in Germany before they were exported to and sold in the United States.  *Id.*[2]

Porsche sells and distributes automobiles, sold under the Porsche brand name, to approximately 202 dealerships located throughout the United States.  Compl. ¶ 38.  Porsche also provides parts, service, marketing, advertising, and training for its dealerships.  *Id.*

In 2003, Porsche first introduced the Cayenne sports utility model to the United States. Compl. ¶ 41.  Porsche has represented that "[t]he Cayenne had to satisfy not only Porsche's extreme high performance and quality standards, but it had to meet the utility and reliability expectations only Porsche engineers demand from an SUV."  Compl. ¶ 42.

### 3.    The defective Cayenne cooling system

The cooling system is an integral part of the engine.  Compl. ¶ 44.  The coolant tubes circulate coolant through the engine while simultaneously maintaining an even temperature throughout the motor.  *Id.*

Various pipes and seals make up the "water crossover" section of the cooling system, which carries coolant to and from the engine.  Compl. ¶ 45.  These pipes carry the coolant from the radiator into the engine block, thus cooling the engine.  *Id.*  Heated coolant is then carried out of the engine from the coolant pipes through the thermostat and back to the radiator where it is

---

[2]    PAG is presently contesting jurisdiction.  If it does not prevail on the jurisdictional issues, the Court has indicated it will then consider PAG's Motion to Dismiss, which Motion incorporated the same arguments PCNA has made in its Motion to Dismiss.  Therefore, the arguments herein are equally applicable to oppose PAG's Motion to Dismiss when it becomes ripe for the Court's consideration.

cooled and brought back into the engine via the coolant pipes. *Id.* The coolant traveling from the engine back to the radiator is extremely hot. *Id.*

Most high-end performance vehicles with powerful engines use aluminum pipes to transport the coolant. Compl. ¶ 46. Aluminum pipes have withstood the extreme temperatures of the cooling system. *Id.* Notwithstanding that fact – and further notwithstanding that Porsche only manufactures high-end performance vehicles – Porsche manufactured its Cayennes with plastic coolant tubes. *Id.*

In the Cayenne, valley coolant tubes run on top of the engine, underneath the intake manifold. Compl. ¶ 47. The valley coolant tubes are the three black tubes shown below:



*Id.* In the valley between the cylinder heads of the Cayennes, plastic coolant tubes transport coolant between the front and rear of the engine. Compl. ¶ 48.

As a result of continuous exposure to extreme heat, plastic coolant tubes crack and degrade. Compl. ¶ 52. Compounding this problem, as part of Porsche's design of its Cayenne engines, the plastic tubes are located between the intake manifold and the engine – a placement that guarantees constant increased exposure to heat. *Id.* Specifically, unlike most vehicles, the water crossover in the Cayenne is not located on top of the engine. *Id.* Rather, Porsche has

designed the water crossover such that the plastic coolant tubes sit directly on top of the vehicle's starter and engine block. *Id.*

This combination of (a) the tube placement relative to the engine and (b) Porsche's use of plastic composite material to carry the coolant virtually guarantees that the plastic coolant tubes Porsche used in its Cayennes will prematurely fracture and fail. Compl. ¶ 53. Porsche's plastic coolant tubes in its Cayenne are defective, as they regularly fail under normal use and within the cooling system's expected useful life, rendering the vehicle inoperable and causing engine damage. Compl. ¶ 54.

Moreover, coolant escaping from the defective plastic coolant tubes can come into contact with the car's starter and cause permanent damage. Compl. ¶ 55. Escaping coolant can also leak into Porsche's "Tiptronic" transmission torque converter area. *Id.* If this occurs, the Tiptronic transmission torque converter seals can be damaged, causing coolant to leak between the transmission and the torque converter. *Id.* Extensive coolant leakage to this area can result in complete transmission failure. *Id.*

To correct the defective plastic coolant tubes, the consumer is immediately faced with a costly labor charge. Compl. ¶ 56. A mechanic cannot access the coolant tubes and properly diagnose the problem without disassembling a significant portion of the engine. *Id.* Once the cracked tube is located, the Cayenne owner or lessee is then informed that Porsche does not offer replacement plastic coolant tubes. *Id.* Rather, the Cayenne owner or lessee must purchase from Porsche aluminum coolant pipes to replace the defective plastic coolant tubes. *Id.* The aluminum pipes can cost more than $1,000, which is significantly more costly than the originally installed plastic coolant tubes. *Id.*

Specifically, the consumer is forced to buy an "OEM update kit" that contains the aluminum coolant pipes. Compl. ¶ 57. Unlike the plastic coolant tubes, the new aluminum coolant pipes are designed to last the lifetime of the engine. *Id*. The labor to install the aluminum coolant pipes is on average 8-10 hours for experienced mechanics. *Id*. By way of example, the average hourly rate of Porsche-certified mechanics in California is between approximately $95 and $165 per hour, and between approximately $94 and $115 per hour in Ohio. *Id*.

### 4. Porsche knew of the defective coolant tubes

Notwithstanding its repeated efforts to distance itself from the truth about the plastic coolant tubes, ***Porsche has acknowledged*** the defective nature of plastic coolant tubes in its own Internal Technical Bulletin (Compl. Ex. A.) issued to its authorized Porsche mechanics. Compl. ¶ 58. That Bulletin states, in pertinent part:

- Coolant Pipe Leak

- Information: Plastic coolant pipe leaking.

- Note: Both coolant pipes (lower and heater) must be replaced at the same time with new coolant pipes made from aluminum.

Compl. ¶ 58, Ex. A. Not only is Porsche aware of the problem it has caused, but it has admitted that the plastic tubes are substandard equipment which require replacement with aluminum parts.

Porsche is aware of the failure rate of its plastic coolant tubes and has received many complaints from Cayenne owners and lessees concerning failure of the tubes since the U.S. commercial launch of the Cayenne in 2003. Compl. ¶ 59. In fact, one of the leading independent Porsche publications, "Excellence" magazine, has run multiple articles highlighting the plastic coolant tube problem, most recently a Spring 2011 article detailing the problem and

8

stating:  "The demise of the original Cayenne V8's plastic valley coolant pipes is pretty much unavoidable; at some point, they will leak and require replacement."  Compl. ¶ 60.

Porsche had, and continues to have, exclusive knowledge of the coolant tube defect.  Compl. ¶ 61.  Porsche has had access to aggregate data from its dealers regarding the coolant tubes; Plaintiffs and the other Class members have not.  *Id*.  Porsche has had access to pre- and post-release testing data; Plaintiffs and Class members have not.  *Id*.  Porsche has had access to complaints made to it and its dealers regarding the coolant tubes; Plaintiffs and the other Class members have not.  *Id*.  As such, Porsche was – and continues to be – in a superior position to know that its coolant tubes would prematurely fail.  *Id*.

## 5.  Porsche has made material misrepresentations regarding the Cayenne cooling system

Despite this knowledge, Porsche has made numerous and repeated representations regarding the quality of its Cayennes and the Cayenne's cooling system, in particular.  *See, e.g.,* Compl. ¶¶ 39, 40, 42, 43, 62.  These representations about the Cayennes specifically emphasized the Cayenne's cooling system.  Compl. ¶ 43.  Porsche described the Cayenne's cooling system in its marketing brochure as follows:  "Keeping cool is essential to any engine.  A high-performance engine can only maintain its maximum capability over a long service life if all components are operating consistently within a specific temperature range.  The engines in the new Cayenne models are therefore designed for optimal cooling."  *Id*.  Further, Porsche stated in its brochures and other marketing materials:

     (a)    The Cayenne includes "a cooling system perfected in the deserts of Dubai;"

     (b)    "In the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperatures throughout every part of the engine;"

     (c)    "The entire cooling system is specifically designed for prolonged heavy-duty operation;"

9

      (d)      "Every technical detail has been examined and optimized to ensure that the Cayenne Turbo reaches benchmark levels of SUV performance;"

      (e)      "The cooling system is extremely robust;"

      (f)      "The Cayenne Turbo engine is among the most advanced internal combustion engines ever produced by Porsche [and that] this mechanical symphony integrates a list of technical features that is a culmination of everything our engineers have learned about watercooled V8 engines and turbo technology over the past four decades;"

      (g)      "The Cayenne V8 engine's cooling system helps to maximize performance in every respect [and that] the strategy for achieving these objectives is nothing if not thorough."

*Id.* ¶ 62.

Porsche made these misrepresentations, concealments, and omissions of material facts with full knowledge that they were false and misleading, or with reckless disregard of the truth, and with the intent that consumers – including Plaintiffs and the other Class members – would rely upon such misrepresentations, concealments, and omissions.  Compl. ¶ 63.  Specifically, Porsche knew, or was reckless in not knowing, that these representations were false at the time it made them, based on, among other things: widespread customer complaints of prematurely cracking coolant tubes, dealer inquiries, repair shop inquiries, dealer-provided repair data, the high volume of replacement parts being ordered, and NHTSA complaints.  *Id.*

While publicly touting the Cayenne's performance, Porsche knew, reasonably should have known, or was reckless in not knowing that its use of plastic coolant tubes in its Cayenne vehicles would result not just in premature failure of the parts, but also in potential damage to the Cayenne's engine and/or its component parts.  Compl. ¶ 64.  Porsche's specific representations regarding the quality of the Cayenne's cooling system, coupled with Porsche's omission of the fact that the plastic coolant tubes were destined to prematurely crack or fracture, had the likely effect of misleading the public, including Plaintiffs and the other members of the Class.  *Id.*

Moreover, the facts that Porsche's plastic coolant tubes – a critical component of the vehicles – were destined to prematurely crack and fracture, and that they were subject to a costly replacement program were material facts. Compl. ¶ 65. Knowledge of these material facts would have altered consumers' buying decisions. *Id.*

Rather than fix the problem, Porsche chose to exploit owners and lessees of its Cayenne vehicles by making them incur the cost of new parts and labor charges for the repair – as well as run the risks associated with failure and the resulting engine damage. Compl. ¶ 66. Despite its knowledge, Porsche never made any attempt to notify Cayenne owners or lessees of the problem, nor did it issue a recall. *Id.*

As a result of Porsche's practices, Plaintiffs and the other Class members were overcharged by Porsche for their vehicles, and incurred, or will incur, expensive repairs that they should not have to bear. Compl. ¶ 67. As a result of Porsche's concealment and deceptive practices, Porsche was unjustly enriched. *Id.*

The damages sustained by Plaintiffs and the other members of the Class flow from the common nucleus of operative facts surrounding Defendants' misconduct, including:

    (a)    that Porsche designed, manufactured, and sold Cayennes with defective plastic valley coolant tubes that would prematurely degrade and leak, and that can also catastrophically rupture during normal vehicle use;

    (b)    that the degradation of the Cayenne's plastic valley coolant tubes is entirely disproportionate to the age and purported quality of these vehicles;

    (c)    that the Cayennes purchased and/or leased by Plaintiffs and the other members of the Class were worth less than promised because of the presence of the aforementioned valley coolant pipe defect; and

    (d)    that Porsche, despite its knowledge of this problem, has not informed the Class thereof, nor has Porsche taken steps to inspect, repair, or replace all the defective valley coolant tubes at no charge to the owners or lessees.

Compl. ¶ 68.

The cost of replacing the defective valley coolant tubes in Plaintiffs and the other Class members' Cayennes, including parts and labor, can be at least $1,500 to $3,600 per vehicle. Compl. ¶ 69. As indicated by Plaintiffs' experiences alone, described in detail below, the problem with the coolant tubes is widespread, material, and dangerous. Compl. ¶ 71.

### B. The named Plaintiffs' experiences

#### 1. Bob Conrad

Plaintiff **Bob Conrad** leased a new 2005 Porsche Cayenne S equipped with defective plastic coolant pipes for approximately $68,000 from Circle Porsche in Long Beach, California, in March 2005. Compl. ¶ 72. In August 2010, the low coolant light came on in Plaintiff Conrad's Porsche Cayenne. *Id.* ¶ 73. Plaintiff Conrad added coolant to the vehicle, but it drained out of the vehicle. *Id.* Plaintiff Conrad took the vehicle to Shorecliffs Auto Service in San Clemente, where it was discovered that the plastic coolant pipes had degraded and cracked prematurely. *Id.* On August 4, 2010, Plaintiff Conrad paid $2,097.70 to have the defective coolant pipes replaced, including $1,170.25 for Defendants' update kit containing the replacement aluminum coolant pipes and $765.00 in labor costs to have the aluminum coolant pipes installed at Shorecliffs Auto Service. *Id.*

Two months later, Plaintiff Conrad discovered that the coolant leak that resulted from the defective plastic coolant pipes had ruined the seals in his vehicle's transmission. Compl. ¶ 74. On October 11, 2010, Plaintiff Conrad paid $1,415.61 to have the damage to the transmission repaired at Shorecliffs Auto Service. *Id.*

#### 2. David Graas

In December 2008, Plaintiff **David Graas** bought his 2004 Cayenne Turbo for approximately $27,000. Compl. ¶ 78. In March 2010, Plaintiff Graas became aware that the

plastic coolant tubes in his Cayenne model were known to prematurely crack. *Id.* ¶ 79. Concerned that this problem would occur while he was driving, he brought his Cayenne to his local authorized Porsche dealer, Stevens Street Porsche in San Jose, California and had them conduct a pressure test for a possible coolant leak. Plaintiff Graas was told that the pressure test revealed no problems. *Id.*

Several months later, in September 2010, while driving with his daughter on Highway 88 in the Sierra Nevada mountain range, his plastic coolant tubes burst. Compl. ¶ 80. Stranded on the highway in the middle of the night, Plaintiff Graas attempted to call all towing companies within a 100 mile radius, but no one would come out to help him. *Id.* ¶ 81. Eventually, a California highway patrol officer arrived and stayed with Plaintiff Graas and his daughter until a relative arrived to get them, approximately four hours later. *Id.*

Plaintiff Graas was issued a warning for having to leave his disabled Cayenne on Highway 88. *Id.* ¶ 82. Unable to find a towing company willing to pick up and transport the Cayenne from where it broke down, Plaintiff Graas was forced to rent a vehicle himself and tow the Cayenne all the way back to San Jose. *Id.* ¶ 83.

Plaintiff Graas' local Porsche dealership, Stevens Street Porsche, replaced the cracked plastic coolant tubes with the OEM "update kit." This repair cost Plaintiff Graas approximately $2,200. Compl. ¶ 84. Unfortunately, less than 48 hours after the aluminum pipes were installed, the Cayenne's transmission seals failed, causing the entire transmission to fail. *Id.* ¶ 85. Plaintiff Graas was told that the transmission seals failed because coolant leaked into his engine when his plastic coolant tubes cracked. *Id.* Stevens Street Porsche estimated that it would cost Plaintiff Graas between $5,000 to $8,000 to repair the transmission. *Id.*

13

Due to his inability to pay for this costly repair, Plaintiff Graas traded in his damaged Cayenne to a local VW dealership for approximately $18,000, less than two years after purchasing the vehicle. Compl. ¶ 86.

### 3. Sean Krider

In September 2008, **Sean Krider** purchased a 2004 Cayenne Turbo with approximately 29,000 miles. Compl. ¶ 90. While driving his children to a Halloween event on October 31, 2010, the coolant tubes in his Cayenne burst, resulting in coolant pouring all over the road. *Id.* ¶ 91. Plaintiff Krider drove a short distance to a family friend's house and called a towing company to tow the Cayenne back to his home. *Id.*

The following day Plaintiff Krider called his local Porsche authorized dealership, Niello Porsche, located in Rocklin, California, and described what had happened to a service department representative. Compl. ¶ 92. Plaintiff Krider asked the service person if he could estimate the potential cost of such a repair. *Id.* ¶ 93. Without hesitation, the employee replied "the average cost for this is between $3,200-3,300 because the repair takes so many labor hours." Plaintiff Krider was also informed that the only available replacement part for the repair was the OEM update kit with aluminum pipes. *Id.* The service person informed Plaintiff Krider that the dealership did "a lot of these coolant pipe repairs," "usually a few a month." *Id.*

Unwilling to pay for such a costly repair, Plaintiff Krider purchased a discounted OEM update kit from a Porsche dealership in Oregon and repaired the coolant pipes himself. *Id.* ¶ 94. Plaintiff Krider spent over $1,000 as a result of the defective plastic coolant hoses and over 12 hours of his time repairing the vehicle himself. *Id.*

### 4.    Sy Duc Tran

Plaintiff **Sy Duc Tran** purchased a new 2006 Porsche Cayenne S equipped with defective plastic coolant tubes for approximately $72,000 from McKenna Porsche in Norwalk, California, in May 2006.  Compl. ¶ 99.  In November 2010, the low coolant light came on in Plaintiff Tran's Porsche Cayenne.  *Id.* ¶ 101.  Plaintiff Tran's wife took the vehicle to Steve's Independent Repair of Porsche & V.W. in Orange, California, a couple of days later, where it was discovered that the plastic coolant pipes had degraded and cracked prematurely.  On November 4, 2010, Plaintiff Tran, through his wife, paid $1,739.48 to have the defective coolant pipes replaced, including $771.93 for Defendant's update kit containing the replacement aluminum coolant pipes and $900.00 in labor costs to have the aluminum coolant pipes installed at Steve's Independent Repair of Porsche & V.W.

### 5.    Kevin Starkey

During the time period relevant to this action, **Kevin Starkey** was a resident of Arapahoe County, Colorado, and the owner of a 2006 Porsche Cayenne S Sport Utility Vehicle.  Compl. ¶ 105.  In 2010, Plaintiff Starkey purchased his Cayenne, his eighth Porsche-brand vehicle, as a consumer for personal use as a family vehicle.  *Id.* ¶ 106.

In March 2011, Plaintiff Starkey was driving his Cayenne in the mountains of Colorado on the way to a ski resort with his children when suddenly, and without warning, his plastic coolant tubes cracked and his Cayenne ceased operating.  Compl. ¶ 107.  The cracked coolant tubes leaked coolant throughout the engine, damaging the transmission seals and other components and rendering his Cayenne disabled.  *Id.*

After repairing the coolant tubes, Plaintiff was forced to replace his transmission seals because of the damage caused to them by the leaked coolant.  Compl. ¶ 108.  Plaintiff Starkey

15

has incurred more than $3,600 in expenses to repair his Cayenne that have not been reimbursed by Porsche. *Id.* ¶ 109.

### 6.   Joseph Dudley

In 2010, Plaintiff **Joseph Dudley** purchased the subject 2004 Cayenne CTT for personal use as a family vehicle. Compl. ¶ 113. Plaintiff Dudley became aware in 2010 that the plastic coolant tubes in his 2004 Cayenne CTT were defective. Compl. ¶ 114. To avoid leaking or failed tubes and the potential catastrophic failure of other major engine/transmission components, Plaintiff Dudley replaced the tubes at a cost exceeding approximately $1,500.00 in parts and labor. *Id.*

### 7.   Anthony Gardner

During the relevant time period, Plaintiff **Anthony Gardner** was a resident of Fulton County, Georgia, and the owner of a V8-equipped 2005 Porsche Cayenne S Sport Utility Vehicle. Compl. ¶ 122. In December 2008, Plaintiff Gardner purchased his Cayenne as a consumer for personal use. Compl. ¶ 123.

In March 2011, Plaintiff Gardner's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine. Compl. ¶ 124. Plaintiff Gardner took the vehicle to a mechanic before more extensive damage to the engine occurred. *Id.* Even with his early detection of the leak, Plaintiff Gardner has incurred approximately $1,800 in expenses to repair his Cayenne that have not been reimbursed by Porsche. *Id.* ¶ 125.

### 8.   Scott Florez

During the time period relevant to this suit, Plaintiff **Scott Florez** was a resident of Cook County, Illinois, and the owner of a 2004 Porsche Cayenne S Sport Utility Vehicle. Compl. ¶ 129. In November 2009, Plaintiff Florez purchased his Cayenne as a consumer for personal use.

Compl. ¶ 130.  In May 2011, Plaintiff Florez's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine.  Compl. ¶ 131.  Plaintiff noticed the leaking coolant and obtained the services of a mechanic before the engine was damaged further. *Id.*  Even with his early detection of the leak, Plaintiff Florez has incurred approximately $2,000 in expenses to repair his Cayenne that have not been reimbursed by Porsche.  Compl. ¶ 132.

### 9.    Jamie Hoffecker

During the time period relevant to this suit, **Jamie Hoffecker** was a resident of Oakland County, Michigan, and the owner of a 2006 Porsche Cayenne Turbo S Sport Utility Vehicle. Compl. ¶ 136.  In 2006, Plaintiff Hoffecker purchased her Cayenne as a consumer for personal use as a family vehicle.  *Id.* ¶ 137.  In February 2011, Plaintiff Hoffecker's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout her engine.  *Id.* ¶ 138.  Plaintiff Hoffecker obtained the services of a mechanic before more extensive damage to the engine occurred.  *Id.*  Even with early detection, Plaintiff Hoffecker incurred more than $1,800 in expenses to repair her Cayenne that have not been reimbursed by Porsche.  *Id.* ¶ 139.

### 10.    Daniel Delgado

During the time period relevant to this suit, Plaintiff **Daniel Delgado** was a resident of Essex County, New Jersey.  Compl. ¶ 143.  He purchased his 2004 Cayenne S from a used car dealer in 2009 for approximately $39,000.  *Id.* ¶ 144.  Approximately September 2010, Plaintiff Delgado brought his Cayenne to Dealer Alternative in West Orange, New Jersey, an authorized Porsche mechanic, after the coolant warning light came on.  *Id.* ¶ 145.

During this service, the mechanic informed Plaintiff Delgado that the Cayenne's plastic coolant tubes were leaking coolant and cracked, and that the replacing them with aluminum pipes would cost approximately $1,800.  Compl. ¶ 146.  Plaintiff Delgado subsequently brought

his Cayenne to KMD Tuning in Mountainside, New Jersey, for another estimate on the repair. *Id.* ¶ 147. Plaintiff Delgado's mechanic estimated the repair to cost approximately $1,600. *Id.* Plaintiff Delgado's mechanic also informed him that the failure of the plastic coolant tubes in the Cayenne was a common issue. *Id.*

Plaintiff Delgado paid approximately $1,600 for the repair, which included replacing the defective plastic coolant tubes with aluminum coolant pipes. Compl. ¶ 148. Although the coolant tubes have been replaced, Plaintiff Delgado's vehicle is now beginning to show signs of collateral damage from the leaking coolant to other car parts, including the starter. *Id.* ¶ 149. KMD Tuning recently informed Plaintiff Delgado that problems with the starter in his vehicle are also associated with problems caused by the defective plastic coolant tubes, and estimated that repair to the starter would cost approximately $1,500. *Id.* ¶ 150.

### 11. Richard Gorospe

During the time period relevant to this suit, Plaintiff **Richard Gorospe** was a resident of Hudson County, New Jersey, and the owner of a V8-equipped 2005 Porsche Cayenne S Sport Utility Vehicle purchased in November 2009, from a used car dealer in Smithtown, New York, without knowledge of the coolant tube defect. Compl. ¶ 153. In November 2010, Plaintiff Gorospe brought his Cayenne to Towne Porsche in Englewood, New Jersey, because it was leaking coolant. *Id.* ¶ 154. At that time, he was told that the tubes were subject to failure, but could not be replaced without charge because the tubes had not actually failed. *Id.* ¶ 155. He was told that the repair, if performed, would cost approximately $1,800. *Id.* Plaintiff Gorospe had his coolant tubes replaced at Elite Motorsports in Medford, New York, on June 9, 2011. *Id.* ¶ 156.

18

### 12.  Nicholas Spagnoletti

During the time period relevant to this suit, Plaintiff **Nicholas Spagnoletti** was a resident of Morris County, New Jersey, and the owner of a V8-equipped 2004 Porsche Cayenne S Sport Utility Vehicle.  Compl. ¶ 159.  In December 2010, Plaintiff Spagnoletti purchased his certified pre-owned Cayenne from Herb Chambers Porsche in Burlington, Massachusetts, for personal use.  *Id.* ¶ 160.

In November 2010, Plaintiff Spagnoletti brought his Cayenne to his authorized Porsche mechanic for the scheduled 60,000 mile maintenance service.  Compl. ¶ 161.  During this service, Plaintiff Spagnoletti's mechanic informed him that the Cayenne's plastic coolant tubes had to be replaced.  *Id.*  The mechanic told Plaintiff Spagnoletti that the plastic coolant tubes were destined to fail earlier than the expected life of the engine, and if it happened on a highway at high speeds, the damage could be significant and dangerous.  *Id.*  Specifically, the mechanic told him that it was very likely that once the coolant tubes fractured, the coolant would leak out very fast, creating clouds of smoke and possibly causing the vehicle to stall.  *Id.*

Further, because the plastic cooling tubes in the Cayenne were placed directly above the starter, Plaintiff Spagnoletti's mechanic believed that replacement of the starter was also necessary.  Compl. ¶ 162.  Plaintiff Spagnoletti paid $2,159 for his cooling pipe "update kit" and additional monies for the labor to install it, a portion of which charge was remitted by Porsche's authorized mechanic directly to Porsche because the update kit at issue was manufactured by Porsche.  *Id.*  Even with his early detection of the leak, Plaintiff Spagnoletti has incurred over $2,000 in expenses to repair his Cayenne.  Compl. ¶ 163.  None of these expenses have been reimbursed by Porsche.  *Id.*

13.     **Gregory Cadman**

During the time period relevant to this suit, Plaintiff **Gregory Cadman** was a resident of Westchester County, New York, and the owner of a 2004 Porsche Cayenne Turbo Sport Utility Vehicle.  Compl. ¶ 166.  In September 2008, Plaintiff Cadman purchased his certified pre-owned Cayenne from Danbury Porsche in Danbury, Connecticut, as a consumer for personal use.  *Id.* ¶ 167.

In late July 2011, Plaintiff Cadman's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine while Plaintiff Cadman was idling at a gas station in New Rochelle, New York.  Compl. ¶ 168.  Plaintiff noticed a substance leaking from his Cayenne's engine and called his mechanic, Kip Harris, who instructed him to drive the vehicle home while carefully monitoring the temperature gauge.  *Id.*  The vehicle was then towed to Mr. Harris' repair shop.  *Id.*

Plaintiff Cadman incurred approximately $1,700 expenses to repair his Cayenne.  None of these expenses have been reimbursed by Porsche.  Compl. ¶ 169.

14.     **Ecliff Jackman**

During the time period relevant to this suit, Plaintiff **Ecliff Jackman** was a resident of Queens County, New York, and the owner of a 2005 Porsche Cayenne S Sport Utility Vehicle. Compl. ¶ 173.  In 2007, Plaintiff Jackman purchased his certified pre-owned Cayenne from Porsche Roslyn in Roslyn Heights, New York, for personal use.  *Id.* ¶ 174.

In June 25, 2011, Plaintiff Jackman noticed that his "check coolant" light had come on while driving in Queens County, New York.  Compl. ¶ 175.  He immediately pulled into a nearby auto supply store, and purchased and added new coolant to his Cayenne engine.  *Id.*  By

the time he arrived home, approximately five to ten minutes later, his "check coolant" light was again on, and Plaintiff Jackman noticed coolant leaking onto the ground. *Id.* ¶ 176.

The next morning, June 26, 2011, Plaintiff Jackman again added new coolant to his Cayenne engine and drove the car to a nearby mechanic, Queenshill Service Station, which performed the necessary repairs to the Cayenne's coolant system. By this time, Plaintiff Jackman's Cayenne had been disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine. Compl. ¶ 177. Even with his early detection of the leak, Plaintiff Jackman incurred approximately $1,550 in expenses to repair his Cayenne. *Id.* ¶ 178.

### 15. Dane McIntosh

During the time period relevant to this suit, Plaintiff **Dane McIntosh** was a resident of Westchester County, New York, and the owner of a V8-equipped 2004 Porsche Cayenne Turbo Sport Utility Vehicle. Compl. ¶ 182. In December 2008, Plaintiff McIntosh purchased his previously-owned Cayenne from Ray Catena Auto Wholesaler, Inc., in Teterboro, New Jersey, for personal use. *Id.* ¶ 183.

In October 2010, Plaintiff McIntosh's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout his engine. Compl. ¶ 184. Plaintiff noticed a pool of liquid underneath his car and, after smelling the liquid and concluding that it was coolant, Plaintiff McIntosh immediately drove the vehicle to the nearest service station, Knights Auto Repair, Inc. in Hawthorne, New York. *Id.*

After determining that the coolant leak was a result of the cracked plastic coolant tubes attached to the cooling system, the mechanic called the nearest certified Porsche dealer, Pepe Performance Cars, Ltd. in White Plains, New York, to order replacement coolant tubes. Compl. ¶ 185. The mechanic was informed by Pepe that the plastic tubes were not available as

"replacement parts," and that the only replacement part available was a set of aluminum pipes – packaged and sold by Porsche as an "OEM update kit" at a cost of $1,000.  *Id.*  During discussions with Pepe, Mr. McIntosh's mechanic was told that Pepe performs about "three repairs a week" for this exact problem on Cayennes.  *Id.*

Even with his early detection of the leak, Plaintiff McIntosh incurred approximately $2,000 in expenses to repair his Cayenne.  Compl. ¶ 186.  None of these expenses have been reimbursed by Porsche.  *Id.*

### 16.  Lance Bredefeld

Plaintiff **Lance Bredefeld** purchased his 2006 Cayenne S in September 2010 from "Bobb Suzuki" in Columbus, Ohio.  Compl. ¶ 190.  In November 2010, while in Indianapolis, Plaintiff Bredefeld's coolant tubes failed.  *Id.* ¶ 191.  Driving through downtown, the "check coolant" notice suddenly appeared on his information screen.  *Id.*  Steam started rising from under the hood and coolant was streaming on the ground behind his car.  *Id.*  Plaintiff Bredefeld immediately pulled into the next available parking lot and turned off the engine.  *Id.*

His Cayenne was towed to the "Tom Wood" authorized Porsche dealership in Indianapolis.  Compl. ¶ 192.  The service department told Plaintiff Bredefeld that because the starter is often damaged when the coolant tubes break, that they would inspect the starter during the repair.  *Id.*  The dealership installed the OEM update kit and charged Plaintiff Bredefeld $1,650.  *Id.*  However, when he went to pick up the vehicle the following week, the battery was almost dead and there was a yellow film all over the Cayenne.  *Id.*  Further, there were extensive coolant stains on the interior leather covered grab handles which cost an additional $300 to repair.  *Id.*

Left in Indianapolis without a vehicle, Plaintiff Bredefeld had to have someone pick him up from 5 hours away.  Compl. ¶ 193.  Plaintiff Bredefeld called Porsche to inquire about reimbursement.  *Id.* ¶ 194.  His request was flatly denied, although a customer service representative told Plaintiff Bredefeld that "Porsche was aware of the problem" and Porsche "had corrected the design."  *Id.*

### 17.   <u>Deana Crawford</u>

During the time period relevant to this action, Plaintiff **Deana Crawford** was a resident of Delaware County, Ohio, and the owner of a 2004 Porsche Cayenne Turbo Utility vehicle. Compl. ¶ 197.  In 2005, Plaintiff Crawford purchased her Cayenne as a consumer for personal use as a family vehicle.  *Id.* ¶ 198.  In late-July 2011, Plaintiff Crawford's Cayenne was disabled when the plastic coolant tubes cracked and leaked coolant throughout her engine.  *Id.* ¶ 199. Plaintiff Crawford's husband noticed the issue and took the vehicle to a mechanic before more extensive damage to the engine occurred.  *Id.*  Even with Plaintiff Crawford's husband's early detection of the leak, she has incurred more than $2,000 in expenses to repair her Cayenne that have not been reimbursed by Porsche.  *Id.* ¶ 200.

### 18.   <u>Randall Stuewe</u>

In 2006, Plaintiff **Randall Stuewe** purchased his Cayenne for personal use.  Compl. ¶ 204.  In March 2011, Plaintiff Stuewe's Cayenne was disabled when the plastic coolant pipes cracked and leaked coolant through his engine.  *Id.* ¶ 205.  Plaintiff Stuewe has incurred more than $2,000 in expenses to repair his Cayenne that have not been reimbursed by Porsche.  *Id.* ¶ 206.

19.  **Sven Wust**

In 2003, Plaintiff **Sven Wust** purchased his Cayenne for personal use.  Compl. ¶ 211.  In May, 2010, Plaintiff Wust's Cayenne was rendered disabled when the plastic coolant tubes cracked and leaked coolant through his engine.  *Id.* ¶ 212.  Plaintiff Wust has incurred nearly $2,000 in expenses to repair his Cayenne that have not been reimbursed by Porsche.  *Id.* ¶ 213.

20.  **Ghassan Daher**

In January 2007, Plaintiff **Ghassan Daher** bought a used 2003 Cayenne Turbo with approximately 28,000 miles for $48,500 from a Ferrari Dealer in Scottsdale, Arizona.  Compl. ¶ 218.  In the late evening of February 14, 2011, Plaintiff Daher was driving approximately 60 miles an hour on I-90 from Bellevue, Washington, to Seattle, Washington, for a Valentine's Day dinner with his wife.  Compl. ¶ 220.  Plaintiff Daher was driving under the speed limit on I-90 when he saw the temperature gauge on the dashboard suddenly spike and a "low coolant" light flash on.  *Id.* ¶ 221.  Startled and confused by the sudden engine temperature rise, Plaintiff Daher slowed the vehicle and traveled approximately four miles to the nearest gas station.  *Id.* ¶ 222.  Plaintiff Daher feared for the safety of both him and his wife, as well as damage to his engine, as a result of the surprise temperature spike and the need to slow down on a busy freeway.  *Id.*

When Plaintiff Daher came to a halt, he noticed smoke rising from his engine.  Compl. ¶ 223.  He lifted the hood and was engulfed by a wave of steam and/or smoke from the engine.  *Id.*  Plaintiff Daher did not feel safe continuing to operate the vehicle and called a tow-truck.  *Id.*

Plaintiff Daher requested the vehicle be towed to Eastside European Auto, a Porsche ASE Certified Mechanic, which had performed service on the vehicle in the past.  Compl. ¶ 224.  The next morning, after quickly examining the engine, Eastside European Auto concluded that the

24

coolant tubes had failed and drained the vehicle of coolant. *Id.* ¶ 225. The mechanic further explained that this is a frequent problem with Porsche Cayennes. *Id.*

Plaintiff Daher called the local Porsche Dealership service department at Barrier Porsche, where he had previously had the vehicle serviced, and was told by a service department representative that the problem he had experienced was "well-known" and was fixed on later models, while previous model year owners were left unaware of the problem. Compl. ¶ 226. Plaintiff Daher further inquired about the repair costs and was given an almost immediate oral estimate of around $3,600 for parts and labor. *Id.* Plaintiff Daher recalls the estimate seemed to roll off the tongue of the service department representative, suggesting that the technician was accustomed to providing estimates for repair of the coolant tubes. *Id.*

The service representative at Barrier Porsche also told Plaintiff Daher that Porsche had known about the problem for awhile and began manufacturing the aluminum replacement kit in 2005. Compl. ¶ 227. Despite having had his Cayenne Turbo serviced multiple times at Barrier Porsche, Plaintiff Daher had never been informed of the coolant pipe problem until his coolant tubes failed. *Id.*

Plaintiff Daher authorized Eastside European Auto to repair the Cayenne for less than the cost quoted by Barrier Porsche. Compl. ¶ 228. The final cost of the repair of the coolant tubes was $1,617.52. The mechanic at Eastside European Auto described the coolant pipe repair as a 10 hour job. *Id.* Plaintiff Daher also had additional repairs done to the CAM sensors located in the engine block of the Cayenne Turbo while the coolant tubes were being replaced. *Id.* ¶ 229. On information and belief, these sensors may have failed as a result of the coolant pipe failure. *Id.* Additionally, Plaintiff Daher has experienced problems with his heating and air conditioning

system, as well as several other Cayenne systems and components, which may have been affected by the coolant pipe failure. *Id.* ¶ 230.

## III.   <u>LEGAL STANDARD</u>

In considering a motion to dismiss, a court must "construe the [complaint] in favor of [Plaintiffs], accept the factual allegations contained in that pleading as true, and determine whether the factual allegations present plausible claims." *Versatile Helicopters v. City of Columbus*, No. 2:10-cv-1110, 2011 U.S. Dist. LEXIS, at \*3 (S.D. Ohio Oct. 26, 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Louisville/Jefferson County Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 384 (6th Cir. 2009).  In *Versatile Helicopters*, the Court held that:

> [A] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft, v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) at 1949.  The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.  *See also Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).

*Versatile Helicopters*, at \*4.  It is also important to note that in conducting its review of a complaint in light of a motion to dismiss, the court should view the complaint as a whole.  *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (citations omitted); *see also In re Dynamic Random Access Memory Antitrust Litigation*, 546 F.3d 981, 984-985 (9th Cir. 2008).  When viewed as a whole, rather than in the piecemeal fashion suggested by PCNA, the Plaintiffs' Complaint contains the notice and particularity required by the Federal Rules.

Further, Federal Rule of Civil Procedure 9(b) does not require the pleading of detailed evidentiary matter.  All that is necessary is "identification of the circumstances constituting fraud

so that the defendant can prepare an adequate answer from the allegations." *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1232 (C.D. Cal. 2011). Rule 9(b) does not change the requirement that the Court accept as true all factual allegations in the complaint, draw all reasonable inferences from those allegations, and construe the complaint in the light most favorable to the Plaintiff. *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 U.S. Dist. LEXIS 68419, at *6-7 (C.D. Cal. July 10, 2008) (citing *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006)).

Furthermore, Rule 9(b) applies heightened pleading standards only to the "circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The particularity requirement in Rule 9(b) does not require a plaintiff to plead with particularity the entire theory of the case, but rather, only those 'circumstances' intrinsic to any fraud-based claim." *United States ex rel. Raymer v. Univ. of Chi. Hosps.*, No. 03 C 806, 2006 U.S. Dist. LEXIS 7943, at *10 (N.D. Ill. Feb. 28, 2006). Those circumstances that are not intrinsic to a defendant's fraudulent conduct need only be pled under the pleading standard of Rule 8(a).

Finally, "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). Rather, matters such as which defendant knew about the defect and when a defendant acquired such knowledge "may be alleged generally" even under Rule 9(b)'s heightened pleading standards. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). This is especially applicable where the necessary information is under the exclusive control of the defendant in order to avoid rewarding fraudulent activity that is successfully concealed. *See United States v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th

27

Cir. 1987)); *see also Deutsch v. Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987); 2-9 James Wm.

Moore *et al.*, Moore's Federal Practice - Civil § 9.03.

## IV.   ARGUMENT

### A.   Magnuson-Moss Act claims[3]

#### 1.   Plaintiffs pled cognizable Magnuson-Moss claims for breach of implied warranties

##### a.   Porsche made written warranties to Plaintiffs

Porsche's Cayenne model vehicles came with a standard form written warranty.  Mot. to

Dismiss, Exs. A-D (2003-2006 warranties) (hereinafter collectively, "Warranty").   Plaintiffs

received these warranties when they purchased their vehicles. Compl. ¶ 218.  The Warranty has a

four-year/50,000 mile term.  (Warranty p. 7.)  The Warranty provides that, "Porsche Cars N.A.

will repair or replace with a new or remanufactured part distributed by Porsche Cars N.A., at its

sole option, any factory-installed part that is defective in material or workmanship under normal

use." *Id.*  Porsche further warrants that, "[w]arranty repairs will be made free of charge for parts

and labor at an authorized Porsche dealership." *Id.* Porsche's contention that Plaintiffs have

failed to identify the written warranty at issue in the Complaint is therefore unfounded.

---

[3]      Plaintiffs will not pursue claims for breach of express warranty under Magnuson-Moss to the extent that they brought their claims after the expiration of their respective warranty durational terms. However, Plaintiffs have brought their Magnuson-Moss claims on behalf of a class of individuals who purchased their vehicles through the 2010 model year (Compl. ¶1), since it is Plaintiffs' understanding that Porsche first replaced the plastic coolant tubes with aluminum cooling pipes beginning in the 2011 model year.  While Porsche's counsel has represented to the Court and to Plaintiffs' counsel that Porsche did not install plastic coolant tubes in its Cayenne vehicles after the 2006 model year, Porsche has yet to substantiate this representation in any manner, notwithstanding Plaintiffs' requests for them to do so.  In any event, because the Court is required to take Plaintiffs' allegations in their Complaint as true, Plaintiffs reserve their express warranty claims under Magnuson-Moss for those class members whose express warranties have not yet expired.

**b.     Plaintiffs can bring claims for breach of implied warranties after the expiration of the express warranty term because the duration limitation is unconscionable and is not prominently displayed on the face of the warranty**

Section 2308 of Magnuson-Moss requires that limitations on implied warranties be "limited in duration to the duration of a written warranty of reasonable duration," and that the limitation be "conscionable" and "set forth in clear and unmistakable language and prominently displayed on the face of the warranty."  15 U.S.C. § 2308(b) (LexisNexis 2012). Porsche's Warranty provides that, "Any implied warranties, including the implied warranties of merchantability and fitness for particular purpose, are limited to the duration of the written warranty . . . ."  Warranty p. 5.

As an initial matter, contrary to Porsche's assertion (Mot. to Dismiss 19), the implied warranty duration limitation is not prominently displayed on the face of the warranty as required by Magnuson-Moss.  Rather, this limitation first appears on page 5 of Porsche's Warranty and is in small print.  (Warranty p. 5.)  Porsche's duration limitation on implied warranties is invalid because it is neither "displayed on the face of the warranty" nor "prominently" displayed, as required by Section 2308(b).

In addition, the duration limitation is unconscionable because, among other things, Plaintiffs allege that Porsche knew of the defect at the time of sale, there was unequal bargaining power between Porsche and Plaintiffs, and Plaintiffs had no ability to detect the defect before the expiration of the warranty term.  The Court should therefore allow Plaintiffs' Magnuson-Moss claims based on breach of implied warranty proceed.

In *Carlson v. General Motors Corp*., 883 F. 2d 287, 293 (4th Cir. 1989), the Fourth Circuit reversed the dismissal of the plaintiffs' breach of implied warranty claim brought after the expiration of the warranty term and overruled the district court's findings, based solely on the

pleadings, that General Motors' durational limitations on its implied warranties were both "reasonable" and "conscionable" as a matter of law. The Fourth Circuit found plaintiffs' allegations that General Motors knew of inherent defects in its diesel engines - but failed to warn its customers of the consequential likelihood of "catastrophic failures" - most significant in allowing their breach of implied warranty claim to proceed. The *Carlson* Court reasoned:

> Here, proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged "durational limitations" on implied warranties constituted "overreaching," and that the disclaimers themselves were therefore "unconscionable." When a manufacturer is aware that its product is inherently defective, but the buyer has "no notice of [or] ability to detect" the problem, there is perforce a substantial disparity in the parties' relative bargaining power. (citation omitted) In such a case, the presumption is that the buyer's acceptance of limitations on his contractual remedies-including of course any warranty disclaimers-was neither "knowing" nor "voluntary," thereby rendering such limitations unconscionable and ineffective. (citations omitted).

*Carlson* at 294.

Other courts have followed *Carlson's* reasoning. In *Bussian v. DaimlerChrysler,* 411 F.Supp.2d 614, 622 (M.D.N.C.2006), the court found that allegations that warranty limitations are unconscionable because the vehicles "contain[ed] a latent defect of which Defendants were actually or constructively aware at the time of sale, and purchasers lacked a meaningful choice with respect to the terms of the warranty due to unequal bargaining power and lack of warranty competition," were sufficient to withstand a motion to dismiss their implied warranty claims. *See also In re Samsung DLP Television Class Action Litig.,* No. 07-2141, 2009 U.S. Dist. LEXIS 100065, at *14-16 (D.N.J. Oct. 27, 2009) (finding sufficient allegations that a warranty is unconscionable when defendant knew it sold a defective product, did not inform consumers about the defect, plaintiffs had no meaningful choice in determining time limitations and a disparity in bargaining power); *Payne v. Fujifilm U.S.A., Inc.,* No. 07-385, 2007 U.S. Dist.

30

LEXIS 94765, at *14-16 (D.N.J. Dec. 28, 2007) (determining that an action brought outside the express warranty period could be maintained because plaintiff asserted that the warranty was unconscionable); *Szymczak v. Nissan North America, Inc.*, No. 10 cv 7493, 2011 U.S. Dist. LEXIS 153011, at *27-29 (S.D.N.Y. Dec. 16, 2011) (refusing to dismiss unconscionable warranty claim at the pleading stage finding, "[w]hether plaintiffs can actually prove such a claim is better left for after the completion of discovery"); *see also Henderson v. Volvo Cars of N. Am., LLC,* Civ. No. 09-4146, 2010 U.S. Dist. LEXIS 73624, at *26-27 (D.N.J. Jul. 21, 2010).

Here, Plaintiffs have alleged the exact same circumstances as those present in *Carlson* and the similar cases cited above. *See* §§ II.A.1., 4. 5., *supra* (reciting Complaint allegations that Porsche knew of the defect at the time of sale and that the defect could potentially damage the vehicle's engine and/or component parts, that Porsche concealed this information from purchasers, that Porsche has exclusive knowledge of the defect and chose not to disclose the defect to its customers, that the defect was not reasonably discoverable by consumers until after the vehicle's warranty had expired, that Porsche has chosen not to warn consumers of the potential dangers of a sudden coolant spill directly into the starter and transmission seals, and that Porsche continues to promote the Cayenne engine and its component parts as safe, reliable, and free from material defects). As a result of Porsche's corporate decisions, superior knowledge, and conduct, Plaintiffs had inferior bargaining power when they purchased their vehicles. Plaintiffs have therefore stated a valid claim against Porsche for breach of implied warranties under Magnuson-Moss.[4]

---

[4]     To the extent that the Court finds that Plaintiffs have not adequately alleged the Warranty's unconscionability, they should be afforded leave to amend. *See Alban v. BMW North America*, No. 09-5398, 2011 U.S. Dist. LEXIS 26754, at *8 (D.N.J. Mar. 15, 2011) (allowed leave to amend where plaintiff did not explain why the warranty's duration limitation was unconscionable and refused to find that warranty was not unconscionable as a substantive matter).

### c. **Contrary to Porsche's assertion, the Plaintiffs who brought implied warranty claims in states requiring privity have valid Magnuson-Moss claims**

As an initial matter, Porsche does not argue that privity does not exist for the purposes of Plaintiffs' Magnuson Moss claims for those Plaintiffs who purchased their vehicles in Colorado, Michigan, New Jersey, and Texas. These Plaintiffs' claims are therefore valid.  The California, Florida, Illinois, New York, and Washington Plaintiffs have not brought implied warranty claims. As such, these Plaintiffs are not raising claims under Magnuson-Moss. As discussed in §§ IV.E.1. and IV.I.1., *infra*, the Georgia and Ohio Plaintiffs have stated valid implied warranty claims under Magnuson-Moss.

### 2. **Plaintiffs have standing to bring their Magnuson Moss claims**

Porsche claims that Plaintiffs lack standing to bring a Magnuson-Moss claim because they did not provide it with an opportunity to cure the defect (Mot. to Dismiss, 20).  However, an opportunity to cure is not required if the manufacturer knew of the defects at the time of sale.[5] *Radford v. Daimler Chrysler Corp.,* 168 F.Supp.2d 751, 754 (N.D. Ohio 2001); *Alberti v. Gen. Motors Corps*., 600 F. Supp. 1026, 1028 n 2 (D.D.C. 1985); *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W. 3d 145, 184-85 (Mo. Ct. App. 2006).  Plaintiffs allege that Porsche knew of the defect at the time of sale.  *See* § II(A), *supra.* Thus, the Plaintiffs have standing to bring their Magnuson Moss claims for breach of the implied warranty of merchantability.

---

[5]     Even if Plaintiffs are required to provide Porsche with an opportunity to cure, Magnuson-Moss should be interpreted to mean that the opportunity to cure can be provided after they file their complaint but before they seek class status.  *See* 15 U.S.C. §2310(e) (". . . a class of consumers may not **proceed** in a class action except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the person obligated under the warranty or service contract is afforded a reasonable opportunity to cure. . . .") (emphasis added).  Moreover, since Plaintiffs filed their Complaint, nothing in Porsche's conduct suggests that it has any intention of curing the defects at issue in this case, despite clear evidence that there are safety issues at play.

32

**B.**     **New Jersey**

**1.**     **New Jersey Plaintiffs have adequately alleged claims under New Jersey's Consumer Fraud Act**

To state a cause of action under New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 to 13 (West 2000) (hereinafter, "CFA"), a plaintiff must allege:  (1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between defendant's unlawful practice and plaintiff's ascertainable loss.  *Parker v. Howmedica Osteonics Corp.*, No. 07-02400, 2008 U.S. Dist. LEXIS 2570, at *6 (D.N.J. Jan. 14, 2008) (citing *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 13 (N.J. Super. Ct. App. Div. 2003).  Here, the New Jersey Plaintiffs have provided detailed allegations that PCNA sold the Cayenne vehicles with knowledge of a dangerous defect in the coolant pipes and consistently made representations contrary to that knowledge.  Compl. ¶ 62.

This knowledge is evidenced, *inter alia*, by internal documents acknowledging the defect and requiring replacement parts, by NHTSA complaints and consumer complaints to Porsche, by the high rate of replacement parts ordered, and by dealer-provided repair data.  Compl. ¶ 63.  Moreover, New Jersey Plaintiffs allege that PCNA had not only an ethical, but also a statutory obligation to inform owners and the public of this defect due to the safety concerns involved.  Compl. ¶ 412 (citing the Motor Vehicle Safety Act, 49 U.S.C. §§ 30118 and 30119).  Despite this duty, PCNA concealed its knowledge thereby causing Plaintiffs to pay more for the vehicles than if they had known of the defect and to pay additional costs to repair the defective parts.  Compl. ¶ 57, 66, 67.  Accordingly, the New Jersey Plaintiffs have successfully stated a claim for relief under the CFA.

### a. Because the defect poses a safety hazard and PCNA knew of this defect, New Jersey Plaintiffs are able to maintain a claim under the CFA after the applicable warranty period has expired

PCNA selectively cites New Jersey State and Federal case law to suggest that there is an absolute bar on consumer fraud claims relating to defects that do not become manifest until after the expiration of applicable express warranties. PCNA is incorrect. Although the case law on this matter is not entirely consistent, numerous decisions in New Jersey have recognized that the warranty defense is not available when a manufacturer had knowledge of a defect but concealed it from consumers. *See, e.g.*, *Maniscalco v. Brother Int'l Corp.*, 627 F. Supp.2d 494 (D.N.J. 2009); *Henderson v. Volvo Cars of N. Am., LLC,* Civ. No. 09-4146, 2010 U.S. Dist. LEXIS 73624, at *26-27 (D.N.J. Jul. 21, 2010); *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008). This is particularly true when the defect, as here, poses safety concerns. *Perkins v. Daimler Chrysler Corp.*, 383 N.J. Super. 99, 111-112 (App. Div. 2006); *In re Philips/Magnavox TV Litig.*, No. 09-3072, 2010 U.S. Dist. LEXIS 91343 at *19 (D.N.J. Sept. 1, 2010).

### i. Knowledge of the defect and intent to conceal that knowledge

A consumer claim alleging knowledge of a product defect and the intent to conceal the defect from the public adequately alleges unlawful conduct under the CFA. *Maniscalco*, 627 F. Supp. 2d at 502. In cases of auto part defects, allegations of consumer complaints on the internet, complaints to the National Highway Traffic Safety Administration, and internal technical service bulletins provide adequate support for claims of knowledge. *Henderson*, 2010 U.S. Dist. LEXIS 73624, at *3-4. The New Jersey Plaintiffs here, as noted above, maintain nearly identical allegations to those raised by the *Henderson* plaintiffs.

34

The cases cited by Porsche are easily distinguished from the facts and allegations presented in the instant action.  Porsche relies heavily on the New Jersey Appellate Division decision in *Perkins v. Daimler Chrysler Corporation* where it was determined that "a claim that a defect may, but has not, manifested itself until after the expiration of the warranty period cannot form the basis for a claim under the CFA."  *Perkins v. Daimler Chrysler Corp.*, 890 A.2d 997, 1004 (N.J. Super Ct. App. Div. 2006).  The plaintiff in *Perkins* had purchased a used vehicle with over 100,000 miles and submitted a complaint that merely alleged that the exhaust manifold could potentially crack and require repair.  Her complaint did not allege that the manufacturer had any knowledge of a defect and it did not allege "that the exhaust manifold has even actually required repair or replacement."  *Id.*

Subsequent decisions have made it clear that *Perkins* is limited to cases involving a mere allegation "that the warranty is shorter than the industry standard useful life of the product . . . ." *Maniscalco*, 627 F.Supp.2d at 501.  In *Maniscalco*, consumer plaintiffs had alleged that a defective part in a printer did not break down until after the warranty expired and that the manufacturer's knowledge of the defect was evidenced by internal documents describing the defect.  Accordingly, the Court found the following:

> [W]here a manufacturer or seller of a product knew that its product had a defect which would cause it to fail before its expected useful life, and intentionally concealed that information from the purchaser, for the purpose of maximizing profit, I predict that the New Jersey Supreme Court would not be willing to find, as a matter of law, that the CFA was categorically inapplicable.

*Id.*, 627 F.Supp.2d at 502.

Similarly, in *Henderson*, the Court found that allegations that Volvo knew of design defects in the transmission, evidenced by NHTSA complaints and technical service bulletins, and failed to inform consumers of the defect, were adequate to maintain an action under the CFA.

*Henderson*, 2010 U.S. Dist. LEXIS 73624, at *15-21. The New Jersey Plaintiffs have made these same allegations and have even attached to the Complaint an internal PCNA technical service bulletin that evidences PCNA's knowledge of the defective coolant pipes.

Likewise, in *Doll v. Ford Motor Co.*, No. 10-01505, 2011 U.S. Dist. LEXIS 95427, at *41-42 (D. Md. Aug. 25, 2011), the Court – examining unfair and deceptive practice claims brought under various states' laws – held that *Perkins* only "stands for the proposition that merely alleging that the warranty is shorter than the industry standard useful life of the product does not state a claim under the Consumer Fraud Act" and did not bar claims regarding an allegedly deficient torque converter where, *inter alia*, the manufacturer "knew of the defect," knew the part would fail, and "consciously concealed this information during the advertisement of the vehicles."

Porsche further relies on *Noble v. Porsche Cars N. Am., Inc*, 694 F. Supp.2d 333 (D.N.J. 2010), to suggest that New Jersey law does not allow CFA claims for part failures outside the warranty period. *Noble* held "a plaintiff cannot maintain an action under New Jersey's CFA when the **only** allegation is that the defendant 'provided a part – alleged to be substandard – that outperforms the warranty period'." *Noble*, 694 F. Supp.2d at 337 (quoting *Perkins*) (emphasis added). But unlike the Plaintiffs in *Maniscalco* and *Henderson*, or the case at bar, the plaintiffs in *Noble* did not point to any indications that the manufacturer knew of the defect and intended to withhold this knowledge, other than the statement of an independent service center representative. *Noble*, 694 F.Supp.2d at 334. Noticeably absent from *Noble*, is any allegation regarding internal documents or any statements attributable directly to the manufacturer acknowledging a problem and corrective measures. Moreover, *Noble* did not deal with safety-related issues of the kind alleged here.

36

Porsche's reliance on *Duffy v. Samsung* is misguided for similar reasons.  In *Duffy*, the court specifically held that the plaintiff did not state an unlawful act under the CFA because the complaint contained no allegations that Samsung knowingly failed to disclose a defect.  *Duffy v. Samsung Elecs. Am., Inc.,* No. 06-5259, 2007 U.S. Dist. LEXIS 14792, at *22 (D.N.J. Mar. 2, 2007).  Thus, the New Jersey Plaintiffs adequately pleaded concealment for purposes of the CFA.

### ii.  Safety concerns

*Perkins* also expressly limited its decision to cases that did not involve claims of safety concerns stating as follows:

> We agree in principle with the trial judge's determination that—**absent those circumstances in which safety concerns might be implicated, as to which we offer no view**—the failure of a manufacturer or seller to advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of the warranty period cannot constitute a violation of the CFA.  **Our determination is driven by the fact that in this case, it was not alleged that the deterioration or failure of such part represented a danger to others**.

*Perkins,* 383 N.J. Super. at 111-112 (emphasis added); *See also* §§ IV.C.2.c.iv., IV.I.3., IV.J.2., and IV.K.2., *infra.*

New Jersey Plaintiffs, in addition to raising specific allegations of PCNA's knowledge of the defect, have pointed to the serious safety concerns raised by the defect.  The coolant pipe failure allows coolant to leak out onto other parts of the motor which can lead to engine malfunction or seizure.  Indeed, one California Plaintiff had his engine seize at night on the highway, leaving him and his daughter stranded in the dark for hours.  Compl. ¶¶ 80-83.  These safety concerns raise a duty to disclose that prevents PCNA from raising the warranty defense to a CFA claim.  *In re Philips Magnavox TV Litig*, 2010 U.S. Dist. LEXIS 91343 at *19. (holding

that a warranty defense is unavailable where defendant has an obligation of disclosure and such obligation arises when there is, *inter alia*, a safety concern).

Likewise, in *Doll* the Court discussed *Perkins* extensively in considering an analogous claim regarding an allegedly defective auto part (a torque converter), and found *Perkins* inapplicable because, unlike in *Perkins*, "plaintiffs have alleged that the defect in question is related to the safety of the vehicle." *Doll*, 2011 U.S. Dist. LEXIS 95427 at *42. *Cf. Nobile v. Ford Motor Co.*, No. 10-1890, 2011 U.S. Dist. LEXIS 26766, *16-17 (D.N.J. Mar. 14, 2011).

As alleged in paragraph 412 of the Complaint, PCNA also had statutory obligations to notify consumers of the defect in its Cayenne vehicles.  The Motor Vehicle Safety Act, 49 U.S.C. §§ 30118 and 30119, requires vehicle makers to send out notifications of defects related to safety.  Although PCNA knew of the defect with the coolant pipes here, no recall or notification procedures were put in place.  Instead, PCNA put the burden and cost on consumers to both discover the defect and replace the defective parts with replacement kits.  Moreover, consumers had to pay the labor costs involved in replacing the plastic coolant pipes with the metal pipes that, unlike the plastic pipes, were intended to last for the useful life of the vehicle. Compl. ¶¶ 57, 66, 67.

PCNA's duty to inform consumers also arose from the fact that its omission was "contrary to representations actually made by the defendants." *In re Phillips/Magnavox TV Litig.*, 2010 U.S. Dist. LEXIS 91343 at *19.  The Complaint points to several representations that PCNA repeatedly made in its brochures and marketing material regarding the cooling system.  For example:

- In the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperature throughout every part of the engine.
- The cooling system is extremely robust."

- The Cayenne V8 engine's cooling system helps to maximize performance in every respect [and that] strategy for achieving these objectives is nothing if not thorough.

Compl. ¶ 62(b),(e),(g).

These statements fundamentally misrepresent a cooling system that uses plastic coolant pipes that will prematurely crack or burst when subjected to the heat of the engine. And, as alleged in the Complaint, the leading independent Porsche publication, "Excellence" magazine, has run multiple articles on this problem and recently indicated that "[t]he demise of the original coolant pipes is pretty much unavoidable; at some point they will leak and require replacement." Compl. ¶ 60. Accordingly, PCNA had a duty to inform consumers that its representations were contrary to the knowledge it had of the defects in the coolant pipes. Instead, Defendant chose not to comply with its equitable and statutory duty to notify consumers. *Glass v. BMW of N. Am., LLC*, No. 10-5259, 2011 U.S. Dist. LEXIS 149199, *27-30 (D.N.J. Dec. 29, 2011) (citing *Perkins*, *Alban*, and *Noble* for the proposition that a failure to inform consumers that a part may require repair after the expiration of warranty alone is not a violation of the CFA and requiring more specific indications of a manufacturer's knowledge with certainty that a part will fail).

Although the cases are not entirely uniform, *Henderson* and *In re Philips/Magnavox* make clear that courts routinely apply the safety exception stated in *Perkins*, where, like here, a manufacturer's internal documents and data, and complaints from regulatory agencies, indicate a manufacturer's specific knowledge of a dangerous defect and a failure to comply with its obligations to inform consumers. *See also* § IV.B.1.b., *infra*. As a result, the safety concerns pleaded by the New Jersey Plaintiffs also support the denial of PCNA's Motion to Dismiss on this issue.

39

        **b.**     **New Jersey Plaintiffs have pled their CFA claim with the particularity required under FRCP 9(b)**

PCNA also contends that New Jersey Plaintiffs' CFA claim fails for lack of particularity pursuant to Rule 9(b).  PCNA is, again, incorrect.

Under Rule 9(b) a plaintiff must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud claim." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).  Although CFA claims are subject to the heightened pleading standards of FRCP Rule 9(b), "the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  Accordingly, in the context of fraudulent omissions, plaintiffs who allege that a car manufacturer "did not fully and truthfully disclose to its customers the true nature of . . . inherent design defects, which are not readily discoverable until years later, often after the warranty has expired," successfully state a claim for consumer fraud under the CFA.  *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008).

In *Henderson v. Volvo*, the court further ruled that consumer allegations of a car manufacturer's failure to disclose knowledge of design defects in specific model years, where that knowledge is "evidenced by: widespread complaints of transmission problems on the internet, complaints to the National Highway Traffic Safety Administration . . .; complaints received by [the manufacturer] [and] technical service bulletins issued by [the manufacturer] in attempts to address this known problem" satisfy the Rule 9(b) pleading standards for a CFA claim of knowing omission.  *Henderson*, 2010 U.S. Dist. LEXIS 73624, at *3-4.

Likewise, in *Luppino v. Mercedes-Benz USA, LLC*, No. 09-5582, 2010 U.S. Dist. LEXIS 83584 (D.N.J. Aug. 16, 2010), the court determined that allegations that a manufacturer

knowingly withheld knowledge of a part defect were stated with sufficient specificity under Rule 9(b) when the allegations were based on NHTSA data revealing the defect, anecdotal evidence of NHTSA complaints, and the manufacturer's ultimate change in design. *Luppino*, 2010 U.S. Dist. LEXIS 83584 at *21-24 (citing *Maniscalco* and *Dewey* in denying Rule 9(b) challenge to consumer fraud pleadings); *see also Alin v. Am. Honda Motor Co., Inc.*, No. 08-4825, 2010 U.S. Dist. LEXIS 32584, at *28-29 (D.N.J. Mar. 31, 2010) (finding that allegations of manufacturer's sale and lease of vehicle with a known defective part that will prematurely fail provided the requisite notice of precise misconduct under Rule 9(b), based on an authorized service technician's statement about the frequency of the part failure).

The New Jersey Plaintiffs have raised claims virtually identical to those in *Dewey*, *Henderson*, and *Luppino*. Plaintiff's allegations detail PCNA's knowledge of the defect from the first year of the Cayenne sales in 2003. Compl. ¶ 59. Moreover, the New Jersey Plaintiffs point to an attached internal PCNA document that specifically identifies the problem of leaking plastic coolant pipes and requires replacement with aluminum pipes in all Cayenne models. Compl. ¶ 58, Ex. A.

By contrast, *Federico*, relied upon by PCNA, dismissed the consumer's claim because her complaint made only "generic references to Home Depot's excessive late rental fees, failure to disclose lack of after-hours rental return facilities or procedures, and false representation . . ." Accordingly, the Circuit Court affirmed the dismissal of Federico's claims because "[n]one of these broad statements disclose the particular argument made on appeal as to the substance of the misrepresentation, namely, that Home Depot misrepresented the actual hours during which vehicles could be returned so as to avoid or halt the accumulation of late fees." *Federico*, 507 F.3d 188, 200-01. In contrast, the New Jersey Plaintiffs in the instant case have not made

41

"generic references" to the Cayenne underperforming in some vague sense, but rather have identified a specific, defective part and specific, knowingly misleading, statements made by PCNA regarding the defective part.  *See, e.g.*, Compl. ¶ 62, Ex. A. excerpted, *inter alia*, at Section IV.E.1.c., *infra*.

It must also be noted that the *Henderson* and *Luppino* decisions specifically apply the standards identified by the *Federico* court in holding allegations nearly identical to those raised by Plaintiffs here sufficient to satisfy Rule 9 (b).  *Henderson*, 2010 U.S. Dist. LEXIS 73624, at *15-21; *Luppino*, 2010 U.S. Dist. LEXIS 83584  at *17.

PCNA's reliance on *Alban v. BMW N. Am.*, No. 09-5398, 2011 U.S. Dist. LEXIS 26754 (D.N.J. Mar. 15, 2011) and *Rait v. Sears, Roebuck and Co*., No. 08-2461, 2009 U.S. Dist. LEXIS 103091 (D.N.J. Nov. 4, 2009) is equally misplaced.  *Alban* dismissed the claim of a BMW owner who alleged that the manufacturer might have known of a defect that would cause a "burnt-crayon" odor in the interior of the car.  *Alban*, 2011 U.S. Dist. LEXIS 26754 at *37.  In so determining, the Court stressed that BMW's statement that "an unpleasant odor **may** be noticed" in vehicles of a particular class was not sufficient "basis on which to find that all or substantially all" vehicles of that class were affected by the odor.  *Id.* at *35-36 (emphasis in original).

But, unlike in *Alban*, the Complaint here points to a PCNA technical service bulletin that identifies the defect of leaking plastic coolant pipes and specifically advises that "[b]oth coolant pipes **must** be replaced at the same time with new coolant pipes made from aluminum."  Compl. ¶ 58; Ex. A. (emphasis added).  This is not at all like the speculative statements regarding the potential for an "unpleasant odor" made by the manufacturer in *Alban*.   Instead, Plaintiffs here have pointed to the certainty of the coolant pipe failures and the need to replace them in order to avoid the potentially dangerous results related to that failure.  Compl. ¶ 59-60.

42

Moreover, the court in *Alban*, specifically cited the *Perkins* "safety concerns" exception to determine that allegations regarding an odor in the interior do "not provide any basis on which to find that such odor threatens [plaintiff's] safety." *Alban*, 2011 U.S. Dist. LEXIS 26754 at *33-34. Here, as explained above, PCNA had a statutory duty to disclose the defective parts due to their impact on vehicle and consumer safety. Such concerns, as even the court in *Alban* indicates, relax the heightened pleading standards for CFA claims regarding a manufacturer's knowledge of a defect.

*Rait v. Sears, Roebuck and Co*. also does not apply to the facts and allegations raised in this lawsuit. Instead, *Rait*, which involved a consumer claim related to a malfunctioning light bulb in a garage door opener, provides another example of a mere claim for part failure outside of the warranty, with no bearing on safety. *Rait*, 2009 U.S. Dist. LEXIS 103091 at *4 ("[Plaintiff] only has alleged that she purchased a product that broke once, that she was charged for a successful repair, and that there were some complaints about the product on the internet."). Moreover, as described above, New Jersey Plaintiffs here, unlike *Rait*, have pointed to specific representations made by PCNA regarding the quality and performance of the cooling system that are contrary to the knowledge of the defect.

In sum, New Jersey Plaintiffs have provided detailed allegations that PCNA knew of the defects in the Cayenne vehicles as evidenced by a service bulletin making specific recommendations for replacement of the defective part and by NHTSA complaints and other customer complaints on the internet, and failed to notify consumers of the defect, despite its bearing on the safety of the vehicle. Accordingly, New Jersey Plaintiffs have met the Rule 9(b) pleading standards for a CFA claim. *See* §§ IV.C.1., IV.F.1., IV.G.1.a., IV.H.3.a., and IV.K.1, *infra*.

43

> **2.** **New Jersey Plaintiffs may maintain claims for breach of implied warranty despite the expiration of the manufacturer's warranty limiting liability under UCC § 2-314**

Defendant erroneously suggests that New Jersey Plaintiffs are incapable of a maintaining a breach of implied warranty claim because PCNA's warranties expressly exclude any implied warranty of merchantability and expired before Plaintiffs brought their claim. *See also* §§ IV.A.1.b., IV.E.1.b., IV.H.1., IV.J.3., and K.4., *infra*. In order to modify or limit the implied warranty of merchantability, the modification or limitation must be conspicuous. N.J. Stat. § 12A:2-316(2). To be conspicuous under New Jersey law, the modification or limitation must be

> so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court.

N.J. Stat. § 12A:1-201.

Here, Porsche's attempted limitation on the implied warranty of merchantability is not conspicuous. A more detailed discussion of this issue can be found in §§ IV.A.1.b., IV.E.1.b., IV.H.1., IV.J.3., and K.4., *infra*; *see also Realmuto v. Straub Motors*, 65 N.J. 336, 341 n.2 (1974) (attempted disclaimer language in plain text on the back of an agreement was not conspicuous). Because the attempted limitation on the implied warranty of merchantability is not conspicuous, the limitation is ineffective, the implied warranty of merchantability never expired so that the New Jersey Plaintiffs' claims survive the motion to dismiss.

Also, even if the implied warranty of merchantability had been properly limited by PCNA, which it was not, New Jersey Courts, have allowed consumer claims for breach of implied warranty related to auto parts that have failed after the expiration of limited warranties where the time limit is unconscionable or unreasonable. *Henderson*, 2010 U.S. Dist. LEXIS

73624, at *25-27; *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, No. 03-4558, 2008 U.S. Dist. LEXIS 73690, at *59 (D.N.J. Sept. 3, 2008); and *Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, MDL No. 1112, 1999 U.S. Dist. LEXIS 22892, at *12 (D.N.J. May 14, 1999).

The New Jersey Plaintiffs have alleged that Defendant breached the implied warranty of merchantability as the cooling system in the Cayennes was defective and of a lower quality than similar goods in the industry. Compl. ¶ 421. And, as explained above, the Complaint includes allegations that the defect in the cooling pipes is contrary to specific representations PCNA made about the cooling system in brochures and marketing materials. Compl. ¶ 62. Furthermore, the New Jersey Plaintiffs alleged that "Porsche knew or was reckless in not knowing this at the time of sale, and knew or was reckless in not knowing that the cooling systems would fail well before their useful lives." Compl. ¶ 422. Moreover, the Complaint specifically alleges that in light of PCNA's knowledge, "any express limitation or negation of Porsche's implied warranty, including any time limitation, is unconscionable, unreasonable, and unenforceable." Compl. ¶ 423.

Although case law is split on the issue, the better view has found that for purposes of a 12(b)(6) motion to dismiss prior to any discovery, allegations of knowing omission of a defect that will not present itself until after the expiration of the limited warranty adequately state a claim for breach of implied warranty under New Jersey law. *In re Samsung DLP TV Class Action Litig.*, No. 07-2141, 2009 U.S. Dist. LEXIS 100065, at *15 (D.N.J. Oct. 27, 2009) (denying dismissal where plaintiffs alleged manufacturer "knew or should have known that the televisions were defective at the time of sale and would fail well before their useful lives, thereby rendering the time limitations insufficient, inadequate, and unconscionable"); *Payne v. Fujifilm U.S.A.*, No. 07-385, 2007 U.S. Dist. LEXIS 94765, at *14-16 (D.N.J. Dec. 28, 2007) (denying

45

dismissal where plaintiffs alleged manufacturer knew of an inherent defect and kept that information form purchasers).

Because questions of unconscionablility should rarely be decided on the pleadings, consumer-plaintiffs in these circumstances should be afforded "a reasonable opportunity to present evidence as to commercial setting, purpose, and effect to aid the court in making the determination whether the time limitations of the warranties are unconscionable, which can only occur after an opportunity for discovery." *Id.* at *16.

Accordingly, the New Jersey Plaintiffs have adequately stated a claim for breach of implied warranty.

### C.  California

PCNA contends that Plaintiffs Conrad, Graas, Krider, and Tran have failed to adequately allege each of the causes of action asserted under California law, and that Plaintiffs have failed to allege violations of the Consumer Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL") with respect to PCNA with sufficient particularity.  These arguments misinterpret California law and require the Court to ignore or disregard factual allegations from the Complaint.  As such, each of PCNA's contentions must be rejected.

#### 1.  The claims against PCNA satisfy Rule 9(b)

PCNA argues that California Plaintiffs fail to plead their claims under California law with the requisite specificity, primarily because California Plaintiffs fail to specify which conduct is attributable to PCNA, as opposed to PAG.  PCNA is wrong, for the following reasons.

Rule 9(b) of the Federal Rules of Civil Procedure, which requires that allegations of fraud be pleaded with particularity, applies to claims which are made in federal court under the CLRA and UCL.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009).  However, the Court

must accept as true all factual allegations in the Complaint and must draw all reasonable inferences from those allegations, construing the Complaint in the light most favorable to Plaintiffs. *See Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863, 2008 U.S. Dist. LEXIS 68419, at *6-7 (C.D. Cal. July 10, 2008) (citing *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006)). Furthermore, contrary to Defendant's assertions, Rule 9(b) does not require the pleading of detailed evidentiary matter. All that is necessary is "identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1232 (C.D. Cal. 2011).

While it is true that under FRCP 9(b) allegations of fraud must be pleaded with particularity, courts have acknowledged that plaintiffs have extra leeway when the necessary information is under the exclusive control of the defendant in order to avoid rewarding fraudulent activity that is successfully concealed. *See United States v. Smithkline Beecham Clinical Labs.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)); *see also Deutsch v. Flannery*, 823 F.2d 1361, 1366 (9th Cir. 1987); 2-9 James Wm. Moore *et al.*, Moore's Federal Practice - Civil § 9.03.

The district court well-summarized these standards in *Falk v. GMC*, which presented a factual pattern remarkably similar to the present case, as follows:

> Allegations of fraud must meet the heightened pleading standards of Rule 9(b), which requires "specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Clearly, a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim. Another judge in this district has recognized that a fraud by omission claim can succeed without the same level of specificity required by a normal fraud claim. *See, e.g., Washington v. Baenziger*, 673 F. Supp.

47

> 1478, 1482 (N.D. Cal. 1987) (Weigel, J.) ("Where the fraud consists of
> omissions on the part of the defendants, the plaintiff may find alternative
> ways to plead the particular circumstances of the fraud. [F]or example, a
> plaintiff cannot plead either the specific time of the omission or the place,
> as he is not alleging an act, but a failure to act.") (internal citations and
> quotations omitted); *see also David K. Lindemuth Co. v. Shannon
> Financial Corp.*, 637 F. Supp. 991, 995 (N.D. Cal. 1986) (Weigel, J.).
> Accordingly, plaintiffs' fraud by omission claim will not be dismissed
> purely for failure to precisely state the time and place of the fraudulent
> conduct.

*Falk v. GMC*, 496 F. Supp. 2d 1088, 1098-1099 (N.D. Cal. 2007).

Under a relaxed standard, a pleader need provide only enough detail to give the opposing party notice of the particular misconduct that is alleged to constitute fraud. *Ebeid v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. Ariz. 2010). In this case, the necessary information regarding the extent of involvement of Porsche in perpetrating fraud is under the exclusive control of the respective Defendants – they should not be allowed to profit by concealing details of their fraud.

Moreover, in the context of a fraud suit involving multiple defendants, a plaintiff need only "identif[y] the role of [each] defendant[] in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (citing *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)). California Plaintiffs have done so. The Complaint identifies PCNA as a wholly-owned subsidiary of PAG. Compl. ¶ 33. California Plaintiffs have identified PCNA as the importer of PAG's vehicles for sale and lease in the US. *Id.* California Plaintiffs have identified PCNA's role as being responsible for vehicles, parts, servicing, marketing, training, and warranting Porsche vehicles in the U.S. *Id.* California Plaintiffs have identified PCNA as the exclusive manufacturer, importer, and/or seller of Porsche Cayenne vehicles in the US. *Id.* Accordingly, California Plaintiffs, to the extent reasonably possible, have "identif[ied] the role of each defendant in the fraudulent scheme" satisfying the particularity requirements of

Fed. R. Civ. P. 9(b).  *See Swartz*, 476 F.3d at 765; *see also* §§ IV.B.1.b., IV.F.1., IV.G.1.a., IV.H.3.a., and K.1., *supra* and *infra*.

PCNA also briefly argues that the Complaint fails because it does not "describe when the decision to conceal the defect was made, who made it, where it occurred, and where it was implemented."  Such details are simply not required in a Complaint, especially one based on concealment.  See *Falk*, 496 F. Supp. 2d at 1098-1099.  California Plaintiffs have done more than necessary to adequately identify the circumstances constituting fraud so that Defendant can "prepare an adequate answer from the allegations."  *Cholakyan*, 796 F. Supp. 2d at 1232.  California Plaintiffs have described with particularity that the defect was not disclosed and additionally described with particularity the impact of that non-disclosure.  California Plaintiffs have also described when and how PCNA had knowledge of the defect which was not disclosed.  In a case of non-disclosure, requiring California Plaintiffs to attempt to list all the places in which the disclosure could have been made, but was not, would be nonsensical and is not required by law.  As such, the complaint satisfies Fed. R. Civ. P. 9(b)'s heightened pleading standard.[6]

### 2.    Plaintiffs state a claim under the Consumer Legal Remedies Act

The Complaint alleges violation of two sections of the CLRA:

(5)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or

---

[6]    Finally, dismissals under Rule 9(b) are "functional[ly] equivalent" to dismissals under Rule 12(b)(6) and should be without prejudice if defects are curable.  Swartz, 476 F.3d at 765 (reversing the district court's denial of leave to amend a fraud claim).  Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint cannot possibly be cured by amendment.  *Middlesex Ret. Sys.*, 2008 U.S. Dist. LEXIS at *7 (citing *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)); see also *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  If the Court finds that the Complaint fails to meet the Fed. R. Civ. P. 9(b)'s particularity requirement, California Plaintiffs respectfully request the Court grant leave to amend.

that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

. . . .

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

Cal. Civ. Code §§ 1770(a)(5),(7).

The CLRA is to be broadly construed, in accordance with the legislature's intent as expressed in the statute.  *See* Cal. Civil Code § 1760 ("This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection"); *accord Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 869-879 (2002) (acknowledging "the requirement that the [CLRA] be construed liberally").

### a.  *Bardin* and *Daugherty* do not bar all post-warranty CLRA claims

PCNA argues that California Plaintiffs' CLRA claim is precluded by the *Daugherty* and *Bardin* line of cases.  *See Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006); *see also Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (Cal. Ct. App. 2006).  PCNA argues that *Daugherty* and *Bardin* bar any CLRA claim based on defects that become manifest after the express warranty period.  This view is incorrect.

*Daugherty* and *Bardin* do not establish an absolute bar to post-warranty defect claims under the CLRA.[7]  As explained by Judge Alsup in *Falk*, *Daugherty* and *Bardin* were decided on their particular facts, and the CLRA claims were rejected because plaintiffs failed to allege any facts establishing a duty to disclose.  *See Falk*, 496 F. Supp. 2d at 1094.

---

[7]  PCNA uses both *Daugherty* and *Bardin* as purportedly persuasive authority in other states.  California Plaintiffs' arguments in this section and elsewhere dealing with these cases should be considered applicable to all states.

50

> In both of these cases, the court's decision to dismiss a claim for unlawful omission rested on the lack of a duty to disclose.  Both *Bardin* and *Daugherty* allow CLRA claims for certain omissions, however, when the "omission [is] contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Daugherty*, 144 Cal. App. 4th at 824.  *Daugherty* emphasized that an "unreasonable" safety risk would lead to a duty to disclose.

*Falk*, 496 F. Supp. 2d at 1094.

In other words, *Bardin* and *Daugherty* did nothing to change two fundamental ways in which a defendant's omissions can create CLRA liability:  (1) when the defendant makes a representation "which could have the likely effect of misleading the public 'for want of communication' of the" omitted facts; or (2) when the defendant has a duty to disclose the defect.  *Bardin*, 136 Cal. App. 4th at 1276; *accord Daugherty*, 144 Cal. App. 4th at 824.  California Plaintiffs' allegations in this action establish both that PCNA made representations that were misleading due to omission of information regarding the coolant tube defect, and that PCNA had a duty to disclose the coolant tube defect.

### b.　　PCNA made representations that were misleading

As detailed in the Complaint, PCNA's advertising and promotional materials related to the Cayenne were misleading.  *See* Compl. ¶¶ 39, 40, 42, 43, 49, 62(a)-(g) (quoted in Mot. to Dismiss at 36-37, n.11).  These representations "could have the likely effect of misleading the public" because they omitted key facts – namely that Cayennes' coolant tubes and systems were not designed for "long service life," "optimal cooling," or "prolonged heavy-duty operation," but instead were designed to provide cost savings to Defendant.  *See Bardin*, 136 Cal. 4th at 1276.  PCNA argues that the representations are "puffery," and therefore do not constitute an actionable representation.  The cases relied upon by PCNA involved vague general statements about the quality of the whole product.  They were not, as is the case here, specific representations about a

51

particular component of the overall product.  *See also, e.g.*, §§ IV.D.1.c., IV.F.1.d., IV.H.3.a., IV.I.5.c., and IV.J.1.fn. 35, *infra*.

For example, in *In re Sony Grand WEGA KDF-E A 10/A20 Series Rear Projection HDTV Television Litig.*, Nos. 08-CV-2276-IEG (WVG), 09-CV-0620-IEG (WVG), 09-CV-0736 (WVG), 09-CV-2703-IEG (WVG), 2010 U.S. Dist. LEXIS 126077, at *21 (S.D. Cal. Nov. 30, 2010), which PCNA relies upon heavily, the plaintiffs' complaint rested "on alleged representations that the televisions were of 'high' or 'superior' quality."  The alleged defect, however, was very specific in nature:  "anomalies, including bright blue, yellow, and green spots, stains, and haze.  Those anomalies were allegedly caused by a defect inherent in the LCD rear-projection technology utilized in the televisions' 'optical block' – the component part of the televisions that causes the video signal to be displayed as a picture on the viewing screen."  *Id.* at *7.  Indeed, *In re Sony Grand* acknowledged the importance of this distinction, noting that "misdescriptions of specific . . . characteristics of a product are actionable."  *Id.* at *20.

PCNA's representations here were related to the specific characteristics of the defective product.  PCNA specifically represented that the components of its cooling system were designed for "long service life" and "optimal cooling."  Compl. ¶ 43.  When combined with the omission of the fact that the coolant tubes were made of a plastic compound that would not last as long as high quality aluminum tubes, these representations "could have the likely effect of misleading the public."  *Bardin*, 136 Cal. App. 4th at 1276.  Accordingly, under *Bardin* and *Daugherty*, California Plaintiffs have stated a valid claim under the CLRA because PCNA omitted material facts which made their public statements misleading to consumers.

Moreover, PCNA's arguments about why the representations were not misleading, or why the representations were true, are an attempt to resolve factual disputes about the meanings

of the representations and how they were interpreted by consumers.  This is inappropriate in a motion to dismiss.  *See Louisville/Jefferson County Metro Gov't*, *supra*, at § III, 590 F.3d at 384.  Further, PCNA's "explanations" are unavailing.  PCNA contends that the first four statements listed in footnote 11 of its Motion (Compl. ¶¶ 39, 40, 42) are not misleading because they only relate to marketing materials describing Porsche as an "innovator and leader in the high-performance automotive industry."  Those statements were misleading and false as the coolant systems were not in fact high performance, excellent, or high quality – instead they were designed and installed because they were cheap, and as a result they were destined to fail.  It would certainly be reasonable for a consumer to conclude from these assurances that the coolant system was not defective and was not designed to fail prematurely.

PCNA next contends that the fifth and sixth statements in footnote 11 (Compl. ¶¶ 43, 49) merely describe how the coolant system operates and therefore cannot be promises underlying a CLRA claim because "neither makes any representation regarding the longevity" of the coolant system.  Mot. to Dismiss 37.  Again, this is a factual assertion about how consumers would interpret those statements.  The fifth statement promised that the system was designed for "optimal cooling" which was objectively false.  PCNA's only argument regarding the sixth statement is that it is "objectively true" which, at most, creates a factual issue about whether the statement was true and whether reasonable consumers would be misled by the statements.  Determination of these issues is inappropriate at this stage when all factual allegations must be accepted as true.  *See Louisville/Jefferson County Metro Gov't*, 590 F.3d at 384.

PCNA next argues that statements 7, 8, and 9 in footnote 11 (Compl. ¶¶ 62(a) – (c)) describe how the system was tested.  Again, whether a consumer would interpret those statements about the testing of the system to constitute a promise that the coolant system was not

defective is a question of fact. California Plaintiffs allege that those statements were untrue and misleading, an allegation which must be accepted as true for purposes of this motion. *See Versatile Helicopters,* at *3-4, at § III, *supra.*.

Finally, PCNA argues that statements 10-13 in footnote 11 (Compl. ¶¶ 62(d) – (g)) are merely "prideful opinions and semantics" which do not subject it to CLRA liability. This is incorrect. Those statements assert objective facts indicating that engine cooling is important to performance and that the Cayenne was designed after scrupulous research. Despite this "scrupulous research," the Cayennes contained defective parts which were known to prematurely fail. This demonstrates exactly the sort of conduct the CLRA was designed to prevent and exactly the sort of conduct the CLRA is designed to remedy when it occurs. This Court should reject PCNA's attempts to explain its statements and to factually assert what consumers did and did not believe as a result of those statements.

### c.      PCNA had a duty to disclose the coolant tube defect

The second alternative by which California Plaintiffs may establish omission-based CLRA liability is the allegation of facts that establish a duty of disclosure. *See Falk*, 496 F. Supp. 2d at 1094. PCNA argues that under *Daugherty*, CLRA liability for post warranty defects arises only when "the defect at issue presents a safety concern." Mot. to Dismiss at 35. PCNA mischaracterizes *Daugherty*, which did not so limit the duty to disclose. Instead, under well-settled California law, a duty to disclose arises under any of the four following circumstances:

> (1) When the defendant is in a fiduciary relationship with the plaintiff; (2) When the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) When the defendant actively conceals a material fact from the plaintiff; and (4) When the defendant makes partial representations but also suppresses some material fact.

*LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (Cal. Ct. App. 1997); *accord Falk*, 496 F. Supp. 2d at 1095.

The fourth *Judkins* prong is identical to the circumstance described in the foregoing section, in which there are allegations of an omission "which could have the likely effect of misleading the public 'for want of communication' of the" omitted facts. *Bardin*, 136 Cal. App. 4th at 1276. In addition, as discussed in the following sections, the allegations of the Complaint in this case adequately establish a duty to disclose under the second and third prongs of the *Judkins* test.

Additionally, even were PCNA correct, the allegations in the Complaint demonstrate an objective safety risk under California law, precluding dismissal of the action.

### i.      The defect is material

Under both the second and third prongs of the *Judkins* test, the nondisclosed information must be material. Here, as in *Falk* and *Chamberlan v. Ford Motor Co.* (314 F. Supp. 2d 953 (N.D. Cal. 2004)), the defect was material. "In order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Falk*, 496 F. Supp. 2d at 1095 (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (Cal. 1993)). "Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer.'" *Id.* (quoting *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360 (Cal. Ct. App. 2003)).

In *Falk*, Judge Alsup found that the defect – defective speedometers – was material, based on allegations that "had [Plaintiff] known of the alleged defect in certain GM speedometers, they would have considered not purchasing the trucks or demanding a lower price." *Id.* at 1095 (citing to complaint). Moreover, Judge Alsup noted that:

> Common experience supports plaintiffs' claim that a potential car buyer would view as material a defective speedometer.  That a speedometer is prone to fail and to read a different speed than the vehicle's actual speed, even a difference of ten miles per hour, would be material to the reasonable consumer, driver and passenger.  Such a faulty speedometer easily would lead to traveling at unsafe speeds and moving-violation penalties.

*Id*. at 1096.

Judge Alsup also added the following, in a footnote:

> Moreover, plaintiffs successfully allege that the potential for failed speedometers constitutes a safety hazard.  Daugherty stated that the "unreasonable risk alleged is merely . . . the cost of repairs in the event the defect ever causes an oil leak."  *Daugherty*, 144 Cal. App. 4th at 836.  Here, plaintiffs allege a far greater risk:  the risk of inadvertent speeding, driving at unsafe speeds, and accidents.  These risks are far more "unreasonable" than the monetary consequences in *Daugherty*, and further strengthen plaintiffs' arguments that their speedometers were truly defective.  Plaintiffs therefore state sufficient facts to survive a Rule 12(b)(6) motion to dismiss on their allegation of defective speedometers.

*Id.* at 1096 n.*.

Similarly, in *Chamberlan*, Judge Wilken found a defect – very similar to the defect in this case – to be material for purposes of the CLRA.  In *Chamberlan*, the defect was a plastic intake manifold put in several Ford vehicles.  *See Chamberlan*, 369 F. Supp. 2d at 1141.  The court held that:

> An intake manifold performs multiple functions in a automobile engine.  The intake manifold distributes air to each of the engine's cylinders.  The intake manifold may also serve as part of the cooling system by channeling coolant across the engine, to and from the radiator.  **Historically, intake manifolds have been made of aluminum or other metal.**  Aluminum manifolds can be expected to last the life of the engine.  Defendant had no problems with the performance of the water crossover portions that distribute coolant in its aluminum manifolds.

*Id.* (emphasis added).

Unlike the standard aluminum intake manifolds, the new plastic intake manifolds did not last as long as expected, leading to coolant leaks, failed manifolds, and the risk of total engine failure.  *Id.* at 1141-42.  On summary judgment, Judge Wilken found that the defective nature of the plastic intake manifolds would be material to the "reasonable consumer."  *Id.* at 1145.

Plaintiffs' case is highly analogous – indeed almost identical – to *Falk* and *Chamberlan*. As in *Chamberlan*, this case is about using plastic, rather than aluminum, in a critical engine component, resulting in premature failure, leakage of coolant, and expensive repair.  As alleged in the Complaint, this defect – had California Plaintiffs known about it – would have affected California Plaintiffs' purchasing decisions.  *See, e.g.,* Compl. ¶ 65 ("The facts that Porsche's plastic coolant tubes – a critical component of the vehicles – were destined to crack and fracture and that they were subject to a costly replacement program were material facts.  Knowledge of these material facts would have altered consumers' buying decisions."); *see also* Compl. ¶¶ 72, 76, 78, 88, 90, 97, 100, 103.  The Complaint also alleges failure of the tubes is likely to occur "under normal use and within the cooling system's expected useful life, rendering the vehicle inoperable and causing engine damage."  Compl. ¶ 54.  Finally, the Complaint details how failure is extremely costly, can cause serious transmission damage, and can disable the vehicles without warning, leaving motorists stranded.  *See, e.g.*, Compl. ¶¶ 55-57, 74, 78, 80-82, 85, 91, 107, 108, 117, 119, 220-223, 229, 230.

As in *Falk*, "common experience supports plaintiffs' claim that a potential car buyer would view as material" a defect that causes thousands of dollars in damages, and can disable the car completely, without warning.  This is not a case like *Bardin*, where the defect did not disable the vehicles, *see* 136 Cal. App. 4th at 1262 (cracked exhaust manifolds), nor is it a case such as

*Daugherty*, in which the "defect may be easily repaired by installing a retainer bracket designed to maintain the oil seal in its proper position," *Daugherty,* 144 Cal. App. 4th at 827.

Finally, as in *Falk*, the defect constitutes a safety hazard. *See* § IV.C.2.a., *supra*. As detailed in the Complaint, the plastic cooling tubes can fail, without warning, immediately and permanently disabling the vehicle – whether in the middle of the freeway or in the middle of nowhere.

For all of these reasons, the defective coolant tubes are a material defect.

ii.     **Defendant had exclusive knowledge of the coolant tube defect**

Under the second *Judkins* factor, a duty to disclose arises "when the defendant had exclusive knowledge of material facts not known to the plaintiff." *Judkins*, 52 Cal. App. 4th at 337. In *Falk*, Judge Alsup found the complaint adequately alleged exclusive knowledge, stating:

> Plaintiffs claim that "[o]nly GM had access to the aggregate data from its dealers[,] only GM had access to pre-release testing data[, and] only GM had access to the numerous complaints from its customers." When accepted as true for the purposes of this Rule 12(b)(6) motion, plaintiffs' material allegations suffice to state a claim that GM had exclusive knowledge of the alleged defect in their speedometers. The record of complaints to GM between 2003 and 2007 show that GM was clearly aware of a problem with its speedometers; the record makes it equally clear that customers only became aware of the problem if they actually experienced it first-hand. Since, as plaintiffs argue, GM "was in a superior position to know" that its speedometers might fail, plaintiffs successfully state a CLRA claim for omission of a material fact which lay within GM's exclusive knowledge. This alone defeats GM's 12(b)(6) motion to dismiss for failure to state a claim.

*Id.* at 1096-97.

Similarly, California Plaintiffs in this case allege that PCNA "is aware of the failure rate of its plastic coolant tubes and has received many complaints from Cayenne owners and lessees concerning failure of the tubes since the U.S. commercial launch of the Cayenne in 2003."

Compl. ¶ 59. Moreover, the Complaint describes how PCNA's mechanics see so many of these burst coolant tubes that they have no problem providing an immediate estimate for the repair. *See e.g.,* Compl. ¶¶ 93, 147, 161, 185, 226. Only Porsche had the aggregate data from such mechanics. Based on its exclusive knowledge, Porsche issued an internal service bulletin, dated February 22, 2008, that detailed the fix for the leak. Compl. ¶ 58, Ex. A.

As in *Falk*, the ordinary consumer had no way of knowing of all of the complaints to Defendant about the coolant tubes, and had no way of knowing that Porsche had accumulated sufficient information regarding the defect to issue an internal service bulletin. As alleged in the Complaint:

> Plaintiffs could not have discovered through the exercise of reasonable diligence that their Cayennes' plastic coolant tubes were defective . . . . Among other things, Plaintiffs did not know and could not have known that the coolant tubes regularly fail in other similar vehicles and/or that [Defendant] recommended to its dealerships that they be replaced with aluminum tubes. Due to the concealed placement of the tubes within the engine bay, Plaintiffs did not and could not have performed a visual inspection that would have revealed the defect.

Compl. ¶ 35.

These allegations, like those in *Falk*, sufficiently claim that Porsche "had exclusive knowledge of facts not known to the plaintiff." *Judkins*, 52 Cal. App. 4th at 337. Accordingly, under the second prong of *Judkins* alone, California Plaintiffs' CLRA claim survives.

### iii. Defendant actively concealed the defect from Plaintiffs

Under the third *Judkins* prong, a duty exists "when the defendant actively conceals a material fact from the plaintiff." *Judkins*, 52 Cal. App. 4th at 337. Such is the case here.

In *Falk*, Judge Alsup found this prong met based in part on allegations that "various GM customers complained between 2003 and 2007 yet GM never made any attempt to notify other

customers or issue a recall, [which] suggests that GM may have attempted to actively conceal the alleged defect in their speedometers."  496 F. Supp. 2d at 1097.

Similarly, in this case, California Plaintiffs' Complaint alleges that PCNA received complaints, knew of the defect, and even internally acknowledged the defective nature of plastic coolant tubes with an internal technical bulletin (Compl. ¶¶ 58, 59), but "never made any attempt to notify Cayenne owners or lessees of the problem, nor did it effect a recall."  Compl. ¶ 66. This strongly suggests PCNA knowingly concealed the defect from its customers, establishing a duty to disclose the defect and triggering CLRA liability.  *See Falk*, 496 F. Supp. 2d at 1097; *see also Judkins* 52 Cal. App. 4th at 337.

### iv.    The Complaint alleges a significant safety risk to the public resulting from the defect

Even ignoring *Judkins*, as PCNA does, Plaintiffs state a claim because the defect in the Cayennes constitutes a significant safety risk.  *See, e.g.*, Compl. ¶ 70, 71; *see also* §§ IV.B.1.a.ii., IV.I.3., IV.J.2., and IV.K.2, *supra* and *infra*.  Seven of the Plaintiffs named in the Complaint had their engines or transmissions fail and/or become damaged, requiring additional repairs beyond the replacement of the coolant tubes.  *See, e.g.,* Comp. ¶¶ 74, 78, 85, 107, 108, 119, 149, 150, 192, 229, 230.  Additionally, six of the named Plaintiffs were stranded and felt unsafe driving the vehicle as a result of the failure.  *See, e.g.,* Comp. ¶¶ 80-82, 91, 107, 117, 193, 220-223.  The fact that the coolant tube failure causes Cayennes to become inoperable, causes engines to emit smoke, causes individuals to cease operating the Cayennes — including being forced to do so on the side of highways — and  causes individuals to feel unsafe operating their vehicle is sufficient to state a safety risk.

PCNA contends that there is no claim that the defective coolant tubes "cause sudden, unexpected engine failure, or that it compromises power steering, breaks, or other systems

necessary to vehicle operability. . .  [nor does the Complaint allege] a single way in which the defect adversely affects vehicle performance to such an extent that it places consumers at a heightened risk of physical harm."  Mot. to Dismiss 41.  This argument is simply wrong—the Complaint does allege serious impacts on operability and safety.  Moreover, at best, the argument raises factual issues that cannot be considered at this stage.  California Plaintiffs allege that the defect made driving unsafe – an allegation which must be accepted as true for purposes of the present motion.  *See Versatile Helicopters*, 2011 U.S. Dist. LEXIS, at *3-4.  Simply because none of the named Plaintiffs suffered some sort of horrific crash as a result of the defective coolant tubes does not mean that the defect does not present a serious safety risk.  Also, PCNA's contention that the only conditions which can be unsafe are those which would cause sudden engine failure, compromise power steering or brakes or cause unexpected or uncontrolled acceleration or swerving is far too narrow a view of what is safe and unsafe.

As a matter of law, California courts have recognized that simply stopping on the side of a highway is unsafe.  *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (Cal. 2011) (risk of injury resulting from stopping on the side of a highway is sufficiently foreseeable for a driver to owe a duty to other highway travelers because the act of stopping on the side of the highway is necessarily unsafe).  Here, California Plaintiffs allege precisely that situation.  Plaintiff Graas, for example, had his Cayenne's tubes inspected by his PCNA dealer in March 2010, and was told the tubes were fine.  Compl. ¶ 79.  Just six months later, while driving with his daughter on Highway 88 in the Sierra Nevada mountain range, his coolant tubes burst.  Compl. ¶ 80. Stranded on the side of the highway in the middle of the night, Mr. Graas attempted to call all towing companies within a 100-mile radius, but no one would come out.  Compl. ¶ 81. Eventually, a California highway patrol officer arrived and stayed with Mr. Graas and his

daughter until a relative arrived to get them, more than four hours later.  *Id.*  Plaintiff Graas was forced into a situation as a result of the defect that was objectively and subjectively dangerous. Graas feared for his own safety when he discovered that the coolant tubes were defective in Cayennes and sought assistance from his local Porsche dealer.  Compl. ¶ 79.  Despite this action, Graas was forced to sit on the side of the highway for four hours with his daughter as a result of the defective coolant system.  This *per se* dangerous condition was caused by the defective coolant tubes.  *See Cabral*, 51 Cal. 4th at 774-775.

This case, like both *Falk* and *Chamberlan* before it, states a claim under the CLRA because the defect threatens consumer safety.  *See* discussion of *Falk* and *Chamberlan* at §§ III.C.2.c.i-iii., *supra*.  *Falk* dealt with faulty speedometers and *Chamberlan* dealt with plastic (instead of aluminum) manifold defects.  Each of those was unsafe because they caused increased risk to individuals as a result of operating the vehicles with the defect.  Those risks were to drivers, passengers, bystanders, and other travelers.  Here, the exact same is true.  The risk that a Cayenne may be disabled as a result of coolant tubes bursting or leaking, or that the defect may cause an engine failure is sufficient to demonstrate that it is a dangerous defect.  *See Daugherty*, 144 Cal. App. 4th at 839, n.8.

For all of these reasons, California Plaintiffs' Complaint adequately states a claim for violation of the CLRA.

### 3.  Plaintiffs state a valid claim under all three prongs of the UCL

Plaintiffs have adequately pled a violation of the UCL.  The UCL is written in the disjunctive, and it therefore applies separately to business acts or practices that are unlawful, unfair, or fraudulent.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009). California courts have "consistently interpreted the language of section 17200 broadly."  *South*

*Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 877 (Cal. Ct. App. 1999).

<strong>a.    <u>PCNA's conduct was unlawful</u></strong>

In order to state a claim under the unlawful prong of the UCL, a plaintiff must allege violation of other laws. "Virtually any law – federal, state or local – can serve as a predicate" for a UCL claim. *Stevens v. Superior Court*, 75 Cal. App. 4th 594, 602 (Cal. Ct. App. 1999). This includes violations of the laws of other states as well. *See, e.g.*, *Process Specialties, Inc., v. Sematech, Inc.*, No. Civ. S-00-414 (FCD) (PAN), 2001 U.S. Dist. LEXIS 26261, at *45-48 (E.D. Cal. Nov. 8, 2001) (a plaintiff "may bring its UCL claim based on a violation of Delaware law").

As discussed above, Plaintiffs have stated a valid claim under the CLRA (*see* § III.D.2), under the Magnuson-Moss Act (*see* § IV.A., *supra*), and under the laws of numerous other states (*see* §§ IV.B., IV.D., IV.E., IV.F., IV.G., IV.H., IV.I., IV.J., IV.K., and IV.L.). Each of these state laws can serve as a "predicate" for a UCL claim. *Process Specialties*, at *45; *see also AICCO, Inc. v. Ins. Co. of N. Am.,* 90 Cal. App. 4th 579, 587 (Cal. Ct. App. 2001) ("when determining whether a practice is 'unlawful,' section 17200 'borrows' violations of other laws, and makes them independently actionable under the UCL") (citing case). Plaintiffs' UCL claim therefore survives under the "unlawful" prong of § 17200. PCNA's argument that the CLRA claim is not incorporated into the UCL Cause of Action is unavailing. The Complaint alleges "Defendants engaged in unfair competition or unlawful, unfair or fraudulent business practices in violation of the Unfair Business Practices Act when Porsche committed the acts alleged in this Complaint." Compl. ¶ 263. This is sufficient to allege proper claims, so PCNA's Motion to Dismiss should be denied.

**b.      PCNA's actions constitute "unfair" conduct under the UCL**

Plaintiffs have also stated a valid claim under the "unfair" prong of § 17200.  As an initial matter, PCNA mischaracterizes the "unfair" test under the UCL.  The unfairness portion of the UCL is not limited to explicitly unlawful activity, or to activity which causes "substantial injury to consumers."

As explained in *Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999), the California Supreme Court held that an allegation of unfairness under the UCL must be "tethered to some legislatively declared policy."  *Cel-Tech*, 20 Cal. 4th at 186.   In *South Bay Chevrolet* the California Court of Appeals noted that the unfairness "standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud."  *South Bay Chevrolet v. v. GM Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).  In order to determine whether a business practice is unfair, the Court must examine the "practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Id.*

There is plainly a legislatively declared policy, both in California and nationally, against misleading consumers **and** against manufacturing vehicles which are defective and pose a safety risk.  This meets the *Cel-Tech* test.  Further, under *South Bay Chevrolet*, PCNA's conduct is also "unfair."   The impact on victims is high – the defect creates a safety hazard and forces consumers to spend more for their vehicles than they are worth and to spend thousands of dollars on repairs.   Additionally, PCNA gives no counterbalancing rationale for manufacturing the coolant tubes with plastic, which is destined to crack, as opposed to aluminum.   Plaintiffs specifically allege that the industry standard and practice was to use aluminum tubes and that

64

Defendant intentionally decided to use plastic ones in order to save money.  The "utility" of this conduct, if any, is outweighed by the safety risk and financial harm caused to Plaintiffs.  As the Court in *Falk* noted, this is more than sufficient:

> Plaintiffs plead only that GM's business practices were unfair insofar as GM allegedly violated the CLRA.  As shown above, plaintiffs allege sufficient facts to state a CLRA claim; although they do not plead that GM made any representations about the quality of its speedometers, outside of its warranty, they plead sufficient facts to show that GM failed to meet its duty to disclose any known and material defects. This failure to disclose constitutes a violation of the CLRA, which in turn can be an unfair practice under the UCL. Plaintiffs therefore state an unfair practices claim under the UCL.

*Falk*, 496 F. Supp. 2d at 1098.

PCNA's reliance on *Clemens v. DaimlerChrysler Corp.*,534 F.3d 1017 (9th Cir. 2008) is misplaced.  *Clemens* dealt with an appeal of the trial court's decision on summary judgment that plaintiffs had failed to prove any substantive injury resulting from the defendant's conduct. First, this is irrelevant to the present suit as Plaintiffs have alleged substantial injury as discussed above (and because Plaintiffs meet the test articulated in *Cel-Tech*).  Second, *Clemens* dealt with a product defect that was not safety related, as distinguished from this case.  Third, *Clemens* was decided based on a factual determination that there was no proof defendant had engaged in widespread fraudulent conduct, had misled consumers, or had manufactured a product which was a safety risk.  At this stage of the proceedings, this Court must accept as true the allegations in the Complaint that PCNA has engaged in widespread misleading of consumers, has engaged in fraudulent conduct, and has manufactured and sold vehicles which pose a significant safety risk to consumers.

<strong>c.</strong>      <strong><u>PCNA's Actions Were Fraudulent</u></strong>

Under the fraud prong of the UCL, Plaintiffs must allege that "members of the public are likely to be deceived." *Bardin*, 136 Cal. App. 4th at 1261.  In *Falk*, Judge Alsup found this prong satisfied, using the same analysis employed under the CLRA, namely "that GM had a duty to disclose the existence of a known defect to its customers.  If GM had this duty, yet failed to follow through with it, members of the public would very likely be deceived."  *Falk*, 496 F. Supp. 2d at 1098.

Similarly, here, as discussed above, PCNA had a duty to disclose the defect to Plaintiffs under three prongs of *Judkins*, and breached that duty.  Accordingly, because members of the public were likely to be deceived, California Plaintiffs have stated a claim under the fraud prong of the UCL.

<strong>4.</strong>      <strong><u>Unjust enrichment</u></strong>

PCNA argues that there is no separate cause of action for "unjust enrichment" under California law.  In fact, there is a split of authority on the issue under California law.  "California courts appear to be divided on whether there is an independent cause of action for unjust enrichment."  *Keilholtz v. Superior Fireplace Co.*, No. C-08-00836 (CW), 2009 U.S. Dist. LEXIS 30732, at *10 (N.D. Cal. March 30, 2009) (citation omitted); *accord Falk*, 496 F. Supp. 2d at 1099 ("California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy.").  "One view is that unjust enrichment is not a cause of action or a remedy, but a general principle underlying various legal doctrines and remedies."  *Keilholtz* at *10 (citation omitted).  "Another view is that a cause of action for unjust enrichment exists and its elements are receipt of a benefit and unjust retention of the benefit at the expense of another."  *Id*. at *11 (citing *Lectrodryer v. Seoul Bank*, 77 Cal. App. 4th 723, 726

66

(Cal. Ct. App. 2000); *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662-63 (Cal. Ct. App. 1992).

In denying a motion to dismiss an unjust enrichment cause of action, the Court in *Keilholtz* explained that "whether Plaintiffs' unjust enrichment cause of action is construed as a claim for restitution . . . or is considered to be an independent cause of action as in the *Lectrodryer* and *First Nationwide* cases, the allegations are sufficient to state a claim under California law.  Although this claim may ultimately be superfluous to Plaintiffs' restitution claim under the UCL, it is inappropriate at this early stage in the litigation to determine whether other remedies available to Plaintiffs are adequate."  *Keilholtz*, 2009 U.S. Dist. LEXIS 30732 at *11.

The same is true here.  California Plaintiffs have adequately pled a claim for unjust enrichment.  PCNA received benefits – increased purchase prices and repair proceeds – and unjustly retained those benefits at the expense of Plaintiffs and the class.  The allegations are sufficient to state a claim.

> **D.**    **New York**

> **1.**    **New York Plaintiffs properly stated claims under Gen. Bus. Law § 349**

N.Y. Gen. Bus. Law § 349(a) (West 1984) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  To sustain a private claim under § 349, a plaintiff must show "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (N.Y. 2000); s*ee also Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 24-25 (N.Y. 1995).  Furthermore, "because a private action under § 349 does not require proof of the same essential elements (such

as reliance) as common-law fraud, an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed. R. Civ. P., but need only meet the bare-bones notice-pleading requirements of Rule 8(a), Fed. R. Civ. P." *Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005).

The deceptive practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 85 N.Y.2d at 26. "[I]t is not necessary under the statute that a plaintiff establish the defendant's intent to defraud or mislead . . . By the same token, while the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm." *Id.*

> ### a. New York Plaintiffs' claims under § 349 are properly tied to the geographic territory of New York state

In its Motion to Dismiss, PCNA first argues that "Section 349 applies only to transactions that occur within the geographic territory of New York," (Mot. to Dismiss at 48), and that because New York Plaintiffs Dane McIntosh and Gregory Cadman purchased their Cayennes outside the state, the § 349 claims should be dismissed.[8] This is simply wrong. Rather, the case law is clear that purchase of goods in New York is not required, so long as at least some of the alleged deceptive acts or practices occurred in New York.

PCNA's reluctance to analyze the only case upon which it relies (without discussion), *Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E. 2d 1190, 1195 (N.Y. 2002) is understandable, as the facts and holding of the case provide no support for PCNA's argument. In *Goshen*, the New York Court of Appeals answered the question: "can 'hatching a scheme' or

---

[8]     New York Plaintiff Ecliff Jackman purchased his Cayenne, certified pre-owned, from Porsche Roslyn in Roslyn, New York. Compl. ¶ 174. For this reason, Porsche does not seek dismissal of his § 349 claim on this ground.

originating a marketing campaign in New York in and of itself constitute an actionable deceptive

act or practice under the statute, or does the statute also require that the consumer be deceived in

New York?" 98 N.Y.2d at 324. The case joined two related cases, one in which plaintiff was a

Florida resident and purchased allegedly deceptively marketed insurance in Florida, *id.* at 321-

22, and the other in which a mix of New York and non-New York residents brought suit against

an internet service provider for allegedly deceptive acts in marketing DSL service. *Id.* at 322-23.

> In answering its inquiry, the Court of Appeals reasoned that:

> > The reference in section 349(a) to deceptive practices in "the conduct of any business, trade or commerce or in the furnishing of any service **in this state**" (emphasis added) unambiguously evinces a legislative intent to address commercial misconduct occurring within New York. Indeed, an examination of the text of General Business Law § 349 leads us to conclude that "in this state" can only modify "the conduct of any business, trade or commerce [or] the furnishing of any service." The phrase "deceptive acts or practices" under the statute is not the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer. Thus, **to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York**.

*Id.* at 324-35 (citations omitted) (second emphasis added). Accordingly, the Court upheld the §

349 claim except as to the Plaintiff who was "a Florida resident" and, in addition, had

"purchased his [allegedly deceptive insurance] policy and paid his premiums in Florida." *Id.*

> In light of the narrowness of the actual holding in *Goshen*, numerous courts have found

that even loose connections to New York State are sufficient to state a claim under § 349. For

example, Judge Baer of the Southern District of New York discussed the geographic scope of §

349 at length in *Leider v. Ralfe*, and concluded that "[t]hose cases that have rejected § 349 claims

for lack of a geographical nexus to New York involved schemes with **no tangible tie to the

state**." *Leider*, 387 F.Supp.2d 283, 294 (S.D.N.Y. 2005) (emphasis added); s*ee, e.g., Szymczak

v. Nissan N. Am., Inc.*, No. 10-7493, 2011 U.S. Dist. LEXIS 153011, at *23-24 (S.D.N.Y. Dec.

16, 2011) (dismissing § 349 claims of named class members who did not reside in New York, where there was also no allegation that the defective vehicle was purchased in New York, nor that any other deceptive conduct occurred within the state); and *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100-99 (S.D.N.Y. 1997) (same).

In contrast, where a plaintiff alleges that any part of the deceptive conduct occurred in New York, a § 349 claim survives. For example, in *Meachum v. Outdoor World Corp.*, 235 A.D.2d 462, 463 (N.Y. App. Div. 2d Dep't 1997), a New York Appellate Court held that even where a contract was executed in Pennsylvania, a § 349 claim survived a motion to dismiss because the complaint asserted that defendants engaged in deceptive conduct in New York State. *See also Mountz v. Global Vision Prods., Inc.*, 770 N.Y.S.2d 603, 608 (N.Y. Cty. Sup. Ct. 2003).

In the instant case, New York Plaintiffs assert that PCNA committed deceptive acts in New York State, (Compl. ¶¶ 4-8, 43, 60-68, 425-435); that New York Plaintiffs Gregory Cadman and Ecliff Jackman suffered injury in New York as a result of PCNA's deceptions inasmuch as their Cayennes' coolant tubes failed inside New York State, (Compl. ¶¶ 168, 175-77); and finally, that all three New York Plaintiffs were then forced to purchase the "OEM update kit" from PCNA while in New York State, Compl. ¶¶ 168-69, 177-178, 184-186. In every case, New York Plaintiffs were deceived in New York State by PCNA's material misrepresentations regarding the Cayenne's coolant system regardless of where and from whom they purchased their over-priced vehicles, and the harm was suffered in New York, thus establishing the proper geographic nexus for the New York Plaintiffs' § 349 claims.

### b. New York Plaintiffs properly allege deceptive acts or omissions under § 349

PCNA next argues that the New York Plaintiffs fail to allege deceptive acts or omissions because "a manufacturer or distributor commits neither a misrepresentation nor a deceptive

omission by failing to inform consumers that a product may require repair following the warranty period." Mot. to Dismiss 48. This argument distorts the assertions of the New York Plaintiffs, replacing their allegations with a straw man, and effectively asks this Court to convert New York Plaintiffs' § 349 claim into a claim for breach of warranty beyond the expiration date of the warranty.

PCNA fails to recognize that even when an express warranty has expired, or a warranty claim fails, a defendant may be held liable **separately** for deceptive conduct with regard to product defects pursuant to consumer protection statutes, where, as here, PCNA had knowledge of those defects and Plaintiffs allege that they overpaid for the product at issue because of PCNA's deceptions.

The New York Court of Appeals' ruling in *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314 (N.Y. 2002), is instructive. In *Goshen*, the Court upheld denial of a motion to dismiss § 349 claims based on allegedly deceptive "vanishing premium" insurance plans. Critically, the Court held that even though plaintiffs were outside the 30-day trial period for the product and despite a written product disclaimer, those plaintiffs could proceed, stating:

> Plaintiffs assert that the service they purchased was defective due to malfunctions largely or wholly within defendants' control. They further assert that defendants knew this to be the case and that defendants' promotional representations were therefore knowingly deceptive. As pleaded this is sufficient.

*Id.* at 326-327.

Indeed, in *Szymczak*, not cited by PCNA, the Court allowed class claims regarding a defective radiator to move forward under § 349 despite the fact that the named Plaintiffs did not discover the defect until after the warranty expired. The allegations of the plaintiffs in *Szymczak* were virtually identical to those of New York Plaintiffs in the instant case:

71

>Plaintiffs allege defendants had knowledge of the radiator defect as a result of pre-release testing data; early consumer complaints; replacement part sales data; data from dealerships; and from information from their dealers who are, allegedly, their agents for vehicle repairs. Plaintiffs claim they could not have discovered the latent radiator defect through any reasonable inspection. Instead, plaintiffs relied upon defendants' representations and warranties concerning the quality and durability of the vehicles. Plaintiffs further assert defendants failed to adequately research, design, test, and manufacture the radiator and transmissions before warranting, advertising, promoting, marketing, and selling them as suitable and safe for use in the intended manner. Plaintiffs contend that had they known of the defect, they would have taken steps to avoid the danger, would have paid less for their vehicles, or would not have bought them in the first place.

*Szymczak,* 2011 U.S. Dist. LEXIS 153011, at *14.

Despite dismissal of the consumers' warranty claim in *Szymczak*, the Court held that plaintiffs could maintain a cause of action under Section 349 for defendants' failure to disclose a defect when such failure was likely to mislead a reasonable consumer. *See Oswego*, 85 N.Y.2d at 26.

>An omission-based claim is actionable under Section 349 when "the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Id.*, 85 N.Y.2d at 26. Plaintiffs' allegations meet this standard, and their claim under Section 349 based on a failure to disclose is not dismissed.

*Szymczak*, 2011 U.S. Dist. LEXIS 153011, at *46 (*quoting Oswego*, 85 N.Y.2d at 26).

Likewise, in *Doll v. Ford Motor Co*., No. 10-01505, 2011 U.S. Dist. LEXIS 95427 (D. Md. Aug. 25, 2011), also not cited by PCNA, a federal district court in Maryland denied a motion to dismiss an indistinguishable claim under § 349 brought by a New York subclass where Plaintiffs alleged that Ford withheld material information regarding a defective torque converter. The Court described the claim as follows:

>Plaintiffs allege that the Ford vehicles were equipped with defective torque converters that suddenly and without warning prevented the vehicles from accelerating or maintaining their speed. *Id.* ¶ 2.

Consequently, Plaintiffs contend that the defect renders the vehicles entirely inoperative or barely maneuverable, thereby posing a safety hazard for drivers and passengers of the vehicles. *Id.* ¶ 19. Moreover, Plaintiffs claim that the defective torque convertors do not conform to reasonable consumer expectations as these components have a markedly reduced useful life when compared to similar vehicles with similar torque convertors and transmissions. *Id.* ¶ 25. Due to this alleged defect, Plaintiffs were forced to replace the torque converter, transmission, and/or related parts at a cost of approximately $1,000 to $3,000. *Id.*

Plaintiffs further claim that Ford both concealed and failed to disclose essential information concerning the vehicles' defective torque converter. *Id.* ¶ 3. Plaintiffs assert that Ford knew the torque converter was defective and knew that it would fail before the component's expected life. *See id.* ¶ 3-4. Nevertheless, Plaintiffs claim that Ford consciously concealed facts concerning the component's performance history and propensity for premature failure throughout the distribution, marketing, sales, customer service and advertisement of the vehicles. *See id.* Plaintiffs argue that Ford had exclusive knowledge of the defect from access to relevant data, as well as supplemental knowledge from numerous complaints made to Ford by its customers, internet websites, and various other public forums. *See id.* ¶ 26.

As a direct consequence of Ford's conduct, Plaintiffs claim to have suffered injuries, damages and/or ascertainable loss. *Id.* ¶ 28. Plaintiffs assert that they would have paid less for the vehicles or not have purchased the vehicles if Ford had disclosed the material information regarding the defective torque convertor and resulting transmission failure. *See id.* ¶¶ 29, 31. Additionally, Plaintiffs claim to have paid unreasonably high sums of money to repair and replace the vehicles' torque converter, transmission and related parts. *Id.* ¶ 29. Finally, Plaintiffs allege injury because the defective torque convertor effectively prohibited the Plaintiffs' safe enjoyment of the vehicles. *Id.* ¶ 30.

*Doll*, 2011 U.S. Dist. LEXIS 95427 at *4-7.

The Court then discussed the limitations of the "warranty defense" advanced in the instant case by Porsche, stating:

[A] warranty defense is generally unavailable where there are allegations of intentional concealment of a defect or where a defendant has an obligation to disclose the defect. *See Maniscalco v. Brother Int'l Corp.*, 627 F.Supp.2d 494, 501-02 (D.N.J. 2009); *In re OnStar Contract Litig.*, 600 F.Supp.2d 861, 869-71 (E.D. Mich. 2009). A duty to disclose can arise where there is a safety concern, a fiduciary relationship, or where a

defendant's omission goes against a previous representation. See *In re Philips*, 2010 U.S. Dist. LEXIS 91343, 2010 WL 3522787, at *6-7; *In re OnStar Contract Litig.*, 600 F.Supp.2d at 869-71 ("[W]hen safety issues are presented, courts have sustained claims and distinguished those cases"). In the present case, Plaintiffs allege that the sudden loss of power to the vehicles poses a safety hazard for drivers and passengers of the vehicles, as well as for other travelers on the highways and streets. *See id.* ¶ 19. Plaintiffs have pled sufficient facts to show that the defective torque converter presents a risk of accidents and injuries, which directly relates to motor vehicle safety.

*Id.*, 2011 U.S. Dist. LEXIS 95427 at *40-41.

Turning to GBL §349, the Court then stated:

Plaintiffs have adequately pled a claim under [GBL 349]. In the Amended Complaint, Plaintiffs contend that Ford misled consumers by withholding material information regarding the defective torque converter, and, as a result, consumers were harmed by high repair and replacement costs. (*See* Am. Compl. ¶¶ 3, 4). This Court finds that Ford's alleged omissions are consumer orientated, materially misleading, and are the source of the Plaintiff's injuries. Consequently, Defendant's motion to dismiss the Ziehrs' consumer protection claims is DENIED.

*Id.* at 51-52.

Plaintiffs' allegations of PCNA's conduct and other facts in the instant case –Porsche's provision of a defective part with a reduced useful life (Compl. ¶ 54); Porsche's knowing concealment of the defect (Compl. ¶ 63); Porsche's misleading statements in marketing and sales materials (Compl. ¶ 62); the decreased value of the New York Plaintiffs' vehicles (Compl. ¶ 68); the increased repair and replacement costs (Compl. ¶¶ 66-68); the safety related nature of the defect (Compl. ¶ 70); and the duty to disclose it (Compl. ¶ 70) – are materially identical to the claims upheld in *Doll*. *See also Zwicker v. G.M.A.C.*, No. 07-0291, 2007 U.S. Dist. LEXIS 99310 (W.D. Wash. July 26, 2007) (motion to dismiss denied as to Washington Consumer Protection Act claims that auto maker sold vehicles with defective speedometers and had concealed the defect from consumers) (*see* discussion at § IV.L *infra*).

Arguing to the contrary, PCNA relies on two cases:  *Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 267 A.D.2d 44 (N.Y. App. Div. 1st Dep't 1999), and *Moore v. Microsoft Corp.*, 293 A.D.2d 587 (N.Y. App. Div. 2d Dep't 2002).  These cases are easily distinguishable and, as discussed below, their reliance on the effectiveness of contractual disclaimers is, in any event, no longer good law in New York where the § 349 claim is based on deceptive statements and omissions separate from the contract in which the disclaimer appears.

In *Against Gravity*, a plaintiff sued a software manufacturer for selling software that was allegedly not Y2K compliant, but the trial court dismissed the action on the grounds that plaintiff failed to properly allege "a materially misleading or deceptive omission implying Y2K compliance."  267 A.D.2d at 44.  Here, of course, Plaintiffs have made detailed allegations regarding misleading statements and omissions concerning the quality of the Cayennes' cooling systems.  *See, e.g.,* Compl. ¶¶ 62-64

Moreover, *Against Gravity* was also based in part on a disclaimer that, under *Goshen* (decided later the same year) and progeny, would now be ineffective as a defense to a § 349 claim as a matter of law.  Indeed, even prior to *Goshen*, the Court of Appeals had clarified that claims under § 349 survive notwithstanding express disclaimers in a contract between purchaser and seller where the claims "are based on deceptive business practices, not on deceptive contracts."  *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 344-345 (N.Y. 1999)*; see also DeAngelis v. Timberpeg East, Inc.*, 2008 NY Slip Op 4253 (N.Y. App. Div. 3d Dep't May 8, 2008) (same).[9]

---

[9]     PCNA also references *Against Gravity* in the portion of its Motion to Dismiss dealing with Ohio Plaintiffs.  *See* § IV.I., *infra*.  The arguments presented here are equally applicable under Ohio law.

The other case relied upon by Porsche, *Moore v. Microsoft*, is similarly unavailing.  In *Moore*, the plaintiffs alleged a software defect, but did not allege any misleading statements or other deception beyond the weakness of the product itself.  The Court upheld the enforceability of an "End-User License Agreement," including a disclaimer of all warranties, where Plaintiff "failed to allege that the defendant engaged in materially misleading practice" but merely asserted that the software contained errors.  *Moore*, 293 A.D.2d at 587.[10]

In contrast, New York Plaintiffs in the instant case have alleged a detailed list of misleading statements and omissions.  *See, e.g.,* Compl. ¶¶ 39, 40, 42, 43, 62-67.  The New York Plaintiffs' § 349 allegations focus on PCNA's misrepresentations and omissions regarding the true performance of the Cayenne's cooling system, not on the quality of the warranty offered for the Cayenne.  The New York Plaintiffs assert that PCNA knew that the Cayenne's defective coolant pipe would cause the pipes to prematurely degrade and fracture, subjecting class members to a substantial safety risk should the tubes fail while driving.  Despite that knowledge, PCNA concealed information about the defects from its customers while simultaneously promoting the Cayenne's coolant system as of extraordinarily high quality.  Compl. ¶¶ 53-70.  And *Moore*, like *Against Gravity*, was also decided prior to *Goshen*'s holding that a claim under § 349 survives so long as "Plaintiffs assert that the service they purchased was defective due to malfunctions largely or wholly within defendants' control . . . [;] that defendants knew this to be the case and that defendants' promotional representations were therefore knowingly deceptive."

---

[10]     Although not cited by PCNA, it should be pointed out that nothing in *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y. 1997) casts doubt upon the viability of New York Plaintiffs' claims.  In *Weaver*, the Court dismissed a § 349 claim where a plaintiff had not identified any specific misleading statements by the defendants regarding the quality of the alleged defect with an integrated child safety seat, and made all of its § 349 allegations on information and belief.

In sum, for the same reasons cited in *Goshen*, *Szymczak*, and *Doll*, all of which post-date any case cited by PCNA, Plaintiffs' allegations in the instant case easily satisfy the requirements of § 349.

> **c.** **PCNA's statements regarding the robustness, superiority, and durability of the Cayenne's coolant system are not mere puffery**

PCNA next asserts that its representations regarding the Cayenne's coolant system were statements of mere puffery or opinion, and thus do not suffice to state claims under § 349. Again, PCNA's position is baseless. *See also* §§ IV.C.2.b., IV.F.1.d., IV.H.3.a., IV.I.5.c., and IV.J.1. fn.35, *supra* and *infra*.

In contrast to materially deceptive statements or omissions, statements of mere puffery or opinion are not actionable under § 349 because such representations cannot be proven either true or false. *Verizon Directories Corp. v. Yellow Book USA, Inc*., 309 F.Supp.2d 401, 405 (E.D.N.Y. 2004). In support of its position, PCNA relies on three cases where New York courts disallowed claims under § 349 based on statements which clearly constituted puffery: *Bose Corp. v. Linear Design Labs., Inc.*, 467 F.2d 304, 310-11 (2d Cir. 1972) (claim that product was based on "countless hours of research"; and was the most "life-like" sound reproduction ever constituted puffery); *Woods v. Maytag Co.*, No. 10-CV-0559, 2010 WL 4314313, at *15 (E.D.N.Y. Nov. 2, 2010) ("*Woods I*"); and *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 300 (S.D.N.Y. 1998) (claim that product was "the gold standard" in the industry constituted puffery).

In the instant action, New York Plaintiffs point to numerous deceptive and misleading representations made by Porsche regarding the Cayenne's cooling system, to wit:

(a)     The Cayenne includes "a cooling system perfected in the deserts of Dubai;"

(b)     "In the V8 on the Cayenne Turbo and Cayenne S, we've used a special coolant management system offering effective control of operating temperatures throughout every part of the engine;"

77

      (c)     "The entire cooling system is specifically designed for prolonged heavy-duty operation;"

      (d)     "Every technical detail has been examined and optimized to ensure that the Cayenne Turbo reaches benchmark levels of SUV performance;"

      (e)     "The cooling system is extremely robust;"

      (f)     "The Cayenne Turbo engine is among the most advanced internal combustion engines ever produced by Porsche [and that] this mechanical symphony integrates a list of technical features that is a culmination of everything our engineers have learned about water-cooled V8 engines and turbo technology over the past four decades;" and

      (g)     "The Cayenne V8 engine's cooling system helps to maximize performance in every respect [and that] the strategy for achieving these objectives is nothing if not thorough."

Compl. ¶ 62.

In contrast to the statements made in the cases relied upon by PCNA, the veracity of these statements is clearly demonstrable, and thus these statements are not properly classified as puffery. For example, by comparison with comparable vehicles, reference to industry standards, and examination of empirical data, it could be objectively determined whether the cooling system "effectively controlled" operating temperatures is subject to objective proof. Or, through discovery, it can be discerned whether it is true or false how the Cayenne's cooling system was designed and whether and how prolonged heavy duty operation was considered in its design. Unlike the statements in the cases cited by PCNA, the truth of each of the statements alleged by Plaintiffs can be determined through objective evidence.

PCNA's reliance on *Woods I* is likewise unavailing. In *Woods I*, the Court merely held that the bare allegation that "upon information and belief . . . defendant, Maytag . . . expressly warranted to the general public and to the Plaintiff, through the [I]nternet, by advertisement literature and other means that consumers could safely use the product for the purpose of

78

cooking . . . ." was, standing alone, insufficiently detailed to support a claim under § 349.[11]  New York Plaintiffs' detailed pleading regarding PCNA's misrepresentations is sharply distinct from the boilerplate, information and belief statement regarding material misstatements found wanting in *Woods I.*

Moreover, the New York plaintiffs' allegations in part assert that PCNA failed to adequately and timely disclose material information regarding the true performance of the Cayenne's cooling system, *i.e.*, that PCNA violated § 349 by *omission*.  *See, e.g., Oswego*, 85 N.Y.2d at 27 (holding that an omission can constitute a deceptive act under § 349 "where the business alone possesses material information that is relevant to the consumer and fails to provide this information").  PCNA side-steps this fact and instead focuses on the (unavailing) defense that PCNA's marketing statements are mere "puffery" or opinion.

  2. **New York Plaintiffs have properly stated claims for unjust enrichment**

    a. **PCNA's warranty does not foreclose New York Plaintiffs' unjust enrichment claims**

PCNA attacks New York Plaintiffs' unjust enrichment claims on the grounds that a valid contract governing the subject matter in dispute prohibits an action rooted in quasi-contract, and therefore, the existence of the original Cayenne warranty precludes the New York Plaintiffs from bringing an unjust enrichment claim. While it is true that New York courts generally refuse to

---

[11] *See also Woods v. Maytag Co.* (*Woods II*), No. 10-0559, 2010 U.S. Dist. LEXIS 116595, at *42-545 (E.D.N.Y. Nov. 2, 2010) (not cited by PCNA) (dismissing class § 349 claims regarding a defective oven where plaintiffs alleged nothing regarding deceptive statements other than that "[u]pon information and belief, the defendant knowingly misrepresented material facts regarding the safety and use of said Maytag oven in an effort to induce plaintiffs and the public at large to purchase said oven. . . .").  *Woods II* is also instructive because the Court reached this issue despite the fact that the named plaintiff's oven failed almost two years after its warranty had expired, suggesting that the Court did not share PCNA's analysis regarding the "warranty defense."

allow an unjust enrichment claim where a valid contract governs the subject matter over which plaintiff complains, "[w]here the express contract has been rescinded, is unenforceable or abrogated, a recovery may be had on an implied promise to pay for benefits conferred thereunder." *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 836 (N.Y. App. Div. 1983).

In the instant case, PCNA's 4-year/50,000-mile warranty is not valid and enforceable with respect to the Cayenne's coolant pipes because PCNA concealed material facts about the performance of said pipes while simultaneously representing that the Cayenne's cooling system was designed for optimal cooling, durability, and performance. Compl. at ¶¶ 53-70. Indeed, it would be manifestly unjust for PCNA to be permitted to withhold material information about the performance of the Cayenne's coolant system, and then point to an expired warranty when the coolant system fails.

As the Court held in *Szymczak*, these allegations, if proven, would render any written warranty unenforceable:

> Plaintiffs have alleged that (1) defendants were aware of the radiator defect, (2) defendants sold the vehicles with knowledge of the defect and of the fact that [*29] the defect would not manifest itself until after the expiration of the express warranty, and (3) they would have negotiated better terms in the purchase of their vehicles and the warranties had they been aware of the radiator defect. Amended Complaint ¶¶ 68-70, 72. As quoted above, they also allege they had no meaningful choice about the time limits contained in the warranty, there was a disparity between the parties' bargaining power, and NNA knew or should have known of the propensity of the radiator to fail. Amended Complaint ¶ 174. These allegations are sufficient to state a claim that the express warranty is unenforceable because the durational limitation is unconscionable. *See, e.g., Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 683 n.6 (E.D. Pa. 2011); *In re Samsung DLP TV Class Action Litig.*, 2009 U.S. Dist. LEXIS 100065, at *16. Whether plaintiffs can actually prove such a claim is better left for after the completion of discovery.

*Szymczak*, 2011 U.S. Dist. LEXIS 153011 at *28-29.

Likewise, in *Carlson v. General Motors Corp.*, 883 F. 2d 287, 293 (4th Cir. 1989), the

manufacturer's knowledge of a major defect at the time any warranty and disclaimer was issued

would render the warranty unconscionable and ineffective:

> [P]roof that GM knew of and failed to disclose major, inherent product
> defects would obviously suggest that its imposition of the challenged
> "durational limitations" on implied warranties constituted "overreaching,"
> and that the disclaimers themselves were therefore "unconscionable."
> When a manufacturer is aware that its product is inherently defective, but
> the buyer has "no notice of [or] ability to detect" the problem, there is
> perforce a substantial disparity in the parties' relative bargaining power.
> (citation omitted)  In such a case, the presumption is that the buyer's
> acceptance of limitations on his contractual remedies-including of course
> any warranty disclaimers-was neither "knowing" nor "voluntary," thereby
> rendering such limitations unconscionable and ineffective.

*Id.*, 883 F.2d at 294 (citations omitted); s*ee also In re Samsung DLP Television Class Action

Litig.,* No. 07-2141, 2009 U.S. Dist. LEXIS 100065, at *15 (D.N.J. Oct. 27, 2009); *Payne v.

Fujifilm U.S.A., Inc.,* No. 07-385, 2007 U.S. Dist. LEXIS 94765, at *14-16 (D.N.J. Dec. 28,

2007); and *Henderson v. Volvo Cars of N. Am., LLC,* No. 09-4146, 2010 U.S. Dist. LEXIS

73624, at *25-27 (D.N.J. Jul. 21, 2010) (*see also* § IV.C.2., *supra*).

### b. Plaintiffs' unjust enrichment claims are viable because Plaintiffs conferred a benefit upon PCNA both directly and indirectly

PCNA next asserts that New York Plaintiffs' unjust enrichment claim must fail because

"plaintiffs allege no relationship whatsoever between PCNA and the used car dealers who sold

them their vehicles" and [w]ithout this showing, PCNA cannot have plausibly benefitted from

plaintiffs' vehicle purchases or any alleged decline in value".  Mot. to Dismiss 51.  As with

PCNA's other arguments, the Court should refuse to dismiss the New York Plaintiffs' claims on

this basis.

First, New York Plaintiffs bestowed value to PCNA **directly** when they were forced to

purchase repair parts for their Cayennes' cooling systems from PCNA, albeit on the secondary

81

market.  No other parts manufacturer produces the necessary parts, and upon the inevitable failure of their Cayennes' coolant tubes, Plaintiffs were left with no other option than to return to PCNA to purchase repair parts.  Compl. ¶¶ 56, 57, 66.

Second, New York Plaintiffs Cadman and Jackman both purchased their Cayennes from Porsche authorized dealers.  Compl. ¶¶ 166, 173.   Even assuming **arguendo** that the only benefit conferred to PCNA was conferred **indirectly**, such a benefit would be sufficient under New York law to state a claim for unjust enrichment.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011).

For example, in *Syzmcak*, the Court held that unjust enrichment claims by purchasers of both new and used vehicles with an allegedly defective radiator survived a motion to dismiss because "the costs incurred by plaintiffs, with the exception of Boyd, are known and fixed. Therefore, there is an amount known that represents the premium paid by plaintiffs for a faulty radiator." *Syzmcak*, 2011 U.S. Dist. LEXIS 153011 at *56-57.

Likewise, in *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 41 (N.Y. App. Div. 1st Dep't 2004), downstream-purchasers brought actions under § 349 and for unjust enrichment alleging that Microsoft engaged in deceptive, monopolistic business practices that resulted in artificially inflated prices for Microsoft products.  *Cox*, 8 A.D.3d at 40-41.  As PCNA urges here, the trial court in *Cox* dismissed plaintiffs' unjust enrichment claim on grounds that there was no direct connection between the manufacturer and the end user (in that Microsoft's "prime customers" were the manufacturers and distributors, not the consumer). *Id.*  The appellate division reversed, stating:

> The motion court erroneously dismissed plaintiffs' cause of action for unjust enrichment, holding that, as indirect purchasers of Microsoft's software products, plaintiffs only indirectly bestowed a benefit upon Microsoft.   Contrary to such reasoning, plaintiffs' allegations that

> Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment.

*Id.* (citations omitted).

New York Plaintiffs have alleged not only that they were initially overcharged for their vehicles, they have further alleged that they were forced to purchase repair parts from PCNA, thereby **directly** conferring an economic benefit.  Compl. at ¶¶ 56, 57, 66-69.  Such allegations meet the requirements of New York jurisprudence to state a claim for unjust enrichment.

### c.    Allowing PCNA to keep the ill-gotten gains of its deceptive acts would be inequitable, unjust, and unreasonable

PCNA's final argument in favor of dismissing New York Plaintiffs' unjust enrichment claims—made without citation to case law—is that "even assuming that the New York plaintiffs somehow conferred a benefit on PCNA, allowing PCNA to retain that benefit would not be inequitable."  Mot. to Dismiss 51.

PCNA's argument is meritless.  The New York Plaintiffs' allegations of knowing material misstatements, omissions, and intentional concealment regarding a severe, safety-related defect, the inflated prices paid by Plaintiffs' for their vehicles, as well PCNA's practice of charging for replacement of the defective plastic coolant tubes with the aluminum pipes that should have been installed originally fit comfortably within traditional, and well-established notions of what constitutes unfair practices.  Indeed, as discussed above, a New York court recently upheld a virtually identical claim.  *Szymczak*, 2011 U.S. Dist. LEXIS 153011, at *56-57.  For all of these reasons, the Court should deny PCNA's Motion to Dismiss on all of the New York Plaintiffs' claims.

E.      **Georgia**

Plaintiff Gardner's claims for breach of implied warranty, for violations of the Uniform

Deceptive Trade Practices Act, and for unjust enrichment should be permitted to proceed.

1.      **Plaintiff Gardner pleads a valid cause of action for breach of implied warranty**

PCNA raises two arguments in opposition to Plaintiff Gardner's breach of implied

warranty claim:  first, it asserts that there is no privity between Plaintiff Gardner and PCNA

(Mot. to Dismiss 17-18 & n.6, 52); second, it relies on its attempt to disclaim any implied

warranties of longer duration than its express warranty (Mot. to Dismiss 19 and n.8, 52).  As

discussed below, both arguments are without merit.

a.      **PCNA's express warranty creates privity for purposes of Plaintiff Gardner's breach of implied warranty claim**

PCNA's argument that Plaintiff Gardner lacks privity fails to acknowledge that under

Georgia law, unlike that of some other states, its express warranty establishes such privity.[12]

"[P]rivity exists between a buyer and manufacturer if the manufacturer extends an express

warranty to the buyer." *Terrill v. Electrolux Home Prods., Inc.*, 753 F. Supp. 2d 1272, 1288

(S.D. Ga. 2010) (*citing Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321, 323 (Ga. Ct.

App. 1974); *Jones v. Cranman's Sporting Goods*, 237 S.E.2d 402, 406 (Ga. Ct. App. 1977)).  In

*Chrysler*, the Georgia Court of Appeals expressly held that "where an automobile manufacturer,

through its authorized dealer issues to a purchaser of one of its automobiles from such dealer

admittedly as a part of the sale a warranty by the manufacturer running to the purchaser, privity

---

[12]     PCNA's citation to *Keaton v. A.B.C. Drug Co.*, 467 S.E.2d 558 (Ga. 1996) (Mot. to Dismiss at 17 n.6) is thus inapposite, since *Keaton*, unlike this case, did not present a situation in which the defendants had extended an express warranty to the plaintiff.  *Keaton*, 467 S.E.2d at 385.

exists." *Chrysler Corp.*, 208 S.E.2d at 323.  As the court in *Terrill* noted, *Chrysler*'s viability

was reaffirmed by the Georgia Court of Appeals in *McQueen v. Minolta Business Solutions, Inc.*,

620 S.E.2d 391, 393 (Ga. Ct. App. 2005).  *See Terrill*, 753 F. Supp. 2d at 1288 ("[T]he *McQueen*

court supported this proposition of law with a citation to *Chrysler Corp*, thus indicating

continued approval of *Chrysler Corp's* holding.").[13]  Because PCNA concedes that it issues an

express warranty with every vehicle it distributes (Mot. to Dismiss 1), PCNA is also in privity

with each of its Georgia purchasers, including Plaintiff Gardner.

> **b.     PCNA's disclaimer of implied warranties was not conspicuous and, therefore, was ineffective**

PCNA's attempt to limit its implied warranties to the duration of its express warranty

runs afoul of the Uniform Commercial Code's (hereinafter, "UCC") requirement that any

disclaimer be "conspicuous."[14]   Ga. Code Ann. § 11-2-316(2).   To be "conspicuous," a

disclaimer must satisfy the following statutory standard:

> "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it.  Whether a term is "conspicuous" or not is a decision for the court.  Conspicuous terms include the following:
>
> (a)     A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (b)     Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding

---

[13]     In *Monticello v. Winnebago Indus., Inc.*, 369 F. Supp. 2d 1350 (N.D. Ga. 2005), also relied on by PCNA (Mot. to Dismiss 17-18 n.6), the court failed to consider this long-standing precedent when considering the plaintiff's implied warranty claim.  *Monticello*, 369 F. Supp. 2d at 1361.  As the *Terrill* court correctly held, "[t]his Court must follow the opinions of the Georgia Court of Appeals in matters of Georgia law." *Terrill*, 753 F. Supp. 2d at 1288.

[14]     In *Holman Motor Co. v. Evans*, 314 S.E.2d 453, 455 (Ga. Ct. App. 1984), on which PCNA relies (Mot. to Dismiss 19 n.8), the court did not consider whether the disclaimer was "conspicuous."  *Id.* at 455.

> text of the same size by symbols or other marks that call attention
> to the language.

Ga. Code Ann. § 11-1-201.

The disclaimer in the Cayenne manual on which PCNA relies is written in small font, with nothing to distinguish it from the surrounding text. It is buried in the middle of the page under the misleading sub-heading "Responsibilities." The heading at the top of the page is not in capitals, and it refers only to "Limitations and Disclaimers" generally and does not specifically mention implied warranties (Mot. to Dismiss, Exs. A-D at 5.)

This disclaimer is void because it is not conspicuous under Sections 1-201 and 2-316 of the UCC (as incorporated into Georgia law). Where the disclaimer at issue "appears in the same size font as the rest of the printed terms . . . and . . . is not otherwise set apart," just as the disclaimer here, Georgia courts have found such disclaimers are not conspicuous. *Bailey v. Tucker Equip. Sales, Inc.*, 510 S.E.2d 904, 906 (Ga. Ct. App. 1999); *see also Leland Indus., Inc. v. Suntek Indus., Inc.*, 362 S.E.2d 441 (Ga. Ct. App. 1987) (holding that a disclaimer "written in the same size and color type as all the other paragraphs of the 'conditions' on the back of the form" was not conspicuous) (*citing Chrysler Corp. v. Wilson Plumbing Co.*, 208 S.E.2d 321 (Ga. Ct. App. 1974)). *See also* §§ IV.A.1.b., IV.B.2., IV.H.1, IV.J.3., and IV.K.4, *supra* and *infra*.

### 2. Plaintiff Gardner has pleaded a valid claim for injunctive relief under the UDTPA

As PCNA concedes, Plaintiff Gardner has properly requested injunctive relief for his claim under the Uniform Deceptive Trade Practices Act ("UDTPA"). Mot. to Dismiss 53 ("Gardner claims that 'an injunction should be entered requiring Defendants to stop the . . . deceptive conduct alleged herein,' Compl. ¶ 331) . . . ."). The Complaint plainly alleges the

deceptive conduct that Plaintiff Gardner seeks to have enjoined.[15]  As discussed in Paragraphs 42-43 and 62 of the Complaint, PCNA made a series of deceptive misrepresentations concerning the cooling system of the Cayenne, even though it knew that the plastic coolant tubes were defective.  On information and belief, PCNA has never made any corrective disclosures to Cayenne purchasers regarding this defect.  The Complaint also explains the future harm likely to result from Porsche's deceptive conduct.  Absent injunctive relief, class members are subject to costly repairs and even at risk for their safety when the coolant pipes fail.  Compl. ¶¶ 69–70.[16]  Thus, Plaintiff Gardner seeks injunctive relief requiring Porsche to remedy the defect in its Cayenne vehicles, which is available under the UDTPA.

### 3.      Plaintiff Gardner pleads a valid cause of action for unjust enrichment

PCNA's argument that its warranty requires dismissal of Plaintiff Gardner's unjust enrichment claim (Mot. to Dismiss 54) ignores the fact that Plaintiff Gardner is entitled to plead both an implied warranty claim and an unjust enrichment claim.  Rule 8 provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically," (Fed. R. Civ. P. 8(d)(2)), and that "[a] party may state as many separate claims or defenses as it has, regardless of consistency," (Fed. R. Civ. P. 8(d)(3)).  Thus, Georgia federal courts have held that a claim based on contract or warranty and an unjust enrichment claim may be pursued at the pleadings stage, or even later, regardless of any inconsistency between those two claims.  *See WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1363 (N.D. Ga. 2007) ("The Court

---

[15]      By contrast, the plaintiff in *Accord Patents, LLC v. Alden Corp.*, No. 1:10-CV-0859, 2011 U.S. Dist. LEXIS 6386 (N.D. Ga. Jan. 20, 2011), relied on by PCNA (Mot. to Dismiss. 53) made only one conclusory allegation that it was "likely to be damaged" with no factual support.

[16]      These allegations of likely future harm also distinguish this case from the cases cited by Porsche (Mot. to Dismiss 53–54) in which the plaintiffs did not establish the need for injunctive relief.  *See Terrill*, 753 F. Supp. 2d 1272; *Hous. Auth. v. MMT Enters., Inc.*, 475 S.E.2d 642, 642 (Ga. 1996).

finds that Defendants currently are entitled to assert an unjust enrichment claim alternative to their breach of contract claim under the Agreement."); *McBride v. Life Ins. Co. of Va.*, 190 F. Supp. 2d 1366, 1378-1379 (M.D. Ga. 2002) (denying summary judgment on unjust enrichment claim and rejecting the defendant's argument that "Plaintiff is prohibited under Georgia law from recovering under a breach of contract theory and an unjust enrichment theory").

Plaintiff Gardner has properly pled his unjust enrichment claim in the alternative to his warranty-based claim. *See* Compl. ¶ 54 (stating that the unjust enrichment count is "[p]led in the [a]lternative to Counts [Magnusson-Moss] & [Implied Warranty]"). By framing this claim in the alternative, Plaintiff Gardner makes no concessions regarding the validity of PCNA's warranty.[17] Thus, any inconsistency of this claim with the warranty claims is expressly permitted by the Rules and does not require dismissal. Furthermore, as discussed with respect to the New York Plaintiffs, Plaintiff Gardner has also provided substantial support for his allegations that Porsche retained a benefit at his expense and that Porsche's retention of this benefit is unjust. Plaintiff Gardner pleads that Porsche received a benefit "in the form of higher payments" for the Cayenne vehicles and "obtained revenues from the repair of Cayennes using replacement parts sold by Porsche," both of which came at Plaintiff Gardner's expense.[18] Compl. ¶¶ 334-335.

---

[17] In the cases upon which PCNA relies (*see* Mot. to Dismiss 54), it was uncontested that Porsche's warranties governed the parties' relationship. *See Terrill*, 753 F. Supp. 2d at 1291 n.11 (holding that the defendant was "prohibit[ed] from challenging the validity or existence of the warranties"); *Goldstein v. The Home Depot, U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009) (finding no dispute regarding the validity of the contract).

[18] The authority PCNA cites, *Hernandez Auto Painting & Body Works, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. CV408-256, 2009 U.S. Dist. LEXIS 83669, (S.D. Ga. Sept. 14, 2009) (*see* Mot. to Dismiss 54-55), is inapposite, because that case did not involve the situation here, where Plaintiff made a payment that was received and unjustly retained by Defendants.

F.  **Illinois**

As discussed below, Plaintiff Florez's claims under the Illinois Consumer Fraud and Deceptive Practices Act ("CFA") and for unjust enrichment should be sustained.

1.  **Plaintiff Florez has satisfied the pleading standards for his CFA claim**

Both the pleading standards of Fed. R. Civ. P. 8(a) and 9(b) apply to Plaintiff Florez's CFA claim. Rule 9(b)'s heightened pleading standards apply to the portion of the CFA claim that pertains to the circumstances intrinsic to Plaintiff Florez's claim of PCNA's fraudulent conduct, and Rule 8(a)'s notice pleading standards apply to the remaining elements of the CFA claim, including the allegations that Defendants' conduct was unfair. As demonstrated below, Plaintiff Florez has satisfied both standards, and the CFA claim should be sustained.

a.  **Heightened pleading standards do not apply to the allegations of Plaintiff Florez's CFA claim that are not based on fraud**

Porsche wrongly argues, without support, that Plaintiff Florez's CFA claim is subject, in its entirety, to the heightened pleading standards of Fed. R. Civ. P. 9(b). Mot. to Dismiss 56. Rule 9(b) applies only when "alleging fraud or mistake." The CFA, however, prohibits not just fraudulent conduct, but also any act or practice that is "unfair." *See* 815 Ill. Comp. Stat. 505/2 ("Unfair methods of competition and unfair or deceptive acts or practices . . . are hereby declared unlawful."). Plaintiff Florez alleges that Defendants' conduct violates the CFA not only because it is fraudulent, but also because it is "unfair." Compl. ¶¶ 346, 351. Rule 9(b) does not apply to this portion of Plaintiff Florez's CFA claim.

As the Seventh Circuit recognized, "[b]ecause neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT*

89

*Tech. Fin. Servs.*, 536 F.3d 663, 670 (7th Cir. 2008);[19] *see also Russian Media Group LLC v. Cable Am., Inc.*, No. 06 C 3578, 2008 U.S. Dist. LEXIS 9788, at *9 (N.D. Ill. 2008) ("Courts have recognized that not all actions under the ICFA need to be pled with the particularity required by Federal Rule of Civil Procedure 9(b).")  Plaintiff Florez's allegations of unfair conduct against Porsche satisfies the liberal pleading standards of Rule 8(a), and PCNA does not argue otherwise.  *See Windy City*, 536 F.3d at 670 ("Therefore, under federal notice pleading standards, the complaint need only provide a short and plain statement of the claim that shows, through its allegations, that recovery is plausible rather than merely speculative.").

Furthermore, Rule 9(b) applies heightened pleading standards only to the "circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "The particularity requirement in Rule 9(b) does not require a plaintiff to plead with particularity the entire theory of the case, but rather, only those 'circumstances' intrinsic to any fraud-based claim."  *United States ex rel. Raymer v. Univ. of Chi. Hosps.*, No. 03 C 806, 2006 U.S. Dist. LEXIS 7943, at *10 (N.D. Ill. Feb. 28, 2006).  Thus, those circumstances that are not intrinsic to Porsche's fraudulent conduct also need only be pled under the pleading standard of Rule 8(a), which, as discussed above, are plainly satisfied here.

### b.  <u>Plaintiff Florez's fraud-based allegations are pled with particularity consistent with Rule 9(b)</u>

As discussed above in conjunction with the consumer fraud claims of the New Jersey, California, Colorado, Florida, Michigan, and Texas Plaintiffs (*see* §§ IV.B.1.b; IV.C.1; IV.G.1.a; IV.H.3.a., IV.J.1.,4., IV.K.1), Plaintiff Florez's CFA claim has been pled with the requisite

---

[19]     In *Greenberger v. Geico Gen. Ins. Co.*, 631 F.3d 392 (7th Cir. 2011), relied on by PCNA (Mot. to Dismiss. at 56), the court applied Rule 9(b) pleading standards to the plaintiff's CFA claim because the plaintiff cast the claim "using the language of fraud."  *Id.* at 399.  *Greenberger* did not overrule the same court's conclusion in *Windy City* that Rule 8(a) applies to CFA claims alleging unfair practices.  Similarly, PCNA's quotation from *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002) stating the elements of a CFA claim (Mot. to Dismiss 55-56) is limited to the context of fraudulent practices.

particularity under Rule 9(b). Florez alleges much more than simply that he "experienced a problem with the coolant pipes in his Cayenne that PCNA should have prevented," as PCNA claims. Mot. to Dismiss 56. Indeed, PCNA itself acknowledges that "Florez claims that PCNA violated the CFA by making affirmative 'misrepresentations and omissions regarding the safety and reliability of its vehicles,'" (Mot. to Dismiss at 57 (*quoting* Compl. ¶ 346)) and that Florez also alleges fraud by concealment (Mot. to Dismiss at 58).

PCNA's criticisms of Plaintiff Florez's CFA claim that it "fails to differentiate between PCNA and Porsche AG, contains no averments showing when each defendant learned of the problem, or what steps each defendant took (or failed to take) in response" are all misplaced. "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). Rather, matters such as which Defendant knew about the defect and each Defendant acquired such knowledge "may be alleged generally" even under Rule 9(b)'s heightened pleading standards.[20] *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Plaintiff Florez does identify evidence that supports its allegations of Defendants' knowledge: the release of the Internal Technical Bulletin attached as Exhibit A to the CAC and the complaints that Porsche has received from customers related to the failing coolant pipes. Compl. ¶¶ 58-59. *See Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill. App. 3d 1139, 759 N.E.2d 66, 72 (Ill. App. Ct. 2001) (upholding a CFA claim premised on the issuance of a technical service bulletin). Plaintiff Florez also plainly alleges that Defendants took no steps to notify him or remedy the defect. Compl. ¶¶ 7, 66.

---

[20]     If and when jurisdictional discovery confirms the close relationship between Porsche AG and PCNA and their joint involvement in the allegedly fraudulent conduct, this issue may become moot.

These allegations are sufficient to establish a CFA claim.  In *Federico v. Freedomroad RV, Inc.*, No. 09-CV-2027, 2010 U.S. Dist. LEXIS 121107 (N.D. Ill. Nov. 10, 2010), the purchaser of an RV alleged that the manufacturer and dealer concealed material defects in the vehicle.  Although the plaintiff's allegations "are somewhat unclear as to 'who knew what when,'" the court held that the fact that the vehicle was in defective condition and "[t]he close temporal proximity between [plaintiff]'s purchase of the RV and the onset of the RV's performance problems suggests that [defendants] may have been aware of the problems at the time of sale."  *Id.* at *25.  In another vehicle defect case, *IWOI, LLC v. Monaco Coach Corp.*, 581 F. Supp. 2d 994 (N.D. Ill. 2008), the court sustained a CFA claim, despite its view of "Plaintiff's allegations as somewhat unclear with respect to 'who knew what when'," because it recognized "that that this might be information to be uncovered during discovery."  *Id.* at 1004.

Here, Illinois Plaintiffs' allegations are already sufficient to establish Defendants' knowledge about the coolant pipe defect, and further evidence regarding this knowledge will be obtained through discovery.

c.      **The circumstances of Plaintiff Florez's purchase establish a nexus to Illinois**

Plaintiff Florez is prepared to establish that, in addition to his residency in Illinois, which he has already pleaded (Compl. ¶¶ 20, 129), each of the other circumstances pertaining to his transaction also occurred in Illinois; that is, he also received Defendants' misrepresentations and purchased his Cayenne in Illinois.[21]  These circumstances are sufficient to establish a nexus to Illinois for purposes of the CFA claim, and PCNA's authorities (Mot. to Dismiss 56) are distinguishable.  *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005)

---

[21]      If this Court holds that these facts should be pled, then Plaintiff Florez respectfully requests leave to amend in order to include these additional facts.

92

("The overwhelming majority of circumstances relating to the disputed transactions in this case . . . occurred outside of Illinois."); *Vulcan Golf LLC v. Google, Inc.*, 552 F. Supp. 2d 752, 775 (N.D. Ill. 2008) ("[T]he plaintiffs point to no allegations that plausibly suggest that the purported deceptive domain scheme occurred primarily and substantially in Illinois.").

**d.     PCNA's Alleged Misrepresentations and Omissions Violate the CFA**

As discussed above with respect to the California plaintiffs, PCNA's argument that the affirmative misrepresentations alleged in the Complaint amount only to "puffery" (Mot. to Dismiss 57-58) fails to acknowledge that its statements were not limited to vague generalizations regarding the quality of the vehicle, but were specifically intended to mislead consumers regarding its cooling system. *See also* §§ IV.C.2.b., IV.D.1.c., IV.H.3.a., IV.I.5.c., and IV.J.1.fn. 35*, supra* and *infra*.  PCNA does not dispute that, as pled in the Complaint, it made numerous statements regarding its cooling system, including that it is "extremely robust" and that it "helps to maximize performance in every respect [and that] the strategy for achieving these objectives is nothing if not thorough."  Compl. ¶ 62.  In reality, the cooling system was defective because, by virtue of being made from plastic, it prematurely degrades and ultimately fails.  This extends beyond mere puffery about a product's general quality and constitutes an actionable misrepresentation regarding the capacity of the cooling system to perform its intended function. *See Cold Spring Granite Co. v. Information Mgmt. Assocs., Inc.*, No. 99 C 6690, 1999 U.S. Dist. LEXIS 19730, at *9 (N.D. Ill. Dec. 16, 1999) (distinguishing "statements concern[ing] the

93

product's quality" from actionable representations that "addressed the product's ability to function").[22]

Plaintiff Florez has also pleaded a CFA claim based on Defendants' concealment of the coolant tube defect.  *See Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 595 (Ill. 1997) ("An omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud.").  PCNA cites *Connick* as an example of a well-pled concealment-based CFA claim (Mot. to Dismiss at 59-60), and that case serves to illustrate why Plaintiff Florez's claim is similarly well-pled, as follows:

| ***Connick* Complaint** | **Plaintiff Florez's Complaint** |
|---|---|
| "Plaintiffs alleged that Suzuki was aware of the Samurai's safety problems, including its tendency to roll over and its inadequate protection for passengers." *Id.* at 595. | Plaintiff Florez alleged that Porsche was aware of the Cayenne's coolant tube defect, including facts evidencing such knowledge such as Defendants' access to testing data, the technical service bulletin, and customer complaints. Compl. ¶¶ 58-59, 61. |
| "Plaintiffs further alleged that Suzuki failed to disclose these defects." *Id.* | Plaintiff Florez further alleged that Porsche failed to disclose this defect. Compl. ¶¶ 7, 66. |
| "Finally, plaintiffs alleged that the safety problems of the Samurai were a material fact in that they would not have purchased the vehicles if Suzuki had disclosed the Samurai's safety risk." *Id.* | Finally, Plaintiff Florez alleged that the defect of the Cayenne was a material fact in that he and other members of the Class would not have purchased the vehicles if Defendants had disclosed the defect. Compl. ¶¶ 55, 130. |

The above allegations are all that is required to plead an omission-based claim, and, as stated above, they have been pled with the requisite factual particularity.[23]    Porsche's

---

[22]    By contrast, the cases upon which PCNA relies (Mot. to Dismiss at 57) deal only with general statements about overall quality.  *See Avery*, 835 N.E.2d at 846-47 (discussing representations that the defendant's product was of high "quality" and satisfied "very high performance criteria"); *Saltzman v. Pella Corp.*, No. 06 C 4481, 2007 U.S. Dist. LEXIS 19650, at *4 (N.D. Ill. Mar. 20, 2007) (finding that the representations at issue were "subjective and non-quantifiable").  It is also worth noting that, contrary to PCNA's mischaracterization that the *Saltzman* court "dismiss[ed] a CFA claim" (Mot. to Dismiss at 57), the court actually **sustained** the plaintiff's CFA claim.  See *Saltzman*, 2007 U.S. Dist. LEXIS 19650, at *3-8.

unsupported argument that Plaintiff Florez must "identify the person or entity that sold him the vehicle" has no basis in the CFA.  Rather, "manufacturers can be liable under the Illinois Consumer Fraud Act when they knowingly place a materially defective product into the stream of commerce whether or not they are in privity of contract with or communicate directly to the end consumer."  *IWOI*, 581 F. Supp. 2d 994, 1004 (N.D. Ill. 2008).  Moreover, Plaintiff Florez alleged that Porsche intended that he and the other class members rely on their omission of the defect; this allegation may be made "generally" pursuant to Rule 9(b).  *See* Fed. R. Civ. P. 9(b) (providing that "intent . . . may be alleged generally"); *see also Pappas v. Pella Corp.*, 844 N.E.2d 995, 1004 (Ill. App. Ct. 2006) ("In effect, plaintiffs allege they relied on Pella's concealment by silence.  Requiring anything more would eviscerate the spirit and purpose of the Consumer Fraud Act.").

### e.  **Plaintiff Florez adequately pleads causation**

Finally, PCNA's challenge to Plaintiff Florez's allegations of proximate cause is without merit.  "[T]he required allegation of proximate cause is minimal since that determination is best left to the trier of fact."  *Connick*, 675 N.E.2d at 595.  As PCNA concedes, Plaintiff Florez pleads that "[he] and the other Illinois Subclass members did rely on such misrepresentations or were

---

[23]    PCNA's reliance on *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 549 (Ill. App. Ct. 2006) (see Mem. at 58-59) is inapposite for a number of reasons.  In *White*, the plaintiff never pled that "he would have acted differently if he had possessed the information before the sale," *id.* at 549, whereas here, Plaintiff Florez did so allege.  *See* CAC ¶¶ 55, 130.  The *White* court also found that the complaint lacked detail about the defect itself and how and what Defendants knew of the defect.  *Id.* at 550.  As discussed above, Plaintiff Florez's allegations are sufficient under Rule 9(b), recognizing that much of this information is in the exclusive possession of Defendants and will be available in discovery.

deceived." Mot. to Dismiss 60 (quoting Compl. ¶ 348).[24] This allegation is sufficient, particularly where Plaintiff Florez's claim is based in part on PCNA's omissions. *See Pappas*, 844 N.E.2d at 1004 (finding that plaintiffs adequately pleaded proximate causation by alleging that the defendant, "even though aware of a material defect, never notified its customers that the [products] were defective").

### 2. Plaintiff Florez's unjust enrichment claim should be sustained

PCNA makes four arguments for dismissing Plaintiff Florez's unjust enrichment claim. For the reasons discussed below, each of these arguments should be rejected.

PCNA first argues that Florez's unjust enrichment claim should be dismissed because it "cannot survive independently" of Plaintiff Florez's CFA claim. Mot. to Dismiss 61 This argument fails both because, as argued above, Plaintiff Florez's CFA claim has been adequately pleaded, and also because the unjust enrichment claim is independent of the CFA claim. In Illinois, unjust enrichment is a separate and independent cause of action. *See HPI Health Care Servs. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 678-679 (Ill. 1989) (analyzing unjust enrichment claim separately from fraud claim); *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[F]raud is not an indispensable element of an unjust enrichment

---

[24] The cases upon which PCNA relies – *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151 (Ill. 2002) and *De Bouse v. Bayer AG*, 922 N.E.2d 309 (Ill. 2009) – are both inapposite since the plaintiffs in those cases conceded that they never had any communication with the defendant, but were instead relying on a "market theory" of causation. *See Oliveira*, 776 N.E.2d at 155 ("Plaintiff did not allege, however, that defendant's advertisements induced him to buy the gasoline or that he was deceived by the ads."); *De Bouse*, 922 N.E.2d at 314 ("[Plaintiff] acknowledged that she saw no advertising for Baycol and knew nothing of the drug prior to her doctor's providing her with a prescription.").

claim.").[25]   Plaintiff Florez has pleaded his unjust enrichment claim without incorporating the allegations of fraudulent conduct from his CFA claim (*see* Compl. ¶¶ 352-259), and it should be evaluated on its own merits.

PCNA's second argument, that Plaintiff Florez has failed to "to specifically plead that the defendant both owed him an independent duty and failed to abide by that duty" (Mot. to Dismiss 61) is incorrect both as a matter of law and as a matter of what Plaintiff Florez actually pleaded. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI*, 545 N.E.2d at 679.  PCNA's attempt to graft an additional requirement that Plaintiff Florez plead the existence of a duty is inconsistent with this Illinois Supreme Court precedent.  Nevertheless, the Complaint plainly states that Defendants did owe Plaintiff Florez a duty to disclose the alleged coolant tube defect and that the Defendants violated that duty. *See, e.g.*, Compl. ¶ 37 ("Porsche was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality and nature of its plastic coolant tubes.  Porsche knowingly, affirmatively and actively concealed the true nature, quality and character of its plastic coolant tubes from consumers.").

Third, as with Plaintiff Gardner, Plaintiff Florez, who does not bring any warranty-based claims, is permitted to plead his unjust enrichment claim despite any seemingly inconsistent allegations concerning PCNA's written warranty. *See Lilly v. Ford Motor Co.*, No. 00 C 7372 2002 U.S. Dist. LEXIS 910, at *18 (N.D. Ill. Jan. 17, 2002) (holding that "plaintiffs may raise

---

[25]      As the court recognized in *Sefton v. Toyota Motor Sales U.S.A., Inc.*, No. 09 C 3787, 2010 U.S. Dist. LEXIS 37036, at *17 (N.D. Ill. Apr. 14, 2010), the decision that PCNA relies on, *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920 (Ill. App. Ct. 2009) (*see* Mot. to Dismiss 61), is inconsistent with this Illinois Supreme Court and Seventh Circuit precedent.

alternative claims of breach of contract and unjust enrichment despite the inconsistency of these claims") (quotations omitted).[26]

PCNA's fourth argument that Plaintiff Florez's allegations "are insufficient to establish that it would be inequitable for PCNA to retain the benefit allegedly conferred by Florez" (*see* Mot. to Dismiss 62) fails for the same reasons that were discussed above with respect to the California, New York, and Georgia Plaintiffs.  Plaintiff Florez has adequately pleaded that PCNA's retention of the benefit was inequitable based on his allegations that Porsche knowingly manufactured and sold the Cayennes with defective coolant tubes that would inevitably fail.  *See, e.g.*, Compl. ¶¶ 2-4, 58-61.

## G.  **Florida**

### 1.  **Plaintiff states a claim under Florida's Deceptive and Unfair Trade Practices Act**

The FDUTPA is "a consumer protection law intended to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the course of any trade or commerce." *Tuckish v. Pompano Motor Co*., 337 F. Supp. 2d 1313, 1319 (S.D. Fla. 2004); *see also* Fla. Stat. § 501.202 (2011).  Unlike common law fraud, a "deceptive practice" under FDUPTA is one that is likely to mislead consumers.  *Davis v. Powertel, Inc*., 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000).  In the interests of consumer protection, courts should liberally construe FDUTPA.  *See Samuels v. King Motor Co.*, 782 So. 2d 489, 499 (Fla. Dist. Ct. App. 2001) ("While the

---

[26]  PCNA's authorities (*see* Mot. to Dismiss 61-62) are each distinguishable, either because they do not relate to pleading standards or because the plaintiffs in those cases conceded the existence of a valid warranty.  *See Prima Tek II, LLC v. Klerk's Plastic Indus.*, 525 F.3d 533 (7th Cir. 2008) (reviewing appeal taken after judgment); *Lantz v. Am. Honda Motor Co., Inc.*, No. 06 C 5932, 2007 U.S. Dist. LEXIS 34948, at *36 ("Plaintiffs agree that they have express written warranties in this case."); *Adrion v. Knight*, No. 07-11277, 2009 U.S. Dist. LEXIS 91968 (D. Mass. Sept. 28, 2009) (ruling on motion for summary judgment).

Legislature does not define what 'an unfair or deceptive act' is, it has mandated that FDUTPA is to be liberally construed.").

"[A] consumer claim for damages under the FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). To succeed under FDUPTA, "the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstance." *Davis*, 776 So. 2d at 974. PCNA fails to show that the FDUTPA claim should be dismissed. Plaintiff Dudley has set forth sufficient allegations in support of each element of an FDUTPA claim.

> ### a. Plaintiff Dudley's allegations satisfy the applicable pleading standard

As PCNA notes, there is a split of authority over whether Rule 9(b) applies to FDUTPA claims. There is even a split of authority within the United States District Court for the Southern District of Florida. *Compare Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*, No. 10-22153, 2011 U.S. Dist. LEXIS 108720, at *18-19 (S.D. Fla. Sept. 23, 2011) (applying Rule 9(b) to FDUTPA claim), *with Costa v. Kerzner Int'l Resorts, Inc.*, No. 11-60663-CV-COHN, 2011 U.S. Dist. LEXIS 66921, at *6-7 (S.D. Fla. June 23, 2011) (concluding that Rule 9(b) does not apply to FDUPTA claim), and *State of Florida, Office of Atty. Gen., Dep't. of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310-1311 (S.D. Fla. 2005) (explaining that the defendant's "insistence that the [plaintiff] must plead its FDUTPA claim 'with particularity' is without merit". In *Costa*, the court correctly concluded that Rule 9(b) does not apply to an FDUPTA claim because "Florida state courts have stated that FDUTPA claims are 'a somewhat unique tortuous act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the

representation or omission at issue.'" *Costa*, 2011 U.S. Dist. LEXIS 66921, at *6 (quoting *State of Florida, Office of Atty. Gen., Dep't. of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004)); *accord Tenet Healthcare*, 420 F. Supp. 2d at 1310. Accordingly, Rule 9(b) should not be applied to Plaintiff's FDUTPA claim.

Even if Rule 9(b) were to apply, the fraud allegations pertaining to Plaintiff's FDUTPA claim satisfy Rule 9(b)'s particularity requirement. *See* §§ IV.B.1.b, IV.C.1., IV.F.1., IV.H.3.a., and IV.K.1, *supra* and *infra*. A plaintiff satisfies Rule 9(b) by setting forth the statements or omissions that were made, when and where they were made, the content of the statements or omissions and the manner in which they mislead the plaintiff, and what the defendant obtained as a consequence of the fraud. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). "The rule requires this particularity in order to 'alert […] defendants to the precise misconduct with which they are charged and [to] protect […] defendants against spurious charges of immoral and fraudulent behavior.'" *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (citation omitted).

However, Rule 9(b) does not require knowledge or intent to be alleged with particularity. Fed. R. Civ. P. 9(b). Furthermore, "Rule 9(b) must be read in conjunction with Rule 8(a) [of the Federal Rules of Civil Procedure], which requires a plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (per curiam) (citation omitted); *accord Wagner*, 464 F.3d at 1278. Courts also relax Rule 9(b)'s particularity requirement where, as here, "factual information is peculiarly within the defendant's knowledge or control." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield, Inc.*, 755 F. Supp. 1040, 1052 (D. Ga. 1990); *see also Smithkline Beecham*, 245 F.3d at 1052 (citing *Wool*,

818 F.2d at 1439); *United States ex rel. Russell v. EPIC Healthcare Management Group*, 193

F.3d 304, 308 (5th Cir. 1999); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418. In

this case, the necessary information regarding the extent of involvement of each Defendant in

perpetrating fraud are under the exclusive control of the respective Defendants – they should not

be allowed to profit by concealing details of their fraud. Furthermore, courts still "must view the

complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded

facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007).

     As discussed more fully above, Florida Plaintiff's claims are, in part, based on a non-

disclosure theory; all Plaintiffs have described with particularity that the defect was not disclosed

and have also described with particularity the impact of that non-disclosure on Plaintiffs. *See,

e.g.,* §§ II.A.1., II.A.4., and II.A.5., *supra*. In particular, Plaintiffs have described PCNA's

knowledge of the coolant pipe defect, including the release of the Internal Technical Bulletin

attached as Exhibit A to the CAC and the complaints that PCNA has received from customers

related to the failing coolant pipes, and how PCNA concealed the defect from Cayenne

purchasers before they bought their vehicles, allowing them to suffer repair costs and reduction

in value of their vehicles as a result of the concealment. Compl. ¶¶ 58-68*; see also* § II.A.1., 4.

5., *supra.*. Plaintiffs have explained that if they had known that the vehicles' plastic coolant

tubes would likely fail prematurely, they would not have purchased Cayennes, or would have

insisted on paying less for them. *See, e.g.*, Compl. ¶ 113. By concealing the cooling pipe defect,

PCNA was able to increase Cayenne purchase prices and repair proceeds. While in a case of

affirmative representation, a complaint must detail who made the representation, and when and

where it was made, in a case of non-disclosure, requiring plaintiffs to attempt to list all the places

in which the disclosure could have been made, but was not, would exceed the bounds of common

sense and the law.  Plaintiff Dudley's allegations are already sufficient to establish Defendants' knowledge about the coolant pipe defect, and further evidence regarding this knowledge will be obtained through discovery.  Accordingly, the complaint satisfies Rule 9(b)'s heightened pleading standard.

There is also no merit to PCNA's assertion that Plaintiff Dudley has not adequately specified each Defendant's participation in the fraud.  Plaintiff has identified PCNA as a wholly-owned subsidiary of PAG.  All Plaintiffs have identified PCNA as the importer of PAG's vehicles for sale and lease in the U.S. and identified PCNA's role as being responsible for vehicles, parts, servicing, marketing, training, and warranting Porsche vehicles in the U.S.  The Complaint also identifies PCNA as the exclusive manufacturer, importer, and/or seller of Cayennes in the U.S. and identifies PAG's role as being "actively involved in designing, manufacturing, marketing, distributing, and selling Porsche Cayennes."  Compl. ¶¶ 33-34.  Given that PCNA's and PAG's respective roles in the fraud is information largely within their exclusive control, Plaintiff Dudley has, to the extent reasonably possible, "inform[ed] each defendant separately of the allegations surrounding 'his alleged participation in the fraud.'" *Haskin v. R.J. Reynolds Tobacco Co.*, 995 F. Supp. 1437, 1439 (M.D. Fla. 1998) (citation omitted).

### b.    Plaintiff Dudley sets forth facts establishing causation

PCNA incorrectly asserts that Plaintiff Dudley does not allege that any of PCNA's deceptive or unfair acts caused him damages.  Not only has Plaintiff Dudley adequately alleged for the reasons set forth above that PCNA concealed the coolant pipe defect from him and other purchasers, but Plaintiff Dudley has also adequately alleged that PCNA's non-disclosure caused him damages, because if he had "known that the plastic coolant tubes were likely to fail, he

102

would have not purchased the Cayenne, or would have insisted on paying less for the Cayenne." Compl. ¶¶ 113, 115, 303.  If PCNA had not concealed the coolant pipe defect, Plaintiff would also not have had to replace the plastic coolant tubes on his Cayenne with non-defective coolant tubes at substantial expense.  *Id.* ¶¶ 114-115, 303.  As such, Plaintiff Dudley has set forth sufficient facts showing causation, and has not merely stated that his damages occurred "as a result" of PCNA's deceptive and unfair acts, as PCNA contends.  *See* §§ IV.F.1.e., and IV.K.2., *supra* and *infra*.

> ### c.    Plaintiff Dudley adequately allege that he suffered "actual damages" under the FDUTPA
>
> #### i.    The FDUTPA permits recovery for damages incurred outside of the warranty period

Despite Plaintiff Dudley's well-pled allegations that he overpaid for his Cayenne and had to replace its coolant pipes as a result of PCNA's deceptive and unfair acts, PCNA remarkably argues that Plaintiff Dudley has only suffered subjective feelings of disappointment.  In addition to ignoring the facts alleged in the Complaint, PCNA's argument is based on the flawed premise that PCNA's manufacturer's warranty somehow governs Plaintiff Dudley's FDUTPA claim. More relevant to the FDUTPA claim is the Cayenne purchase agreement Plaintiff Dudley would not have entered into, or which would have had different terms, if PCNA had not concealed the coolant pipe defect from Plaintiff Dudley and other consumers.  Critically, PCNA does not cite a single case in which a court has held that the FDUTPA does not apply to repair or replacement costs incurred outside of a product's warranty period.  Of course, PCNA's argument does not apply to Plaintiff Dudley's allegation that he paid more for his vehicle than it was worth as a result of PCNA's conduct.  Compl. ¶ 115.

Furthermore, even if PCNA's manufacturer's warranty did somehow govern the

FDUTPA claim—which it does not—"any attempt to limit one's liability for deceptive or unfair trade practices would be contrary to public policy." *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984). Accordingly, in *Heller*, on which PCNA mistakenly relies, the court held that the "recovery of actual damages pursuant to [the FDUTPA] violation . . . is not limited by the limitation of damages provision in the contract." *Id.* Thus, Plaintiff Dudley may recover damages under the FDUTPA for the replacement costs he incurred outside of the Cayenne's warranty period.

> ii.     **Plaintiff Dudley incurred actual damages when he overpaid for his Cayenne and when he replaced its coolant tubes**

Next, PCNA incorrectly asserts that Plaintiff Dudley cannot recover under the FDUTPA because the defect has not yet caused the coolant pipes to rupture. The Florida state class action certification decisions PCNA cites in support of its argument do not support that broad proposition. Rather, those decisions stand for the proposition that FDUTPA classes should not include persons who have sustained no actual loss due to class certification issues. *See Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1139-40 (Fla. Dist. Ct. App. 2008); *Butland*, 951 So. 2d at 873. Neither case precludes Plaintiff Dudley's claim for recovery of the amount he overpaid for his Cayenne and the amount he paid to replace its coolant tubes as a result of PCNA's concealment of the coolant pipe defect. Plaintiff Dudley has sustained actual loss caused by PCNA's deceptive and unfair acts.

> iii.     **Plaintiff Dudley's replacement costs are recoverable under the FDUTPA**

Lastly, while the FDUTPA does not permit recovery of consequential damages, the expense Plaintiff Dudley incurred to replace the defective coolant pipes in his Cayenne is not consequential damage. *See Butland*, 951 So. 2d at 869. Plaintiff Dudley was remedying the

defect, not repairing damage sustained as a consequence of the defect.  In addition, PCNA does not even attempt to argue that Plaintiff Dudley's overpayment damages are not recoverable under the "diminished value" measure of damages articulated in *Heller*.  *See Heller*, 454 So. 2d at 585.

2.     **Plaintiff Dudley's negligence claims are not barred by the Economic Loss Rule**

Under Florida law, it "is well established that the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation."  *D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. Dist. Ct. App. 2003) ("The Supreme Court has announced 'that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action.'" (quoting *Moransais v. Heathman*, 744 So. 2d 973, 983 (1999)).  "As such, the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation."  *Id.*

"The test to determine if the economic loss rule applies is to ask if the fraud alleged is in an act of performance or in a term of the bargain."  *Id.*  The fraud alleged relates to a term of the bargain, and the economic loss doctrine does not apply, if "the fraud occurs in connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction."  *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. Dist. Ct. App. 2000).

Here, Plaintiff Dudley's negligence claim is based on fraud/or and negligent misrepresentations.  Plaintiff Dudley alleges that PCNA's intentional and/or knowing omissions caused him to enter into a purchase agreement for a Porsche Cayenne.  Compl. ¶¶ 57-67, 113, 309-10.  Thus, the fraud alleged relates to a term of the bargain because it occurred in connection with omissions that caused Plaintiff Dudley to enter into transaction to purchase his Cayenne,

105

clearly removing Plaintiff Dudley's negligence claim from the operation of Florida's economic loss rule.  *See Allen*, 784 So. 2d at 457.

> **3.**     **Plaintiff Dudley's unjust enrichment claim is valid**

> **a.**     **PCNA's manufacturer's warranty does not preclude Plaintiff Dudley's unjust enrichment claim**

Plaintiff Dudley's unjust enrichment claim is not barred by PCNA's manufacturer's warranty because Plaintiff Dudley's purchase agreement, not the manufacturer's warranty, is the subject of this claim, and PCNA was not a party to that agreement.  Plaintiff Dudley alleges that he would not have purchased his Porsche Cayenne, or would have insisted on paying less for the vehicle, if he had known about the coolant pipe defect.  Compl. ¶ 113.

It is only when there is a contract between the parties that is the subject of the action that an unjust enrichment claim is not viable under Florida law.  *See, e.g.*, *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. Dist. Ct. App. 2009) ("With regard to the count for unjust enrichment, where there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment.").  This point is illustrated by *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254 (M.D. Fla. 2010), which PCNA cites in support of its argument.  In *Rushing*, the court dismissed an unjust enrichment claim because the plaintiff and the defendant had a contractual relationship based on an agreement entered into by the plaintiff and the defendant.  *Rushing*, 752 F. Supp. 2d at 1257, 1265.

PCNA incorrectly asserts that *David v. American Suzuki Motor Corp.*, 629 F. Supp. 2d 1309 (S.D. Fla. 2009), is instructive.  In addition to the court's failure to adhere to the rule that an unjust enrichment claim is precluded only where there is a contract between the parties on which the claims at issue are based, PCNA's reliance on *David* is misplaced because the plaintiff in that case brought an express warranty claim and based his unjust enrichment claim on the

106

express warranty. *Davis*, 629 F. Supp. 2d at 1324 ("The unjust enrichment claim arises out of Defendants' alleged failure to perform under the warranty, and the damages pled under unjust enrichment are not distinct from those pled under express warranty."). Plaintiff Dudley does not bring any express warranty claims under Florida law, and the only warranty claims alleged in the Complaint are implied warranty claims that arose by operation of law, not any manufacturer's warranty, making *David* inapposite.

Another case PCNA cites does not specifically address this issue, devoting only a sentence and a few citations to it. *See In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (M.D. Fla. 2002). Also, the section of the Florida Supreme Court case PCNA quotes from at length discusses the economic loss rule, not whether a manufacturer's warranty precludes an unjust enrichment claim under Florida law—which it does not. *See Fla. Pwr. & Light v. Westinghouse Elec. Corp.*, 510 So. 2d 899, 901 (Fla. 1987).

### b. <u>Plaintiff's unjust enrichment claim is adequately alleged</u>

#### i. <u>Plaintiff Dudley conferred benefits on PCNA</u>

PCNA's assertion that Plaintiff Dudley has not adequately alleged that he directly conferred a benefit on PCNA misses the mark. First, PCNA cites no case law in support of the unfounded proposition that a plaintiff must directly confer a benefit on the defendant. As discussed more fully above, as a result of PCNA's concealment of the coolant pipe defect from Plaintiff Dudley and other consumers, PCNA received benefits – increased purchase prices and repair proceeds – and unjustly retained those benefits at the expense of Plaintiff Dudley and the class. *See* § IV.F.2., *supra*; *see also* §§ IV.C.4., IV.D.2., and IV.H.4.b.ii., *supra* and *infra*. That circumstance remains true regardless of whether Plaintiff Dudley purchased his Porsche Cayenne new or used.

107

     **ii.**      **It would be inequitable for PCNA to retain the benefits Plaintiff Dudley conferred**

In arguing that it would be equitable for it to retain the benefits conferred on it by Plaintiff Dudley, PCNA ignores that, after learning of the coolant pipe defect, Plaintiff Dudley replaced the plastic coolant tubes on his Porsche Cayenne with aluminum ones to avoid leaking or failed tubes and the potential catastrophic failure of other major engine/transmission components.  Compl. ¶ 114.  For this and other reasons discussed above, it would be inequitable for PCNA to retain profits from increased purchase prices and repair proceeds that resulted from its concealment of the coolant pipe defect.  *See also* § IV.F.2., *supra*.

    **H.**    **Texas**

      **1.**     **Plaintiffs' breach of implied warranty claim is viable**

The claim for breach of implied warranty is valid, notwithstanding that PCNA's written warranty limited all warranties to four years from the date of the vehicle's original sale or 50,000 miles, whichever occurred.  PCNA's time and mileage limits on its implied warranties do not preclude claims for breach of those warranties for the reasons set forth more fully above in connection with Plaintiffs' discussion of their claims under the Magnuson-Moss Act, and the discussion of the UCC in §§ IV.B.2., IV.G.1.b., IV.J.3., and IV.K.4., *supra* and *infra*.  Stated simply, PCNA's attempt to disclaim or limit implied warranties is unconscionable, and, further, it is neither prominently displayed on the face of the warranty as required by Magnuson-Moss nor conspicuous as required by the UCC.   *See* §§ IV.A,, IV.B.2., IV.E.1.b., IV.J.3., IV.G.1.b., and IV.K.4., *supra* and *infra*.  PCNA simply incorporates by reference its arguments regarding the Magnuson-Moss Act, making no additional arguments regarding Texas Plaintiffs' breach of implied warranty claim.

With respect to the UCC, to be "conspicuous," a disclaimer must satisfy the following statutory standard:

> "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (a)   A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (b)   Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language.

Tex. Bus. & Com. Code § 1.201(b)(10) (Vernon 2006).

The disclaimer in the Cayenne manual on which PCNA relies is written in small font, with nothing to distinguish it from the surrounding text. It is buried in the middle of the page under the misleading sub-heading "Responsibilities." The heading at the top of the page is not in capitals, and it refers only to "Limitations and Disclaimers" generally and does not specifically mention implied warranties. (Mot. to Dismiss, Exs. A-D at 5.)

This disclaimer is void because it is not conspicuous under Sections 1-201 and 2-316 of the UCC (as incorporated into Texas law). Tex. Bus. & Com. Code §§ 1.201, 2.316 (Vernon 2006). Where the disclaimer at issue "is not in larger type or other contrasting font or color," just as the disclaimer here, Texas courts have found such disclaimers are not conspicuous. *Fieldtech Avionics & Instruments, Inc. v. Component Control.com, Inc.*, 262 S.W.3d 813, 829 (Tex. App. 2008); *see also Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex. App. 1990) (holding that a disclaimer "printed in the same typeface, size and color as the rest of the warranty text" was not conspicuous).

109

In addition, for a warranty limitation or disclaimer to be effective under Texas law, "the plaintiffs must have had an opportunity to examine it prior to consummation of the contract for sale." *Klo-Zik Co. v. General Motors Corp.*, 677 F. Supp. 499, 508 (E.D. Tex. 1987) (citing *Mercedes Benz of North America, Inc. v. Dickenson*, 720 S.W.2d 844, 852 (Tex. App 1986); *Willoughby v. Ciba-Geigy Corp.*, 601 S.W.2d 385, 388 (Tex. Civ. App. 1979)); *see also Metro Nat'l Corp. v. Dunham-Bush, Inc.*, 984 F. Supp. 538, 559-60 (S.D. Tex. 1997) (holding that warranty disclaimers in operating manual plaintiff received after entering contract were ineffective). Here, none of Texas Plaintiffs' allegations indicate that they received PCNA's manufacturer's warranty containing the mileage and duration limits before they signed purchase agreements for their Porsche Cayennes, and the only logical inference is that they did not.

Lastly, enforcement of a warranty disclaimer or limitation can also be avoided if it is unconscionable. *See* Tex. Bus. & Com. Code § 2.302; *Arkwright-Boston Mfgs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988). PCNA's attempt to limit its implied warranties to the duration of its express warranty is procedurally unconscionable because the limitation was not the result of a fair bargaining process. *See Chubb Lloyds Ins. Co. v. Andrew's Restoration, Inc.*, 323 S.W.3d 564, 578 (Tex. App. 2010). PCNA had superior knowledge about the coolant pipe defect, especially given PCNA's concealment of the defect, and Plaintiffs neither knew of the defect nor had any opportunity to negotiate the implied warranty limitation. *See id.*; *see also Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App. 2005). The implied warranty limitation is substantively unconscionable because, in light of the parties' respective levels of knowledge about the defect, the limitation "'is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.'" *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 678 (Tex. 2006) (citation omitted).

110

2.      **Texas Plaintiffs' negligence claim is not barred by the Economic Loss Doctrine**

The economic loss doctrine does not bar Texas Plaintiffs' negligence claim because of the absence of contractual privity between Texas Plaintiffs and PCNA.  "Federal Courts applying the economic loss rule have consistently held that the rule does not apply in the absence of contractual privity."  *Crawford Pharmacies v. AmerisourceBergen Drug Corp.*, Civ. A. No. C-08-12, 2008 U.S. Dist. LEXIS 18666, at *9 (S.D. Tex. Mar. 11, 2008) (citing *Elk Corp. v. Valmet Sandy-Hill, Inc.*, No. 3:99-cv-2298-G, 2000 U.S. Dist. LEXIS 3586, at *8 (N.D. Tex. Mar. 21, 2000) (stating that the court "[could] not conclude that [the plaintiff's] claims [we]re clearly barred by the economic loss doctrine," where there was no contractual privity between the plaintiff and the defendant); *Jackson v. Dole Fresh Fruit Co.*, 921 F. Supp. 454, 459 (S.D. Tex. 1996); *Juarez v. Chevron USA, Inc.*, 911 F. Supp. 257, 260 (S.D. Tex. 1995) (finding that the economic loss doctrine did not apply in the absence of contractual privity, and explaining that "[i]t is problematic to say that Plaintiff's injury is only 'economic loss to the subject of the contract' or that Plaintiff's damages are entirely contractual in nature when the alleged tortfeasors were not parties to the [contract].")).

As the United States District Court for the Southern District of Texas explained in *Jackson*: "Clearly, the [economic loss rule] is inapplicable to the Plaintiffs' tortious interference claim against [Defendant].  Because there is no contract between [Defendant] and the Plaintiffs, it can hardly be said that the duty [Defendant] allegedly breached arose from a contract." *Jackson*, 921 F. Supp. at 459.  Texas state courts have also held the economic loss doctrine inapplicable where there was no contractual privity between the plaintiff and defendant.  *See, e.g., Lyda Constructors, Inc. v. Butler Mfg. Co.*, 103 S.W.3d 632, 639 (Tex App.2003) (holding that the economic loss rule was not applicable to plaintiff's negligent misrepresentation claim

111

against a defendant who was not a party to the contract).  Because PCNA was not a party to

Texas Plaintiffs' Cayenne purchase agreements, there is no contractual privity and the economic

loss doctrine does not apply.

### 3.    Texas Plaintiffs state a claim under Texas' Deceptive Trade Practices Act

PCNA's attacks on Texas Plaintiffs' DTPA claim are without merit.  Texas Plaintiffs

adequately allege three types of DTPA violations: (1) false, misleading, or deceptive acts or

practices; (2) unconscionable actions or courses of action; and (3) breach of an implied warranty.

*See* Tex. Bus. & Com. Code Ann. § 17.50(a)(1)-(3) (Vernon 2006).

### a.    Texas Plaintiffs' allegations satisfy the applicable pleading standard

Even if Rule 9(b) applies to Plaintiffs' DTPA claim, Plaintiffs' allegations are set forth

with the requisite particularity, for the reasons discussed above and below.  *See* §§ IV.B.1.b.,

IV.C.1., IV.F.1., IV.G.1.a., and IV.K.1., *supra* and *infra*.  Rule 9(b) does not require knowledge

or intent to be alleged with particularity.  Fed. R. Civ. P. 9(b).  In addition, notwithstanding Rule

9(b)'s particularity requirement, the Court must "accept all well-pleaded facts as true and view

them in the light most favorable to the plaintiff."  *Baker v. Putnal*, 75 F. 3d 190, 196 (5th Cir.

1996).  Courts also recognize an exception relaxing the Rule 9(b) standard where, as here, facts

relating to the alleged fraud are peculiarly in the defendant's possession.  *Smithkline Beecham*,

245 F.3d at 1052 (citing *Wool*, 818 F.2d at 1439); *Russell*, 193 F.3d at 308 (explaining that the

United States Court of Appeal for the Fifth Circuit has "held that when the facts relating to the

alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is

relaxed, and fraud may be pled on information and belief"); *In re Burlington Coat Factory Sec.

Litig.*, 114 F.3d at 1418; *Stinson*, 755 F. Supp. at 1052.  In this case, the necessary information

regarding the extent of involvement of each Defendant in perpetrating fraud are under the exclusive control of the respective Defendants – they should not be allowed to profit by concealing details of their fraud.

Texas Plaintiffs adequately allege that they relied to their detriment on PCNA's material nondisclosures that violated the DTPA. *See* Tex. Bus. & Com. Code § 17.46(b)(24) (Vernon 2006) (prohibiting persons from "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"). Compl. ¶¶ 65, 210, 217, 488-89. Texas Plaintiffs described PCNA's knowledge of the coolant pipe defect, including the release of the Internal Technical Bulletin attached as Exhibit A to the CAC and the complaints that PCNA has received from customers related to the failing coolant pipes, and how PCNA concealed the defect from Cayenne purchasers before they bought their vehicles, allowing them to suffer repair costs and reduction in value of their vehicles as a result of the concealment. *See* Compl. ¶¶ 58-68 Texas Plaintiff's allegations are already sufficient to establish Porsche's knowledge about the coolant pipe defect, and further evidence regarding this knowledge will be obtained through discovery. Texas Plaintiffs further allege that if they had known that the vehicles' plastic coolant tubes would fail prematurely, they would not have purchased Cayennes, or would have insisted on paying less for them. *Id.* ¶¶ 210, 217. By concealing the cooling pipe defect, PCNA was able to increase Cayenne purchase prices and repair proceeds.

Texas Plaintiffs have also identified PCNA as the importer of PAG's vehicles for sale and lease in the U.S. and identified PCNA's role as being responsible for vehicles, parts, servicing, marketing, training, and warranting Porsche vehicles in the U.S. *Id.* ¶ 33. The

complaint identifies PCNA as the exclusive manufacturer, importer, and/or seller of Cayennes in the U.S. and identifies PAG's role as being "actively involved in designing, manufacturing, marketing, distributing, and selling Porsche Cayennes." *Id.* ¶¶ 33-34.  As such, Texas Plaintiffs have adequately alleged the time, place, and contents of the non-disclosures PCNA made and what PCNA obtained thereby.  *See Russell*, 193 F.3d at 308 ("To plead fraud with particularity a plaintiff must include the 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [the person] obtained thereby.'" (quoting *Williams v. WMX Tech., Inc*., 112 F.3d 175, 177 (5th Cir. 1997)) (alteration in original)); *see also* §§ IV.B.1.b., IV.C.1., IV.F.1., IV.G.1.a., and IV.K.1., *supra* and *infra*.  As discussed more fully above, in a case of non-disclosure, requiring plaintiffs to attempt to list all the places in which the disclosure could have been made, but was not, would exceed the bounds of common sense and the law.

Texas Plaintiffs also allege that they relied on PCNA's marketing claims discussed above, which constitute additional DTPA violations.  *See* Tex. Bus. & Com. Code §§ 1746(b)(5), (7); 1750(a)(1).  Compl. ¶¶ 62, 210, 217, 488-89.  Those marketing claims are not puffery; they are specific representations about a specific component of the product, not vague or general statements about the quality of the whole product, in contrast to the statements in the only case PCNA cites.  *See Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 464 (Tex. App. 1990) ("In the case before us, the misrepresentations arising from the Autohaus salesman's statement could have been that the car: (1) was the best engineered car in the world; (2) probably would not have mechanical difficulties; and (3) probably would only need servicing for oil changes.").

For the foregoing reasons, Texas Plaintiffs' DTPA claim satisfies Rule 9(b)'s heightened pleading standard, not to mention Rule 8(a)'s liberal requirement of "a short and plain statement

of the claim." Fed. R. Civ. P. 8(a). If the Court finds that the complaint fails to meet the Rule 9(b) particularity requirement, Texas Plaintiffs respectfully request that the Court dismiss the claims without prejudice and allow leave to amend, as any deficiencies the Court may find will certainly be curable by amendment. *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so.").

PCNA's other two arguments concerning Texas Plaintiffs' DTPA allegations are also unavailing.

        **i.**        **Texas Plaintiffs set forth facts showing that PCNA's deceptive conduct was "in connection with a consumer transaction"**

PCNA relies solely upon *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644 (Tex. 1996), to support its incorrect contention that Texas Plaintiffs have not pled allegations showing that PCNA's deceptive conduct occurred "in connection with a consumer transaction." PCNA's reliance on *Amstadt* is entirely misplaced. In *Amstadt*, the plaintiffs were homeowners who sued the manufacturer of plumbing systems, and the compounds and resins used in them, when they failed. The Supreme Court of Texas examined the role that each manufacturer played in the plaintiffs' purchase of their homes. The manufacturers and suppliers of the compound and resins used in the plumbing systems had not acted in connection with the purchase of the homes because they exercised no control over the manufacture and installation of the finished systems or of the homes, and because there was no evidence that the information provided to homebuilders or building code officials was intended to be, or actually was, passed on to

consumers.  919 S.W.2d at 651.  The court emphasized that the resin manufacturer's marketing efforts were not "incorporated into the efforts to market homes to the plaintiffs."  *Id.*

The court noted that the manufacturer of the plumbing system, *U.S. Brass*, had a greater role in the consumer transaction.  Its representatives had met with homebuilders and provided them with a catalog that stated that the pipes would not corrode, freeze, or experience mineral build up.  Yet, as with the other defendants, *U.S. Brass*'s marketing efforts had not been intended to, nor had they been, incorporated into the marketing of the homes.  *Id.* at 652.

In stark contrast, there is no question that PCNA's marketing efforts were intended to be, and were, incorporated into the marketing of its Cayennes.  *See Church & Dwight Co. v. Huey*, 961 S.W.2d 560, 565 (Tex. App. 1997) (analyzing *Amstadt* and holding that defendant satisfied the "in connection with" requirement where its marketing efforts were incorporated into end seller's marketing efforts).  *See also* Compl. ¶¶ 38-40, 42-43, 62-63.  PCNA is not a downstream supplier of a component part and was far more central in the marketing of the products at issue than were the defendants in *Amstadt*.  PCNA's non-disclosures were intended to, and did, reach Texas Plaintiffs and other consumers prior to their purchasing Cayennes, satisfying the "in connection with" requirement.

  ii. **Texas Plaintiffs have set forth a plausible claim that PCNA's conduct was "unconscionable" under the DTPA**

PCNA attempts to set the bar for alleging "unconscionable" conduct under the DTPA far too high.  An "[u]nconscionable action or course of action" is defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus. & Com. Code § 17.45(5) (Vernon 2006).  The only authority PCNA cites is *Strauss v. Ford Motor Co.*, 439 F. Supp. 2d

680 (N.D. Tex. 2006), in which the court relied on *Chastain v. Koonce*, 700 S.W.2d 579 (Tex. 1985), for the proposition that "proving unconscionability in a TDTPA case is difficult." *Strauss*, 439 F. Supp. 2d at 687.  However, *Chastain* only stands for the proposition that conduct that "occurred approximately one year after the alleged misrepresentations occurred . . . do[es] not reflect on the unfairness of the original transaction." *Chastain*, 700 S.W.2d at 584.  Plaintiffs submit that the unfairness of permitting PCNA to conceal the coolant pipe defect and take advantage of Plaintiffs and other consumers' lack of knowledge about that safety risk is flagrant and unmitigated.  *See id.*; *see also Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. 2010) (explaining that "[f]raud by omission is a subcategory of fraud because the omission or non disclosure may be as misleading as a positive misrepresentation of fact"); *see* discussion of safety risks at §§ IV.B.1.a.ii., IV.C.2.c.iv., IV.I.3., IV.J.2., and IV.K.2., *supra*  and *infra*.

### b. Texas Plaintiffs state a DTPA claim based on breach of implied warranty

PCNA's attack on Texas Plaintiffs' DTPA claim based on PCNA's breach of implied warranty simply incorporates PCNA's previously-discussed flawed implied warranty arguments. As set forth more fully above, Texas Plaintiffs' breach of implied warranty claim is sufficient under Texas law.  *See* §§ IV.E.1., IV.I.1., *supra*; *see also* § IV.A., *supra*.

### 4. Texas Plaintiffs' unjust enrichment claim is viable

### a. Unjust enrichment is an independent cause of action

Texas courts have recognized unjust enrichment as an independent cause of action.  *See, e.g.*, *Pepsi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App. 2007) ("Unjust enrichment is an independent cause of action." (citing *HECI Exploration Co. v. Steel*, 982 S.W.2d 881, 891 (Tex. 1998) (analyzing a claim for unjust enrichment on its merits)); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000) (discussing a cause of action for unjust enrichment); *HECI*

*Exploration*, 982 S.W.2d at 885 (recognizing that a two-year statute of limitations governs "unjust enrichment" claims).  In *Newington Ltd. v. Forrester*, the United States District Court for the Northern District of Texas explained as follows: "Given that the Supreme Court has stated that unjust enrichment is a cause of action, and that Texas courts seem willing to award recovery based on unjust enrichment, even if it is nothing more than a theory, the court concludes that [plaintiff's] claim for unjust enrichment should proceed."  No. 3:08-CV-0864-G, 2008 U.S. Dist. LEXIS 92601, at *11-12 (N.D. Tex. Nov. 13, 2008) (denying motion to dismiss unjust enrichment claim); *see also Prophet Capital Mgmt. v. Prophet Equity, LLC*, No. A-09-CA-316 LY, 2009 U.S. Dist. LEXIS 888474, at *5 & n.2 (N.D. Tex. Sept. 25, 2009) (stating that it would not be appropriate to dismiss unjust enrichment claim on the ground that unjust enrichment is not an independent cause of action under Texas law).

> **b.**    **Texas Plaintiffs' unjust enrichment claim is pled sufficiently**

Unjust enrichment is an equitable principle requiring one who receives benefits unjustly to make restitution for those benefits.  *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265 (Tex. App. 2004).  "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."  *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  Unjust enrichment occurs when the defendant wrongfully secures a benefit or passively receives a benefit which would be unconscionable to retain.  *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App. 2009).  Plaintiffs have stated an unjust enrichment claim under Texas law.

i.    **Texas Plaintiffs' adequately allege PCNA was unjustly enriched through fraud, duress, or undue advantage, and that they conferred benefits on PCNA**

PCNA's assertion that Texas Plaintiffs have not set forth allegations tending to show that they conferred benefits that unjustly enriched PCNA through fraud, duress, or undue advantage is specious at best. As a result of PCNA's concealment of the coolant pipe defect from Plaintiffs and other consumers, PCNA received benefits – increased purchase prices and repair proceeds – and unjustly retained those benefits at the expense of Plaintiffs and the class, as set forth more fully above. *See* §§ IV.C.4., IV.D.2., IV.F.2, IV.G.3.b.i., *supra*.

ii.    **Texas Plaintiffs' unjust enrichment claims are quasi-contractual in nature**

PCNA's argument that Texas Plaintiffs' unjust enrichment claims are not quasi-contractual in nature is a red herring. The subject of Texas Plaintiffs' unjust enrichment claim is the purchase agreement between them and the dealerships where they purchased their Porsche Cayennes. As PCNA was not a party to those agreements, it is not entitled to dismissal of the unjust enrichment claim on the ground that the claim is not quasi-contractual. *See Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App. 2008) ("The doctrine of unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties."). In addition, the Texas Supreme Court has recognized an exception to the rule that an express contract between the parties precludes an unjust enrichment claim when overpayment was made under the contract. *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998). Texas Plaintiffs alleged such overpayment here. Compl. ¶¶ 67, 209, 216.

            iii.        **Texas Plaintiffs adequately allege that it would be inequitable for PCNA to retain the benefits they conferred**

Lastly, PCNA rehashes its prior arguments by asserting that it would not be inequitable for PCNA to retain the benefits that Texas Plaintiffs and the class conferred on it. As discussed more fully above, it would be inequitable for PCNA to retain the benefits that Texas Plaintiffs and the class conferred on it as a result of PCNA's concealment of a known safety risk that would have been material to the purchase decisions of Texas Plaintiffs and the class.

**I.**        **Ohio**

         **1.**     **The Ohio Plaintiffs have stated a claim for breach of implied warranty under the Magnuson-Moss Act**

The Ohio Plaintiffs have stated a cause of action under Ohio law for breach of the Magnuson-Moss Federal Warranty Act ("Magnuson-Moss"). Magnuson-Moss provides a federal cause of action for breach of an "implied warranty," which is defined in the Act as "an implied warranty arising under state law in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301(7). The Act is not limited to implied warranties arising under the Uniform Commercial Code, nor is it confined to implied warranties arising from any particular **theory** of law (e.g., tort or contract). Because the Ohio Plaintiffs have sufficiently claimed a breach of the implied warranty in tort, they have also stated a cause of action for breach of implied warranty under Magnuson-Moss.

In footnote 4 of its Motion to Dismiss, PCNA inaccurately suggests that coverage of Magnuson-Moss is limited to implied warranties arising under a contract theory. To the contrary, Magnuson-Moss contains no such limitation, and there is no basis upon which to impose such a limitation. Instead, Magnuson-Moss applies, without qualification, to all implied warranties arising under state law in connection with a consumer product. *See Zumwalde v.*

120

*Madeira & Indian Hill Joint Fire Dist.*, 128 Ohio St.3d 492, ¶ 22-23 (Ohio 2011) (a court should give effect to the words actually employed in a statute, and should not delete words used, or insert words not used, in the guise of interpreting the statute); *United States v. Lohr*, 966 F.2d 201, 204 (6th Cir. 1992) (if the words have a plain and clear meaning, interpret them that way).

As PCNA recognizes, had the Ohio Plaintiffs claimed a breach of the implied warranty of merchantability under the Uniform Commercial Code (hereinafter, the "UCC"), the claim would likely have been barred by the lack of privity. *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St.3d 266, ¶ 28 (Ohio 2007). Without privity, a Magnuson-Moss claim for breach of the implied warranty of merchantability would likewise have failed. *Id.* Ohio Plaintiffs, however, have not claimed a breach of the implied warranty of merchantability under the UCC. Instead, the Ohio Plaintiffs assert a claim for breach of the implied warranty in tort, which, as admitted by PCNA, does not require privity. Mot. to Dismiss 87 (quoting *Chemtrol Adhesives, Inc. v. Am. Manuf.'s Mut. Ins. Co.*, 42 Ohio St.3d 40, 49 (Ohio 1989)). Thus, contrary to PCNA's Motion, the Ohio Plaintiffs have separately pleaded a count for breach of warranty under state law.

Moreover, Ohio provides consumers with an implied warranty in tort action to allow consumers to overcome the UCC's restrictive privity requirements. *See Chemtrol Adhesives*, 42 Ohio St.3d at 49 (implied warranty is designed to protect consumers not covered by contractual sales warranties because of the lack of privity). Implied warranty in tort is available in cases that mirror those in which the UCC implied warranty of merchantability would be available but for its privity requirements. *White v. DePuy, Inc.*, 129 Ohio App.3d 472, 479 (Ohio Ct. App.

1998).[27]  PCNA cannot deny that if Ohio, like a number of other states, allowed for recovery for breach of the implied warranty of merchantability in the absence of privity, recovery under Magnuson-Moss would be available as well.  Through the implied warranty in tort doctrine, Ohio law, in effect, allows for recovery in circumstances similar to a breach of the merchantability warranty, so recovery should likewise be available to Plaintiffs under Magnuson-Moss.

PCNA cites only a single case in Footnote 5 to argue that Magnuson-Moss is limited to an implied warranty in contract claim.  *Ultimax, Inc. v. Mercedes-Benz USA, LLC,* No. 2:06-cv-951,2008 U.S. Dist. LEXIS 28475 (S.D. Ohio Apr. 8, 2008).  PCNA suggests that this case stands for the proposition that only a breach of implied warranty in contract can sustain a Magnuson-Moss claim.  *Ultimax* says no such thing.  *Ultimax* merely holds that a claim for breach of the implied warranty of merchantability cannot sustain a Magnuson-Moss cause of action, which is true.  *Ultimax* at *25.  ("In Ohio, purchasers of automobiles may assert a contract claim for breach of implied warranty of merchantability, pursuant to the Magnuson-Moss Warranty act, only against parties with whom they are in privity of contract").

The Court in *Ultimax* relied entirely upon the *Curl* case which held, as both parties agree, that a **contract claim** for breach of implied warranty is not sufficient to support either a state claim or a Magnuson-Moss claim by a non-privity plaintiff.  *Id.* at *25-26.  The entire premise of *Ultimax* is that a breach of a warranty that requires privity under state warranty law also requires

---

[27]     In *White*, the Court held that the plaintiff must allege that a defect existed in the supplier's product that "made it unfit for its ordinary, intended use" to allege a breach of implied warranty in tort.  *White*, 129 Ohio App.3d at 479-48080.  Under the Ohio version of the UCC, a product breaches the implied warranty of merchantability when (among other possibilities) it is "not fit for its ordinary use."  Ohio Rev. Code Ann. § 1302.27(B)(2).  As this comparison demonstrates, the core requirements of the implied warranty of merchantability and the implied warranty of tort are precisely the same.

privity under Magnuson-Moss, which is not disputed by the Ohio Plaintiffs.  However, neither *Curl*, nor any other Ohio case, holds that implied warranty in tort requires privity.[28]

The Court should deny PCNA's Motion to Dismiss on this issue.

### 2. The Ohio Plaintiffs alleged proper claims for a breach of implied warranty in tort based upon reasonable consumers' expectations

Ohio Plaintiffs have properly stated a claim for breach of implied warranty in tort under Ohio law.[29]  PCNA has proffered two arguments for why Ohio Plaintiffs are not entitled to recover for breach of implied warranty in tort.  Upon examination, both arguments rely on false premises and misapplied law.  But PCNA stated much with which the Ohio Plaintiffs agree.

The parties agree that all sellers must provide products to consumers of merchantable quality and fit for the purposes for which they are designed.  *McDonald v. Ford Motor Co.,* 42 Ohio St.2d 8, 10 (Ohio 1975); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 322 (Ohio 1977). A breach of the implied warranty in tort may be asserted by a consumer against a supplier not in

---

[28]     In *Ultimax*, the court stated that the "Plaintiff argues that 'privity of contract is not required for a contractual claim for an action in tort for breach of implied warranty . . . This argument, however, was squarely rejected by *Curl* . . . ." *Id.* at *25.  To the extent that PCNA relies on this single isolated sentence in *Ultimax*, its reliance is misplaced for a number of reasons. First, the language is confusing and internally inconsistent.  A contractual claim for breach of implied warranty must be brought under the UCC—there is no such thing as "a contractual claim for an action in tort for breach of implied warranty."  Second, the immediately preceding sentence in the *Ultimax* case makes clear that the court intends to reference the contractual warranty of merchantability, not implied warranty in tort.    Third, and most importantly, the Court relies entirely on the *Curl* case for its decision.  *Id.* at *24-26.  The *Curl* case, as mentioned in the text above, dealt only with the UCC warranty of merchantability and required privity for that warranty (and thus, for Magnuson-Moss).  *Curl* did not hold that privity was required for implied warranty in tort, and as PCNA admits, it is not so required.  *See, e.g.,* *McKinney v. Bayer Corp.*, 744 F.Supp.2d 733, 756 (N.D. Ohio 2010); *Johnson v. Monsanto Co.*, No. 11-02-02, 2002 Ohio App. LEXIS 4740, at *20-21 (Ohio Ct. App. Sept. 6, 2002).

[29]     It should be noted that the implied warranty in tort, unlike UCC warranties, cannot be disclaimed.  *Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.,* 42 Ohio St. 3d 40, 49-50 (1989) ("whenever the doctrine of implied warranty in tort is applicable, the provisions of the Uniform Commercial Code permitting parties to contractually modify or exclude warranties, or to modify or limit remedies are of no avail").

privity with a buyer when the harm from the breach is solely economic. *LaPuma v. Collinwood Concrete,* 75 Ohio St. 3d 64, 67 (Ohio 1996); *Hartman v. Mercedes-Benz, U.S.A., L.L.C.*, No. 1:08-cv-03034, 2010 U.S. Dist. LEXIS 22536, at *20 (N.D. Ohio 2010) (relying on *La Puma*); *Flex-Homes, Inc. v. Ritz-Craft Corp. of Mich.*, No. 07cv1005, 2009 U.S. Dist. LEXIS 91723, at *63 (N.D. Ohio 2009) (consumer not in privity with manufacturer can assert implied warranty in tort claim).

Also, as PCNA suggests, breach of implied warranty can be asserted in both tort and contract. If a contractual claim for breach of implied warranty is made, however, the person asserting the breach must be in privity with the supplier. *Curl* at ¶ 28. Whether a breach of implied warranty claim is brought in contract or tort, its fitness is judged from the standpoint of the reasonable consumer, considering all circumstances surrounding the transaction. *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 249 (Ohio 1958). The parties agree on these aspects of Ohio law. Misconstruing this law, however, PCNA then derives two arguments that are contrary to the law it cites, rely on incorrect assumptions or premises, and are facially implausible.

### 3. PCNA lacks authority to suggest that the Ohio Plaintiffs' implied warranty in tort claims contradict consumers' reasonable expectations

The Ohio Plaintiffs adequately pleaded that their Cayennes were unfit for their ordinary, intended use because of the defects in the coolant lines. PCNA boldly asserts that no reasonable consumer would expect that a product would not fail after the expiration of the written warranty, but it provides meager support, at best, for such a conclusion. PCNA cites **no** Ohio authority in support of this remarkable assertion, and mentions briefly only two other cases, both of which involve claims that are distinguishable from those of the Ohio Plaintiffs. *See Daugherty v. Am.*

124

*Honda Motor Co*., 144 Cal. App. 4th 824 (Cal. Ct. App. 2006); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008).

Neither *Daugherty* nor *Clemens* deal with the present issue.  Both cases hold that under certain circumstances the emergence of non-safety related defects outside the express warranty period does not give rise to a claim for deception under California's Consumer Legal Remedies Act (*Daugherty*) or the California Unfair Competition Law (*Clemens*).  Neither case even touches whether a breach of implied warranty in tort can occur outside the period of express warranty.  Moreover, Plaintiffs have specifically pleaded that the defects at issue are safety related, and the *Daugherty* and *Clemens* cases are inapposite for this and other reasons argued in §§ IV.C.2 and IV.C.3, *supra*.

PCNA's argument also contradicts the assumptions that underlie both Ohio and federal warranty law.  Taken to its logical conclusion, PCNA's argument would necessarily imply that if a supplier offers no express warranty, it gives no implied warranties either.  After all, if a consumer's expectations with respect to product quality are co-extensive with the length of express warranties, the reasonable consumer cannot have any expectations of product quality in the absence of express warranties.  The argument's disconnect to the real world of consumer expectations is obvious.

Finally, PCNA's argument reflects either a misunderstanding or ignorance of the warranty provisions underlying the UCC.[30]  Under the UCC in Ohio, the absence of an express warranty does not negate the existence of implied warranties; implied warranties must be

---

[30]     Although the Ohio Plaintiffs' allegations sound in tort rather than contract under the UCC, the substance is the same.  In fact, Ohio courts have stated that a fundamental purpose of the implied warranty in tort doctrine is to permit non-privity consumers to have the benefit of an implied warranty.  *See*, *e.g.*, *Chemtrol Adhesives*, 42 Ohio St. 3d at 49.  Thus, the structure of the UCC warranty provisions is highly relevant to the interpretation of Ohio's implied warranty in tort.

specifically disclaimed pursuant to Ohio Rev. Code Ann. § 1302.29 (LexisNexis 2012). Nor are implied warranties limited to the duration of express warranties, unless the seller expressly so provides. *Id.* (providing the means by which implied warranties may be modified). In fact, the Magnuson-Moss Federal Warranty Act requires that any attempt to limit the duration of implied warranties must be conscionable and set forth in clear and unmistakable language and prominently displayed on the face of the warranty. *Carr v. Hashman*, No. 88AP-165, 1988 Ohio App. LEXIS 3027, at *10 (Ohio Ct. App. July 28, 1988). If the Court should find that implied warranties cannot outlive express warranties, this language in Magnuson-Moss becomes surplusage.

Existing Ohio authority supports the Ohio Plaintiffs. One appellate court reversed a trial court's decision to exclude evidence of defects arising after the expiration of the express limited warranty, indicating that this evidence supported implied warranty claims. *Nearhouse v. Volkswagen of Am., Inc*., 42 Ohio App. 3d 42, 44 (Ohio Ct. App. 1987). In *Hartman*, another court denied the defendant's motion for summary judgment on a claim for breach of implied warranty in tort despite the defendant's claim that the plaintiff had an adequate remedy by way of express warranty. PCNA fails to cite a single Ohio case to support its argument.

Finally, PCNA asks this court to ignore the basic premise that the trier of fact determines the expectations of a "reasonable person." *See Couto v. Gibson, Inc.*, No. 1475, 1992 Ohio App. LEXIS 756, at *25 (Ohio Ct. App. Feb. 26, 1992 (reasonable minds could conclude that a representation created a false impression in the mind of a "reasonable consumer"). This assertion ignores that the Ohio Plaintiffs have alleged defects in the coolant system contrary to PCNA's affirmative representations, and have further alleged that these defects present serious and legitimate safety concerns. Compl. ¶¶ 7, 53-55, 58-59, 70, 455-58; *see also* §§ IV.B.1.a.ii,

IV.C.2.c.iv., IV.J.2., and IV.K.2, *supra* and *infra*.  Instead of analyzing the issues, however, PCNA wants this Court to simply dismiss the implied warranty in tort claims based upon a "reasonable consumer" standard applied in a vacuum, divorced from the actual circumstances of the case.  This is contrary to Ohio law and common sense.  For all of these reasons, the Court should deny PCNA's efforts to dismiss the implied warranty claims.

### a. Recovery for breach of implied warranty in tort is not constrained by the UCC statute of limitations

The Court should also allow the Ohio Plaintiffs' implied warranty claims to proceed because PCNA relies on a fundamental misreading of Ohio law.  Contrary to Ohio law, PCNA argues that allowing the Ohio Plaintiffs to recover for breach of implied warranty in tort would illogically provide second-hand purchasers with greater rights against a manufacturer (or a manufacturer's subsidiary such as PCNA) than first-hand purchasers.  To avoid this result, it argues that a suit for breach of implied warranty in tort must be constrained by the period of the UCC statute of limitations.

PCNA's entire argument, however, is based upon the premise that a consumer who purchases a new vehicle from a dealer would be required to sue the manufacturer for breach of UCC implied warranties, subject to the UCC statute of limitations, and would have no cause of action for breach of implied warranty in tort.  This premise is simply wrong; the *Curl* case holds precisely the opposite.  Ohio law provides that privity of contract exists only "within immediate links in the distributive chain," and that the purchaser of a new vehicle from a dealer **cannot** sue the manufacturer for breach of a UCC implied warranty.  *Curl*, 114 Ohio St.3d at ¶ 32; *Ultimax* at *25 (the purchaser of a new Mercedes-Benz automobile could not sue the manufacturer for breach of implied warranty under the UCC without privity).  Thus, under Ohio law, **neither** the purchaser of a new car nor the purchaser of a second-hand car can sue the manufacturer for

127

breach of a UCC implied warranty.[31]  *Id.*  No illogical "advantage" or "greater protection" accrues to the purchaser of the second-hand car from which any reasonable expectations can arise.

In the end, we return to the issue free of PCNA's facile attempts to avoid its fundamental factual nature—what are the reasonable expectations of a consumer who purchases a premium vehicle from a manufacturer with an established reputation; a manufacturer who makes false and specific representations regarding the quality of its vehicle and its cooling system?  The Ohio Plaintiffs adequately pleaded that a critical, safety-related component touted by its manufacturer is defective—a defect costing thousands of dollars to replace or repair.  The durations of the express warranty and the UCC statute of limitations are "red-herrings" designed to avoid the issue.  This issue requires consideration by a fact finder all circumstances surrounding the transactions, not by a court at the pleading stage.  As such, the Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' implied warranty in tort claims.

---

[31]     To the extent that PCNA might suggest that privity for purposes of implied warranty would be established between PCNA and a new car buyer because PCNA gives an express warranty, the argument is clearly foreclosed by *Curl* and its progeny.  The consumer buyer in *Curl* was held by the court not to be in privity with Volkswagen of America for purposes of the implied warranty of merchantability, even though the consumer was given, and took advantage of, Volkswagen's express limited warranty.  *See also Haynes v. George Ballas Buick-GMC Truck*, No. L-89-168, 1990 Ohio App. LEXIS 5661 (Ohio Ct. App. Dec. 21, 1990) (finding no privity for purposes of the implied warranty of merchantability between a manufacturer and a consumer despite the presence of an express warranty); *Hartman v. Mercedes-Benz, U.S.A., L.L.C.,* No. 1:08-cv-03034, 2010 U.S. Dist. LEXIS 22536 (S.D. Ohio March 11, 2010) (lessee of vehicle from dealer not in privity with manufacturer for purposes of implied warranty of merchantability even though express warranty existed and was not subject to manufacturer's summary judgment motion).

**4.    The Ohio Plaintiffs have adequately pleaded notice and the elements of their CSPA claims, if the Court chooses to proceed with these issues on the pleadings**

**a.    Plaintiffs adequately pleaded notice for purposes of making class action claims under the CSPA**

The Court should deny PCNA's efforts to dismiss Plaintiffs' class action claims under the CSPA, especially at this early stage.  To sufficiently allege class action claims under the CSPA, Ohio Rev. Code Ann. § 1345.09(B) only prohibits a plaintiff from bringing a class action if the defendant lacks prior notice that conduct substantially similar to its alleged conduct is deceptive or unconscionable through either: a) a rule adopted by the Ohio Attorney General; or, b) an Ohio state court holding.  *See Marrone v. Philip Morris USA, Inc.*, 110 Ohio St.3d 5, ¶ 9 (Ohio 2006).  PCNA incorrectly suggests that this notice, including the specific cases relied upon by Ohio Plaintiffs, must be provided in the Complaint.  PCNA provided no such authority, and none exists.

PCNA's notice argument appropriately belongs at the class certification stage, not the pleading stage.  *In re: Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F.Supp.2d 942, 948-49 (N.D. Ohio 2009); *Lilly v. Hewlett-Packard Co.*, No. 1:05-cv-465, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006).  At the pleading stage, a plaintiff must merely plead that notice sufficient for class certification exists, which it has done.   Moreover, even if no such notice exists, Ohio Plaintiffs (and every other putative class member from Ohio) can maintain individual claims under the CSPA, and thus the CSPA claims should not be dismissed.  The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' class action claims under the CSPA at this stage.

    **b.**  **Adequate notice exists to support the class action notification requirements under Ohio Rev. Code Ann. § 1345.09(B)**

   Even if the Court concludes that Ohio Plaintiffs must provide specific authority prior to class certification, the authority provided in the Complaint and in this brief fully supports their class allegations.  The Ohio Supreme Court has held that cases providing notice must have only "substantial similarity," which means "a similarity not in every detail, but in essential circumstances and conditions."  *Marrone*, 110 Ohio St.3d at ¶ 24; *see also Kline v. Mortg. Elec. Sec. Sys.*, No. 3:08-cv-408, 2010 U.S. Dist. LEXIS 143391, *27-28 (S.D. Ohio Dec. 30, 2010).  Importantly, *Marrone* relied on crucial differences between the automobile and cigarette industries to support its decision; key differences not present in this case.  *Marrone*, 110 Ohio St. 3d at ¶ 46.  The court held, for example, that the tobacco industry defendants, unlike those in the auto industry, were subject to a unique, "highly regulated" industry to which that Court gave deference.  *Id.* at ¶¶ 48-50.  More recently, the Southern District found "substantial similarity" between plaintiffs' allegations and comparable conduct in an earlier case, despite the fact that a collection agency and residential mortgage company are hardly identical.  *Kline,* at *27-28.

    **i.**  **Sufficient authority exists in the OPIF to support the class action claims under the CSPA for breach of implied warranty**

   Turning to the Plaintiffs' OPIF authority, the cases cited by the Ohio Plaintiffs in the Complaint provide ample notice that the conduct alleged by the Plaintiffs violates the CSPA.  Rather than confront the Ohio Plaintiffs' authority, PCNA succinctly misstates what notice would be necessary: "that CSPA liability attaches to a failure to inform consumers that a product may require post-warranty repairs."  Mot. to Dismiss 92.  In fact, the Ohio Plaintiffs alleged much more deceptive and unconscionable conduct in the Complaint than PCNA's simple articulation of the issue.

Among other allegations, which discovery will even more clearly delineate before class certification, the Ohio Plaintiffs allege that PCNA committed all of the following:

- PCNA sold its Cayennes to class members with a design defect (Compl. ¶¶ 445-46);

- PCNA knew would require costly replacement and repair to avoid both known safety risks and risks to other engine components (Compl, ¶¶ 7, 53-55, 58-59, 70); and,

- PCNA continued to tout its Cayennes as premium vehicles containing superior technology in its coolant system while withholding information regarding the design defect from consumers (Compl. ¶¶ 42-43, 62).

This sampling of allegations against PCNA makes clear that the deceptive and unconscionable practices the Plaintiffs have alleged are not limited to allegations that PCNA has merely failed to inform consumers that a product may require post-warranty repairs. As a result, the Court should disregard PCNA's overly-simplistic view of what notice is required of Plaintiffs.

With regard to the case law cited by Ohio Plaintiffs in the Complaint, the *Lilly* case held that failure to honor an implied warranty constitutes a deceptive sales practice. *Lilly* at *18-19. As the Southern District of Ohio held, at least two prior state court cases stood for that proposition and, as a result, gave the defendant in *Lilly* notice that its alleged conduct violated the CSPA. *Id.* Contrary to PCNA's interpretation of the case in its parenthetical, the *Lilly* case's holding covers both express and implied warranties. *Id.* at *6-9. Thus, as PCNA acknowledges, the Ohio Plaintiffs' class action claims under the CSPA survive once the Court denies dismissal of the implied warranty claims.

The *Mason* case also provided notice to PCNA of the Ohio Plaintiffs' CSPA claims. Similar to the present case, the plaintiff in *Mason* lost confidence in her vehicle and no longer felt safe. *Mason v. Mercedes-Benz USA, LLC*, No. 85031, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005). The loss of faith in the vehicle and its safety supported an implied warranty claim, which in turn supported her CSPA claim. *Id.* at *35-36. As such, the *Mason* case provides yet further support for the Ohio Plaintiffs' OCSPA claims.

131

This portion of PCNA's arguments for dismissal of the OCSPA claims hinges upon whether the Court dismisses the Ohio Plaintiffs' implied warranty claims. Because their implied warranty claims were amply pleaded, both case law and PCNA's own admissions support that the OCSPA claims also survive. As such, this Court should allow the Ohio Plaintiffs' OCSPA claims for breach of implied warranty to proceed.

> ii. **The Ohio Plaintiffs have sufficient authority so that their class action claims under the CSPA related to deceptive representations should be allowed to proceed**

The OPIF provides additional authority to support the Ohio Plaintiffs' CSPA class action claims. For example, the following cases support class action claims from the OPIF that are similar to the Ohio Plaintiffs' allegations:

- *State ex rel. Betty D. Montgomery v. Ford Motor Co.* **(OPIF #10002123) (attached as Exhibit 1):** The Court issued injunctive relief against the manufacturer, which included that the manufacturer shall not advertise that a vehicle has a particular quality, characteristic, feature, or attribute unless all vehicles meet those specified standards (¶ 5.4). The Ohio Plaintiffs have alleged that PCNA's Cayennes lacked many of the performance, reliability, and safety attributes that PCNA advertised. Thus, this case provides adequate notice to PCNA for purposes of class action claims under the CSPA.

- *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* **(OPIF #10002025) (attached as Exhibit 2):** In an Agreed Entry and Final Judgment Order, it was agreed that the defendant and anyone associated with the defendant would:

    a)    not offer for sale or otherwise offer or deliver any tire which it knows is unsafe or contains a safety-related defect (¶ 7.1);

    b)    shall cease directly producing, manufacturing, distributing, advertising, or selling any of the defect tires (¶ 7.3); and,

    c)    shall not represent that any tires have qualities, characteristics, or durability (among other things) when such representations or implications are not the case (¶ 7.6).

132

As the Court prohibited in the *Bridgestone* case, the Ohio Plaintiffs have claimed that PCNA made affirmative representations regarding the quality, characteristics, durability, and safety of the coolant system on its Cayenne model.

- *Bellinger v. Hewlett-Packard Co.*, **No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077):** The Court observed that failure to disclose material information can constitute an actionable claim under the CSPA. *Id.* at ¶ 20. Although the Court ultimately found against the plaintiffs, the Court nonetheless explicitly recognized that such a claim exists under the CSPA. *Id.* This case alone allows the Ohio Plaintiffs' CSPA claims to proceed.

- *Walker v. Dominion Homes, Inc.*, **164 Ohio App. 3d 385 (Ohio Ct. App. 2005) (OPIF #10002405):** The plaintiffs alleged that the manufacturer provided them with false information concerning programs they could use to purchase their home. *Id.* at ¶ 14. The Court found an issue of fact on whether the plaintiffs were falsely led to believe that they qualified for one of the programs. *Id.* at ¶ 26. In ultimately concluding that the trier of fact should determine whether unfair, deceptive, or unconscionable acts occurred, the Court held that whether the manufacturer had a duty to disclose information about the product should be determined at trial. *Id.* at ¶ 32.

- *Borror v. MarineMax of Ohio*, **No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388):** The plaintiff alleged CSPA violations because MarineMax failed to disclose the extent of repairs and damages to a boat, which the Court found to be deceptive. Because the seller held the boat out as satisfactory for purchase without disclosure of the severity of the defects, the Court held that the seller had violated the CSPA. *Id.* at ¶ 47. As alleged by the Ohio Plaintiffs, PCNA committed the same deceptive acts by continuing to sell its Cayennes without informing consumers that they contained a defect in the coolant system.

- *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* **(OPIF# 10002347) (attached as Exhibit 3):** In an Agreed Final Judgment Entry and Order, the Court held that a supplier commits unfair, deceptive, and unconscionable acts or practices in violation of the CSPA if it:

    a)    makes false and misleading statements to consumers during sales presentations (¶ 61);

    b)    makes specific express representations as to the quality and uses of its goods, then disclaims those representations in its sales and warranty documents (¶ 64).

The Court found that these violations constituted CSPA violations, as reported in the PIF for all suppliers to follow.

All of these cases provided PCNA with adequate notice of the potential for class action CSPA claims against them for the allegations made by the Ohio Plaintiffs. These cases involve either auto manufacturers or comparable conduct from other manufacturers to satisfy *Marrone*. Thus, even if the Court finds that PCNA's arguments on this issue are not premature at the pleading stage, the Court should allow the Ohio Plaintiffs' class action claims for deceptive representations and omissions to proceed.

iii.      **The consent judgments offered by the Ohio Plaintiffs qualify as notice from the PIF for purposes of Ohio Rev. Code Ann. § 1345.09(B))**

Consent judgments that contain detailed findings of fact and conclusions of law satisfy Ohio Rev. Code Ann. § 1345.09(B), so all of the Ohio Plaintiffs' cases equally serve to provide PCNA notice for class action claims. It is anticipated that PCNA will suggest that the state court decisions coming from consent judgments cannot satisfy the notice requirement under Ohio Rev. Code Ann. § 1345.09(B). *See Kline,* at *24-25. This argument overstates *Kline*. In *Kline*, the defendant argued – and the court agreed – that the state court decision at issue "had no analysis of any kind that could put a defendant on notice that any specific conduct was deceptive or unconscionable under the OCSPA." *Id.* at *24. The Court then added that such judgments, *i.e.*, consent judgments with no analysis, "are of little, if any, precedential value." *Id.* at *25.

Understood properly, *Kline* only stands for the proposition that consent judgments without **any analysis** should be afforded little value. The Court's holding in *Kline* should not preclude the use of the consent judgments cited by the Ohio Plaintiffs that contain very detailed findings of fact and conclusions of law directly on point. In fact, several of the cases cited by the Ohio Plaintiffs involved the auto industry, so they are precisely on point when evaluating notice of deceptive and unconscionable conduct alleged by the Ohio Plaintiffs against PCNA.

134

Likewise, consent judgments satisfy Ohio Rev. Code Ann. § 1345.09(B) as a "court determination." Consent judgments constitute a contract and a judicial decree. *See Williams v. Vukovich*, 720 F.3d 909, 920 (6th Cir. 1983); *Iron Works Loc. Union No. 17 Ins. Fund v. Philip Morris, Inc.*, 35 F. Supp. 2d 582, 593 (N.D. Ohio 1999). "As a judicial decree, a consent judgment gives 'judicial approval of a settlement agreement [and] places the power and prestige of the court behind the compromise struck by the parties.'" *Iron Workers*, 35 F. Supp. 2d at 593. The Court must necessarily make certain determinations to approve a settlement agreement, which keeps consent judgments from being illegal, products of collusion, or contrary to public interest. *See Williams*, 720 F. 3d at 920.

Finally, if this issue is seriously raised by PCNA, this Court has an Ohio state case for guidance.[32] *Musuraca v. Kurlemann Bldrs., Inc.*, Case No. 05 CV 652446, *3 (Warren Cty. Ct. Comm. Pl. Oct. 25, 2007) (attached as Exhibit 4). In *Musuraca*, the Common Pleas court held that consent judgments appearing in the PIF constitute proper notice for a class action because "there are no quasi judgments or second class judgments." *Id.* As such, the Court should consider all consent judgments provided in the OPIF as cases for which PCNA had notice to support the Ohio Plaintiffs' class action claims under the CSPA.

**c.** **The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs' individual CSPA claims because deceptive and unconscionable conduct was properly pleaded in the Complaint**

This Court should allow the Ohio Plaintiffs' OCSPA claims to proceed irrespective of Plaintiffs' class allegations. In order to sustain claims under the OCSPA, the Ohio Plaintiffs need only plead sufficient facts showing at least one act or practice embodying the deceptive or unconscionable conduct prohibited by the OCSPA. *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27,

---

[32]     *Kline*, of course, is a federal case interpreting state law.

29 (Ohio 1990).  Under  Ohio Rev. Code Ann. § 1345.02(A)(2), representations that the subject of a consumer transaction is of a particular grade, quality, or character is specifically prohibited by the CSPA.  *See Hoffer v. Cooper Wiring Devices, Inc.*,  No. 1:06cv763, 2007 U.S. Dist. LEXIS 42871, at *9-10 (N.D. Ohio June 13, 2007); *Keel v. Toledo Harley-Davidson/Buell*, 184 Ohio App. 3d 348 (Ohio Ct. App. Sept. 30, 2009).  At a minimum, fact issues exist regarding whether PCNA's representations regarding its coolant system and safety issues caused by the defect constitute deceptive or unconscionable behavior in the mind of a reasonable consumer.  Consequently, the Court should deny PCNA's 12(b)(6) Motion.

Like it did above, PCNA inaccurately frames the issue.  For instance, PCNA disregards the plethora of allegations in the Complaint alleging deceptive and unconscionable acts, instead suggesting that the Ohio Plaintiffs' claims are limited to whether "PCNA committed deceptive or unfair acts by distributing and promoting Cayennes while knowing that the coolant pipes might require repair during the vehicle's useful life."  Mot. to Dismiss 93.  The allegations of the Ohio Plaintiffs are much more encompassing; among other things, Ohio Plaintiffs have alleged affirmative representations by PCNA regarding the performance and quality of their vehicles while knowing that they will fail.

Instead of describing the Court's actual holding in *Noble*, PCNA adds additional words that suggest consideration of issues that the Court never reached.  *See Noble v. Porsche Cars N. Am., Inc.*, 694 F.Supp.2d 333 (D.N.J. 2010).  In *Noble*, the Court actually held that "this Court holds that a plaintiff cannot maintain an action under New Jersey's CFA when the only allegation is that the defendant 'provided a part – alleged to be substandard – that outperforms the warranty provided.'" *Id.* at 337.  (emphasis added).  But, of course, this is not the **only** allegation Ohio Plaintiffs are making.  In addition to the claims brought against PCNA similar to those in the *Noble* case, the Ohio

136

Plaintiffs have explicitly alleged that PCNA misrepresented the nature and characteristics of the coolant system. Compl. ¶¶ 42-43, 62. PCNA, however, incorrectly attempts to focus the Court's attention solely on whether PCNA represented that it would pay for repairs beyond the express warranty period., To the contrary, the Ohio Plaintiffs have alleged that PCNA made affirmative representations regarding the quality of its Cayennes that violated the CSPA. Compl. ¶¶ 455-56, 458-59. When all of these allegations are considered, the Plaintiffs have properly pleaded deceptive conduct.

PCNA further relies upon faulty logic by suggesting that the length of the written warranty governs whether an act is deceptive or unconscionable. To make the written warranty serve as an absolute roadblock, the Court must find that consumers' expectations are ultimately determined only by the written warranty. No Ohio case suggests that a CSPA claim cannot be brought after the expiration of a written warranty for a defect in a product, especially when the defect contradicts prior representations and raises serious safety issues. In fact, even in cases of "as-is-no warranty" language, CSPA claims may be brought for its enumerated violations. *See Keel,* at *353-354. Other jurisdictions also support such a claim. *See also* the discussion in § IV.I.3, *supra.*

For example, the Central District of California recently denied PCNA's precise argument based upon the same allegations as those made by the Ohio Plaintiffs. In the *Keegan* case, that Court held that "[a] manufacturer's duty to consumers is limited to its warranty obligations **absent either an affirmative misrepresentation or a safety issue**." *Keegan v. Am. Honda Motor Co.*, No. 10-09508, 2012 U.S. Dist. LEXIS 3007, at *23 (C.D. Cal. Jan. 6, 2012) (emphasis added). In another California case, the Northern District observed the current law in the Ninth Circuit provides that "a manufacturer cannot be found liable under the CLRA for failure to disclose a defect that manifests itself after expiration of a warranty period unless such omission (1) is 'contrary to a representation

137

actually made by the defendant' or (2) pertains to a 'fact the defendant was obligated to disclose.'" *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 987 (N.D. Cal. 2010) (quoting *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835-36 (Cal. Ct. App. 2006)).  All Plaintiffs have made these allegations, which PCNA never even addressed when seeking dismissal of the CSPA claims.  *See* discussion in § IV.C.3.a., *supra*.

PCNA improperly characterized the Plaintiffs' allegations yet again by suggesting that the Plaintiffs' claims are limited to whether PCNA should have disclosed the possibility that the coolant pipes may require replacement after the written warranty period.  As alleged in ¶ 456 of the Complaint and elsewhere, the Plaintiffs alleged that PCNA knew about the defect and failed to inform its customers when they initially purchased and owned their respective Cayennes.  Moreover, PCNA ignores the damages posed by its defective pipes.  Coolant line replacement is not like replacing tires or a serpentine belt.  The coolant issue is a serious, potentially catastrophic, defect that the Plaintiffs pleaded PCNA knew would occur but failed to disclose.

The *Eisert* case cited by PCNA does not support dismissal of the Ohio Plaintiffs' CSPA claims.  In finding for the home contractor in *Eisert*, the Court distinguished the plaintiffs' authority on the basis that "[i]n each of those cases the defendants were under a legal obligation to the homeowners to repair the problems based upon representations they made in their contracts at the time of the original consturctions [sic]."  *Eisert v. Kanter*, No. 2-10-13, 2010 Ohio App. LEXIS 4088, at *17 (Ohio Ct. App. Oct. 4, 2010).  Instead, PCNA focused on the contractor's promise to repair the conditions post-warranty and ignored the fact that the plaintiffs in *Eisert* never pleaded any affirmative representations made to them before the warranty expired or any safety-related defects as alleged in this case.  *Id.* at *17-18.  As a result, *Eisert* fails to provide authority for PCNA.

The Ohio Plaintiffs properly alleged that PCNA's deceptive conduct consisted of acts of omission as well as affirmative conduct.  Similar to the claims here, one Court refused to dismiss a plaintiff's claim that Whirlpool's failure to disclose a defect in the ice-maker on certain model refrigerators was a CSPA violation.  *Nessle v. Whirlpool Corp.*, No. 1:07-cv-3009, 2008 U.S. Dist Lexis 56940, at *6 (N.D. Ohio July 25, 2008).  *Nessle* focused on affirmative representations made during the sale of the ice maker—just like the Ohio Plaintiffs have pleaded in this case.  *Id.* at *6.  The Court also concluded that the plaintiff should have the opportunity to prove that, through its omissions, the defendant acted deceptively.  *Id.*; *Walker*, 164 Ohio App. 3d at *394-395 (failure to disclose that buyer would not qualify for loan); *Borror*, at *8-9 (failure to disclose prior damage).  Thus, whether an act or omission, the Plaintiffs have adequately pleaded that PCNA violated the CSPA.

> **5.** **The Court should deny PCNA's request for the Court to dismiss Plaintiffs' DTPA claims because they have standing for their adequately pleaded claims**
>
> > **a.** **Plaintiffs have standing to bring claims under the DTPA**
> >
> > > **i.** **The plain language of the DTPA supports standing**

The Court should adhere to the plain language of the Ohio Deceptive Trade Practices Act ("DTPA") and find that the Ohio Plaintiffs have standing.  Under Ohio Rev. Code Ann. § 4165.01(D), "[p]erson means an individual."  The DTPA uses the term "person" many times throughout the statute, most importantly in  Ohio Rev. Code Ann. § 4165.03(A)(1) and (2).  This section allows a "person" to obtain injunctive relief and actual damages if they are injured by a person who violates the DTPA.  The only case on point from the Southern District of Ohio, after applying Ohio Supreme Court precedent on statutory interpretation, properly construed the term "person" to include an individual consumer.  *See Bower v. IBM*, 495 F.Supp.2d 837, 843-44

139

(S.D. Ohio 2004).  Contrary to PCNA's suggestion that this Court should follow an Ohio Court of Appeals case, the *Bower* case offers the most compelling authority.  Thus, the claims should be allowed to proceed.

In *Bower*, a putative class of individual consumers brought a class action which, in part, sought relief based upon alleged violations of the DTPA.  The defendants argued that only commercial entities were entitled to relief under the DTPA—that individual consumers were not among the permissible plaintiffs.  Rejecting the defendants' arguments, the Court allowed the putative class's DTPA claims to proceed, relying upon the unambiguous definition of the term "person" contained in the statute.  *Bower*, 495 F. Supp. 2d at 843-44.  Applying accepted canons of statutory interpretation, the court determined that the language of the statute was clear, and it placed no limits on the type of individuals able to pursue claims.  *Id.* at 843.  This Court should apply the same reasoning to conclude that the Ohio Plaintiffs have standing under the DTPA.

### ii.      The logic behind applicable case law supports consumer standing under the DTPA

This Court should allow the DTPA claims to proceed because contrary authority lacks the soundness of *Bower*.  In anticipation of PCNA's response (although not argued yet), case law from the Northern District of Ohio is distinguishable.  *Chamberlain v. The Am. Tobacco Co.*, No. 1-96 CV 2005, 1999 U.S. Dist. LEXIS 22636 (N.D. Ohio Nov. 19, 1999); *Glassner v. R.J. Reynolds Tobacco Co.*, No. 5:99 CV 0796, 1999 U.S. Dist. LEXIS 22637 (N.D. Ohio June 29, 1999).  Both of these cases were decided before the *Bower* case, and there are at least two reasons why this Court should not rely upon this authority to cast aside an unambiguous statute.

First, unlike the Court in *Bower*, neither *Glassner* nor *Chamberlain* utilized, or even referred to, any authority regarding statutory interpretation.  In fact, *Glassner* never even analyzed the relevant language of the DTPA.  Instead, the Court summarily denied a cause of

140

action for consumers on the basis that "an examination of cases brought under this Code section reveals that parties are virtually always competitors in some line of business." *Glassner*, at *21. The Court even acknowledged that it found (at that time) no Ohio court that precluded consumers from bringing claims under the DTPA. *See id.* As a result, the *Glassner* court reached the decision upon which PCNA relies without ever interpreting the relevant statute; instead it relied upon the legally irrelevant empirical observation as to what "virtually always" occurs.[33] This hardly forms a compelling basis for precluding relief for consumers under the DTPA when the unambiguous language of the statute clearly gives them this right.

Second, the *Chamberlain* case provides no additional support beyond the flimsy authority of *Glassner* because *Chamberlain* relied almost entirely upon the reasoning of *Glassner*. *Chamberlain*, at *55-56. In concluding that the DTPA applies only to disputes between commercial entities, the *Chamberlain* case observed that the language "legal or commercial entity" at the end of the definition of a person modified all the terms listed. *See id.* at n.12. Even if this strained interpretation were true, it would avail PCNA nothing unless it was prepared to take the position that an individual consumer was not a "legal entity." In the end, rather than engaging in any additional analysis, the court in *Chamberlain* merely adopted "Judge Dowd's ruling in *Glassner*." *Chamberlain*, at *56.

Apart from a decision from a Common Pleas Court, PCNA's exclusive state court authority is a single Ohio Court of Appeals case. *Dawson v. Blockbuster*, No. 86451, 2006 Ohio App. LEXIS 1138, *11 (Ohio Ct. App. Mar. 16, 2006). Like *Glassner* and *Chamberlain*, *Dawson* is virtually devoid of analysis, and there is no attempt whatsoever to parse the language

---

[33] As an empirical matter, the court's conclusion is subject to question. The Ohio Plaintiffs have uncovered numerous cases (examples cited below) in which consumers have asserted claims under the DTPA.

of the statute or apply appropriate interpretive principles. The Court in *Dawson* merely noted the supposed similarity between the Lanham Act and the Ohio DTPA, stated that the Lanham Act has been interpreted by some courts to exclude suits by consumers, and concluded, without explanation or analysis, that the DTPA does not apply to consumer suits. *Id.*

Some Ohio authority suggests that consumers lack standing under the DTPA based upon a perceived equivalence between the Lanham Act and the DTPA; however, the Lanham Act is far from the equivalent of the DTPA. In fact, the very provision of the DTPA at issue in this case appears nowhere in the Lanham Act, as is the case with a number of other provisions of the DPTA. Conversely, there are numerous provisions of the Lanham Act that have no counterpart in the DTPA. *See Dayton Sports Ctr., Inc. v. 9-Ball, Inc. dba BHA Billiards*, 141 Ohio App.3d 402, 408 (Ohio Ct. App. 2001) (no portion of the Lanham Act's trademark protection applies to that action). Ohio Rev. Code Ann. § 4165.02(A)(7), on which the Ohio Plaintiffs rely, is nowhere to be found in the Lanham Act.

As one court has recognized, the thrust of the Lanham Act "regulates trademarks, unfair competition, and false advertising." *Arlington Video Prods. v. Fifth Third Bancorp*, No. 2:08-cv-122, 2008 U.S. Dist. LEXIS 51196, *6-7 (S.D. Ohio May 1, 2008) (citing *Dawson* at *9). To the extent that the Lanham Act and the DTPA overlap, it might in some cases make sense to refer to the Lanham Act, and cases decided pursuant to it, as a general backdrop for interpreting the same provisions of the DTPA. To assume, however, that the General Assembly intended the scope of the DTPA to mirror that of the Lanham Act in its entirety is unwarranted, especially when the General Assembly declined to provide that result.

Although not directly confronting the issue in this case, there are a number of cases that indicate that Ohio appellate courts would not agree with the court in *Dawson* that consumers lack

standing under the DTPA. For example, Ohio's Eighth District Court of Appeals considered the merits of a DTPA claim brought by a consumer. *Spafford v. Cuyahoga Comm. Coll.*, No. 84786, 2005 Ohio App. LEXIS 1607, at *7-12 (Ohio Ct. App. Apr. 7, 2005). Similarly, Ohio's Seventh District has considered whether representations made by a car dealer to a consumer violated the DTPA. *Popovoch v. Southern Park Pontiac & Subaru, Inc.*, 123 Ohio App.3d 364, 373-74 (Ohio Ct. App. 1997). The Fourth District has not questioned the standing of a consumer under the DTPA. *Evans v. Cheek*, 65 Ohio App.3d 535, 536 (Ohio Ct. App. 1989); *see also Limberios v. Vermilion River Resort, Inc.*, Nos. 89CA004581 and 89CA004596, 1990 Ohio App. LEXIS 105, at *7-8 (Ohio Ct. App. Jan. 17, 1990) (upheld class certification for consumer's claim against commercial entity under the DTPA); *Falasco v. Bishop Motors, Inc.*, No. 14637, 1990 Ohio App. LEXIS 4938, at *3, *8 (Ohio Ct. App. Nov. 7, 1990) (court overruled summary judgment on merits of DTPA claim brought by consumer).

Nothing prevents the DTPA and the CSPA from containing overlapping causes of action. Without a clear and unambiguous indication from the General Assembly, or an irreconcilable conflict, courts cannot presume that a statute passed later in time is intended to abrogate or limit a statute already in existence. As long as statutes can be reconciled, courts have no reason to presume that the General Assembly intended one to supersede the other. *See* Ohio Rev. Code Ann. § 1.52. In conclusion, the relevant language of the DTPA is simple, concise, and unambiguous: any "person," including an "individual," has standing to sue under the Ohio DTPA.

> **b.**     **Once standing is established, the Ohio Plaintiffs have adequately pleaded their claims under the DTPA**

The Ohio Plaintiffs have adequately pleaded DTPA violations in the Complaint. Rather than confront all of the Ohio Plaintiffs' allegations, PCNA improperly limits its analysis to the

143

allegations in two paragraphs of the Complaint.  Under Ohio Rev. Code Ann. § 4165.02(A)(7), the Plaintiffs claim that PCNA made representations that its Cayenne possessed characteristics or qualities that it never had.  Compl. ¶¶ 42-43, 62.  In light of the specific, explicit representations made by PCNA, the Plaintiffs have fully met all pleading requirements for the DTPA.

      **c.**     **The Ohio Plaintiffs provided numerous, specific representations upon which they based their DTPA claims, so the Court should not dismiss such claims as mere promotion and puffery**

As with PCNA's other arguments which disregard the totality of the Ohio Plaintiffs' DTPA allegations, the Court should reject them and allow the DPTA claims to proceed based upon the allegations in the Complaint.  As discussed previously, this Court should refuse PCNA's attempts to have the Lanham Act supplant the clear, plain language provided in the DTPA.

Even to the extent that the Lanham Act supplements the DTPA, the Ohio Plaintiffs' DTPA allegations do not constitute the kind of puffery present in the authority relied upon by PCNA.  In the *Interactive Prods.* case, the plaintiff challenged an advertisement suggesting that the defendant "carries the redesigned and improved product."  *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 689 (6th Cir. 2003).  In finding that claim not actionable under the DTPA, the Sixth Circuit observed that the announcement in question constituted "mere opinion" because it was undisputed that the defendant was involved in the design of a new, subsequent product.  *Id.*  But those facts do not compare with the allegations alleged by the Ohio Plaintiffs here.

Rather than merely touting a new design, the Ohio Plaintiffs have alleged that PCNA made specific representations regarding the quality of the Cayenne coolant system.  PCNA not only offered a newly-designed SUV when it began marketing the Cayenne, it represented to prospective Cayenne owners that its coolant system was designed with the kind of high performance that Porsche owners sought.  Compl. ¶¶ 39, 42-43, 62.  In Paragraph 62 of the Complaint alone, the Plaintiffs alleged at

144

least seven different ways that PCNA represented the kinds of qualities and characteristics that go

beyond mere puffing or advertising.  The Plaintiffs' case does not involve statements that "this year's

Cayenne improves on last year's Cayenne," which might be comparable to PCNA's authority in the

*Interactive Prods.* case.  Thus, based upon a complete reading of the Plaintiffs' allegations, the Court

should allow the Ohio Plaintiffs' DTPA allegations to proceed.  *See also* §§ IV.C.2. b., IV.D.1.c.,

IV.F.1.d., IV.H.3.a., and IV.J.1.fn. 35, *supra* and *infra*.

      **6.**      **<u>The Court should deny PCNA's efforts to dismiss the Ohio Plaintiffs'</u>**
                **<u>negligence claims because they are consumers rather than commercial</u>**
                **<u>entities</u>**

The economic loss rule does not bar recovery by the Ohio Plaintiffs for negligence, so

PCNA's Motion should be denied.  Contrary to PCNA's argument, the weight of authority in

both Ohio and the federal courts provides that a consumer not in privity with a manufacturer may

recover in negligence for solely economic loss caused by a defective product.  Having little

authority to support its position, PCNA chooses to largely ignore the much richer contrary

authority.

As one court has put it, "consistent holdings of Ohio courts" support the assertion of a

negligence claim for purely economic loss.  *In re Whirlpool*, 684 F.Supp.2d at 950-51.  That

Court keyed on the distinction between commercial and consumer buyers and relied upon a

series of cases from both the Ohio Supreme Court and lower Ohio courts allowing recovery for

economic loss on a variety of tort theories by a non-privity consumer.  *See id.*  Dealing with the

*Lee* case relied upon by PCNA, described by the Court as the only contrary authority, the Court

in *Whirlpool* said that "one court's summary misapplication of *Chemtrol* cannot override the

otherwise consistent holding of Ohio courts that absent privity, consumer plaintiffs may bring a

145

negligence action for economic losses." *Id.* at 951 (distinguishing *Lee* based upon its disregard for the differences between consumer and commercial buyers).

In its footnote 23, PCNA tries hard to discredit *Whirlpool* by asserting that it ignores *Chemtrol*'s "admonishment that a negligence claim should be permitted, if at all, when a consumer lacks any other remedy to 'protect the consumer's property interest.'" PCNA buttresses this argument by again asserting its time-worn argument that an express warranty is sufficient protection. This "admonition" (if it can be described as such) occurs in a sentence which must be read in context. The sentence following the "admonition" indicates that a buyer is "able to protect its property interest" when it is in privity of contract and has negotiated the contract from relatively equal bargaining position. *Chemtrol*, at 46. Obviously, neither is the case here. More importantly, this is simply another attempt by PCNA to reduce all of a consumer buyer's remedies to one—breach of express warranty. As previously discussed, this position has no basis in Ohio law and PCNA cites to no authority supporting such a proposition.[34]

Of the cases cited in *Whirlpool*, the most notable is an Ohio Supreme Court case in which the Court permitted a negligence cause of action to proceed against gun manufacturers for solely economic harm to a City with whom the gun manufacturers were not in privity of contract. *See City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St. 3d 416, ¶ 25 (Ohio 2002). Although not

---

[34] In fact, PCNA's arguments contradict recent authority on this issue. The Northern District of Ohio rejected the defendants' claim that the presence of an express warranty should bar recovery in negligence by a non-privity consumer plaintiff. *Hale v. Enerco Group, Inc.*, No.1:10-cv-00867, 2011 U.S. Dist. LEXIS 781, at *20 (N.D. Ohio Jan. 5, 2011)); *see also State Farm Mut. Auto. Ins. Co. v. Kia Motors Am., Inc.*, 160 Ohio App. 3d 727, 734-735 (Ohio Ct. App. 2005) ("the failure to allege other than economic damages does not necessarily destroy the right to pursue common-law negligence claims").

involving consumers *per se*, the case shows the willingness of the Court to extend a negligence cause of action to parties suffering solely economic harm when policy reasons so dictate.

The cases upon which PCNA relies do not support its conclusion that the Ohio Plaintiffs may not assert a negligence claim. Ohio law has long distinguished between commercial and consumer buyers in applying the economic loss rule. *See*, *e.g.*, *Midwest Ford v. C.T. Taylor Co., Inc.*, 118 Ohio App.3d 798, 802 (Ohio Ct. App. 1997); *Flex Homes, Inc., v. Ritz-Craft Corp. of Mich.*, No.07cv1005, 2009 U.S. Dist. LEXIS 91723, at n. 22 (N.D. Ohio Sept. 30, 2009). This is for the very salutary reason that consumers are less able than commercial buyers to protect their interests with respect to those with whom they are not in contractual privity. *See Midwest Ford* at 804 (policies include, among others, the relative bargaining power of the parties and the allocation of loss to the better risk-bearer in a modern marketing system).

PCNA relies only on cases involving commercial parties, not consumers. The *Queen City Terminals* case involves a commercial party's claim and says nothing about the ability of consumers to recover for economic loss for defective products. In fact, less than a year later, the same Ohio Supreme Court permitted recovery in tort by a non-privity consumer for solely economic harm caused by a defective product. *LaPuma*, 75 Ohio St. 3d at 66-67 (Ohio 1996).[35] Again in its footnote 23, PCNA quotes at length from the Ohio Supreme Court's decision in *Chemtrol*. *Chemtrol*, like *Queen City Terminals*, involved a commercial buyer. *Chemtrol*, 42 Ohio St. 3d at 42-43. More importantly, the decision of the Court in *Chemtrol* actually supports the Ohio Plaintiffs because the Court recognized the distinction between commercial and consumer buyers and explicitly refused to extend its holding to consumer buyers. *Id.* at 46.

---

[35]    Although *LaPuma* was based upon implied warranty in tort rather than negligence, PCNA has offered no basis upon which a distinction should be made with respect to the tort of negligence and the tort of breach of implied warranty in applying the economic loss rule.

In the final paragraph of its lengthy footnote 23, PCNA also cites other cases that fail to support its decision. The *Ohio Dep't of Admin. Servs*. case, while refusing to distinguish between commercial and consumer plaintiffs, *actually abrogated the economic loss doctrine for both commercial and consumer plaintiffs* with regard to implied warranty in tort. *Ohio Dep't of Admin. Servs. v. Robert P. Madison Int'l*, 138 Ohio App.3d 388, 396-397 (Ohio Ct. App. 2000). While the court in the case refused to allow a negligence cause of action to go forward, it was in the context of a commercial buyer, not a consumer buyer.

The *Pavlovich* case relied upon the economic loss rule to preclude a negligence action against a bank for allegedly negligently following the instructions of plaintiff's broker. *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 569 (6th Cir. 2006). The facts of the case present a far different context from that of defective products where, of course, for sound policy reasons, Ohio courts have already abrogated the economic loss rule in the context of implied warranty.

In *Long v. Time Ins. Co.*, the issue was whether an insurance company owed any duty to pay plaintiff's medical bills independent of a valid health insurance contract, not whether a manufacturer owes a duty to a consumer to produce a non-defective product. *Long v. Time Ins. Co.*, 572 F.Supp.2d 907, 909-11 (S.D. Ohio 2008).

The facts in *Bosak* are arguably even further removed from the facts of the present case. The crux of *Bosak* was whether the defendant's insurer could be liable to the plaintiff under Ohio Rev. Code Ann. § 3926.06 when the defendant's policy excluded liability for breach of contract. *Bosak v. H & R Mason Contr., Inc.*, No. 86237, 2005 Ohio App. LEXIS 6080, at *1-2 (Ohio Ct. App. 2005). In denying the plaintiff's claim, the court decided that the essence of the plaintiff's complaint was breach of contract, not negligence; therefore, the insurance policy was not applicable. *Id.* at ¶ 15. More importantly, the plaintiff's claim against the insurer was premised

148

on the negligence of a contractor with whom the plaintiff was in privity of contract, so the court's discussion of the economic loss rule must be understood in this context. *See id.*

PCNA readily admits, as it must, that a consumer not in privity with a supplier may recover for purely economic loss for breach of implied warranty in tort. Mot. to Dismiss 87. PCNA has cited to no Ohio cases that have proffered a reasoned distinction between negligence and implied warranty in tort in the application of the economic loss rule, and no such principled basis exists. To the contrary, the court in the *Whirlpool* case expressly found that the exception to the economic loss rule for consumer plaintiffs is not limited to tortious breach of warranty but includes claims of negligence as well.

The policy reasons that permit a non-privity consumer to sue a manufacturer for breach of implied warranty in tort apply equally to negligence. As *Chemtrol* stated: "[W]here implied warranty in tort applies, the parties are not free to determine by contract the quality of goods that the seller is bound to deliver or the remedies available to the buyer in the event that the goods do not measure up to the agreed quality." *Chemtrol*, 42 Ohio St. 3d at 50. Thus, the Court should deny PCNA's Motion to Dismiss on the Ohio Plaintiffs' negligence claims.

### J.   Michigan

The Complaint asserts the following claims under Michigan Law: violations of the Michigan Consumer Protection Act (the "MCPA") (*id.* ¶¶ 382-397); breach of implied warranty under the UCC (*id.* ¶¶ 374-381); strict product liability based on the defective plastic coolant tubes (*id.* ¶¶ 360-373); and negligence for defective design and/or manufacture of the plastic coolant tubes in the Cayennes (*id.* ¶¶ 398-402). For the reasons discussed herein, PCNA's motion to dismiss the Michigan law claims should be denied.

1.      **Consumer Protection Act**

PCNA states that the MCPA claim should be dismissed for two reasons.  First, it argues that the Michigan implied warranty of merchantability claim is deficient, and thus that the MCPA claim based on a breach of the implied warranty of merchantability cannot stand.  As discussed herein at §§ IV.A., IV.B.2., IV.E.1.b., IV.H.1., IV.J.3., and IV.K.4., *supra* and *infra*, PCNA did not validly disclaim the implied warranty of merchantability.  That being the case, PCNA's argument for dismissing the MCPA claim that is based on breach of the implied warranty of merchantability fails.

Second, PCNA claims that not enough facts are provided regarding the circumstances surrounding the purchase of Plaintiff Hoffecker's Cayenne to provide a plausible basis to conclude that PCNA intended to deceive the Plaintiff, and that its statements about the Cayennes' cooling system are not actionable.  Contrary to PCNA's assertions, the Complaint properly alleges a claim under the MCPA, and sufficient facts are pled to render it plausible that PCNA violated the MCPA.

The MCPA broadly prohibits the use of "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  Mich. Comp. Laws § 445.903(1).  It defines the term "trade or commerce" as "the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity."  Mich. Comp. Laws § 445.902(d).  The intent of the MPCA is "to protect consumers in their purchases of goods which are primarily used for personal, family or household purposes."  *Noggles v Battle Creek Wrecking, Inc*., 153 Mich. App. 363, 395 (Mich. Ct. App. 1986).

Among the "unfair, unconscionable or deceptive" acts listed in the MCPA are: (1) representing that goods . . . are of a particular standard, quality or grade . . . if they are of another; . . . (2) failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. Mich. Comp. Laws § 445.903(d), and (s), respectively.  Breach of an express or implied warranty also constitutes an MCPA violation, even though a plaintiff does not need to show a breach of warranty in order to recover.  *See Mikos v. Chrysler Corp.*, 158 Mich. App. 781, 783 (Mich. Ct. App. 1987) (breach of express or implied warranty violates MCPA); *Kovack v. Daimler Chrysler Corp.*, Nos. 265761 and 265761, 2006 Mich. App. LEXIS 1644, at *8-9 (May 11, 2006) (proof of implied warranty breach is not a prerequisite for a MCPA claim).

In addition to its warranty argument, PCNA asserts that the Complaint does not provide a basis to determine whether Plaintiff Hoffecker had seen any of the statements about the Cayenne's cooling system set forth in the Complaint at ¶ 62(a)-(g).[36]  For a class action under the MCPA alleging deceptive business practices, however, individual members need not individually plead or prove reliance on any alleged misrepresentations.  *Dix v. Am. Bankers Life Ass. Co.*, 429 Mich. 410, 415 (1987).  As the Michigan Supreme Court held, "[i]t is sufficient if the class can establish that a reasonable person would have relied on the representations . . . a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis." *Id.* at 418.

---

[36]      PCNA argues that all of Porsche's "promotional statements" regarding the Cayenne and its cooling system constitute non-actionable puffery.  Mot. to Dismiss, p. 100 n.25.  Defendants' statements constituted more than expressions of opinion, and instead related to past or existing facts about the Cayenne and its cooling system.  *See, e.g.*, §§ IV.C.2.b., IV.D.1.c., IV.F.1.d., IV.HI.3.ac., and IV.I.5.c., *supra* J.3.a.

PCNA also states that the Complaint does not plead enough facts to plausibility suggest PCNA intended to deceive.  To the contrary, to the extent it is necessary, the Complaint pleaded facts sufficient to infer such intent.  The Complaint sets forth that PCNA had exclusive knowledge of the coolant tube defect based on sources unavailable to Plaintiff Hoffecker and the other Class members.  Compl. ¶¶ 59, 61.  It also alleges that it was material to consumers that the plastic coolant tubes, which are critical vehicle components, were destined to crack.  *Id.* at ¶ 65. PCNA did not disclose to Plaintiff Hoffecker and the other Class Members the material information that it had regarding the problem with the plastic coolant tubes.  *Id.* at ¶¶ 63-64, 66. These allegations provide ample support to infer intent to deceive.  As set forth above, the Complaint pleads sufficient facts to support Plaintiff Hoffecker's claim that PCNA violated the MCPA.

### 2.     Strict liability and negligence

Plaintiff Hoffecker also brings strict product liability and negligence claims.  *Id.* ¶¶ 360-373 and 398-402, respectively.  The Complaint alleges that PCNA is liable in strict products liability because: (1) the Cayennes were defectively designed and built using plastic cooling tubes that prematurely deteriorate and crack, which can cause coolant leakage and damage to other parts of the vehicle (*id.* ¶ 365); for that reason, the Cayennes purchased by Plaintiff Hoffecker and the other Sub-Class members were not reasonably fit or safe when they left the manufacturer's control (*id.* ¶ 366); (2) there were technologically feasible alternatives to the plastic coolant tubes that could have been used that would not have prematurely degraded and cracked without impairing the Cayennes' usefulness or desirability to consumers at the time the Cayennes were manufactured (*id.* ¶¶ 367-68); (3) Porsche knew that the Cayennes were defective because they contained plastic coolant tubes that prematurely degrade and had a

152

substantial likelihood of causing damages and injury, and actively concealed the defect while continuing to make and sell Cayennes (*id.* ¶ 369-70); (4) Plaintiff and the Sub-Class members did not alter their vehicles (*id.* ¶ 371); and (5) they suffered damages proximately caused by the defect or unreasonably dangerous condition of the Cayennes (*id.* ¶ 372).

With respect to the negligence claim, the Complaint alleges that PAG and/or PCNA owed a duty to Plaintiff Hoffecker and the other Michigan Sub-Class members to design and manufacture the Cayennes so that their critical coolant tubes would not prematurely deteriorate, crack and fail, leading to expensive repairs.  *Id.* ¶ 400.  PAG and/or PCNA breached a duty by negligently designing or manufacturing Cayennes with plastic coolant tubes that, in fact, prematurely degrade, crack and otherwise fail.  The Complaint further alleges that Plaintiff Hoffecker and the members of the Michigan Sub-Class were damaged as a direct and proximate result of the alleged negligence on the part of PCNA.  *Id.* ¶¶ 399, 402.  Plaintiff Hoffecker has thus alleged all the elements of a negligence claim under Michigan law.  *See Roulo v. Auto Club of Michigan,* 386 Mich. 324. 328 (Mich. 1971).

PCNA seeks dismissal of the strict liability and negligence claims based on the operation of the economic loss doctrine.  PCNA's position is that because the only alleged was to different parts of the Cayennes, and not personal injury, Plaintiff Hoffecker and the Sub-Class members are left with only their contract and statutory claims.

The Michigan Supreme Court has adopted the economic loss doctrine, and held that "[w]here . . . claims arise from a commercial transaction in goods and the plaintiff suffers only economic loss . . . such claims are barred by the economic loss doctrine."  *Neibarger v. Univ. Coop., Inc.*, 439 Mich. 512, 520 (Mich. 1992).  According to the Michigan Supreme Court:

> [T]he doctrine hinges on a **distinction between transactions involving the sale of goods for commercial purposes** where economic expectations

> are protected by commercial and contract law, and those involving the sale
> of defective products to individual consumers who are injured in a manner
> which has traditionally been remedied by resort to the law of torts.

*Id.* (emphasis added).  Thus, the court refused to permit dairy farmers to recover on a strict liability theory for harm to their cattle (and resulting loss of profits) caused by allegedly improperly functioning milking machines used for the commercial purpose of milking cows.

The *Neibarger* case, however, expressly limited the application of the economic loss doctrine to cases in which "a plaintiff seeks to recover for economic loss caused by a defective product purchased **for commercial purposes**."  *Id.* at 527-28 (emphasis added).  This interpretation is reinforced by a Michigan appellate court case in which the plaintiffs suffered damage to their home due to defective external insulation.  *Blackward v. Simplex Prod. Div.*, No. 221066, 2001 Mich. App. LEXIS 1940, at *1-2 (Mich. Ct. App. Oct. 19, 2001).

In *Blackward*, the plaintiffs sued the manufacturer of the insulation for breach of warranties and also brought a product liability claim.  *Id.* at *2.  In analyzing the case under *Neibarger*, the court held that the economic loss doctrine did not apply to transactions with individual consumers:

> The economic loss doctrine as adopted in Michigan clearly distinguishes
> between transactions involving the sale of goods for commercial purposes,
> where there are economic expectations attached to the purchases, and
> those involving the sale of defective products which result in losses
> traditionally remedied by resort to tort law.  The traditional product
> liability action in Michigan encompasses liability for damage to property
> caused by or resulting from the production of a product.  If we applied the
> economic loss doctrine, as defined by *Neibarger*, to transactions involving
> individual consumers making non-commercial purchases, we would
> render that language useless and obliterate the use of product liability
> actions for damage to property caused by defective products.

*Id.* at *8.  The court declined to apply the economic loss doctrine to preclude the plaintiffs' product liability claims.  *See id.* at *8-9.

154

Porsche places great emphasis on *Sherman v. Sea Ray Boats,* 251 Mich. App. 41 (Mich. Ct. App. 2002).  The reasoning in *Sherman* is convoluted, but, unlike in *Blackwood*, the court applied the economic loss doctrine and decided that it did not apply only to "commercial" or "non-consumer" transactions.  *Id*. at 50-52.  To reach this conclusion, the *Sherman* court had to relegate the Michigan Supreme Court's repeated use of the word "commercial" and the words "commercial purposes" to *dicta*, *id*. at 46, and conflate "commercial transaction" with "commercial purposes."  The refusal in *Sherman* to distinguish between commercial and consumer transactions has been criticized.  *See Safeco Ins. Co. of Am. v. CPI Plastics Group, Ltd.,* 625 F. Supp. 2d 508, 520 (E.D. Mich. 2008) (court was "unwilling to conclude that the Michigan Supreme Court was careless in holding that the sweep of the economic loss doctrine was restricted to products 'purchased for commercial purposes'.").

The Michigan Supreme Court in *Neibarger* applied the economic loss doctrine only to "commercial transactions" and "commercial purposes." There is no definitive holding by Michigan's highest court limiting *Neibarger* the way the court in *Sherman* limited it.  Therefore, PCNA's Motion to Dismiss the strict liability and negligence claims should be denied.

There are also Michigan cases that have not followed the economic loss rule and have allowed a negligence claim to proceed against a remote manufacturer.  Here, Plaintiff Hoffecker did not purchase the vehicle from either PAG or PCNA, although PCNA did provide the warranty.  Because Plaintiff Hoffecker could bargain with neither PAG nor PCNA with respect to the vehicle or the warranty, the rationale for application of the economic loss doctrine to bar the strict liability or negligence claims does not apply.

In *Auto-Owners Ins. Co. v. Chrysler Corp.,* 129 Mich. App. 38, 341 N.W.2d 223 (Mich. Ct. App. 1983), the plaintiff's subrogors purchased a used motor home from another company

that manufactured the body of a motor home and attached it to the chassis.  *Id.* at 40.  The motor home caught fire because of a fuel feed system malfunction.  The plaintiffs sued Chrysler under negligence and other theories.  *Id.* at 41.  The court in *Auto-Owners* allowed the negligence claim to proceed despite the economic loss rule because there was no contractual privity between the plaintiffs and the defendant manufacturer.  In reaching this conclusion, the court in *Auto-Owners* relied upon an earlier Michigan Supreme Court case, *Spence v. Three Rivers Bldrs. & Masonry Supply, Inc.*, 353 Mich. 120 (1958), in which the court held that a remote purchaser plaintiff could bring a negligence action for the negligent manufacture of cement blocks.  The court in *Auto-Owners* reasoned that, although the *Spence* case was prior to the adoption of the UCC, the UCC would not be undermined by permitting a remote purchaser plaintiff to sue in negligence for economic loss.  *Auto-Owners* at 42.  Thus, neither the strict liability nor the negligence claim should be dismissed based on the economic loss doctrine.

Moreover, there is language in a number of cases, including *Neibarger*, that suggests that when a defect is safety-related, tort principles come into play.  *See Neibarger*, 439 Mich. at 519 (where losses are solely economic, policy considerations supporting products liability fail to serve the purpose of encouraging the design and production of safer products); *State Farm Fire & Casualty Co. v. Conair Corp.*, No. 11-20237, 2011 U.S. Dist. LEXIS 68921, at *5 (E.D. Mich. 2011).  Here, the defective coolant tubes present a safety hazard, which provides another reason why the economic loss rule is inapplicable.  *See* discussion of safety at §§ IV.B.1.a.ii., IV.C.2.c.iv., IV.I.3., and IV.K.2., *supra* and *infra*.

3.     **Breach of warranty**

A claim for breach of implied warranty under the UCC (Mich. Comp. Laws §

440.2314(1)(a) and (c)) is pled in the Complaint as the seventeenth cause of action.  Compl. ¶¶

374-381.  Mich. Comp. Laws § 440.2314 provides that:

> (1) unless excluded or modified (section 2316), a warranty that goods shall
> be merchantable is implied in a contract for their sale if the seller is a
> merchant with respect to goods of that kind . . . (2) goods to be
> merchantable must be at least such as: (a) pass without objection in the
> trade under the contract description. . . (c) are fit for the ordinary purpose
> for which such goods are used . . . .

*State Farm Fire & Cas. Co. v. Bay City Electric Light & Power*, WL 571935, at *1

(Mich. Ct. App., Feb. 18, 2010), appeal denied.

The Complaint alleges that the Cayennes are "goods", Plaintiff Hoffecker and the

Michigan Sub-Class members are "buyers", and that PCNA is a "merchant" under Mich. Comp.

Laws § 440.2105(1), 2103(1)(a), and 2104(1).  *Id*. ¶¶ 375-377.  Because the Cayennes contained

defective plastic coolant tubes that crack and leak, they were not fit for their ordinary purposes

and would not pass without objection in the trade under the contract description as luxury, high-

performance SUVs.  *Id*. ¶ 379.  Therefore, PCNA breached the UCC's implied warranty of

merchantability.  *Id.*. ¶¶ 378-379.  Further, PCNA had timely notice of the breach, but did not

offer to repair or replace the defective coolant tubes.  *Id*. ¶ 380.  Plaintiff Hoffecker and the Sub-

Class members suffered injury and damages as a direct result of the breach of the implied

warranty of merchantability.  *Id*. ¶ 381.

PCNA argues that all warranties had temporal and mileage limitations, and since

Plaintiff's Cayenne's cooling tubes defect manifested (in other words, cracked and leaked

coolant on the engine) after the end of the time and mileage limitations, there is no actionable

breach of warranty claim.  Mot. to Dismiss 98-99;  *See* §§ IV.A.1.b., IV.B.2., IV.E.1.b., IV.H.1.,

157

and IV.K.4, *supra* and *infra*.  In order to modify or limit the implied warranty of merchantability, the modification or limitation must be conspicuous.  Mich. Comp. Laws § 440.2316.  To be conspicuous under Michigan law, the modification or limitation must be

> so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous."

Mich. Comp. Laws § 440.1201(10).

Here, Porsche's attempted limitation on the implied warranty of merchantability is not conspicuous.  A more detailed discussion of this issue can be found in §§ IV.B.2., IV.E.1.b., IV.H.1., and IV.K.4.    Likewise, the attempted limitation is unenforceable because it is unconscionable, as discussed in more detail in § IV.A.1., IV.B.2., IV.G.1.b., and IV.J.3.  *See also* Mich. Comp. Laws § 440.2302 (if a clause of a contract is unconscionable, the court may refuse to enforce it or limit its application so as to avoid an unconscionable result).  Because the attempted limitation on the implied warranty of merchantability is not conspicuous and is unconscionable, it is ineffective, it never expired and the Michigan warranty claim (and the MCPA claim that is partly based on the alleged breach of the implied warranty of merchantability) should not be dismissed.

**K.**    **Colorado**

Plaintiff Starkey set forth in ¶277(a)-(e) of the Complaint, respectively, his claims under the Colorado Consumer Protection Act ("CCPA").  In its Motion to Dismiss, PCNA does not challenge the sufficiency of Plaintiff Starkey's claims asserted pursuant to Colo. Rev. Stat. § 6-1-105(1)(i) and (r).  Compl. ¶¶ 277(c) and (d).  Instead, PCNA has only challenged the claims made under Colo. Rev. Stat. § 6-1-105(1)(e), (g) and (u), which correspond to ¶¶ 277(a), (b) and

158

(e) of the Complaint (Mot. to Dismiss 105) (where PCNA begins its argument by listing only Colo. Rev. Stat. §§ 6-1-105(1)(e), (g) and (u) claims). Therefore, the claims set forth in ¶¶ 277(c) and (d) (the Colo. Rev. Stat. § 6-1-105(1)(i)and (r) claims) clearly withstand the Motion to Dismiss and cannot be dismissed.[37]

As to the claims made pursuant to Colo. Rev. Stat. § 6-1-105(1)(e), (g) and (u) (Compl. ¶¶ 277(a), (b) and (e)), as the Colorado Supreme Court has held:

> To prove a private claim for relief under the CCPA, a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Crowe v. Marc B. Tull and Franklin D. Azar & Associates, P.C.*, 126 P.3d 196, 201 (Colo. 2006) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-147 (Colo. 2003)). PCNA admits that the Plaintiff Starkey has pled with particularity elements (2) and (3) of his CCPA claims, given that it has not challenged these elements. Rather, PCNA claims that Plaintiff Starkey has not pled with particularity elements (1), (4), or (5).

As to element (1) (proving an unfair or deceptive trade practice), PCNA claims Starkey had to plead that the defendants "knowingly made a false representation" to properly plead Colo. Rev. Stat. § 6-1-105(1)(e), (g) or (u) claims. Mot. to Dismiss 105, citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P. 3d 142, 147 (Colo. 2003). This is true for § 6-1-105(1)(e) and (g) claims, but incorrect for § 6-1-105(1)(u) claims. With respect to a § 6-1-

---

[37] PCNA should not be permitted to expand its Motion to Dismiss at this stage, either through filing another motion to dismiss or asking in its reply that ¶¶ 277(c) and (d) be included in the pending motion to dismiss, because (1) the deadline by which PCNA was to file a motion to dismiss for these claims has passed and (2) it would prejudice Plaintiff Starkey to permit PCNA to move to dismiss these claims without providing him an opportunity to respond to the same.

105(1)(u) claim, contrasted with a § 6-1-105(1)(e) claim, a plaintiff must only plead that PCNA failed to disclose or omitted material information with an intent to deceive. *See, e.g. Schmaltz v. SmithKline Beecham Corp.*, No. 08-cv-00119, 2009 U.S. Dist. LEXIS 47825 (D. Colo. 2009) (the CCPA applies to omissions as well as misrepresentations, citing Colo. Rev. Stat. § 6-1-105(1)(u)).[38] Plaintiff Starkey has met the Rule 9(b) pleading requirements of pleading with particularity PCNA's unfair and deceptive practices.

### 1.    Starkey has pled with particularity that PCNA engaged in unfair and deceptive practices

In moving to dismiss on the ground of "lack of particularity" with respect to these elements, PCNA ignores entirely ¶¶ 1–8, 38-71 and Ex. A. of the Complaint that, when read in conjunction with ¶¶105-112, describe the "who, what, when, where and how" of Plaintiff Starkey's CCPA claims, as discussed at §§ IV.B.1.b, IV.C.1, IV.F.1., IV.G.1.a., and IV.H.3.a., *supra*.  In *Duran v. Clover Club Foods Company*, 616 F. Supp. 790 (D. Colo. 1985), the first case to hold that CCPA claims are subject to Rule 9(b), the Court explained that Rule 9(b) "only requires identification of the circumstances constituting fraud."  *Duran*, 616 F. Supp. at 793 (citation omitted).  Additionally, "the sufficiency of the complaint must be judged in its entirety

---

[38]      PCNA cites to *Perkins*, *Daugherty,* and *Against Gravity Apparel* for the assertion that an "omission" by PCNA, such as "failing to disclose" as alleged in the CAC, is not actionable. However, those cases apply New Jersey, California and New York law, respectively, and were distinguished, §§ IV.B., IV.C., and IV.D., *supra*.  They are in no way binding with respect to Mr. Starkey's claims; furthermore, *Schmaltz* makes it clear that the CCPA *does* apply to omissions as well as misrepresentations.  Previous to *Schmaltz*, in *Warner v. Ford Motor Co.*, No. 06-cv-02443, 2008 U.S. Dist. LEXIS 82858, at *28-29 (D. Colo. 2008) the Colorado District Court held that to prevail on a Colo. Rev. Stat. §6-1-105(1)(u) "failure to disclose" claim a plaintiff must show (1) that the defendant failed to disclose information concerning goods, services or property to consumers; (2) that the defendant knew this information at the time of the advertisement or sale of the goods, services or property; (3) that the non-disclosed information was material; and (4) that the defendant did not disclose this information with the intent to induce the consumer to enter into a transaction.  These allegations were sufficiently pled by Plaintiff Starkey.

rather than in a piecemeal fashion," and "a court must not allow particularity requirements to pervert and allow a 'sophisticated defrauder to successfully conceal the details of their fraud'". *HealthOne of Denver, Inc. v. UnitedHealth Group Inc.*, 805 F. Supp.2d 1115, 1121 (D. Colo. 2011) (citation omitted).

Here, Plaintiff Starkey has pled sufficient, detailed facts to apprise PCNA of the alleged deceptive trade practices to satisfy *Duran* and *HealthOne*. Plaintiff Starkey has pled the following, which answers PCNA's "who, what, when, where and how" inquiries:

- He is the owner of a 2006 Porsche Cayenne S Sport Utility Vehicle and at all relevant times he lived in Colorado (Compl. ¶ 105) ("who" "what" and "where");

- He purchased his Cayenne in 2010, which was his eighth Porsche brand vehicle (Compl. ¶ 106) ("who" "what" and "when");

- He purchased his Cayenne because he wanted a luxury, high performance Sport Utility Vehicle for use in the mountains of Colorado (Compl. ¶ 106) and Porsche has touted the Cayenne as satisfying Porsche's "extreme high performance and quality standards," and has touted the Cayenne's cooling system (Compl. ¶¶ 42-43, 62 – in this paragraph, among other things, Starkey has alleged that Porsche misrepresented the Cayenne by saying "The entire cooling system is specifically designed for prolonged heavy-duty operation," "the cooling system is extremely robust," and that the cooling system "helps maximize performance **in every respect**" [emphasis added]) ("who" "what" and "how");

- Porsche manufactured Mr. Starkey's Cayenne with plastic coolant tubes (Compl. ¶ 2) ("who" "what" and "how");

- At the time of his purchase, Mr. Starkey did not know that Porsche had manufactured his Cayenne with plastic coolant tubes and did not know that Porsche had faced numerous complaints concerning these coolant tubes (Compl. ¶¶ 106, 111) ("who" "what" and "when");

- Since 2003 and, therefore at the time of Mr. Starkey's 2010 purchase, Porsche knew that the plastic coolant tubes would prematurely degrade and fracture, and knew that customers would have to pay high amounts to update the coolant tubes to aluminum coolant pipes (Compl. ¶¶ 3, 4, 59, 63, and Ex. A) ("who" "what" and "when");

161

- Despite knowing this, Porsche decided to conceal the defects from Mr. Starkey, to not warn Mr. Starkey of the dangers of a sudden coolant spill, and it continued to promote the Cayenne to consumers, including Mr. Starkey, as safe, reliable and free from material defects.  (Compl. ¶¶ 4, 7, 63, 64, 66) ("who" "what" and "how");

- If Mr. Starkey had known that the plastic coolant tubes were likely to fail, he would not have purchased his Cayenne or would have insisted on paying less for his Cayenne (Compl. ¶ 106) ("who" and "what");

- In March 2011, Mr. Starkey was driving to a ski resort with his children when the plastic coolant pipes cracked, without warning, disabling his vehicle, leaking coolant throughout the engine and damaging his transmission (Compl. ¶¶ 107, 108) ("who" "what" "when" and "where");

- Mr. Starkey had to pay more than $3,600 to repair his Cayenne and in the first instance overpaid for his Cayenne and, therefore, he has been damaged, suffered injury in fact and has lost money or property because of Defendants' concealment and non-disclosure of the plastic coolant pipe defect (Compl. ¶¶ 6, 8, 68, 109) ("who" "what" and "how");

- Because of all of this, Mr. Starkey's Cayenne did not meet his reasonable consumer expectation for a luxury, high-performance vehicle (Compl. ¶ 110) ("who" and "what"); and,

- Plaintiff Starkey was exposed to the actual safety issue of having a disabled Cayenne on a Colorado mountain road and was exposed to the safety risk of an acute failure of the tubes while travelling at a high speed on public roadways, causing risk of severe injury or even death to himself, his passengers (including his children) and to others sharing the road with his Cayenne (Compl. ¶¶ 70, 107).

Similar allegations were found to withstand a motion to dismiss in *Birdsall v. Roanoke Companies Group, Inc.*, No. 07-cv-001738, 2010 U.S. Dist. LEXIS 138105 (D. Colo. 2010), a case in which the plaintiff also alleged false representations and failures to disclose.  There, the court found allegations that defendants had knowledge of defects in a product and knowingly and intentionally concealed its adverse health effects sufficient to state a cause of action under the CCPA.  *Birdsall*, 2010 U.S. Dist. LEXIS at *11-13.

162

Likewise, in *Schmaltz v. SmithKline Beecham Corp.*, No. 08-cv-00119, 2009 U.S. Dist. LEXIS 47825 (D. Colo. 2009), a case dealing with a consumer's claim that her repeated use of denture adhesive resulted in a copper deficiency that caused a nervous system injury to her, she alleged that the risk of zinc-induced copper deficiency was material information that the defendant knew but did not disclose.  Noting that the CCPA permits a claim for such an omission pursuant to Colo. Rev. Stat. § 6-1-105(u), the District Court held that with these simple allegations the plaintiff had adequately pled a "failure to disclose" claim under the CCPA.  *See also DeWitt v. Liberty Mut. Ins. Co.*, No. 07-cv-02485, 2008 U.S. Dist. LEXIS 23522 (D. Colo. 2008).

By contrast, the cases cited by PCNA are distinguishable.  In *Mayhew*, the plaintiff was a *pro se* plaintiff who failed to state any facts as to a fraud, simply alleging that the defendants made "false, purposely misleading and wrongfully inaccurate material statements and representations."  *Mayhew v. Cherry Creek Mortg. Co., Inc.*, No. 09-cv-00219, 2009 U.S. Dist. LEXIS 125725, at *34 (D. Colo. 2009).  Thus, the District Court summarily dismissed his CCPA claim.   *Allen* also involved a *pro se* plaintiff who failed to describe the alleged false representations made.  *Allen v. United Prop. and Constr., Inc.*, No. 07-cv-00214, 2008 U.S. Dist. LEXIS 67154 (D. Colo. 2008).[39]

In *Jacobs* the plaintiffs alleged they were fraudulently induced to refinance a loan although their income did not support the loan.  However, the plaintiffs did not state any of the allegedly fraudulently statements the defendant Clarion made.  The District Court found that this singular allegation, without more, failed to state a cognizable CCPA claim and dismissed the same. *Jacobs v. Credit Suisse First Boston*, No. 11-cv-00042, 2011 U.S. Dist. LEXIS 112967, at

---

[39]     For the Magistrate's recommendation issued August 12, 2008 that was adopted by the district court judge at 2008 U.S. Dist. LEXIS 67154, see 2008 U.S. Dist. LEXIS 118706.

\*8 and \*12-13 (D. Colo. 2011). The same occurred in *McDaniel*. Plaintiff failed to state specifically "what conduct or representations [defendants] made that were allegedly false or misleading." *McDaniel v. Denver Lending Group, Inc.*, No. 08-cv-02617, 2009 U.S. Dist. LEXIS 125766 (D. Colo. 2009), at \*15. The same occurred in *Genl. Steel Domestic Sales, LLC*, where the plaintiff failed to set forth the "who, what, when, where and how" of the alleged fraud. *Genl. Steel Dom. Sales, LLC v. Chumley*, No. 10-cv-01398, 2011 U.S. Dist. LEXIS 61997 (D. Colo. 2011), at \*15. As set forth previously, Plaintiff Starkey has set for the "who, what, etc." allegations in his Complaint and his CCPA claims are not subject to dismissal.

Finally, in *Baca*, a case decided at the evidentiary stage, PCNA purports to rely on it for its "Johnny Cochranism" of "No communication, no misrepresentation." Mot. to Dismiss 107. However, to read this case to say that only misrepresentations are actionable, or that absent direct communications between the manufacturer and the consumer there can be no CCPA claim, is incorrect. In fact, in *Baca* the District Court recognized that the plaintiff could bring a Colo. Rev. Stat. § 6-1-105(1)(u) claim for a failure to disclose, but when plaintiff failed to authenticate key documents, admitted that she could not point to key information that the manufacturer withheld, and recognized her own claim as "preposterous," the District Court concurred. *Baca v. Clark*, 2007 U.S. Dist. LEXIS 49426, at \*18. Such weaknesses are not present here where Plaintiff Starkey has made detailed, serious, and legally supported claims regarding his Cayenne, including representations and failures to disclose.

Based on the foregoing analysis, any requirement that Plaintiff Starkey had to set forth his "unfair and deceptive acts" allegations under the CCPA with particularity pursuant to Rule 9(b) has been satisfied. Likewise, he has pled sufficiently the fourth and fifth elements of a

CCPA claim, in that he pled sufficiently that he suffered injuries in fact to a legally protected interest and that PCNA's challenged practices caused his injuries.

> ### 2. **Starkey has pled sufficiently that he suffered injuries in fact to a legally protected interest and that PCNA's challenged practices caused his injuries**

In its Motion to Dismiss, PCNA asserts "Starkey has not sufficiently pled the violation of a legally protected interest" but fails to point this Court to case law that so holds, other than citing a conclusory statement in the *US Fax Law Ctr., Inc.* case. Nonetheless, Plaintiff Starkey addresses this argument herein.

In 1996, the Colorado Supreme Court addressed the "legally protected interest" element, otherwise known as "standing," necessary to support a CCPA claim and rejected the defendant's argument therein that the plaintiffs had failed to establish the same:

> [W]e hold that property is a legally protected interest under the CCPA and that a plaintiff may recover under section 6-1-113 for injury to property and property value provided that the plaintiff satisfies each element of the standard for a private CCPA cause of action announced in this opinion. That a plaintiff may have other statutory or common law causes of action based on the same set of facts does not affect the plaintiff's right to assert a claim under the CCPA. [citation omitted].

*Hall v. Walter*, 969 P.2d 224, 237 (Colo. 1998).

Accordingly, there is no question that Plaintiff Starkey's Complaint alleging that he paid more ("value") than what his Cayenne was worth, that the plastic coolant pipes cracked, disabled his vehicle, leaked coolant throughout his engine, damaged his transmission, and resulted in payment for repairs in excess of $3,600, state sufficient "injuries in fact" to "legally protected interests." Compl. ¶¶ 6, 8, 68, 109, 112.

In contrast, *US Fax Law Ctr., Inc. v. iHire, Inc.*, 374 F. Supp. 2d 924 (D. Colo. 2005), cited by PCNA, held that the plaintiff had no "legally protected interest" to assert because it was

asserting CCPA claims as an assignee and, the court held, such claims are not assignable.  These facts are completely inapposite to this case.  Starkey is not making CCPA claims pursuant to an assignment of those claims to him by another.[40]  Thus, he has independent standing to make his claims as recognized in *Hall*.

In regard to causation, *Hall* is also instructive.  First, *Hall* instructs that the existence of a causal link between a defendant's conduct and a plaintiff's injury is a question of fact more appropriate for a jury determination.  *Hall*, 969 P.2d 224 at 236, 237.  Next, *Hall* instructs that it is sufficient to establish a causal connection if the plaintiff incurred damages or losses caused by an act or failure to act which in natural and probable sequence produced the claimed injury or loss."  *Hall*, 969 P.2d 224 at 237.  PCNA's reliance on  *Witters v. Daniels Motors, Inc.*, 524 P.2d 632 (Colo. Ct. App. 1974) is misplaced because it examined the level of proof necessary for a plaintiff to prove causation *at trial*, not what is adequately pled to assert causation in a complaint.

Plaintiff Starkey has alleged that he incurred damages or losses caused by Porsche's manufacture of his Cayenne with plastic coolant tubes while Porsche, at the same time, represented that the coolant system was "extremely robust" (among many other things detailed previously) and failed to disclose or warn of the danger the tubes presented.  In fact, Starkey has asserted the very thing that PCNA states in its Motion to Dismiss satisfies element (5) of the CCPA analysis:  that he would not have purchased the vehicle if PCNA had "told him something different."  Mot. to Dismiss 108.  Plaintiff Starkey has alleged, "Had [he] known that the plastic coolant tubes were likely to fail, he would have not purchased the Cayenne . . . ."  Compl. ¶ 106.  By its own admission, PCNA agrees that Plaintiff Starkey has properly pled causation.

---

[40]     *Walter v. Hall*, 940 P.2d 991 (Colo. App. 1996), also cited by PCNA, was appealed to the Colorado Supreme Court and resulted in the Court's decision in *Hall v. Walter*, discussed herein.

166

In a later discussion of the *Hall* decision, the District of Colorado further negated PCNA's causation arguments as they might apply to Plaintiff Starkey's "failure to disclose" claims. *Warner v. Ford Motor Co.*, No. 06-cv-02443, 2008 U.S. Dist. LEXIS 82858 (D. Colo. 2008).  In that case, the plaintiffs had purchased a 1995 Ford Explorer in 2002 from a used car dealership unaffiliated with Ford.  *Id.* at *4.  The plaintiffs did not communicate with any of Ford's employees or agents during Mr. Warner's search for a car or concerning his purchase of the Explorer.  *Id.*  Mr. Warner was seeking a vehicle that had "some substance" and was generally safe.  *Id.*  At that time, in 2002, Ford no longer even advertised the 1995 Explorer.  *Id.* at *4-5.  Mr. Warner was injured in an accident while driving his Ford Explorer.  Mr. Warner and his wife asserted, among other things, that Ford had marketed a product knowing it had a safety defect (roof defect) that it failed to disclose (Colo. Rev. Stat. § 6-1-105(u)).

After extensive analysis, the District Court held that the claim survived summary judgment because "the Colorado Supreme Court's holding in *Hall* suggests that there need not be a transaction between the defendant and the plaintiff in order for the plaintiff to show causation under the CCPA.  [citation omitted].  The Warners need only present sufficient evidence that Ford's deception caused their injuries."  *Id.* at 47.  In so holding the District of Colorado rejected Ford's claim that "it could not have caused Mr. Warner to purchase the Explorer because he did not rely on any advertising or representations from Ford in doing so."  *Id.* at 48  This was because the theory of causation that "Mr. Warner would not have purchased the Explorer if he had known it had a major safety defect, regardless of from whom he was purchasing the vehicle," adequately stated causation for a CCPA case.  *Id.*  In conclusion, the District of Colorado reiterated that the CCPA should be construed broadly.  *Id.* at 49-50.

Given the foregoing reasoning, Plaintiff Starkey has pled facts in the Complaint sufficient to establish elements (4) and (5) and, thus, has pled a CCPA claim sufficiently.

    **3.**      **Starkey's strict liability claim is not barred by the economic loss doctrine**

In *Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975), the Colorado Supreme Court adopted §402A of *Restatement (Second) of Torts*. *Hiigel*, 544 P.2d 983 at 985. *Hiigel* also addressed the economic loss doctrine. It involved a consumer who brought an action against an automobile manufacturer for a failure to warn of the torque requirements for the lug bolts on its wheels. As a result of the failure to adhere to the torque requirements, the lug bolts sheared off, causing damage to the vehicle, but no personal injury. The plaintiff sought recovery for replacement of the Chevrolet chassis and related repair costs. The defendant claimed that the economic loss rule precluded the claim because the only harm was to the product itself. The Colorado Supreme Court rejected the defendant's argument and held that damage to the product itself caused by a defect was covered by section 402A of the Restatement (Second) of Torts.

In *Town of Alma v. AZCO Constr. Inc.,* 10 P.3d 1256 (Colo. 2000), cited by PCNA, the Colorado Supreme Court again considered the economic loss rule. However, the facts of *Alma* are inapposite to the case herein. In *Alma*, a municipality filed suit against AZCO alleging breach of contract, breach of implied warranty, and tort claims for negligence per se and negligence based upon alleged faulty installation of water service lines. *Id*. at 1258. Of critical importance, *Alma* involved a plaintiff in contractual privity with the defendant, and thus a plaintiff who was capable of negotiating directly with the defendant. The Court stated that "[l]imiting tort liability when a contract exists between parties is appropriate because a product's potential nonperformance can be adequately addressed by rational economic actors bargaining at arms length to shape the terms of the contract." *Alma* at 1262. In addition, the contract itself

168

covered the specific subject matter of the lawsuit, *i.e.*, the duty of care of the contractor. There was also no physical harm to the goods themselves caused by the defect, the plaintiff was a municipality and not a typical consumer and the discussion of the economic loss rule arose in the context of a negligence action, not a strict liability action. Finally, the defect apparently had no safety implications. Notably, in *Alma*, the Colorado Supreme Court did not view its decision as either overruling or limiting *Hiigel*.

After both *Hiigel* and *Town of Alma*, the Colorado District Court decided *Loughridge v. Goodyear Tire and Rubber Co.,* 192 F. Supp. 2d 1175 (Colo. 2002). In this case the Colorado District Court was called upon to determine whether the tort claims of plaintiffs-homeowners, including strict liability claims, who purchased heating systems with alleged defective hoses were barred by the economic loss doctrine. The defective hoses had caused damage to themselves as well as to other property. The District Court held that:

> [S]trict products liability imposes a duty on the manufacturer of a product, outside any contractual duty, to act reasonably in the design, manufacture, and sale of the product. [citation omitted]. Therefore, a duty is imposed upon Goodyear here, outside of its contractual duties to Heatway and third-party beneficiaries, to act reasonable in the design, manufacture, and sale of the [hoses]. I thus conclude that the economic loss rule does not preclude Plaintiffs' tort claims.

*Loughridge*, 192 F. Supp. 2d at 1183.

The District Court then went on address Goodyear's argument that the strict liability claims were barred because the plaintiffs had not alleged that the defective hoses caused damage to anything other than the hoses themselves and the real property into which the hoses were incorporated (much like plastic coolant tubes incorporated into the engine of a vehicle). *Id.* The District Court explained, "Here, the Plaintiffs have alleged property damage as a result of the allegedly leaking hoses. Under *Hiigel*, damage to the hose as well as to the property is covered

169

by strict liability." *Id.* at 1184.  The same holds true here: damage to the plastic coolant tubes as well as Plaintiff Starkey's alleged damage to and replacement of his transmission seals because of the plastic coolant tubes are covered by Colorado strict liability laws and are not barred the economic loss doctrine.

In contrast, PCNA cites to the case of *Carter v. Brighton Ford, Inc.*, 251 P.3d 1179 (Colo. 2010).  In *Carter*, the plaintiff brought an action for mechanical defects in a special high performance 2006 Mustang produced pursuant to a joint manufacturing agreement between Ford Motor Co. and Saleen Inc.  Although the original action was brought against the immediate seller Brighton Ford, Saleen, Inc., and Ford Motor Co., the only remaining claim at the time of summary judgment was the claim against the immediate seller.  While it is true that in *Carter*, the Colorado Court of Appeals rejected the *Loughridge* case and distinguished *Hiigel*,[41] it never concluded that the Colorado Supreme Court had overruled *Hiigel* when it decided *Alma*.  In addition, *Carter* (like in *Alma*) involved a plaintiff and defendant in privity of contract, where there was, in fact, the opportunity to bargain over the terms of the contract.  Finally, to the extent that *Carter* can be read to expand the economic loss rule (or stated another way, to limit *Hiigel*), it is an opinion of the Court of Appeals, not the Colorado Supreme Court, and therefore is not binding as is *Hiigel*.  *Carter* has not been cited by any other Colorado courts since its decision was rendered in September of 2010.

Even if *Carter* is applied here, Plaintiff Starkey has pled in detail the facts that can lead to the conclusion that the Cayennes are "unreasonably dangerous."  The Complaint details how failure is extremely costly, can cause serious transmission damage, and can disable the vehicles

---

[41]     The Carter court distinguished *Hiigel* by stating that the *Hiigel* court had concluded that there was property damage to the product, in addition to the defect, coupled with a danger of harm to others.  *Carter*, 251 P.3d at 1183.

without warning, leaving motorists stranded.  *See, e.g.*, Compl. ¶¶ 55-57, 74, 78, 80-82, 85, 91, 107, 108, 117, 119, 220-223, 229, 230.  Seven of the Plaintiffs named in the Complaint had their engines or transmissions fail and/or damaged, requiring additional repairs beyond the replacement of the coolant tubes.  *See* Complaint ¶¶ 74, 78, 85, 107, 108, 119, 149, 150, 192, 229, 230.  Additionally, six of the named Plaintiffs were stranded and felt unsafe driving the vehicle as a result of the failure.  *See* Complaint ¶¶ 80-82, 91, 107, 117, 193, 220-223.  The fact that the coolant tube failure causes Cayennes become inoperable, causes engines to emit smoke, causes individuals to cease operating the Cayennes, including being forced to do so on the side of highways, and causes individuals to feel unsafe operating their vehicle is sufficient to alleged that the Cayennes are "unreasonably dangerous."

Despite this, PCNA cites *Anderson v. The M.W. Kellogg Co.*, 766 P.2d 637 (Colo. 1988) and concludes, with no justification, that the defects herein are "mere mechanical or functional" defects such that Plaintiff Starkey's Cayenne was not "unreasonably dangerous."  However, at this stage in the litigation, PCNA is not entitled to weigh the evidence and impose this conclusion.  In fact, whether or not a product is "unreasonably dangerous," either because of a manufacturing defect, a design defect or a failure to warn, is a seven factor analysis.  *Camacho v. Honda Motor Co.*, 741 P.2d 1240, 1247 (Colo. 1987).  These factors must be weighed and analyzed, which is not an appropriate analysis at the motion to dismiss stage.

Accordingly, Plaintiff Starkey's strict liability claim, as pled, is viable and is not barred by the economic loss doctrine.

> ### 4. <u>Starkey's claim for breach of implied warranty of merchantability does not fail</u>

PCNA admits that a lack of contractual privity does not affect Plaintiff Starkey's ability to bring an implied warranty claim against it.  Mot. to Dismiss 17.  However, PCNA asks the

Court to accept a purported implied warranty duration limitation set forth in its Warranty and Customer Information manuals to preclude Plaintiff Starkey's implied warranty of merchantability claim. However, PCNA has skipped a very important analytical step in making this argument: Any modification of the implied warranty of merchantability (such as PCNA's four year/50,000 mile warranty limit) must comply with Colo. Rev. Stat. §4-2-316 (comparable to U.C.C. § 2-316 cited by PCNA) *and* Colo. Rev. Stat. §4-1-201 (ignored by PCNA). Colo. Rev. Stat. §4-2-316 requires that the attempted modification/limitation must mention the word "merchantability" and be "conspicuous." "Conspicuous" is then clearly defined by Colo. Rev. Stat. §4-01-201:

> "Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (A) A heading in capital letters equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Colo. Rev. Stat. §4-1-201 (emphasis added). PCNA's limit on the warranty of merchantability meets none of these requirements and, therefore, it cannot be applied to limit or exclude Plaintiff Starkey's implied warranty of merchantability claim.

A scan of the entire 48-page Warranty and Customer Information document for 2006 reveals that the word "merchantability" appears once on page 5. It is reprinted below for the Court's reference:

Case: 2:11-md-02233-MHW-EPD Doc #: 77 Filed: 03/05/12 Page: 203 of 212  PAGEID #: 1233

**All of the Warranties Described in this Booklet are Subject to the Following Limitations and Disclaimers**

**Dispute Resolution**

Porsche Cars North America provides an alternate dispute resolution mechanism, the National Center for Dispute Settlement. A brief description of the program is on page 6 of this booklet. NCDS may be reached at 1 (866) 767-7244.

**Responsibilities**

Porsche Cars North America disclaims any responsibility for loss of time or use of your car as well as any other incidental or consequential expenses or damages. Any implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, are limited to the duration of the written warranty. Some states do not allow either limitations on how long an implied warranty lasts, or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you. These specific warranties give you specific legal rights, and you may also have other rights which vary from state to state.

Note: Components and/or parts that fail during racing or driving events (including Porsche sponsored events) will not be covered by the manufacturer new car limited warranty.

**Warranty Outside the U.S.**

If your car is taken to an authorized Porsche automobile dealer outside the U.S., Porsche Cars N.A.'s warranty will not be applicable and defective parts will be repaired or replaced only within the terms and limitations of the warranty for new Porsche vehicles for your model year in effect in the country where such authorized Porsche automobile dealers are located.

**Warranty Enforcement Laws (Lemon Laws)**

Laws in many states and federal law permit owners and/or lessees to obtain a replacement vehicle or a refund of the purchase or lease price under certain circumstances. The provisions of these laws vary from state to state and vary from the federal law. To the extent allowed or not prohibited by applicable law, Porsche Cars North America, Inc. requires that you first provide Porsche Cars North America, Inc. itself with direct written notification of any alleged unrepaired defect or malfunction, or any other dissatisfaction you have experienced with your vehicle so that Porsche Cars North America, Inc. itself has the opportunity to cure the problem or dissatisfaction. Giving Porsche Cars North America itself this direct notice and opportunity to cure enables us to supplement prior efforts by our authorized dealers so any ongoing problem can be resolved or the dissatisfaction addressed by us. In states that have not enacted Lemon Laws, we also require, without constituting any liability beyond the Porsche Cars North America, Inc. new car warranty, that you give Porsche Cars North America, Inc. itself direct written notice of any service difficulty you have experienced. Written notifications, either required under an applicable Lemon Law or other written notifications should be sent to Porsche Cars North

5

The sentence that mentions the word "merchantability" is in the middle of the second full paragraph and it states, "Any implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, are limited to the duration of the written warranty." This attempted modification/limitation is not conspicuous because it is not in a heading or in all capital letters or in contrasting type, font or color or set off from the surrounding text. It is simply one sentence in a string of sentences on a page with nothing done to make it conspicuous to a consumer. Accordingly, PCNA's attempt to modify/limit the implied warranty of merchantability to four years or 50,000 miles fails.

173

In accord is *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638 (10th Cir. 1991). In that case, even though a disclaimer of the implied warranty of merchantability appeared on an invoice and on the product in question in a different color, because it was not in larger or bolder type than the other text it was not conspicuous. *Id.* at 646. The plaintiff's implied warranty of merchantability claim was submitted to the jury for determination.[42]

Thus, in 2010, PCNA's implied warranty of merchantability of Plaintiff Starkey's Porsche was (and still is) in existence and PCNA's motion to dismiss this claim and the related Magnuson Moss claim solely on the basis that this implied warranty expired should be denied. In this regard, *Regents of the Univ. of Colorado v. Harbert Constr. Co.*, 51 P.3d 1037, cited by PCNA, is inapposite because it addresses the impact of the expiration of an express warranty and not the present situation where an implied warranty of merchantability is still in existence.

The attempt to modify the implied warranty of merchantability also fails because the limitation is unconscionable, as discussed in §§ IV.A.1., IV.B.2., IV.6.1.b., and IV.J.3., *supra*. See Colo. Rev. Stat. § 4-2-302.

**L.    Washington**

To establish a violation of the Washington Consumer Protection Act ("WCPA"), a consumer must prove: (1) an unfair or deceptive act or practice occurred; (2) the act or practice

---

[42]    To the extent PCNA may argue in its Reply that the heading on page 5, appearing in bold, "All of the Warranties Described in this Booklet are Subject to the Following Limitations and Disclaimers," renders the implied warranty of merchantability modification/limit "conspicuous," that argument fails. First, this heading/sentence does not mention the word "merchantability" and is not conspicuous such that it does not suffice to modify/limit the implied warranty of merchantability pursuant to Colo. Rev. Stat. § 4-2-316(2). Second, this heading/sentence does not comply with Colo. Rev. Stat. § 4-2-316(3)(a), which would permit PCNA to use "language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." At best, the heading/sentence indicates that *some* implied warranty is subject to either a limitation *or* a disclaimer, but it is vague and inconspicuous as to which, rendering it a meaningless attempt to modify/limit the warranty of merchantability.

occurred in the conduct of trade or commerce; (3) the act or practice impacted the public interest; (4) the plaintiff suffered an injury to business or property; and, (5) there is a causal link between the unfair or deceptive act or practice and the injury. *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., PLLC*, 168 Wash. 2d 421, 442 (Wash. 2010) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.. 2d 778, 784-93 (Wash. 1986)). PCNA argues that Plaintiff Ghassan Daher has failed to sufficiently plead the first and fifth elements of a WCPA cause of action. This is incorrect.

PCNA ignores Washington case law directly on point. *See Zwicker v. GMC*, No. C07-0291-JCC, 2007 U.S. Dist. LEXIS 99310 (W.D. Wash. July 26, 2007). The absence of any discussion of *Zwicker* is telling. In *Zwicker*, the plaintiff alleged that GM had manufactured parts (speedometers) which systematically failed, that GM was aware of the systematic failure, and that GM concealed that fact from the general public. *Zwicker*, at *14-16. *Zwicker* requires rejecting PCNA's arguments regarding both whether PCNA's conduct was unfair and deceptive and whether Plaintiff has adequately pled causation.

## 1. PCNA's actions are deceptive and/or unfair as a matter of law

The Court must "liberally construe the WCPA in order to protect the public from inventive attempts to engage in unfair and deceptive business practices." *Lewis v. Chase Home Fin. LLC*, No. C11-0088 (JLR), 2011 U.S. Dist. LEXIS 142683 (W.D. Wash. Dec. 12, 2011) (citing *Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 898 (Wash. 2009)); *see also Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 162 Wash. 2d 59, 81 (Wash. 2007). Whether a particular act or practice is "unfair or deceptive" is a question of law. *Panag*, 166 Wash. 2d at 47 (citation omitted). To show a party has engaged in an unfair or deceptive act or practice, a plaintiff need not show the act in question was intended to deceive, only that it had

175

the capacity to deceive a substantial portion of the public.  *Panag*, 166 Wash. 2d at 47; *see also*

*Sing v. John L. Scott, Inc.*, 134 Wash. 2d 24, 30 (Wash. 1997).  Deception exists "if there is a

representation, omission or practice that is likely to mislead" a reasonable consumer.  *Panag*,

166 Wash. 2d at 50 (citing *Sw. Sunsites, Inc. v. Fed. Trade Comm'n*, 785 F.2d 1431, 1435 (9th

Cir. 1986)).

> **a.** **Plaintiff alleges facts sufficient to establish that PCNA's acts or practices had the capacity to deceive a substantial portion of the Washington public**

PCNA misconstrues Plaintiff Daher's allegations in the Complaint.  PCNA argues there

"is nothing 'deceptive' about not generally announcing to the entire State of Washington that a

particular vehicle component was 'destined to fail'."  Mot. to Dismiss 112.  This argument is, at

best, disingenuous.  Washington courts have already dealt with this issue.  In *Zwicker*, a case

with a similar fact pattern to this case, the court ruled on GM's motion to dismiss claims that it

had manufactured and sold vehicles with defective speedometers and had concealed the defect

from consumers.  *Id.*  The court flatly rejected the same argument PCNA is making:

> GM first argues that Plaintiffs [sic] did not engage in any unfair or
> deceptive conduct because [a] failure to disclose that a component part
> may fail in the future cannot be deceptive unless plaintiffs actually and
> reasonably believed to the contrary -- *i.e.* that parts would never fail.  **This
> argument is meritless.  Plaintiffs are not asserting a one-off post-
> warranty failure of an automobile component. Rather, they assert a
> systematic failure of a specific automotive part of which GM was
> allegedly aware and concealed from the public. Thus, this Court easily
> finds that Plaintiffs pled the requisite unfair or deceptive act.**

*Zwicker*, at *15 (internal quotations and citations omitted) (emphasis added).

PCNA's interpretation of the Complaint flies in the face of Washington jurisprudence.

As alleged in the Complaint, and just like in *Zwicker*, the misrepresentations and omissions made

by PCNA had the capacity to, and indeed did, deceive a substantial portion of the public.  *See,*

*e.g.*, Compl. ¶¶ 219, 232, 508.  All Plaintiffs, including Plaintiff Daher, have clearly pled the requisite "unfair or deceptive act" capable of deceiving a substantial portion of the public and have thus established the first element necessary to sustain a WCPA claim.

Finally, contrary to PCNA's assertion, Plaintiff Daher's claim does not fail as a matter of law simply because it fails to explicitly state that PCNA's acts were *per se* unfair under Washington law.  Plaintiff Daher has established a WCPA violation by alleging PCNA's practices had the capacity to deceive a substantial portion of the public.  This is the standard in Washington, and it is a standard which this Plaintiff easily meets.  *See Panag,* 166 Wash. 2d at 47.

### 2.    Plaintiff Daher pleads sufficient facts to establish causation for the purposes of the WCPA claim

PCNA's arguments as to the fifth prong of the WCPA also fail.  PCNA contends that Plaintiff Daher has not pled that PCNA's deceptive conduct was a proximate cause of his injury.  This argument ignores allegations in the Complaint and Washington law.  Additionally, Washington courts have already rejected similar arguments as those made by PCNA regarding proximate causation.  As the court in *Zwicker* wrote:

> GM argues that the Plaintiffs have not pled proximate cause because Plaintiffs cannot reasonably claim they would not have purchased their vehicles if they knew the speedometers had a chance of failing post-warranty.  However, **Plaintiffs specifically pled that had GM informed them about the nature of the speedometer defect they would either not have purchased the cars or paid less for them**.  Common sense also dictates they may have taken steps to avoid damages other than the sheer costs of repair, such as Plaintiff Palmer's court fees for her speeding ticket, by fixing the device prior to a full-fledged malfunction.

*Zwicker*, at *15-16 (internal quotations and citations omitted) (emphasis added).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most

177

favorable to the plaintiff.  *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006); *see also*

*Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863 (DOC) (RNB), 2008 U.S. Dist.

LEXIS 68419, at *6-7 (C.D. Cal. July 10, 2008).  Daher alleged that he purchased his Cayenne

believing that it was a high performance vehicle, and was unaware of the defective coolant

system and pipes.  Compl. ¶ 219.  Plaintiff Daher further alleged that as a result of the coolant

pipes failure, he was forced to spend money to repair his vehicle, paid more than the vehicle was

worth, and was placed in a dangerous situation when his vehicle failed to operate properly while

travelling on a freeway at 60 miles per hour and began to smoke.  Compl. ¶¶ 219, 221-223, 228,

231.

The allegations in the Complaint satisfy the *Indoor Billboard* standard.  "But for"

PCNA's unfair and/or deceptive practices (constructing and selling defective coolant tubes and

systems while concealing the systematic failure of those tubes, all while promising that the

vehicles were of a quality which they were not), Plaintiff Daher would not have purchased the

vehicle or would have paid less.  This is adequate to plead "but for" causation.

PCNA relies principally on two cases to support its novel interpretation of the WCPA's

pleading requirements.  However, PCNA misinterprets and misrepresents each of the holdings

and both are easily distinguishable from the present case.  First, PCNA's reliance on *Walker v.*

*Wenatchee Valley Truck & Auto*, (155 Wash. App. 199 (Wash. Ct. App. 2010)) is misplaced.

PCNA points out that the allegedly deceptive advertisements at issue in *Walker* did not refer to

the specific car models eventually purchased by the plaintiffs.  *Id.* at 215.  Of course, if deceptive

advertising does not refer to the car eventually purchased by a buyer, then the link between the

misrepresentation and the injury requires a higher standard of pleading and proof.  However, that

is not the case here.  *Walker* dealt with an auto dealer making promises about financing, not a manufacturer making promises about the quality of its vehicles.

PCNA's reliance on *Dempsey v. Joe Pignataro Chevrolet* (22 Wash. App. 384, 393 (Wash. Ct. App. 1979)) is also misplaced.  PCNA argues that:

> The Court of Appeals of Washington dismissed WCPA claims against a car manufacturer and dealer in *Dempsey v. Joe Pignataro* . . . Even though it was clear that paint was prematurely chipping away from plaintiffs' new cars, the Washington court found plaintiffs 'failed to prove they were unfairly or deceitfully induced to purchase the vehicle by the acts, omissions, statements, or representation of the defendants.  *Id.* at 1269.

Mot. to Dismiss 115.

It is true that the Court of Appeals of Washington affirmed the dismissal of the respondent car manufacturer because the manufacturer did not refuse to honor warranty claims. *Dempsey*, 22 Wash. App. 384.  However, contrary to what PCNA asserts, the Court of Appeals reversed and remanded the trial court's dismissal of the plaintiffs' WCPA claims against the dealer:

> On the purchasers cross appeal, we reverse the trial court's dismissal of the purchasers' claim against the automobile dealer . . . under the Consumer Protection Act and remand the case to the trial court with instructions: (a) to enter additional findings as to whether or not the purchasers proved that said dealer committed a per se violation of the Consumer Protection Act, RCW 19.86; and (b) if so, what additional damages the purchasers proved they were entitled to recover from the dealer on that basis.

*Dempsey*, 22 Wash. App. at 393 (internal citations omitted).

Thus, in support of its argument, PCNA is misrepresenting the opinion and reasoning of the trial court as the opinion of the Court of Appeals; the Court of Appeals reversed the trial court's dismissal of the WCPA claim against the dealer.  Additionally, both *Walker* and *Dempsey* dealt explicitly with what plaintiffs were able to prove, not whether they had alleged adequate

179

facts to state a claim. At this stage, whether Plaintiff Daher can prove his claims is not the question. The question is whether Daher has adequately alleged that PCNA used an unfair or deceptive practice in the conduct of commerce which impacted the public interested and caused injury to the Plaintiff. *See Columbia Physical Therapy, supra*, 168 Wash. 2d at 442. Plaintiff Daher has done so and PCNA's motion to dismiss must be denied.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss, in its entirety. In the alternative, Plaintiffs request leave to amend.

Respectfully submitted,

*/s/ Mark H. Troutman*
Mark Landes (0027227)
Gregory M. Travalio (0000855)
Mark H. Troutman (0076390)
Joanne S. Peters (0063274)
**ISAAC, BRANT, LEDMAN
& TEETOR, LLP**
250 East Broad Street, Suite 900
Columbus, Ohio 43215
Tel.: 614-221-2121
Fax: 614-365-9516
ml@isaacbrant.com
gmt@isaacbrant.com
mht@isaacbrant.com
jsp@isaacbrant.com


*/s/ Shennan Kavanagh*
Gary Klein (admitted *pro hac vice*)
Shennan Kavanagh(admitted *pro hac vice*)
**RODDY KLEIN & RYAN**
727 Atlantic Avenue, 2nd Floor
Boston, Massachusetts 02111
Tel.: 617-357-5500
Fax: 617-357-5030
klein@roddykleinryan.com
kavanagh@roddykleinryan.com

*/s/ Adam J. Levitt*
Adam J. Levitt(admitted *pro hac vice*)
John E. Tangren(admitted *pro hac vice*)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLC**
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel.:  312-984-0000
Fax:  312-984-0001
levitt@whafh.com
tangren@whafh.com

*/s/ Niall P. McCarthy*
Niall P. McCarthy(admitted *pro hac vice*)
Justin T. Berger(admitted *pro hac vice*)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, California  94010
Tel.:  650-697-6000
Fax:  650-692-3606
nmccarthy@cpmlegal.com
jberger@cpmlegal.com

***Plaintiffs' Interim Co-Lead Counsel***


Daniel Schlanger (admitted *pro hac vice*)
**SCHLANGER & SCHLANGER, LLP**
1025 Westchester Avenue, Suite 108
White Plains, New York  10604
Tel.:  914-946-1981
Fax:  914-946-2930
daniel@schlangerlegal.com

William E. Hoese (admitted *pro hac vice*)
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania  19107
Tel.:  215-238-1700
Fax:  215-238-1968
whoese@kohnswift.com

Fletcher V. Trammell (admitted *pro hac vice*)
**BAILEY PERRIN BAILEY**
440 Louisiana Street Suite 2100
Houston, Texas  77002

181

Tel.: 713-425-7100
Fax: 713-425-7101
ftrammell@bpblaw.com

*Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was filed electronically filed via the Court's ECF system, on this 5th day of March, 2012.  Notice of electronic filing will be sent to all parties by operation of the Court's electronic filing system. Parties not registered for electronic filing will receive a copy of this filing through ordinary U.S. mail.  Parties may access this filing through the Court's system.

*/s/ Mark H. Troutman*
Mark H. Troutman (0076390)